**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

-------------------------------------------------------------- x
      :
LAWRENCE SHEINBERG and GILES HAZEL,  :
on behalf of themselves and others     :
similarly situated,               :    **Civil Action No. 00-6041(JLL)**
      :
      **Plaintiffs,**        :
      :
      v.             :
      :    **THIRD-PARTY COMPLAINT**
ROBERT SORENSON; DUROLITE     :
INTERNATIONAL, INC.; LITETRONICS :
INTERNATIONAL, INC.,       :
      :
      **Defendants and**     :
      **Third-Party Plaintiffs,** :
      :
      v.             :
      :
FLEET CAPITAL CORPORATION,    :
      :
      **Third-Party Defendant.**  :
      :
-------------------------------------------------------------- x

Defendants and Third-Party Plaintiffs Robert Sorenson, Durolite International, Inc. and Litetronics International, Inc., by their attorneys, as and for their Third Party Complaint, state and allege as follows:

**I.**

**PRELIMINARY STATEMENT**

1.      These third-party claims arise from the wrongful conduct of a lender that obtained exclusive control over the revenues and employee welfare benefit contributions of its borrower, and then misused its control. In late 1995, Fleet Capital Corporation, as part of a secured loan facility, imposed a "lock-box" arrangement upon Duro-Test Corporation. The "lock-box" gave Fleet immediate and complete control over all Duro-Test revenues and, ultimately, the power to decide which of Duro-Test's expenditures to fund -- if at all.

2.     In early 2000, as Duro-Test prepared to end it operations, Fleet became more concerned with liquidating its borrower's assets to satisfy its liens than paying wages and welfare benefits for certain Duro-Test employees who are the plaintiffs in this action.  Fleet wrongfully refused to advance the appropriate funds from its "lock-box" -- even though it had just received several millions of dollars to reduce Duro-Test's indebtedness.  In the process, Fleet damaged third-party plaintiffs, and it is proximately and primarily liable for any damages that plaintiffs may prove in this action.

## II.

## PARTIES AND JURISDICTION

### A.   Parties

3.     Defendant and third-party plaintiff Robert Sorenson ("Sorenson") is an individual residing in Illinois.

4.     Defendant and third-party plaintiff Litetronics International, Inc. ("Litetronics") is a corporation formed under the laws of Illinois with its principal place of business located in Alsip, Illinois.

5.     Defendant and third-party plaintiff Durolite International, Inc. ("Durolite") is a corporation formed under the laws of Delaware with its principal place of business located in Fairfield, New Jersey.

6.     Third party defendant Fleet Capital Corporation ("Fleet") is, upon information and belief, a Rhode Island corporation with its principal place of business located in Massachusetts.  Fleet is authorized to conduct business in this judicial district, and maintains offices for that purpose at 750 Walnut Avenue, Cranford, New Jersey 07016.

### B.   Jurisdiction And Venue

7.     The Court has jurisdiction over the third-party claims set forth herein pursuant to 28 U.S.C. § 1331, Fed. R. Civ. P. 14(a) and under the doctrines of ancillary and pendent jurisdiction.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), on the grounds that one or more defendants reside in this judicial district, a substantial part of the events giving rise to the claims and third-party claims occurred in this judicial district, and third-party defendant Fleet is subject to personal jurisdiction in this judicial district.

## III.

## FACTS APPLICABLE TO ALL THIRD-PARTY CLAIMS

### A.     Third-Party Plaintiffs And Their Business

9.     Sorenson has been engaged in various aspects in the lighting business since the 1970s. In the early 1980s, Sorenson acquired a majority stock ownership in Litetronics.

10.     Litetronics is also in the lighting business, and is engaged in the manufacture and sale of halogen lighting products and the distribution of incandescent and fluorescent lighting products. Litetronics' customer base is primarily distributors, wholesalers and original equipment manufacturers in the lighting business.

11.     Durolite is a holding company which, from November 1995 until January 2000, held the stock of Litetronics and another company in the lighting business, known as Duro-Test Corporation.

### B.     The Acquisition of Duro-Test Corporation

12.     Duro-Test Corporation ("Duro-Test") was formed in or about the 1940s and, by the mid-1990s, had become a well-recognized company in the lighting industry. In contrast to Litetronics' business, the major part of Duro-Test's business was in sales of lighting equipment to commercial and industrial end-users. Unlike Litetronics, which distributed incandescent and fluorescent lighting products, Duro-Test manufactured these items.

13.     In or about 1995, Sorenson, Litetronics and others became interested in an acquisition of Duro-Test, particularly due to Duro-Test's well-known name and the fact that it serviced a different segment of the lighting market. Although Duro-Test's annual revenues at that time exceeded $50 million, the company's earnings had been declining over several years. This made Duro-Test an attractive acquisition.

3

14.     In or about late 1995, Durolite was formed as a holding company. Durolite became the owner of the issued and outstanding shares of Litetronics.  Subsequently, in November 1995, Durolite also acquired the stock of Duro-Test.  At the conclusion of the transaction (the "1995 Acquisition"), Durolite held the stock of both Duro-Test and Litetronics. Although Sorenson had held a majority interest in Litetronics prior to this transaction, after the acquisition of Duro-Test, Sorenson held only a 32% stake in Durolite.

**C.     Fleet Assumes A Controlling Financial Role
In Connection With The Acquisition of Duro-Test**

15.     Fleet is engaged in the business of lending and venture capital.  Fleet publicizes itself to the world as "the most resourceful lender in the middle-market" and boasts that it has "a track record as the most resourceful provider of senior secured financing to the middle-market."  For its borrowers, Fleet asserts:  "this means stability, top-tier expertise and vast resources."

16.     In connection with the 1995 Acquisition, Fleet (which was then known as Shawmut Capital Corp.), was approached to serve as a principal secured lender to Duro-Test. Upon information and belief, Fleet recognized an opportunity to improve its lending position, although at the expense of Duro-Test's financial freedom.  Fleet demanded that all receivables and revenues of Duro-Test -- which amounted to approximately $50 million per year -- be funneled directly to a "lock-box" exclusively within Fleet's control.

17.     As a result of the 1995 Acquisition and the demands that Fleet made in connection with that transaction, Fleet became a secured lender to Duro-Test, and to Litetronics and Durolite. Fleet provided a revolving line of credit to Duro-Test which was secured by all of the assets of Duro-Test, including Duro-Test's accounts receivable.  By imposing a "lock-box" upon all of the revenues and receivables of Duro-Test, Fleet gained financial control over Duro-Test and became enmeshed in the management of Duro-Test's business. As holder of the "lock-box," Fleet had the power to determine which of Duro-Test's debts to pay, and in which order they would be paid.

4

**D.     For 4 Years, Fleet Advances Money To Pay
        Salaries And Benefits For Duro-Test's Employees**

18.     Pursuant to the "lock-box" procedure instituted by Fleet, all of Duro-Test's cash, revenues and receivables went directly to Fleet and were, at all times, under Fleet's exclusive control.  In order to pay its vendors, suppliers and employees, Duro-Test was required to submit applications for advances sufficient to fund such expenditures.  The decision whether or not to advance the funds was entirely within Fleet's control.

19.     As Duro-Test's secured lender, Fleet was aware, during the period 1995-2000, that Duro-Test employed several hundred individuals, including plaintiffs in this action.  In addition, Fleet was aware that Duro-Test provided, among other things, employee welfare benefits for its employees.  As Fleet knew, Duro-Test had established a self-insured health benefit plan (the "Plan"), in which plaintiffs were eligible to participate.  All claims submitted by plaintiffs who participated in the Plan were administered by Horizon Blue Cross Blue Shield of New Jersey ("Horizon").  Horizon submitted invoices for its Plan-related services to Duro-Test.

20.     In addition, Fleet was aware, during the period 1995-2000, that Duro-Test's employees, including plaintiffs, made regular contributions to a Duro-Test payroll account in order to pay a portion of the costs of the employee welfare benefits provided under the Plan.  Fleet swept all such contributions from the Duro-Test payroll account into its "lock-box."

21.     In proceeding with the "lock-box" arrangement that it imposed on Duro-Test, and by assuming control over Duro-Test's revenue stream, expenditures and the welfare benefit contributions of Duro-Test's employees, Fleet became subject to various laws governing Duro-Test employees, the payment of wages and the maintenance of the Plan, including but not limited to the Fair Labor Standards Act of 1938, as amended (the "FLSA"), the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Worker Adjustment and Retraining Notification Act "(WARN") and the New Jersey Wage Payment laws.

22.     On a regular basis, Duro-Test submitted requests to Fleet to advance funds required by Duro-Test to pay the wages of its employees and the amounts charged by Horizon to

5

administer the Plan. Despite diminishing revenues, for a period of approximately 4 years, Fleet advanced funds to Duro-Test for payment of salaries and benefits for its employees, which included plaintiffs.

**E.     As Durolite Divests Litetronics, Fleet Cashes Out**
        **And Leaves Plaintiffs Without Salaries And Health Benefits**

23.     In 1999, the financial condition of Duro-Test continued to decline. Durolite and Sorenson made efforts to arrange new financing for Duro-Test, although without success. In or about August 1999, Fleet required Sorenson and other Duro-Test shareholders provide additional financing with the use of their own funds. In addition, in late 1999, at Fleet's insistence, Duro-Test retained a crisis management company named by Fleet. This further deprived Duro-Test's management of authority, and further enmeshed Fleet in the control and supervision of Duro-Test's operations.

24.     In January 2000, a method was developed to generate cash for Fleet by arranging for the sale of Duro-Test's sister company, Litetronics. Under the divestiture plan, which Fleet approved, Sorenson formed a new company, World Lighting Investment Co. For a price of $4 million, World Lighting purchased Litetronics from Durolite. Fleet received all of the $4 million purchase price.

25.     Of the $4 million purchase price, Fleet used $2.8 million to retire all of Litetronics' indebtedness to Fleet. Fleet used the remaining $1.2 million to reduce Duro-Test's indebtedness. Of the $1.2 million, Fleet used $800,000 to retire an advance of funds that it made to Duro-Test in or about August 1999. Fleet used the remaining $400,000 to pay off part of Duro-Test's indebtedness under the revolving credit agreement. This provided Duro-Test with additional available funds under its revolving loan with Fleet.

26.     During February and March 2000, following the sale of Litetronics, Fleet collected additional revenues, consisting of Duro-Test receivables, in excess of $1 million. This provided Fleet with still more funds to reduce Duro-Test's indebtedness, and provided Duro-Test with more access to funding under the revolving loan. During this time, Fleet was also aware

6

that plaintiffs continued to make contributions from their wages for employee welfare benefits, and that such contributions, like the additional revenues, were swept into the "lock-box" that had been operating during the previous 4 years.

27.     However, at or about the time that it collected the additional $1 million, Fleet informed Duro-Test's management that, going forward, it would limit its funding to expenditures for liquidating Duro-Test's assets. As a result, Fleet effectively ended Duro-Test's operations.

28.     Because Duro-Test would cease operations, Fleet knew that the only source of repayment with respect to the revolving loan would be the liquidation of Duro-Test's assets. Fleet devoted its attention solely to liquidation-related issues, to the exclusion of other Duro-Test financial matters, including the payment of wages of Duro-Test employees and payment of employee welfare benefit expenses incurred in connection with the Plan.

29.     In February and March 2000, Duro-Test requested that Fleet advance funds to pay the wages and of its employees, including its non-union employees, and costs associated with the maintenance of the Plan. Duro-Test also forwarded budgets to Fleet that contained appropriate funding arrangements for such wages and employee welfare benefits. Fleet, however, had already determined that it would approve only those expenditures that would facilitate the liquidation of all of Duro-Test's assets. Because providing Duro-Test with funds for wages and employee welfare benefits was contrary to Fleet's revenue-maximizing objectives, Fleet deliberately failed to make any advances for plaintiffs' wages or the maintenance of the Plan – despite the existence of the appropriate funds and due demand from Duro-Test.

## IV.

## THIRD-PARTY CLAIMS

### Count 1
### (Violations of FLSA and N.J. Wage Payment Law)

30.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-29 above.

7

31.    By means of its agreements relating to the establishment of the "lock-box," and its conduct relating to the operation of the "lock-box" and the management and control of Duro-Test, Fleet became subject to or accepted the duties imposed upon "employers" within the meaning of Section 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

32.    Fleet deliberately failed and refused to forward funds from the "lock-box" that were held to pay, among other things, wages and employee welfare benefits for plaintiffs. By failing to pay plaintiffs' wages and benefits, Fleet violated Section 6 of the FLSA, 29 U.S.C. § 206 and the New Jersey Wage Payment law, N.J.S. 34:11-4.2 et seq.

33.    Fleet engaged in such practices deliberately and in bad faith, to the detriment of third-party plaintiffs.

34.    Accordingly, third-party plaintiffs are entitled to recover damages, including liquidated damages, against Fleet as provided under the FLSA and the New Jersey Wage Payment laws.  In the alternative, third-party plaintiffs are entitled to recover damages against Fleet in an amount no less than any damages that plaintiffs may recover in this action.

### Count 2
### (ERISA)

35.    Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-34 above.

36.    By means of its agreements relating to the establishment of the "lock-box," and its conduct relating to the operation of the "lock-box" and the management or control of Duro-Test, Fleet became subject to or accepted the duties imposed upon "employers" within the meaning of Section 3(5) of ERISA, 29 U.S.C. § 1002(5).  In addition, Fleet became subject to or accepted the duties imposed upon fiduciaries pursuant to ERISA.

37.    Fleet deliberately failed and refused to forward funds from the "lock-box" that were held to pay, among other things, wages and employee welfare benefits for plaintiffs. By failing to pay plaintiffs' employee welfare benefits and by failing to maintain coverage for

plaintiffs under the Plan, Fleet violated the terms of the Plan and the duties imposed upon Fleet under ERISA, 29 U.S.C. § 1101, et seq.

38.     Fleet engaged in such practices deliberately and in bad faith.

39.     In addition, by engaging in the wrongful conduct described herein, including but not limited to its failure to advance funds to pay the maintenance of the Plan and to preserve the assets of the Plan, and employee welfare benefit funds, Fleet violated ERISA Section 404, 29 U.S.C. § 1104, in at least the following ways:

>    (a)     by failing to discharge the fiduciary duties to which Fleet became subject or which it accepted with respect to the Plan, solely in plaintiffs' interest and for the purpose of providing employee welfare benefits to participants and beneficiaries, in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

>    (b)     by failing to discharge the fiduciary duties to which Fleet became subject or which it accepted with respect to the Plan, solely in plaintiffs' interest and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with similar objectives, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

40.     By knowingly and deliberately breaching the fiduciary duties to which it was subject, or which it accepted, by knowingly failing to advance funds requested by Duro-Test with respect to maintenance of the Plan, and by failing to make reasonable efforts to cure its violations of fiduciary duty with respect to the Plan, despite its knowledge of such breach, Fleet is liable for breach of fiduciary duty in violation of ERISA Section 404 and/or Section 405, 29 U.S.C. § 1104 and/or § 1105.

41.     Accordingly, in the event that the Plan is determined to be an employee benefit plan under ERISA Sections 3(1) and 3(3), 29 U.S.C. §§ 1002(1) and 1002(3), and in the event that third-party plaintiffs are deemed to be fiduciaries with respect to the Plan, then third-party plaintiffs are entitled to recover damages against Fleet, including punitive damages, pursuant to 29 U.S.C. §§ 1104, 1105 and 1109, in an amount to be determined at trial, but no less than any damages that plaintiffs may recover in this action.

**Count 3**
**(Violation of "WARN" Act)**

42.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-41 above.

43.     By means of its agreements relating to the establishment of the "lock-box," and its conduct relating to the operation of the "lock-box" and the management and control of Duro-Test, Fleet became subject to or accepted the duties imposed upon "employers" within the meaning of the WARN Act, 29 U.S.C. § 2101(a)(1).

44.     By engaging in the wrongful conduct described herein, including but not limited to Fleet's directives causing Duro-Test to cease operations; Fleet's failure to advance funds to pay wages for Duro-Test employees; and Fleet's failure to advance funds to pay for the maintenance and preservation of the Plan and employee welfare benefit funds, Fleet violated the "WARN" Act, 29 U.S.C. § 2102.

45.     Accordingly, third-party plaintiffs are entitled to recover damages, including punitive damages, against Fleet as provided under the "WARN" Act.  In the alternative, third-party plaintiffs are entitled to recover damages against Fleet in an amount no less than any damages that plaintiffs may recover in this action.

**Count 4**
**(Conversion)**

46.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-45 above.

10

47.     Fleet deliberately swept, into the "lock-box" that it established, funds that plaintiffs contributed and paid into a Duro-Test payroll account, and which were to pay for the maintenance and administration of the Plan.  After sweeping such funds into its "lock-box," Fleet deliberately failed to forward or advance funds for payment to Horizon to maintain and administer the Plan.  Fleet intended to, and did, deprive Duro-Test and plaintiffs of such funds permanently.

48.     Accordingly, Fleet is liable to plaintiffs or, in the alternative, to third-party plaintiffs, on grounds of conversion.

49.     Accordingly, third-party plaintiffs are entitled to recover damages, including punitive damages, against Fleet.  In the alternative, third-party plaintiffs are entitled to recover damages against Fleet in an amount no less than any damages that plaintiffs may recover in this action.

**Count 5**
**(Breach of Contract)**

50.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-49 above.

51.     By virtue of the express contractual provisions in connection with the 1995 Acquisition, the establishment of the "lock-box" and the subsequent sale of Litetronics and substantial reduction of Duro-Test's indebtedness, Fleet agreed to act in a manner consistent with law with respect to, among other things, the payment of wages to Duro-Test's employees and the payment of amounts required for the maintenance of the Plan.

52.     Fleet has breached its express and implied contractual duties by, inter alia: deliberately failing and refusing to forward funds from the "lock-box" that it held in order to pay, among other things, wages and employee welfare benefits for plaintiffs.  In addition, Fleet has breached its express and implied contractual duties by deliberately refusing and failing to act in accordance with its longstanding practice of advancing funds to pay wages and employee welfare benefits from amounts collected through the "lock-box" arrangement that Fleet imposed

11

upon Duro-Test. Fleet's wrongful conduct caused damage to third-party plaintiffs and is the direct and proximate cause of any damage alleged to have been sustained by plaintiffs.

53. Accordingly, third-party plaintiffs are entitled to compensatory damages against Fleet, or in the alternative, damages equal in amount to any award that plaintiffs may recover against any of third-party plaintiffs.

### Count 6
### (Breach of the Duty of Good Faith and Fair Dealing)

54. Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 - 53 above.

55. By virtue of the express contractual provisions in connection with the 1995 Acquisition, the establishment of the "lock-box" and the subsequent sale of Litetronics and reduction of Duro-Test's indebtedness, Fleet owed to third-party plaintiffs a duty of good faith and fair dealing.

56. Fleet has breached its duty of good faith and fair dealing by, inter alia: deliberately failing and refusing to forward funds from the "lock-box" that were held to pay, among other things, wages and employee welfare benefits for plaintiffs; and by deliberately refusing and failing to act in accordance with its longstanding practice of advancing funds to pay wages and employee welfare benefits from amounts collected through the "lock-box" arrangement that Fleet imposed upon Duro-Test. Fleet's wrongful conduct caused damage to third-party plaintiffs and was the direct and proximate cause of any damage alleged to have been sustained by plaintiffs.

57. Accordingly, third-party plaintiffs are entitled to compensatory damages against Fleet, or in the alternative, damages in an amount no less than any award that plaintiffs may recover against any of third-party plaintiffs.

### Count 7
### (Negligence)

58.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-57 above.

59.     In connection with the "lock-box" arrangement that it imposed upon Duro-Test and the control and authority that it exercised over Duro-Test's revenues and operations, Fleet had a duty to, among other things, make advances to Duro-Test from the "lock-box" to enable Duro-Test to pay its just debts, including wages. In addition, Fleet had a duty to advance funds from the "lock-box" that were contributed by Duro-Test employees in order to pay the costs associated with the maintenance of the Plan.

60.     Fleet breached such duties by failing to provide Duro-Test with funds from the "lock-box" for, among other things, the payment of plaintiff's wages and the payment of debts incurred by Duro-Test in connection with the administration of the Plan. Third-party plaintiffs have sustained damage as a result of Fleet's wrongful conduct. In addition, Fleet's wrongful conduct is the direct and proximate cause of any damages alleged by plaintiffs.

61.     Accordingly, third-party plaintiffs are entitled to recover compensatory damages against Fleet, based on negligence, in an amount to be determined at trial. In the alternative, third-party plaintiffs are entitled to recover damages against Fleet in an amount no less than any damages proven to have been sustained by plaintiffs.

### Count 8
### (Indemnity and Restitution)

62.     Third-party plaintiffs reallege and incorporate the allegations set forth in paragraphs 1-61 above.

63.     Fleet's exercise of control over Duro-Test's revenues, finances and operations, and its failure to advance funds to pay wages and employee welfare benefits under the Plan, were the sole, direct and proximate cause of any injury or damage suffered or sustained by plaintiffs.

64. In the event that third-party plaintiffs are found to be liable in any respect with regard to any of plaintiffs' claims in this action, then third-party plaintiffs are entitled to recover any and all such damages from Fleet.

## V.

## **REQUEST FOR RELIEF**

Defendants and third-party plaintiffs Robert Sorenson, Durolite International, Inc. and Litetronics International, Inc. respectfully request that this Court enter judgment in their favor, granting the following relief:

(a) dismissing plaintiffs' complaint and denying plaintiffs any recovery whatsoever on any of the claims asserted therein;

(b) in the alternative, and in the event that plaintiffs are entitled to any recovery, an award in favor of third-party plaintiffs against Fleet Capital Corporation in an amount to be determined at trial, but not less than the amount of any award in plaintiffs' favor;

(c) awarding compensatory damages against Fleet in an amount to be determined at trial, including, inter alia, all damages attributable to Fleet's failure to pay wages and amounts to maintain and/or administer the Plan;

(d) awarding liquidated damages as provided by law;

(e) awarding exemplary damages pursuant to applicable law in an amount to be determined at trial, but not less than three times the amount of plaintiffs' compensatory damages;

(f) awarding third-party plaintiffs their reasonable attorneys' fees under, inter alia, 29 U.S.C. § 216 and 29 U.S.C. § 1132, and their disbursements, court costs and applicable pre-judgment and post-judgment interest; and

(g) granting such other and further relief as the Court deems just and proper.

Dated: January 23, 2003

Respectfully submitted,

**KING, PAGANO & HARRISON**

By: _____
    Jeffrey W. Pagano, Esq.
425 Park Avenue
New York, New York 10022
(212) 223-4000

      and

**DENOIA & TAMBASCO**

By: _____
    Jeffrey W. Pagano, Esq.
501 Main Street
Toms River, New Jersey 08754
(732) 341-1030

Attorneys for Defendants and Third-Party Plaintiffs