UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RECEIVED-CLERK
U.S. DISTRICT COURT

2004 JUL -8  P 12: 0

------------------------------------------------------------- x
                  :

LAWRENCE SHEINBERG and GILES HAZEL,  :
on behalf of themselves and others       :
similarly situated,                :   Civil Action No. 00-6041(JLL)
                  :

          Plaintiffs,      :
                  :

     v.               :
                  :

ROBERT SORENSEN; DUROLITE      :
INTERNATIONAL, INC.; LITETRONICS  :
INTERNATIONAL, INC.,         :
                  :

       Defendants and    :
       Third-Party Plaintiffs, :
                  :

     v.               :
                  :

FLEET CAPITAL CORPORATION,    :
                  :

       Third-Party Defendant.  :
                  :
------------------------------------------------------------- x

## DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS

        Defendants Robert Sorensen ("Sorensen"), Durolite International, Inc.

("Durolite") and Litetronics International, Inc. ("Litetronics") submit their Statement of Material

Undisputed Facts pursuant to Local Rule 56.1 of the Civil Rules of the United States District

Court for the District of New Jersey, as follows:

**I.**

## TABLE OF CONTENTS FOR DEFENDANTS' RULE 56.1 STATEMENT

A.   Background: Duro-Test and Litetronics ...........................................................................4

B.   The Acquisition of Duro-Test and the Loan Agreement ...................................................5

C.   Duro-Test and Litetronics Were Managed and Operated Separately ................................7

    1.   The General Operations of Duro-Test and
        Litetronics Were Conducted Separately ...............................................................7

    2.   The Companies' Boards of Directors Operated Separately....................................8

    3.   The Companies' Human Resources Departments Operated
        Separately, and Managed Separate Health Insurance Plans ................................10

        (a)   Litetronics and Duro-Test Had No Influence
            Over Each Other's Employment-Related Policies and Procedures .........10

        (b)   Duro-Test's HR Department, and not Sorensen,
            Managed Duro-Test's Health Insurance Plan ..........................................12

    4.   Duro-Test and Litetronics Conducted
        Their Banking Relationships Separately...............................................................14

    5.   The Companies Conducted Their Own, Separate Sales and Marketing.............16

D.   Following The Acquisition, Duro-Test
    Received Significant Benefits from Litetronics...............................................................16

    1.   The Acquisition Benefited Duro-Test's Sales Personnel.....................................16

    2.   Following the Acquisition, Discrete Segments of
        the Companies' Businesses Were Realigned,
        Which Benefited Duro-Test Far More Than Litetronics .....................................17

        (a)   Telemarketing Was Transferred To Duro-Test.........................................18

        (b)   International Business Was Transferred to Duro-Test...............................18

        (c)   Duro-Test's "Sign Market"
            Lamp Business Was Transferred To Litetronics ......................................19

        (d)   Duro-Test Showroom Lamp Business Was Moved To Litetronics.........19

3.    Duro-Test Benefited From Litetronics' Purchases Of Incandescent Bulbs.........19

E.    Sorensen Was Not Compensated By Duro-Test................................................................21

F.    Duro-Test's Union and Non-Union Employees Did Not Receive The Same Benefits...22

G.    As Duro-Test's Financial Condition Worsens In 1999,
Defendants Help to Keep the Company Running............................................................23

1.    Durolite Attempts To Obtain Financing .............................................................23

2.    Duro-Test Hires Richard Crossland
As its New CEO, and Sorensen Resigns II.........................................................24

3.    Litetronics Supplies Duro-Test With Cash Advances ........................................25

4.    During the Summer of 1999, Sorenson and Others
Invest Nearly $1.5 Million To Keep Duro-Test Operating...................................26

H.    In Early 2000, Durolite Sells Litetronics To Make Additional Funds
Available To Duro-Test While Pursuing a Sale or Re-Financing of Duro-Test..............27

1.    Fleet's Notice Triggers A Need To Raise Cash for Duro-Test.............................27

2.    Sorensen Forms World Lighting To Purchase Litetronics ...................................27

(a)    Fleet And Durolite Approve an
Over-Valued Purchase Price for Litetronics.............................................28

(b)    World Lighting Purchases Litetronics for $4 Million
And Reduces Duro-Test's Indebtedness by $1.2 Million.........................29

(c)    Duro-Test And Litetronics Enter Into Supply Agreements
To Continue Operations Without Disruption To Customers....................30

3.    Fleet Enters Into the Forbearance Agreement ....................................................32

I.    The Closure of Duro-Test's Business.............................................................................33

1.    As Efforts Continue To Sell or Refinance Duro-Test,
Heico and PPM Emerge As The Leading Contenders..........................................33

2.    Fleet Stops Advancing Funds To Duro-Test
Even While Heico and PPM Remain Interested...................................................34

3.    Left Without Funds To Operate, Duro-Test Closes Its Doors..............................35

J.    Plaintiffs Have No Knowledge Concerning the Key Allegations of the Complaint .......37

## II

## MATERIAL UNDISPUTED FACTS

**A.   Background:  Duro-Test and Litetronics**

1.      Duro-Test Corp. ("Duro-Test") is plaintiffs' former employer.  Duro-Test was founded in the late 1920s and was engaged in the business of manufacturing products for the lighting industry.  In the 1990s, Duro-Test employed several hundred individuals, principally in New Jersey.  <u>See</u> Declaration of Robert C. Sorensen, dated May 28, 2004 ("Sorensen Decl."), ¶¶ 3, 5, 6.

2.      Duro-Test no longer exists, and is a defunct Chapter 7 debtor.  Duro-Test filed a Chapter 7 bankruptcy in March 2000.  Sorensen Decl., ¶ 5.

3.      Duro-Test's manufacturing facility was located in Clifton, New Jersey. Sheinberg Dep. at 57-58.  Duro-Test's corporate headquarters, where records were kept and where orders were taken, was in Bloomfield, New Jersey.  Sheinberg Dep. at 57-58.

4.      Duro-Test manufactured mainly incandescent light bulbs, and its customer base consisted mainly of end users of lighting products.  Sorensen Decl., ¶ 7.

5.      Litetronics is an Illinois corporation that is headquartered in Alsip, Illinois. Sorensen Dep. at 7-8; Sorensen Decl., ¶ 3.  Since 1970, Litetronics has engaged in manufacturing and marketing various products for the lighting industry.   For approximately 20 years, Litetronics' area of specialty has been the design and manufacture of halogen bulbs and lamps for the commercial lighting industry.  Litetronics' customers consist mainly of distributors and wholesalers in the lighting industry, as opposed to end users of lighting products.  Sorensen Decl., ¶ 4; Sorensen Dep. at 42.

6.      Defendant Robert Sorensen is an individual with approximately 30 years of experience in the lighting industry, and who resides in Illinois.  Sorensen became President and owner of Litetronics in the early 1980s.   By the mid-1990s, Litetronics employed approximately 120 people and had annual revenues of approximately $11 million per year.

4

7.      In 1995, Duro-Test was a far larger company than Litetronics. Duro-Test had sales of between $50 million and $60 million per year, while Litetronics had only between $11 million and $14 million. Schaechter Dep. at 30-31; Sorensen Decl., ¶ 6. However, in the mid-1990s, Duro-Test's sales were declining and its financial condition was poor, due to a number of factors. Duro-Test's plant and equipment were old. Duro-Test faced increasing competition, particularly from overseas. Duro-Test was also burdened by significant debt in the mid-1990s. In addition, Duro-Test's manufacturing facility was operating significantly below capacity. Sorensen Decl., ¶ 6; Schaechter Dep. at 39.

8.      Litetronics was a successful company in the mid-1990s. Schaechter Dep. at 31. In 1995, Litetronics' corporate structure included a President, Vice President, a marketing manager, a sales manager, a controller, an engineering manager, a telemarketing group, a sign group, a distribution group and an international group. Schaechter Dep. at 21-23.

**B.      The Acquisition of Duro-Test and the Loan Agreement**

9.      In October 1995, Litetronics and Duro-Test participated in a transaction (the "Acquisition") in which they both became subsidiaries of defendant Durolite International, Inc. ("Durolite"). Sorensen Decl., ¶ 8. Durolite acquired Duro-Test for approximately $30 million. Schaechter Dep. at 39.

10.     As a result of the Acquisition, Durolite became the owner of 100% of the stock of Litetronics and 100% of the stock of Duro-Test. Sorensen Decl., ¶ 8. Durolite was a holding company that conducted no business of its own, had no employees of its own, and no payroll of its own. Sorensen Decl., ¶ 8; Sorensen Dep. at 77-78, 197; Schaechter Dep. at 231.

11.     Following the Acquisition, Sorensen owned approximately 32% of the stock of Durolite, but held no stock in Duro-Test or in Litetronics. Sorensen Decl., ¶9.

12.     In connection with the Acquisition, on or about October 31, 1995, Durolite, Duro-Test and Litetronics (and other affiliates) entered into a certain Loan And Security Agreement (the "Loan Agreement") with Shawmut Capital Corp, which was the predecessor of third-party defendant Fleet Capital Corp ("Fleet"). Sorensen Dep. at 82;

Declaration of Gary A. Stahl, Esq., Exh. Q, dated May 28, 2004 ("Stahl Decl."). The Borrowers under the Loan Agreement were Durolite, Litetronics and Duro-Test and other affiliates of Litetronics and Duro-Test. <u>See</u> Loan Agreement (Stahl Decl., Exh. Q).

13.     The Loan Agreement established a credit facility of up to $32 million, including various revolving credit loans to Durolite, Litetronics and Duro-Test. <u>See</u> Loan Agreement (Stahl Decl., Exh. Q), Section 1.

14.     The Loan Agreement permitted, among other things, each Borrower to make requests for advances under the revolving credit loan from time to time. Disbursement of funds would be made by Fleet to such bank accounts as were agreed between each Borrower and Fleet. <u>See</u> Loan Agreement (Stahl Decl., Exh. Q), Sections 3.1.1 and 3.1.2.

15.     The Loan Agreement expressly required Duro-Test and Litetronics to establish separate lock boxes, each with revocable letters of instruction which, among other things, permitted Fleet to receive the Borrowers' revenues that were deposited in each lock box. <u>See</u> Loan Agreement (Stahl Decl., Exh. Q) Section 6.2.5.

16.     Duro-Test and Litetronics established separate lock boxes in connection with the revolving loan from Fleet. Revenues from the companies' respective customers would go directly to the separate lock boxes. Sorensen Dep. at 80, 87-88.

17.     To secure the Loan Agreement, each Borrower granted Fleet a continuing lien upon all of the assets of each Borrower. <u>See</u> Loan Agreement (Stahl Decl., Exh. Q), Section 5; Sorensen Dep. at 83.

18.     Under the Loan Agreement, separate lines of credit were established for Duro-Test and Litetronics, which were based upon assets and payments received from the companies' respective customers. Monies advanced under the lines of credit would be used by Duro-Test and Litetronics to satisfy their respective payment obligations. Sorensen Dep. at 80-81, 93.

19.     Litetronics did not previously do business with Fleet, and neither did Duro-Test. Indebtedness owing to pre-existing creditors was eliminated in connection with the loan facility from Fleet. Sorensen Dep. at 83.

20.     The Acquisition of Duro-Test was not premised upon any benefits that Duro-Test could bring to Litetronics. Rather, the objective was to increase the business and value of Duro-Test. Schaechter Dep. at 30-34.

21.     Following the Acquisition, Sorensen became CEO of Durolite, Litetronics and Duro-Test. Sorensen Dep. at 39. Michael Schaechter worked for Litetronics from 1985-2001. Schaechter Dep. at 7-9. He became President of Litetronics in 1995 or 1996. Schaechter Dep. at 8-9.

**C.     Duro-Test and Litetronics Were Managed and Operated Separately**

**1.     The General Operations of Duro-Test and
        Litetronics Were Conducted Separately**

22.     Duro-Test's business and Litetronics' business were never integrated. Sorensen Dep. at 39-42. Duro-Test and Litetronics were run separately, with separate sales departments, bank accounts, customer service people and sales people. Schaechter Dep. at 106.

23.     Following the Acquisition, Sorensen had no operating role in Litetronics. Sorensen removed himself from the day-to-day operations of Litetronics in order to manage Duro-Test. Sorensen Dep. at 40; Schaechter Dep. at 33-34, 54-55. During the period 1995-1999, Sorensen spent the majority of his time working at Duro-Test's offices in New Jersey. Sorensen Dep. at 163-64.

24.     Michael Schaechter ("Schaechter") was President of Litetronics and made all of Litetronics' day-to-day decisions. Sorensen Dep. at 40. Sorensen never countermanded or overrode any of Schaechter's decisions concerning the management of Litetronics. Sorensen Dep. at 40-41.

25.     No personnel from Litetronics performed any services or any role in the day-to-day management of Duro-Test's business. Crossland Dep. at 161. No officer, director or

manager of Litetronics ever worked for Duro-Test.  Schaechter Dep. at 271.  No employees of Duro-Test worked for or on behalf of Litetronics.  Sorensen Decl., ¶ 11.

26. With the exception of Mr. Sorensen, no Duro-Test officer or director was ever an executive or manager of Litetronics.  Schaechter Dep. at 271.

27. Duro-Test and Litetronics had separate engineering departments. Litetronics never directed Duro-Test how to engineer any Duro-Test products.  Schaechter Dep. at 269-70.

28. Neither Litetronics nor any employee of Litetronics established the production schedules for Duro-Test's Clifton, New Jersey manufacturing facility.  Sorensen Dep. at 224.

29. Litetronics had its own controller, engineering manager and HR manager prior to the Acquisition.  Schaechter Dep. at 251.

30. Litetronics did not attempt to obtain any cost savings through the use of Duro-Test or any of Duro-Test's vendors.  Sorensen Dep. at 184-85.

31. Litetronics had no collective bargaining agreement and was never unionized.  Sorensen Dep. at 228.

32. Richard Crossland ("Crossland"), who joined Durolite's Board of Directors in mid-1998 and who became CEO of Duro-Test in August 1999, did not perceive of Sorensen as the CEO of Duro-Test; rather, Sorensen acted as the Durolite CEO.  Crossland Dep. at 10, 21-22.

33. After Crossland became CEO of Duro-Test in August 1999, neither Crossland nor anyone who reported to him performed any function in the management of Litetronics' day-to-day business.  Crossland Dep. at 161.

**2.    The Companies' Boards of Directors Operated Separately**

34. Following the Acquisition, Durolite was the holding company for Duro-Test, while Duro-Test was the operating company.  Sorensen made recommendations to the Durolite Board concerning strategy.  Sorensen Dep. at 40.

8

35.     The Durolite Board of Directors held meetings approximately once per calendar quarter.  Durolite Board meetings were held at the offices of Litetronics, in Alsip, Illinois.  The directors would usually attend in person.  Crossland Dep. at 16-18; Schaechter Dep. at 42-46.

36.     Agendas were compiled in advance of the Durolite Board meetings, and the agendas allocated separate portions of the meetings for consideration of Duro-Test issues and Litetronics issues.  Schaechter Dep. at 45-46.

37.     At Durolite Board meetings, the Duro-Test CFO would present financials for Duro-Test.  Crossland Dep. at 19-21.  Michael Schaechter, as President of Litetronics, would attend portions of the Durolite meetings to present a financial review pertaining to Litetronics, and would discuss new matters relating to Litetronics.  Schaechter Dep. at 43-44; Crossland Dep. at 19-21.  Schaechter attended only the Litetronics portion of the Durolite Board meetings.  Schaechter Dep. at 246-47.

38.     The Durolite and Duro-Test Board of Directors did not have identical compositions.  Sorensen Dep. at 283.

39.     Richard Crossland became a director of Durolite in mid-1998, approximately one year before being appointed Duro-Test's CEO.  Crossland Dep. at 10, 21-22.  During that year, Crossland did not sit on Duro-Test's Board of Directors.  Crossland Dep. at 20.  Crossland was never a member of the Litetronics Board of Directors.  Crossland Dep. at 20.

40.     Durolite Board meetings were not combined with any meetings of the Litetronics Board of Directors.  Crossland Dep. at 154.

41.     The composition of Litetronics' Board of Directors was different from the composition of Duro-Test's Board.  Sorensen Dep. at 260.  Sorensen and Schaechter were the Directors of Litetronics.  Sorensen Dep. at 261.

42.     Litetronics' Board of Directors meetings were not "formal" meetings and were not held regularly.  Sorensen Dep. at 260; Schaechter Dep. at 43.

9

3.    **The Companies' Human Resources Departments Operated
      <u>Separately, and Managed Separate Health Insurance Plans</u>**

      (a)    **Litetronics and Duro-Test Had No Influence
             <u>Over Each Other's Employment-Related Policies and Procedures</u>**

43.    At the time of the Acquisition, Duro-Test had a fully-staffed Human Resources ("HR") Department. Sorensen Dep. at 112-13.

44.    Louis Szucs ("Szucs") was employed by Duro-Test from 1986 through February 2000, when the Clifton Plant closed. Szucs Dep. at 11-12. Szucs became head of Duro-Test's HR Department in late 1998 or early 1999. Szucs Dep. at 17-20.

45.    During the period 1998 through January 2000, Szucs was the most senior person in Duro-Test's HR Department, and supervised a staff of six people (excluding himself) in Duro-Test's HR Department. Szucs Dep. at 163-4; Crossland Dep. at 76.

46.    Szucs and the employees in the Duro-Test HR Department reported to Duro-Test's CFO. Szucs Dep. at 17-20; Sorensen Dep. at 166. Between January 27, 2000 and the closure of the Clifton Plant, Szucs reported to Duro-Test's President, Richard Crossland. Szucs Dep. at 20-21.

47.    As head of the HR Department, Szucs was responsible for overseeing Duro-Test's payroll, the company's human resources policies and procedures, employee benefits, hiring of staff for the Duro-Test corporate office and building security. Szucs Dep. at 57-58; Sorensen Dep. at 166.

48.    The employees and staff of Duro-Test's HR Departments were never utilized in connection with any business activities of Litetronics. Each company had separate management and performed its own HR work. Sorensen Dep. at 168; Szucs Dep. at 164.

49.    During the period 1995 through February 2000, neither Szucs nor the Duro-Test HR Department made any decisions concerning hiring policies at Litetronics or termination of any Litetronics employees. Szucs Dep. at 188-89.

50.     Neither Szucs nor anyone in the Duro-Test HR Department, nor any Duro-Test employees, rendered any services to Litetronics concerning the Litetronics employee manual, employment-related policies at Litetronics and day-to-day rules at the Litetronics workplace. Szucs Dep. at 188-90; Schaechter Dep. at 269; Crossland Dep. at 155-56.

51.     Litetronics had its own HR manager in 1995, at the time of the Acquisition. Litetronics also had its own Director of Sales, its own Controller, its own Director of Manufacturing, and its own Director of Marketing. Sorensen Dep. at 167-73; Schaechter Dep. at 225. In addition, Litetronics had its own employee manual. Schaechter Dep. at 225.

52.     Neither Litetronics nor any of its employees had any input with respect to the drafting or the amendment of Duro-Test's employee manual and employment-related policies. Schaechter Dep. at 269.

53.     No personnel from Litetronics ever set any day-to-day rules for the Duro-Test workplace, contributed to the Duro-Test drug-free policy, or made any rules with respect to Duro-Test smoking policies. Szucs Dep. at 190-91.

54.     No personnel from Litetronics had any influence in terms of the pay and pay scale for employees at Duro-Test. Szucs Dep. at 191.

55.     Prior to Durolite's acquisition of Duro-Test, Duro-Test's severance policy was one week for every year of service. After the acquisition, Sorenson changed the severance policy to one week for every 2.5 years of service. Szucs Dep. at 25, 191-92. This change applied only to non-union employees. Szucs Dep. at 26.

56.     Sorensen made no other changes with respect to any employment-related policies at Duro-Test. Szucs Dep. at 192-93.

57.     After Richard Crossland became CEO of Duro-Test in August 1999, he did not participate in formulating any Duro-Test HR policies. Crossland Dep. at 76.

11

**(b)**     **Duro-Test's HR Department, and not Sorensen,**
            **Managed Duro-Test's Health Insurance Plan**

58.     Litetronics had its own health insurance plan prior to Durolite's acquisition of Duro-Test in 1995. Sorensen Dep. at 111; Schaechter Dep. at 224. Litetronics' health insurance plan did not change following the Acquisition. Schaechter Dep. at 224

59.     Unlike the Duro-Test plan, Litetronics' health insurance plan was not self-funded. Sorensen Dep. at 111; Schaechter Dep. at 224. Litetronics' health insurance plan was not related in any way to Duro-Test's plan. Sorensen Dep. at 332.

60.     Duro-Test maintained a self-funded health insurance plan that was already in place when Duro-Test was acquired by Durolite in 1995. Sorensen Dep. at 112.

61.     Duro-Test's health plan was not changed following the Acquisition. Sorensen Dep. at 245. It is not known who, if anyone, was a fiduciary of the Duro-Test health insurance plan. Sorensen Dep. at 208-09.

62.     Horizon was the administrator for the Duro-Test self insured health plans for both union and non-union employees. Szucs Dep. at 43-44, 65. Duro-Test's CFO, John Andreacci, negotiated Duro-Test's health insurance plans with Horizon. After Andreacci left Duro-Test's employ, there were no material changes in the plans. Szucs Dep. at 65-66.

63.     Neither Sorensen nor Litetronics or Durolite ever exercised any control over health care funds of any Duro-Test employees. Sorensen Dep. at 427. No officer or employee of Litetronics ever exercised any control with respect to the Duro-Test health plan, or attempted to do so. Schaechter Dep. at 274.

64.     No funds for employee health care contributions ever belonged to or were in the possession of Sorensen, Durolite or Litetronics. Sorensen Dep. at 400; Sorensen Decl., ¶ 12.

65.     All functions relating to the operation and management of Duro-Test's health insurance plan and Duro-Test's payroll were handled not by Sorensen, but by Duro-Test's CFO and the manager of Duro-Test's HR Department. Sorensen Dep. at 115. Duro-Test's CFO,

its accounting department and HR personnel had been delegated all of the responsibilities in this area. Sorensen Dep. at 116-17.

66.    Following the Acquisition, Sorensen did not become involved with Duro-Test's health insurance plan or its operation.  Sorensen would only become involved if any insurance-related problems arose. Sorensen Dep. at 112-13.

67.    Szucs would ordinarily receive Horizon's invoices for Duro-Test health insurance plans and would forward them to Duro-Test's CFO, who would schedule the invoices for payment. Szucs Dep. at 68-70.  Duro-Test was, in general, at least two or three payments behind with respect to its health insurance plans during the period 1995 through February 2000. Szucs Dep. at 70-71, 173.

68.    Duro-Test was also, in general, a month or two behind in its payments to its life insurance company. Szucs Dep. at 173.

69.    From time to time, a Horizon representative would call Duro-Test to apply pressure to pay the health insurance invoices. Szucs Dep. at 174.

70.    In or about October 1999, at Fleet's direction and urging, Duro-Test hired Lissner & Associates ("Lissner") to provide advice concerning cash flow, to review expenditures, and prioritizing expenditures. In addition, Lissner contacted Duro-Test's vendors in an effort to convince them to extend the time for payment. Crossland Dep. at 209-10, 234-37.

71.    The personnel from Lissner Associates who were stationed at Duro-Test were there to provide advice on how to string out payments to vendors. Szucs Dep. at 186. Payments to life insurance companies and Horizon were included among payments to vendors. Szucs Dep. at 171.

72.    At the time the Clifton facility closed in mid-February 2000, Duro-Test's health insurance plan with Horizon was still in effect. Szucs Dep. at 119, 176.

73.    The first time that Szucs learned about the cancellation of the plan was in March 2000, after Duro-Test ceased operations. Szucs Dep. at 119, 176.

74.     After the cessation of Duro-Test's operations, Szucs remained employed at the Duro-Test facilities for a few months, along with a small number of other Duro-Test employees, to help wind up the company's business. Szucs Dep. at 10-11, 27-30. During this period, Szucs was employed by a temporary staffing agency, and his compensation, through the staffing agency, was supplied by Fleet. Szucs Dep. at 10-11.

75.     Sorensen did not make any decisions to withhold any payments from Horizon, or to withhold any wages from any Duro-Test employees. Szucs Dep. at 192-93.

76.     Sorensen never made any decisions concerning how much to pay Horizon for its services. Szucs Dep. at 194.

**4.      Duro-Test and Litetronics Conducted
         Their Banking Relationships Separately**

77.     The Loan Agreement with Fleet expressly permitted each Borrower (which included Duro-Test and Litetronics) to make requests for advances under the revolving credit loan from time to time. In addition, the Loan Agreement expressly provided that Fleet would disburse funds to such bank accounts as were agreed between each Borrower and Fleet. See Loan Agreement (Stahl Decl., Exh. Q), p. 6, Section 3.1.2.

78.     The Loan Agreement expressly required Duro-Test and Litetronics to establish separate lock boxes, each with irrevocable letters of instruction which, among other things, permitted Fleet to receive all funds deposited in each lock box. See Loan Agreement (Stahl Decl., Exh. Q), p. 13, Section 6.2.5.

79.     Litetronics established a line of credit with Fleet under the Loan Agreement that was separate from Duro-Test's line of credit. Schaechter Dep. at 203; Sorensen Dep. at 80-81, 93.

80.     Duro-Test and Litetronics each had their own borrowing base under their revolving loans with Fleet. The borrowing base operated on a formula that included cash received from customers, receivables and eligible inventory, and it determined the amount of

14

funds available under the Duro-Test or Litetronics revolving loan, as the case may be. Sonrensen Dep. at 80-81, 93, 299-300; Schaechter Dep. at 202-05.

81.     Duro-Test and Litetronics prepared separate borrowing base certificates to obtain advances under their separate lines of credit under the Loan Agreement. Sorensen Dep. at 298-99, 410-11.

82.     During the period 1995-1999, Duro-Test's controller or its CFO would receive periodic reports from Fleet concerning the company's borrowing capacity against its line of credit. Sorensen would not receive these reports when there was a problem with Duro-Test's borrowing capacity under the revolving loan that affected the company's ability to meet its expenses. Sorensen Dep. at 96-97.

83.     During the summer of 1999, Sorensen requested an increase in borrowing base capacity on behalf of Duro-Test. Sorensen Dep. at 97-98.

84.     During the period 1995-2000, it was Duro-Test's accounting department, under the control of Duro-Test's controller or its CFO, which made the determination whether to deposit advances from Fleet into the Duro-Test payroll account or into the Duro-Test operating account. Sorensen Dep. at 417.

85.     Sorensen became involved in matters relating to advances from Fleet under Duro-Test's line of credit only when a problem arose. Sorensen Dep. at 393.

86.     Duro-Test and Litetronics never had any joint bank accounts. Schaechter Dep. at 272.

87.     Duro-Test did not have any influence with respect to Litetronics' bookkeeping department. Schaechter Dep. at 271-72. By the same token, no employees or officers of Litetronics ever directed the Duro-Test payroll department how to go about its business. Schaechter Dep. at 272.

88.     From the time of the Acquisition in 1995 through January 2000, Duro-Test had a separate bank account dedicated only to payroll matters. Szucs Dep. at 36. Duro-Test maintained separate payroll and operating accounts. The Duro-Test accounting department

15

operated both the payroll operating account, and was responsible for all disbursements from those accounts. Sorensen Dep. at 332-33.

89.    No Litetronics personnel were paid out of the Duro-Test payroll account, because Litetronics was a separate company. Szucs Dep. at 180. Conversely, no officer or employee of Litetronics ever exercised any control with respect to any payroll payments to Duro-Test employees. Schaechter Dep. at 274-75.

### 5.    The Companies Conducted Their Own, Separate Sales and Marketing

90.    Duro-Test and Litetronics had their own sales staffs. Litetronics never attempted to influence how the Duro-Test sales staff went about its business. Schaechter Dep. at 270-71.

91.    Litetronics employed between 12 and 15 sales people, none of whom reported to Sorensen. Sorensen Dep. at 43.

92.    Duro-Test and Litetronics could not benefit from each other's marketing efforts. Duro-Test and Litetronics each had a product line of its own. Both product lines were independent of each other. Sorensen Dep. at 53-54.

93.    Litetronics and Duro-Test conducted sales operations separately because they had different customer groups and different focuses. Sorensen Dep. at 55.

94.    Although it was natural for Duro-Test and Litetronics to help each other, the companies never jointly marketed each other's products. Sorensen Dep. at 53.

### D.    Following The Acquisition, Duro-Test Received Significant Benefits from Litetronics

#### 1.    The Acquisition Benefited Duro-Test's Sales Personnel

95.    Following the Acquisition, Duro-Test salespersons were permitted to sell Litetronics products in addition to the Duro-Test inventory that they sold previously. Schaechter Dep. at 84, 259-60; Szucs Dep. at 199.

96.    This permitted Duro-Test sales personnel to offer more products to their customers than before. Szucs Dep. at 219-20.

97.     In 1996, Duro-Test requested Litetronics to help sell thousands of Duro-Test's obsolete products to Litetronics' customers.   Litetronics assisted in this project. Schaechter Dep. at 129-30; see also Exh. L to Stahl Decl.  Litetronics was able to arrange sales of the obsolete Duro-Test product through its own customers.  Litetronics did not charge Duro-Test for these services. Schaechter Dep. at 260-61.

98.     In addition, following the Acquisition, Litetronics transferred the storage of its finished products to unused space at the Duro-Test warehouse.  Litetronics paid Duro-Test for the warehouse space, at market value.  Schaechter Dep. at 118-19, 163; Sorensen Dep. at 184-85.

## 2.     Following the Acquisition, Discrete Segments of the Companies' Businesses Were Realigned, Which Benefited Duro-Test Far More Than Litetronics

99.     There was little, if any, competition between Duro-Test and Litetronics. To the extent that conflicts arose relating to product overlap, or from sales to the other's customers, Schaechter and the Duro-Test VP of Sales would confer to resolve the matter, depending on the product, the pricing and each company's history with the customer. Schaechter Dep. at 52-53, 56-57.

100.     Following the acquisition of Duro-Test, the core competencies of Duro-Test and Litetronics were aligned to benefit each company. Sorensen Dep. at 38.  In 1996, Duro-Test and Litetronics held discussions to realign certain markets that each company handled. Schaechter Dep. at 57-61.  The strategic realignment helped to eliminate conflicts or competition with each other. Sorensen Dep. at 56-57.

101.     Litetronics had more expertise with respect to selling lamps to distributors. Duro-Test had more strength in sales to end-users.  Schaechter Dep. at 62, 99, 257-58.  These different strengths, and the goal of aligning Litetronics and Duro-Test with what each company did best, formed the impetus behind re-aligning four areas of business:   the Litetronics

telemarketing department; Litetronics' international business; Duro-Test's "Durolite" brand showroom business; and Duro-Test's sign lamp business. Schaechter Dep. at 257-58.

### (a)   Telemarketing Was Transferred To Duro-Test

102.   In 1996, a group of Litetronics telemarketers, which sold product to end-users, was moved from Litetronics to Duro-Test. Schaechter Dep. at 63-64. Duro-Test employed the telemarketing personnel, who worked from office space that Litetronics provided. Thereafter, the telemarketing employees performed telemarketing on behalf of Duro-Test only. Crossland Dep. at 134-35; Sorensen Dep. at 158-60.

103.   Duro-Test did not compensate Litetronics for the right to have its employees work at Litetronics' Illinois offices. Schaechter Dep. at 163. The Duro-Test telemarketers who were stationed at Litetronics' offices were paid out of the Duro-Test payroll account. Szucs Dep. at 180.

104.   The telemarketing business that Litetronics transferred to Duro-Test accounted for approximately $750,000 in annual sales revenues. Schaechter Dep. at 63-64.

### (b)   International Business Was Transferred to Duro-Test

105.   In 1997, Litetronics' international business was transferred to Duro-Test. Schaechter Dep. at 63-65.

106.   Litetronics transferred its international sales business to Duro-Test because Duro-Test conducted international sales on a far larger scale. Duro-Test had a better opportunity to increase international sales than Litetronics. Schaechter Dep. at 64, 79-80.

107.   As Litetronics' President, Michael Schaechter found this realignment acceptable. Schaechter Dep. at 64-65. Schaechter approved the transfer and made the final decision on behalf of Litetronics. Schaechter Dep. at 65.

108.   The international business that Litetronics transferred to Duro-Test accounted for approximately $750,000 in annual sales revenues. Schaechter Dep. at 63-64.

(c) **Duro-Test's "Sign Market"**
**Lamp Business Was Transferred To Litetronics**

109.   Following the Acquisition, a segment of Duro-Test's business, known as the "sign market" business, was moved to Litetronics. This segment of Duro-Test's business handled sales of between $300,000 and $500,000 per year. Schaechter Dep. at 57-61.

(d) **Duro-Test Showroom Lamp Business Was Moved To Litetronics**

110.   In 1996, Duro-Test also transferred to Litetronics its lighting showroom business, which involved sales of a certain brand of light bulbs that were sold under the brand name "Durolite". Sorensen Dep. at 192-93; Schaechter Dep. at 57-61. Annual sales from the lighting showroom business amounted to approximately $500,000 per year. Schaechter Dep. at 57-61.

111.   The "Durolite brand" lamp business was transferred from Duro-Test to Litetronics because the business involved primarily sales to distributors, which was the focus of Litetronics' business. Schaechter Dep. at 62-63, 257-58.

112.   Overall, as a result of the strategic alignment of business following the Acquisition, Duro-Test received a transfer of business from Litetronics that yielded approximately $1.5 million in revenues per year. In comparison, Litetronics received a transfer of business from Duro-Test that yielded approximately $1 million in revenues per year. Schaechter Dep. at 66-68, 257-58.

3.   **Duro-Test Benefited From Litetronics' Purchases Of Incandescent Bulbs**

113.   Although Duro-Test and Litetronics had independent product lines, following the acquisition of Duro-Test, there were opportunities for the two companies to manufacture products for each other. Sorensen Dep. at 54, 56-57.

114.   Litetronics purchased incandescent light bulbs from Radiant Lamp Company from the late 1980s or early 1990s until 1996 or 1997. After the Acquisition, Litetronics began to purchase incandescent light bulbs from Duro-Test. Schaechter Dep. at 16-

17. Generally, Radiant's prices for lighting products were cheaper than Duro-Test's. Schaechter Dep. at 120.

115. Litetronics purchased incandescent bulbs manufactured by Duro-Test at 5% over Duro-Test's full cost. Crossland Dep. at 151-152. Litetronics purchased product from Duro-Test because Duro-Test had excess manufacturing capacity available. Crossland Dep. at 154. Litetronics' purchases represented "incremental" business to Duro-Test and helped to reduce Duro-Test's overhead. Crossland Dep. at 152-53.

116. By purchasing product from Duro-Test, Litetronics helped to fill Duro-Test's excess capacity and helped to pay Duro-Test's fixed costs and expenses. The arrangement was better for Duro-Test than not producing any product at all for Litetronics. Crossland Dep. at 166-67; Schaechter Dep. at 186-88.

117. When Litetronics purchased incandescent lamps from Duro-Test, it paid Duro-Test 5% more for the same product than Litetronics paid to Radiant. By doing business with Duro-Test, Litetronics also gave up a 3% discount that it received from Radiant. In addition, Litetronics gave up a 6% rebate that it received from Radiant. As a result, Litetronics paid Duro-Test 14% more for the same product that it previously purchased from Radiant. Schaechter Dep. at 186-88.

118. Litetronics had a "stocking program" with Radiant, whereby Radiant would keep 30 to 60 days' worth of product that it manufactured for Litetronics on hand, at no charge, in order to service Litetronics' customers more quickly. Litetronics did not have to pay Radiant for any of the product in storage at Radiant until the product was ordered and shipped. Schaechter Dep. at 250-51. Litetronics had no such arrangement, or corresponding benefit, with Duro-Test. Id.

119. Litetronics' purchases of Duro-Test products amounted to approximately one million incandescent light bulbs per year out of Duro-Test's total annual production of six million incandescent bulbs. In addition, Duro-Test manufactured other types of light bulb products. Sorensen Dep. at 230.

120.    All of Duro-Test's production of light bulbs for Litetronics was managed and performed by Duro-Test employees. Sorensen Dep. at 231.

121.    The prices that Litetronics paid to Duro-Test were higher than what Litetronics could otherwise obtain in the market, and were beneficial to Duro-Test as well. Litetronics' purchase of incandescent products from Duro-Test utilized excess capacity at the Duro-Test plant and did not require Duro-Test to give up any higher-priced sales to other customers. Sorensen Dep. at 234-35.

122.    In addition, Duro-Test purchased product from Litetronics at 5% over Litetronics' cost: Litetronics' normal markup was between 20% and 30%. Schaechter Dep. at 192-93. Prior to entering into this arrangement, Litetronics searched for other customers to buy its products at the normal margin. Schaechter Dep. at 194-95. The result was a great deal for Duro-Test, and it helped to fill the Litetronics factory. Schaechter Dep. at 196.

**E.    Sorensen Was Not Compensated By Duro-Test**

123.    Sorensen's total compensation of $200,000.00 per year was for serving as CEO of the Durolite group of companies. Sorensen Dep. at 75-76. Sorensen's compensation was $85,000.00 less than the previous CEO of Duro-Test. Sorensen also received the use of a company car and benefits. This was his total compensation package. Sorensen Dep. at 72.

124.    Sorensen did not receive his paychecks from Duro-Test. Szucs Dep. at 196.

125.    All of Sorensen's compensation, and his paycheck, came from Litetronics. Sorensen never went on the Duro-Test payroll. Sorensen Dep. at 77-78; Crossland Dep. at 156.

126.    Sorensen did not become entitled to any deferred compensation as a result of Durolite's acquisition of Duro-Test. Sorensen Dep. at 79.

127.    None of the Durolite companies made any loans to Sorensen. Sorensen Dep. at 79-80.

**F.**   **Duro-Test's Union and Non-Union Employees Did Not Receive The Same Benefits**

128.   As far as plaintiff Lawrence Sheinberg ("Sheinberg") knows, any parity between unionized and non-union employees in terms of benefits is based purely upon his own assumption.  No person ever told Sheinberg that union and non-union employees at Duro-Test were entitled to the same benefits.  Sheinberg Dep. at 88-89.  He did not receive any information in this regard from Sorensen, or from anyone at Litetronics.  Sheinberg Dep. at 89-90.

129.   Salaried, non-union employees of Duro-Test were never advised that they were entitled to benefits for a period of three months after a plant closing, which the company's unionized members were to receive under their collective bargaining agreement.  There are no documents indicating that non-union employees were entitled to any such benefit.  Sheinberg Dep. at 91-92.

130.   There was never any time when the non-union employees of Duro-Test received copies of the union contract and were told that they would receive the same benefits as set forth in the union contract.  Sheinberg Dep. at 100.

131.   During Sorensen's tenure with Duro-Test, he was not involved in any discussions to the effect that union employees and non-union employees of Duro-Test would be entitled to the same benefits.  Sorensen Dep. at 243.

132.   Duro-Test's unionized sales force was paid weekly, in arrears.  Szucs Dep. at 47.  The non-union, salaried employees were paid bi-weekly, and were paid current.  Id.

133.   Layoffs at Duro-Test occurred on a fairly regular basis during the period 1995 through early 2000.  Szucs Dep. at 165.  The layoffs would sometimes be short, and at other times, would last from several weeks to a few months.  Szucs Dep. at 165-66.

134.   Duro-Test did not have to pay union employees during the layoff period.  Szucs Dep. at 167.

135.   Non-union salaried employees at Duro-Test were eligible to participate in a 401(k) plan.  Union employees had no such eligibility.  Szucs Dep. at 207.  Non-unionized

employees of Duro-Test had supplemental long-term disability and supplemental life insurance, which were not offered to union employees. Szucs Dep. at 220.

136.    Plaintiff Giles Hazel ("Hazel") was not a unionized employee of Duro-Test. Hazel Dep. at 14. Hazel has never compared the benefits that non-union employees received at Duro-Test with the benefits that unionized employees received. Hazel Dep. at 103. He has no specific knowledge of the benefits that union members were entitled to receive. Hazel Dep. at 103.

137.    Hazel has no facts to support Paragraph 30 of the Complaint, which alleges that Duro-Test management advised non-union employees that that their benefits would be at least equal to those given to union members. Hazel Dep. at 103-04.

138.    Hazel has no knowledge as to whether: union employees had the same payroll deductions as non-union employees for their health care plan; whether union and non-union employees had the same 401(k) plan; or whether he received the same level of benefits as unionized employees of Duro-Test. Hazel Dep. at 156-57.

139.    Hazel has no information as to whether anyone ever told him that non-union employees would have the same benefits as union employees. He cannot name anyone who might have said such a thing. Hazel Dep. at 108, 157. He never discussed the matter with Sorensen, or with anyone in Duro-Test's management. Hazel Dep. at 108-09.

140.    Hazel cannot name anyone at Duro-Test who ever was told that non-union employees would receive the same benefits as their unionized counterparts. Hazel Dep. at 169.

**G.    As Duro-Test's Financial Condition Worsens In 1999, Defendants Help to Keep the Company Running**

**1.    Durolite Attempts To Obtain Financing**

141.    Duro-Test was experiencing serious financial difficulties in August 1999. At the time, Duro-Test's plan was to obtain refinancing. Crossland Dep. at 27, 29.

142.    In 1999, Sorensen worked to find a refinancing source or an equity sponsor for the Durolite companies. Sorensen Dep. at 71.

143.    In 1999, Durolite engaged the services of BT Alex Brown to market all of the Durolite companies to potential buyers or investors, and not Duro-Test by itself.  Sorensen Dep. at 70.

144.    During the Spring and Summer of 1999, Michael Schaechter, Litetronics' President, assisted Sorensen in his attempts to raise capital for Durolite.   Schaechter accompanied Sorensen on "road shows" that were coordinated by BT Alex Brown in order to persuade others to invest capital in Durolite.  The objective was to obtain financing for the entire Durolite group of companies, as opposed to Duro-Test.   Schaechter Dep. at 151-52. Schaechter's role was to discuss the Litetronics component of Durolite with potential investors. Schaechter Dep. at 36.

145.    Schaechter was not compensated by Duro-Test for his assistance with Durolite's attempt to raise capital.  Schaechter Dep. at 34-35.  Schaechter never received any separate compensation from Sorensen, Litetronics or Duro-Test for his efforts in this regard. Schaechter Dep. at 35-36.

## 2.    Duro-Test Hires Richard Crossland As its New CEO, and Sorensen Resigns

146.    Sorensen resigned as CEO of Duro-Test during the Summer of 1999 because, at that time, Duro-Test hired Richard Crossland as its new CEO.  Sorensen Dep. at 61-62; Crossland Dep. at 10.   Crossland joined the Durolite Board of Directors in 1998, approximately one year earlier, and he had approximately 15 to 20 years' experience in the lighting business.  Crossland Dep. at 10, 164-65.

147.    Sorensen resigned as CEO of Duro-Test so that Richard Crossland could run the company.  Schaechter Dep. at 175-76.  In addition, Crossland was needed to assume the duties of Duro-Test's CEO and to focus 100% of his time on the day-to-day management of Duro-Test's business.  Schaechter Dep. at 179.

148.    Crossland's salary as CEO of Duro-Test was higher than Sorensen's. Sorensen Dep. at 80.

149.    Once Crossland was appointed as Duro-Test's CEO, Sorensen removed himself from the management of Duro-Test and all of Duro-Test's day-to-day operating decisions. Sorensen Dep. at 70. After Crossland became CEO of Duro-Test, Sorensen no longer worked out of the Duro-Test corporate office in New Jersey. Crossland took Sorensen's office at Duro-Test's headquarters. Crossland Dep. at 38.

150.    Sorensen may have also resigned as a director of Duro-Test in August 1999, when Crossland was appointed as Duro-Test's CEO. Sorensen Dep. at 200, 279-81.

151.    During the Summer of 1999, much of Sorensen's time was devoted to raising capital for Durolite. Schaechter Dep. at 179. Crossland's hiring enabled Sorensen to concentrate on selling Duro-Test or obtaining refinancing for Duro-Test. Sorensen Dep. at 62.

152.    Crossland oversaw all of the operations of Duro-Test, including its subsidiaries. Crossland Dep. at 27. While Crossland was CEO of Duro-Test, no Duro-Test employees performed services that benefited Litetronics. Crossland Dep. at 36.

153.    After Crossland's appointment as Duro-Test's CEO in August 1999, there were no strategic discussions concerning consolidating the operations of Litetronics and Duro-Test. There were no economies of scale or synergies apparent with the two businesses, including operational areas, information services, or in the operations of the companies' respective human resources departments. Crossland Dep. at 33-35.

154.    In 1999 and 2000, the Durolite Board of Directors did not consider closing or selling the Duro-Test manufacturing facility in Clifton, New Jersey. Crossland Dep. at 42-46.

### 3.    Litetronics Supplies Duro-Test With Cash Advances

155.    From time to time, Litetronics made cash advances to Duro-Test. Duro-Test's CFO would usually request the cash advances from Litetronics' President, Michael Schaechter, and it was Schaechter's decision whether or not to authorize the advance, without checking with Sorensen. Litetronics would make the advances because it had the cash and was making a profit, and because Duro-Test needed the money. Schaechter Dep. at 140-42, 146.

156.    Funds advanced by Litetronics to Duro-Test were offset in an inter-company account that reflected purchases of product between the two companies. The advances were not loans. Schaechter Dep. at 144-45.

157.    There was no benefit to Litetronics from the cash advances that it made to Duro-Test. Litetronics charged no interest on the advances. Schaechter Dep. at 261-62.

### 4.    During the Summer of 1999, Sorenson and Others Invest Nearly $1.5 Million To Keep Duro-Test Operating

158.    During the summer of 1999, Sorensen and a group of investors raised nearly $1.5 million, which was paid to Fleet for the benefit of Duro-Test, in order to offset an overadvance by Fleet of $800,000.00 and to permit Fleet to continue funding Duro-Test's operations. Sorensen Dep. at 99-100, 272.

159.    On or about June 23, 1999, Sorensen and other investors entered into a certain Subordinated, Last-Out Participation Agreement (the "Last-Out Participation") with Fleet. See Sorensen Decl., Exh. 14.

160.    Pursuant to the Last-Out Participation, each of the participants purchased, from Fleet, a subordinated, last-out participation interest in the obligations arising under the Loan Agreement. The last-out participation interest was without recourse against Fleet, and would not be repaid until all of the obligations outstanding under the Loan Agreement were repaid in full and the Loan Agreement was terminated. See Last-Out Agreement (Sorensen Decl., Exh. 14), pp. 1-3, Sections 2-3.

161.    The total amount of the last-out participation interest purchased by Sorensen and the other investors was $1,488,000. Of that amount, Sorensen contributed $130,000. See Last-Out Participation (Sorensen Decl., Exh. 14), p. 13. The last-out participation interest was required by Fleet to eliminate an overadvance position under the Loan Agreement, and it enabled Duro-Test to draw funds under the Loan Agreement and stay in operation. Sorensen Dep. at 272.

26

162.    Neither Sorensen nor any of the other last-out participation investors have been repaid by Fleet. Sorensen Dep. at 274.

## H.    In Early 2000, Durolite Sells Litetronics To Make Additional Funds Available To Duro-Test While Pursuing a Sale or Re-Financing of Duro-Test

### 1.    Fleet's Notice Triggers A Need To Raise Cash for Duro-Test

163.    On or about November 12, 1999, Fleet issued a notice to Durolite due to a purported overadvance of $800,000 under the Loan Agreement. See Stahl Decl., Exh. M and Sorensen Dep. at 262-63.

164.    As set forth in Fleet's notice, Fleet elected to implement a default rate of interest under the Loan Agreement. In addition, Fleet stated that it would amortize the overadvance by applying $15,000 per day from the Borrowers' revenues until the $800,000 overadvance was repaid in full. See Stahl Decl., Exh. M.

165.    By letter dated November 15, 1999, Richard Crossland forwarded Fleet's default notice to Durolite's Board of Directors. As set forth in Crossland's letter, losing $15,000 per day of availability under the Loan Agreement "will undermine our already precarious cash flow situation." In addition, Crossland advised the Durolite Board that selling Litetronics and Duro de Mexico "is the only solution to our immediate need for cash." See Stahl Decl., Exh. M.

### 2.    Sorensen Forms World Lighting To Purchase Litetronics

166.    By letter dated November 8, 1999, Sorensen made an offer, to the Durolite Board of Directors, to purchase Litetronics and Duro de Mexico, which was Duro-Test's Mexico subsidiary, for a total amount of $8 million. Sorensen Dep. at 258-59; see Stahl Decl., Exh. N. Fleet approved this purchase price. Crossland Dep. at 119-20.

167.    The proposed transaction later changed, and became a purchase of Litetronics only, for $4 million. The change was made in order to accommodate Heico Acquisitions ("Heico"), which was interested in purchasing Duro-Test and Duro de Mexico. Crossland Dep. at 120-21.

168.   The intent behind the sale of Litetronics was to retire Litetronics' debt to Fleet and to put extra money into the business of Duro-Test. Crossland Dep. at 149; Schaechter Dep. at 134.   By selling Litetronics, Duro-Test would be supplied with additional working capital, while a refinancing or sale of Duro-Test was completed. Sorensen Dep. at 132.

(a)   **Fleet And Durolite Approve an**
**Over-Valued Purchase Price for Litetronics**

169.   In connection with the sale of Litetronics, Sorensen was the suitor and the balance of the Durolite Board and Fleet represented the sellers. Crossland Dep. at 48-49.

170.   Durolite and Duro-Test were represented by counsel in connection with the sale of Litetronics.  World Lighting Investment Co. ("World Lighting"), which was formed by Sorensen and which became the purchaser of Litetronics, was represented by separate counsel. Crossland Dep. at 130; Sorensen Decl., ¶¶ 15-16 and Exh. 2.

171.   Fleet approved the sale price of Litetronics and was involved in discussions concerning the valuation of Litetronics for sale to World Lighting. Crossland Dep. at 50-52; Sorensen Dep. at 130.

172.   Prior to discussions concerning the sale of Litetronics, all or part of Durolite had been shopped in the marketplace. Crossland Dep. at 47.  BT Alex Brown had been engaged to look for suitors on behalf of Durolite, Duro-Test and Litetronics.  Sorensen Dep. at 70; Schaechter Dep. at 152-53.

173.   In connection with the sale of Litetronics, the Durolite Board and Fleet used a common valuation technique.  The Durolite Board considered Litetronics' trailing EBITDA and applied a multiple of 5.5 to 6.  This technique was consistent with the valuation that General Electric and other suitors utilized in 1999 when they were considering an acquisition of the Durolite companies.  A smaller entity, such as Litetronics, would ordinarily command a lower multiple of EBITDA, but the Durolite Board used the higher multiple instead in determining a selling price for Litetronics. Crossland Dep. at 49-52; Schaechter Dep. at 262-64. A lower multiple, of approximately 4.0-4.5, would have been appropriate for the purchase of

28

a smaller entity, such as Litetronics. Accordingly, the actual multiple was relatively generous. Schaechter Dep. at 264.

174.    The Durolite Board sought Schaechter's opinion concerning the $4 million sale price for Litetronics. Schaechter believed that the price was more than fair. Schaechter Dep. at 149.

### (b)    World Lighting Purchases Litetronics for $4 Million And Reduces Duro-Test's Indebtedness by $1.2 Million

175.    Sorensen was excluded from the vote of the Durolite Board of Directors concerning the sale of Litetronics. Crossland Dep. at 157-58.

176.    On January 25, 2000, World Lighting entered into an a certain Stock Purchase Agreement with Durolite to purchase all of the issued and outstanding shares of Litetronics. See Stock Purchase Agreement. See Sorensen Decl., Exh. 2. As set forth in the Stock Purchase Agreement, the purchase price was $4 million. Id.

177.    World Lighting paid for its acquisition of Litetronics by means of a $4 million loan that American National Bank & Trust Co of Chicago made to Litetronics. The loan was secured by the assets of Litetronics, and Sorensen guaranteed the loan personally. Sorensen Dep. at 124. See also Sorensen Decl., ¶ 15 and Exh. 2.

178.    In connection with the sale of Litetronics, Duro-Test received the benefit of some of the sales proceeds in order to continue operations until a sale of Duro-Test or refinancing could be arranged. Sorensen Dep. at 127-28, 135-37.

179.    The $4 million generated from the sale of Litetronics was transferred to Fleet in order to purchase Litetronics' shares from Durolite. Sorensen Dep. at 125-26, 135-37.

180.    World Lighting's purchase of Litetronics provided $2.8 million to retire Litetronics' indebtedness to Fleet. Schaechter Dep. at 242. The remainder of the purchase price, or $1.2 million, was utilized to pay off the Fleet overadvance of $800,00.00, and provided another $400,000.00 of additional availability to Duro-Test under the Loan Agreement. Sorensen Dep. at 299-300; Schaechter Dep. at 242; Sorensen Decl., ¶ 15.

181.   At the time, Sorensen believed that the additional working capital provided to Duro-Test was adequate to keep the company running until Duro-Test was purchased or refinanced. Sorensen Dep. at 135-37.

182.   Crossland attempted to have Fleet allocate an even greater proportion of the Litetronics purchase price applied to a reduction of Duro-Test's debt. Crossland Dep. at 150-51.

183.   As a result of the sale of Litetronics to World Lighting, Litetronics was burdened with more debt than it carried when Fleet was its lender. Sorensen Dep. at 128. World Lighting acquired Litetronics as a leveraged entity, which had zero value. Sorensen overpaid for Litetronics. Sorensen Dep. at 133-34.

184.   As a result of the sale of Litetronics, Duro-Test and Litetronics ceased to be under common ownership. They had never been under common management. Sorensen Dep. at 150.

**(c)   Duro-Test And Litetronics Enter Into Supply Agreements To Continue Operations Without Disruption To Customers**

185.   At the time of the sale of Litetronics, Duro-Test and Litetronics benefited by manufacturing various products for each other. Sorensen Dep. at 149.

186.   Contemporaneously with the sale of Litetronics, Duro-Test and Litetronics entered into a certain Interim Services and Licensing Agreement, and certain Supply Agreements. The purpose of the agreements was to keep the supply sources for both companies in place, to provide the same services to Duro-Test and Litetronics that each company had received from the other prior to the sale of Litetronics, and to assure each company that it would have the products needed for its customers. Sorensen Dep. at 142-51, Schaechter Dep. at 156-57, 160.

187.   In early 2000, it was in each company's interest to continue to use the other's services. Schaechter Dep. at 156-57, 160. If, following the sale of Litetronics, there

were not a continuation of the same services between Duro-Test and Litetronics, there would have been a disruption of services to each party's customers. Schaechter Dep. at 168.

188.    The Supply Agreements, executed at the time of the sale of Litetronics, were intended to specify the business that had been transacted historically between Litetronics and Duro-Test, and to keep the mutual manufacturing relationships in place. The arrangement was approved by Durolite's Board of Directors without dissent. Crossland Dep. at 95-96.

189.    The Supply Agreements were beneficial for both Duro-Test and Litetronics to maintain the manufacturing relationships that they had prior to the sale of Litetronics. A long time is required to find a replacement supplier to service business that has been sold to a customer. On the supply side, it takes from 6 months to 2 years to find a new supplier in the market that can supply product according to the specifications and quality level that are required. Crossland Dep. at 159-60.

190.    After the sale of Litetronics, the Duro-Test telemarketers who worked out of Litetronics' Illinois offices continued to perform the same jobs for Duro-Test, and were paid by Duro-Test. Schaechter Dep. at 265.

191.    Following the sale, Litetronics continued to use Duro-Test's warehouse facilities and paid for those facilities at market value, which was approximately $13,000 per month. Schaechter Dep. at 265-66.

192.    Duro-Test continued to provide "Navlap Certification" services to Litetronics following the sale of Litetronics. Navlap certification was provided to certify the lamps that Duro-Test manufactured for Litetronics. Schaechter Dep. at 164, 172. Under the Interim Licensing and Services Agreement, Litetronics was not required to pay for such certification for a period of one year, but would be required to pay Duro-Test 150% of its certification costs after that period. Schaechter Dep. at 266.

### 3.   Fleet Enters Into the Forbearance Agreement

193.   Contemporaneously with the Stock Purchase Agreement, Fleet entered into a certain Forbearance Agreement with Litetronics, Duro-Test, Durolite and other affiliates. See Forbearance Agreement. Stahl Decl., Exh. O; Sorensen Dep. at 358-59.

194.   The Forbearance Agreement stated that there were certain existing defaults under the Loan Agreement.  Nevertheless, pursuant to Section 3.2 of the Forbearance Agreement, Fleet agreed, among other things, to forbear from exercising any of its rights as a lender for a period of 60 days from January 25, 2000.  The forbearance period could be terminated at an earlier date, in the event that Fleet believed that both:  (a) Heico ceased to have an interest in purchasing Duro-Test; and (b) PPM ceased to have an interest in making a loan to Durolite and various affiliates of Durolite.  See Forbearance Agreement (Stahl Decl., Exh. O), pp. 2-3.

195.   The objective behind the sale of Litetronics and the Forbearance Agreement was to provide funding to Duro-Test to continue its operation long enough to be refinanced or sold.  Sorensen Dep. at 436.  In addition, the purpose of the Forbearance Agreement was to recognize the Litetronics purchase and for Fleet to forbear from exercising any rights under the Loan Agreement in order to allow Duro-Test to finish negotiations with Heico or another suitor and sell the company. Crossland Dep. at 204-05, 241-42.

196.   In late 1999, Heico Acquisitions ("Heico") showed interest in purchasing Duro-Test, but not Litetronics.  Sorensen Dep. at 120-21; Crossland Dep. at 52.  Heico was also interested in acquiring Duro-Test de Mexico.  Crossland Dep. at 52.

197.   At the time of the Heico offer in February 2000, Heico was interested in pursuing a transaction with Duro-Test.  Sorensen Dep. at 434.

32

## I.   The Closure of Duro-Test's Business

### 1.   As Efforts Continue To Sell or Refinance Duro-Test, Heico and PPM Emerge As The Leading Contenders

198.   In or about October 1999, Duro-Test conducted discussions with General Electric ("GE") concerning a purchase by GE of various assets of the company. GE ultimately did not pursue an acquisition of Duro-Test's Clifton manufacturing facility, and discussions with GE were discontinued in or about November 1999. Sorensen Dep. at 248, 258.

199.   In October 1999, Lawson Products was also a potential purchaser of Duro-Test. Sorensen Dep. at 251. Other potential buyers and investors for Duro-Test included Harvest Partners, Sterling and Linsalata Capital. Crossland Dep. at 185.

200.   Discussions between Heico and Duro-Test began in September or October 1999. Crossland Dep. at 195. Heico issued a letter of intent at the start of the process, and later issued a more detailed proposal. Crossland Dep. at 197.

201.   In November 1999, Heico continued the process of negotiating to purchase Duro-Test and its subsidiaries. Sorensen Dep. at 258-59. On or about December 20, 1999, Heico sent an initial proposal to Durolite to acquire Duro-Test. See Sorensen Decl., ¶ 17 and Exh. 4. Crossland participated with Sorensen in discussions with Heico about a potential purchase of Duro-Test. Crossland Dep. at 126.

202.   In late 1999 and early 2000, Heico became very interested in purchasing Duro-Test, as well as Duro-Test's Canadian and Mexican subsidiaries. Heico sent its personnel to Duro-Test in order to conduct due diligence, and Heico personnel visited Duro-Test's facilities in New Jersey and Mexico. In early 2000, Richard Crossland, Duro-Test's CEO, believed that there was a "high probability" of reaching a deal with Heico. Crossland Dep. at 192-93, 195-96.

203.   In January 2000, Crossland drafted a voice-mail announcement in order to inform Duro-Test's employees that a $1 billion company was evaluating a purchase of Duro-Test and that although there were no guarantees, "we have every intention of moving forward with this transaction." The reference to the "$1 billion company" in Crossland's voice-mail meant

Heico, even though Crossland did not mention Heico by name.  Sorensen Dep., 137-41; see Stahl Decl., Exh. P.

204.    After January 26, 2000, Fleet became actively involved in the discussions with Heico.  Crossland Dep. at 202.

## 2.    Fleet Stops Advancing Funds To Duro-Test Even While Heico and PPM Remain Interested

205.    The forbearance period under the Forbearance Agreement began on January 25, 2000.  The initial period of Fleet's forbearance, subject to the various provisions of the Forbearance Agreement, was 60 days.  See Forbearance Agreement (Stahl Decl., Exh. O), Section 3.2.

206.    Sorensen's intention in 1999 and early 2000 was to keep Duro-Test and its Clifton plant operating as a going concern for the benefit of Duro-Test's stakeholders and its employees.  Sorensen Dep. at 265-66.  One objective behind the Forbearance Agreement was to provide an opportunity for Duro-Test to obtain financing and to keep operating as a going concern.  Sorensen Dep. at 356.

207.    Sorensen's expectation was that Fleet would continue to fund the operations of Duro-Test so long as Heico and PPM were interested in purchasing or refinancing Duro-Test.  Sorensen Dep. at 264.  Section 3.2 of the Forbearance Agreement permitted Fleet to terminate the forbearance period earlier than 60 days in the event that Fleet believed that both Heico and PPM no longer had any interest in pursuing a transaction to purchase or refinance Duro-Test.  See Forbearance Agreement (Stahl Decl., Exh. O), Section 3.2(a)(iv).

208.    In or about late January 2000, Crossland requested additional relief from Fleet under the loan facility.  Sorensen Dep. at 310.  Duro-Test advised Fleet that Heico remained interested in purchasing the company and that Duro-Test was also negotiating potential refinancing with PPM.  Fleet replied that Duro-Test would have a short period of time to obtain an offer from Heico and complete a purchase transaction.  Sorensen Dep. at 311.  As Sorensen described, Fleet put Duro-Test on a "tight leash" to consummate a purchase transaction with

34

Heico. Sorensen Dep. at 313. Fleet directed Sorensen and Crossland to bring in an offer from Heico, or Fleet would liquidate Duro-Test's business. Sorensen Dep. at 266-67.

209.    Heico made an offer to purchase Duro-Test on February 16 or 17, 2000. Crossland Dep. at 248-49.

210.    Dennis Rebman, the Fleet officer with day-to-day responsibility concerning the Loan Agreement, took notes relating to discussions within Fleet on February 16, 2000. Mr. Rebman's notes indicate: "We don't want to fund anything that is not tied to the liquidation of collateral due to the current O/A" [overadvance]. Rebman Dep. at 72-73, 75.

211.    On February 18, 2000, Fleet refused to fund the Duro-Test payroll that was due on that day. Crossland Dep. at 78-81. Nor would Fleet advance funds to pay for other ongoing expenses of Duro-Test's operations. Sorensen Dep. at 338-39; Crossland Dep. at 102.

212.    Duro-Test had not had any opportunity to respond to Heico's initial offer when Fleet stopped advancing funds for Duro-Test's operations. Crossland Dep. at 270.

213.    Fleet never conveyed any indication to Duro-Test to the effect that Fleet believed that Heico and PPM were no longer interested in pursuing a purchase or refinancing transaction with Duro-Test. Crossland Dep. at 252; Sorensen Dep. at 369.

214.    When Fleet stopped advancing funds for Duro-Test's operations, Sorensen and Crossland participated in a telephone conference with Fleet. Sorensen learned that Duro-Test would not make its payroll. During the telephone conference, Fleet requested that Duro-Test submit a budget for the liquidation of its assets. That forced a closure of Duro-Test's Clifton Plant. Sorensen Dep. at 199, 203-04, 422.

### 3.    Left Without Funds To Operate, Duro-Test Closes Its Doors

215.    In early 2000, the only way for Duro-Test to make a payroll was with funds that Fleet advanced. Duro-Test did not have any funds available, other than those which Fleet provided. Crossland Dep. at 255.

216.    Duro-Test paid its bills by writing checks on an account into which Fleet advanced funds under the Loan Agreement. Crossland Dep. at 207.

35

217.   In or about February 2000, Fleet was aware that Duro-Test had salaries and health insurance bills to pay. Sorensen Dep. at 394. Fleet advanced funds to pay several payrolls between the time of the Forbearance Agreement and February 18, 2000. Crossland Dep. at 250-51.

218.   Prior to the shutdown of the Duro-Test facilities on February 18, 2000, Crossland made more than one request to Fleet to fund the Duro-Test payroll and outstanding wages and benefits owed to Duro-Test employees. Crossland Dep. at 81.

219.   Sorensen did not make any decision to close Duro-Test's Clifton Plant. Sorensen Dep. at 198. When Fleet advised Duro-Test that it would no longer fund any expenses other than those required for a liquidation, as a practical matter there was no decision to be made concerning the closure of Duro-Test. Fleet made the decision. Sorensen Dep. at 444.

220.   After February 18, 2000, there was "nothing to be decided about anything other that what Fleet was directing us to do, which was basically liquidating assets." Crossland Dep. at 109-10.

221.   Neither Litetronics nor anyone employed by Litetronics ever exercised any decision-making authority concerning the closure of the Duro-Test facility in February 2000. Schaechter Dep. at 275.

222.   On February 18, 2000, Duro-Test management announced to employees that the company was closing, and both the Duro-Test's Clifton plant and its corporate offices were closed. Crossland Dep. at 78-81; Szucs Dep. at 139-40. On and after February 18, 2000, Crossland informed the Duro-Test sales personnel that, according to Fleet, Fleet would not advance funds to pay salespeople. Fleet would fund only those items to liquidate the assets of Duro-Test. Crossland Dep. at 113-14.

223.   After the closing of Duro-Test's Clifton manufacturing facility, Fleet advanced funds to employ a skeleton workforce in connection with the liquidation. Sorensen Dep. at 343. Sorensen did not participate in any decision making process at Duro-Test concerning what expenditures Fleet would be requested to fund. Sorensen Dep. at 269.

224.    Duro-Test filed a Chapter 7 bankruptcy petition on or about March 27, 2000. Crossland Dep. at 257.

225.    Negotiations between Duro-Test and Heico were ongoing when Duro-Test ceased operating. Crossland Dep. at 121, 190-91, 195, 248-49; Sorensen Dep. at 353-54, 370.

226.    Duro-Test pursued a potential refinancing with PPM aggressively toward the end of Duro-Test's operations. Crossland Dep. at 190-91, 247-48. At the time of the closing of the Clifton Plant, PPM was still interested in potential refinancing for Duro-Test. Sorensen Dep. at 371; Crossland Dep. at 249.

227.    During the summer of 1999, had any potential investor been told that Duro-Test would close its facilities, the effect would have been to drive the investor away, or for the investor to lower its price dramatically. Schaechter Dep. at 274.

228.    Any announcement by Duro-Test concerning the closure of its Clifton manufacturing facility would have undermined any interest by Heico and PPM in pursuing a purchase transaction or refinancing with Duro-Test. Sorensen Dep. at 437. Informing PPM that Duro-Test would close its Clifton Plant would have jeopardized the effort to obtain financing. Sorensen Dep. at 355.

229.    WARN Act notices were drafted following the closure of Duro-Test's facilities, buy they were not sent to any Duro-Test employees because no approval to send them out was received from Fleet. Szucs Dep. at 122-23.

**J.      Plaintiffs Have No Knowledge Concerning the Key Allegations of the Complaint**

230.    In their Initial Disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure, plaintiffs Lawrence Sheinberg and Giles Hazel were the only plaintiffs identified as possessing knowledge concerning the allegations of the complaint. See Plaintiffs' Initial Disclosures (Stahl Decl., Exh. C).

231.    In their responses to defendants' Interrogatories, plaintiffs Lawrence Sheinberg and Giles Hazel were the only two plaintiffs identified as possessing knowledge

concerning the allegations of the complaint. See Plaintiffs' Interrogatory Responses (Stahl Decl., Exh. D).

232.    Sheinberg was never a unionized employee of Duro-Test. Sheinberg Dep. at 15.

233.    Sheinberg had no written employment agreement. Sheinberg Dep. at 33-34.

234.    Sheinberg has no knowledge concerning the acquisition of Duro-Test or the ownership structure of Duro-Test other than one meeting following the Acquisition where, according to Sheinberg, Mr. Sorensen announced that "we're one big happy family." Sheinberg Dep. at 58. In one other meeting, Mr. Sorensen introduced himself to Sheinberg and said "Hi. I'm your new boss." Sheinberg Dep. at 58.

235.    Sheinberg received no documents from Sorensen explaining salary or benefits during his employment at Duro-Test. Sheinberg Dep. at 36. Nor did he receive any such document from anyone at Litetronics or at Durolite. Id.

236.    Sheinberg never discussed salary or benefits with Sorensen, with the exception of asking for pension-related information once, after Sheinberg had been unable to obtain information from Duro-Test's HR department. Sheinberg Dep. at 36-37. Sheinberg never discussed his employment with anyone from Litetronics. Sheinberg Dep. at 37.

237.    Sheinberg never received any paychecks from Durolite or from Litetronics. Sheinberg Dep. at 39-40, 64. Nor did he ever receive any personal checks from Robert Sorensen. Sheinberg Dep. at 40.

238.    Sheinberg admitted that prior to 1997, unionized employees and salaried employees at Duro-Test had different health care providers. Sheinberg Dep. at 47-48.

239.    In general, the factory employees at Duro-Test were union employees. Sheinberg Dep. at 75. Sheinberg has no knowledge concerning the terms of employment, benefits or salary of Duro-Test's unionized employees. Sheinberg Dep. at 75.

240.    Sheinberg has no knowledge concerning the factory workers' health insurance. Sheinberg Dep. at 77.

241.    Plant managers, HR personnel, accounting personnel, secretaries and administrative assistants at the Clifton facility were not union employees. Sheinberg Dep. at 84-87. Sheinberg does not know whether sales personnel had any written employment agreements. Sheinberg Dep. at 86.

242.    If salaried people went home early on a snow day, they were paid. If unionized employees of Duro-Test did the same, they were not paid. Sheinberg Dep. at 121.

243.    If a salaried Duro-Test employee went home sick at 9:30 a.m., he or she would be paid for the day. If unionized employees went home before noon, they were not paid for the entire day. Sheinberg Dep. at 121.

244.    Sheinberg's raises were not the same percentage as the unionized employees' raises. Sheinberg Dep. at 122.

245.    The only basis on which Sheinberg would hold Sorensen responsible for any benefits is that "he was CEO of the corporation." Sheinberg Dep. at 92.

246.    The Clifton facility would generally shut down during the last two weeks of July and the first two weeks of August. Sheinberg Dep. at 100-01.

247.    In February 2000, unionized employees were laid off, and there was another group of salaried, non-union individuals who were asked to work two additional weeks, and then the doors closed. Sheinberg Dep. at 97.

248.    Sheinberg found out that the Duro-Test plant was closing when he came to work one day in February 2000 and he was told that the plant was closed. Sheinberg Dep. at 27-28.

249.    There was no written policy governing the amount of severance to which employees were entitled to receive. Sheinberg Dep. at 98-99.

250.    Sheinberg does not know whether terminated Duro-Test employees ever received one week of severance for every year of service. Sheinberg Dep. at 131.

39

251.    Even though Duro-Test deducted funds for health care insurance from the paychecks of Duro-Test employees, Sheinberg asserts that Durolite is responsible for providing health care insurance. Sheinberg Dep. at 137-38.

252.    As far as the Duro-Test health insurance plan was concerned, Sheinberg believes, without any specific facts or any documents, that Duro-Test and Durolite were one and the same. Sheinberg Dep. at 138.

253.    As far as Litetronics' liability is concerned, Sheinberg's theory is as follows: "Durolite was the parent company, okay, and then all other companies under the parent company are responsible for the money collected and the bills that have to be paid." Sheinberg Dep. at 92-93.

254.    Sheinberg worked exclusively on the engineering and production side of Duro-Test. He has no knowledge of how the business side of Duro-Test operated. Sheinberg Dep. at 142-43.

255.    Hazel was not a unionized employee of Duro-Test. Hazel Dep. at 14.

256.    Hazel never heard about this litigation until he was requested to attend his deposition. Hazel Dep. at 39.

257.    Hazel has no facts on which to base any assertion that Sorensen has any liability to plaintiffs. Hazel believes that Sorensen embodies Duro-Test "because he was – he was the – he was the power. What Mr. Sorensen is was what Duro-Test did." Hazel Dep. at 41. Sorensen was the "ultimate decision maker." Hazel Dep. at 41.

258.    John Nugent served as President of Duro-Test, but without providing any facts to support his beliefs, Hazel asserts that the Duro-Test President "was Sorensen's man." According to Hazel, Sorensen was requested by the Board to have somebody else "take some of the day-to-day load off his plate." Hazel Dep. at 43.

259.    Hazel did not know the extent of any of Duro-Test's cash flow problems. Hazel Dep. at 53.

260.     Hazel does not know which individual at Duro-Test was responsible for the 401(k) plan. Hazel Dep. at 70.

261.     Hazel believes that Litetronics purchased Duro-Test. Hazel Dep. at 75. He knows of no facts to support that assertion. Hazel Dep. at 75.

262.     Hazel never worked for Durolite International, which he understands is simply a shell. Hazel Dep. at 127.

263.     Hazel only received checks from Duro-Test. He has no knowledge concerning how deductions from his check were accounted for. Durolite never tendered him a paycheck. Hazel Dep. at 128-29.

264.     Hazel asserts that Sorensen "was Durolite International," although he was unable to offer any facts to support the assertion. Hazel Dep. at 130-31. Sorensen never mentioned anything to Hazel concerning his status with Durolite International. Hazel Dep. at 132.

265.     Hazel cannot describe whether Sorensen was active in the management of Litetronics or Durolite International. Hazel Dep. at 153, 155.

266.     Hazel does not believe that words quoted in Paragraph 27 of the Complaint were Sorensen's words. Hazel Dep. at 153-54.

267.     Hazel has no knowledge as to whether: union employees had the same payroll deductions as non-union employees for their health care plan; whether union and non-union employees had the same 401(k) plan; or whether he received the same level of benefits as unionized employees of Duro-Test. Hazel Dep. at 156-57.

268.     Hazel has no information as to whether anyone ever told him that non-union employees would have the same benefits as union employees. Hazel Dep. at 108. He never discussed the matter with Mr. Sorensen, or with anyone in Duro-Test's management. Hazel Dep. at 108-09. He cannot name any person who ever told him that his benefits would be the same as those offered to unionized employees. Hazel Dep. at 157.

269.    Hazel cannot name anyone at Duro-Test who ever was told that non-union employees would receive the same benefits as their unionized counterparts. Hazel Dep. at 169.

270.    Hazel has no knowledge concerning any valuable assets that were allegedly transferred from Duro-Test to Litetronics. Hazel Dep. at 161.

271.    Hazel does not know who, if anyone, was the fiduciary with respect to the Duro-Test health plan. Hazel Dep. at 163. He does not know if Sorensen was the fiduciary. Id.

272.    Hazel has no knowledge as to whether Sorensen directed Duro-Test or Durolite not to forward monies that were due to Blue Cross under the health insurance plan. Hazel Dep. at 169.

273.    Hazel does not know if Durolite was responsible for payment of any of the benefit plans in existence at Duro-Test. 137-38.

274.    Hazel does not know if Sorensen wrote checks payable to Blue Cross out of his own pocket. Hazel Dep. at 105.

275.    Hazel has no facts on which to assert that Durolite was required to make health insurance payments or 401(k) payments on behalf of Duro-Test employees. Hazel Dep. at 170.

276.    When Hazel was informed of Duro-Test's closing, "the suddenness was certainly a surprise." Hazel Dep. at 52, 55.

277.    Hazel asserts that "Mr. Sorensen was effectively Duro-Test." Hazel Dep. at 105.   According to Hazel, Litetronics is also responsible because "Mr. Sorensen and Litetronics – or Mr.   or Litetronics as Mr. Sorensen effectively controlled Duro-Test. They were the people who bought out Duro-Test Lighting." Hazel Dep. at 105-06.

Dated: June 1, 2004

Respectfully submitted,

**KING, PAGANO & HARRISON**

By: _____

Jeffrey W. Pagano, Esq.
425 Park Avenue
New York, New York 10022
(212) 223-4000

and

**DENOIA & TAMBASCO**

By: _____

Jeffrey W. Pagano, Esq.
501 Main Street
Toms River, New Jersey 08754
(732) 341-1030

Attorneys for Defendants and Third-Party Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2004, I caused a true and correct copy of the foregoing Defendants' Statement of Material Undisputed Facts Pursuant to Local Rule 56.1 of the Civil Rules of the United States District Court for the District of New Jersey to be served upon the following via e-mail and via Federal Express Overnight Delivery, and addressed as follows:

> Robert B. Bodzin, Esq.
> Kleinbard, Bell & Brecker, LLP
> 1900 Market Street, Suite 700
> Philadelphia, Pennsylvania 19103
> Attorneys for Plaintiffs

> Daniel P. Shapiro, Esq.
> Goldberg Kohn Bell Black Rosenbloom &Moritz, Ltd.
> 55 East Monroe Street, Suite 3700
> Chicago, Illinois 60603
> Attorneys for Third-Party Defendant

> Alison L. Galer, Esq.
> Norris, McLaughlin & Marcus
> 721 Route 202/206
> Bridgewater, New Jersey 08807
> Local Counsel for Third-Party Defendant

_____
Gary A. Stahl