# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------x

LAWRENCE SHEINBERG and GILES HAZEL,
on behalf of themselves and others
similarly situated,

        Plaintiffs,

        v.

ROBERT SORENSEN; DUROLITE
INTERNATIONAL, INC.; LITETRONICS
INTERNATIONAL, INC.,

        Defendants and
        Third-Party Plaintiffs,

        v.

FLEET CAPITAL CORPORATION,

        Third-Party Defendant.

-----------------------------------------------------------x

Civil Action No. 00-6041(JLL)

## DECLARATION OF ROBERT C. SORENSEN

        ROBERT C. SORENSEN states as follows pursuant to 28 U.S.C. § 1746 and under penalty of perjury:

        1.    I am one of the defendants in this action. I submit this Declaration as part of defendants' summary judgment motion and, in particular, to provide the Court with background facts and to introduce certain documents into the record. The statements set forth in this Declaration are made upon personal knowledge

        2.    I am 50 years old, and I reside in Burr Ridge, Illinois. I am currently President of defendant Litetronics International Corp. ("Litetronics"). I have approximately 30 years' experience in the lighting industry.

3.    Litetronics is an Illinois corporation that has been in business since 1970. Since its founding, Litetronics has been engaged in the business of manufacturing and marketing various products for the lighting industry.

4.    I became President and owner of Litetronics in the early 1980s.  For approximately 20 years, Litetronics' area of specialty has been the design and manufacture of halogen bulbs and lamps for the commercial lighting industry.  During the same period, Litetronics' customers have consisted mainly of distributors and wholesalers in the lighting industry, as opposed to end users of lighting products.  By the mid-1990s, Litetronics employed approximately 120 people and had annual revenues of approximately $11 million per year.

5.    Duro-Test Corporation ("Duro-Test") is the former employer of the plaintiffs in this lawsuit.  Duro-Test no longer exists.  Duro-Test became a Chapter 7 debtor in March 2000, and its assets were subsequently liquidated.

6.    Duro-Test was founded in the late 1920s.  By the mid-1990s, Duro-Test had become fairly well known in the lighting industry.  In 1995, Duro-Test employed several hundred individuals, principally in New Jersey.  Duro-Test was far larger than Litetronics and, in 1995, had annual sales of approximately $55 million.  However, Duro-Test's sales were declining in the 1990s and its financial position was poor, for several reasons.  Much of Duro-Test's plant and equipment was old.  Duro-Test faced increasing competition, particularly from overseas.  Duro-Test was burdened by significant debt in the mid-1990s, because its prior owners had taken the company "private" in a highly leveraged transaction.  In addition, Duro-Test's manufacturing facility, located in Clifton, New Jersey, was operating significantly below capacity.  Duro-Test's excess capacity persisted throughout the period 1995 through early 2000, when Duro-Test ceased operations.

7.    There were major differences between Duro-Test's and Litetronics' product lines and customer base in the mid 1990's.  Unlike Litetronics, most of the products that Duro-Test manufactured were incandescent light bulbs.  Duro-Test sold its products principally to end users.

8.    In October 1995, Litetronics and Duro-Test participated in a transaction (the "Acquisition") in which they both became subsidiaries of Durolite International, Inc. ("Durolite"), which is also a defendant in this action. Durolite was a holding company that conducted no business of its own, had no employees of its own, and no payroll of its own. As a result of the Acquisition, Durolite became the owner of 100% of the stock of Litetronics and 100% of the stock of Duro-Test.

9.    Following the Acquisition, I owned approximately 32% percent of the stock of Durolite. I held no stock in Duro-Test or in Litetronics. I became CEO of Durolite, Litetronics and Duro-Test.

10.    Between the time of the Acquisition and late January 2000, I was not involved in the day-to-day business activities of Litetronics. I concentrated on developing the business of Duro-Test.

11.    Duro-Test and Litetronics conducted their business separately. Although the two companies were under common ownership, they were not under common management. No employees of Duro-Test worked for Litetronics, and the reverse was also true.

12.    I resigned as CEO of Duro-Test in or about August 1999, when Richard Crossland was appointed as the company's new CEO. From the time of the Acquisition in October 1995 until Duro-Test ceased operations in February 2000, I did not handle or manage any matters relating to payroll for Duro-Test employees or the payment of wages to Duro-Test employees. Those functions were handled by Duro-Test's human resources department, Duro-Test's controller and Duro-Test's CFO. During the same period, I did not attempt to exercise control over funds for the payment of wages for Duro-Test employees, and I never directed Duro-Test, any Duro-Test employee or any other person to withhold payment from, or not to pay wages to Duro-Test employees. No funds for employees' wages ever came into my personal possession. Nor did Durolite or Litetronics ever possess, control or attempt to control any such funds.

3

13.     Between the Acquisition in 1995 and the closure of Duro-Test's business in February 2000, I did not handle or manage any matters relating to the maintenance of health insurance coverage for Duro-Test employees, or the payment of funds to Horizon, which was the administrator for Duro-Test's self-insured health plan. Those functions were handled by Duro-Test's Human Resources department, Duro-Test's controller and Duro-Test's CFO. I never attempted to exercise any control over such matters, and at no time did I direct Duro-Test, any Duro-Test employee or any other person to withhold or not to pay funds to Horizon for the maintenance or provision of health insurance benefits for any Duro-Test employees. No funds relating to the payment for or maintenance of Duro-Test's health insurance plan ever came into my personal possession or control. Neither Litetronics or Durolite possessed or controlled any such funds, or attempted to control any such funds.

14.     Attached to this Declaration as Exhibit 1 is a true and correct copy of a certain Subordinated, Last-Out Participation Agreement (the "Last-Out Participation"), dated June 23, 1999, between Fleet Capital Corp. ("Fleet") and various participants. My signature appears on page 12, just prior to Schedule 1 of the Last-Out Participation. Schedule 1 of the Last-Out Participation accurately reflects the contributions made by the other participants and myself. My contribution was $130,000.00, and the total participation amounted to $1,488,000.00. This amount was paid to Fleet in accordance with the Last-Out Participation in order to eliminate a pre-existing overadvance of $800,000.00 that Fleet had made to Duro-Test under a certain revolving loan that provided Duro-Test with working capital. The Last-Out Participation enabled Duro-Test to draw additional funds under its revolving loan with Fleet and helped Duro-Test to remain in operation during the Summer of 1999.

15.     Attached to this Declaration as Exhibit 2 is a true and correct copy of a Stock Purchase Agreement between World Lighting Investment Co. ("World Lighting") and Durolite, dated January 25, 2000. I formed World Lighting in early 2000 in order to purchase the stock of Litetronics from Durolite. World Lighting is a holding company that conducts no business of its own and has no employees. As set forth in the Stock Purchase Agreement, the

4

purchase price for the stock of Litetronics was $4 million. This purchase price was paid to Fleet, and eliminated Litetronics' indebtedness to Fleet, which amounted to approximately $2.8 million. In addition, the $4 million purchase price provided another $1.2 million that retired another overadvance from Fleet to Duro-Test, and provided additional availability of approximately $400,000 to Duro-Test under its revolving loan with Fleet.

16.   Attached to this Declaration as Exhibit 3 is a true and correct copy of a promissory note from Litetronics to American National Bank and Trust Company of Chicago, dated January 19, 2000. This note, together with related loan documentation, which included my personal guaranty, provided the financing by which World Lighting purchased the stock of Litetronics from Durolite.

17.   Attached to this Declaration as Exhibit 4 is a true and correct copy of a proposal that Heico Acquisitions ("Heico") conveyed to Durolite on or about December 20, 1999 concerning a potential purchase of Duro-Test. Following the receipt of the proposal, Heico conducted due diligence with respect to a potential purchase of Duro-Test. Negotiations with Heico were ongoing on February 18, 2000, when Fleet refused to advance funds for Duro-Test's normal business operations under the Duro-Test revolving loan, which forced Duro-Test to cease its business operations.

18.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Shanghai, People's Republic of China, on May 28, 2004.

ROBERT C. SORENSEN

5

## CERTIFICATE OF SERVICE

I hereby certify that on June **1**, 2004, I caused a true and correct copy of the foregoing Declaration of Robert C. Sorensen, to be served upon the following via e-mail and by depositing a true and correct copy of same with Federal Express for overnight delivery, and addressed as follows:

> Robert B. Bodzin, Esq.
> Kleinbard, Bell & Brecker, LLP
> 1900 Market Street, Suite 700
> Philadelphia, Pennsylvania 19103
> Attorneys for Plaintiffs
>
> Daniel P. Shapiro, Esq.
> Goldberg Kohn Bell Black Rosenbloom &Moritz, Ltd.
> 55 East Monroe Street, Suite 3700
> Chicago, Illinois 60603
> Attorneys for Third-Party Defendant
>
> Alison L. Galer, Esq.
> Norris, McLaughlin & Marcus
> 721 Route 202/206
> Bridgewater, New Jersey 08807
> Local Counsel for Third-Party Defendant

_____
Gary A. Stahl

## SUBORDINATED, LAST-OUT PARTICIPATION AGREEMENT

THIS SUBORDINATED, LAST-OUT PARTICIPATION AGREEMENT (this "Agreement"), dated as of June 23, 1999, is entered into among those individuals and entities identified on Schedule 1 hereto (each a "Participant" and collectively, the "Participants"), Jackson Boulevard Ventures, L.P., an Illinois limited partnership, as agent for the benefit of Participants ("Participant's Agent") and Fleet Capital Corporation, a Rhode Island corporation ("Lender").

## WITNESSETH:

WHEREAS, DuroLite International, Inc., a Delaware corporation, Litetronics International, Inc., an Illinois corporation, Litetronics Technologies, Inc., an Illinois corporation, Litetronics Discharge, Inc., an Illinois corporation, Litetronics Components, Inc., an Illinois corporation, Duro-Test Corporation, a New York corporation, Duro-Test Canada, Inc. a Canadian corporation, and Duro-Test International Corporation, a New Jersey corporation (each a "Borrower" and collectively, the "Borrowers") and Lender are parties to a Loan and Security Agreement dated as of October 31, 1995 (as amended or otherwise modified from time to time, the "Loan Agreement"); and

WHEREAS, Participants have each agreed to purchase a subordinated, last-out, participation interest in certain of the Obligations on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the agreements herein contained, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  All capitalized terms not otherwise defined herein and defined in the Loan Agreement shall have the meanings ascribed to such terms in the Loan Agreement.

2.    Subordinated, Last-Out Participation.

D 40379

(a)    In General.  Lender hereby sells to each Participant, and each Participant hereby purchases from Lender, a subordinated, last-out, participation interest in the amount set forth opposite such Participant's name on Schedule 1 hereto (the aggregate of all such amounts being collectively referred to herein as the "Subordinated Participation") in Lender's interest in (i) the Obligations consisting of Revolving Credit Loans (except as set forth in Paragraph 2(c)), and (ii) all Collateral securing the Obligations, subject to the terms and conditions of this Agreement.  As payment for the Subordinated Participation, each Participant has, concurrently with execution and delivery of this Agreement, paid to Lender the amount set forth opposite such Participant's name on Schedule 1 hereto, in good funds, the aggregate of such amounts representing the full amount of the Subordinated Participation.

(b)    Characterization of Subordinated Participation.  The aforesaid sales of the Subordinated Participation by Lender to Participants is absolute, without recourse, and, except as expressly provided herein, without representation or warranty of any kind by Lender.  Each Participant shall be fully and irrevocably at risk to the extent of its interest in the Subordinated Participation.  This Agreement evidences a sale to Participants of the Subordinated Participation, and does not evidence or create, and shall not be construed as evidencing or creating, an extension of credit from any Participant to Lender, a security issued by Lender, an investment by Participant in Lender, or a partnership, trust, fiduciary relationship, or other legal relationship whatsoever between Lender and any Participant, other than as expressly provided in this Agreement.

(c)    Exclusion of Certain Obligations.  Notwithstanding any provision of this Agreement to the contrary, each Participant shall have an interest only in that portion of the Revolving Credit Loans consisting of principal and interest due with respect to the Subordinated Participation.  No Participant shall have any interest in any other portion of the Obligations, including that portion of the Obligations consisting of Term Loans, fees (including, without limitation, any early termination fee), expense reimbursements or other amounts payable by Borrowers to Lender under the Loan Agreement or any of the other Loan Documents.

3.    Payments.

(a)    General.  All payments received by Lender pursuant to the Loan Documents shall be applied to the Obligations in accordance with the terms of the Loan Documents; provided, however, that each Participant acknowledges and agrees that Lender shall have discretion to allocate amounts received by Lender to the Obligations in such manner as Lender deems appropriate, and that in exercising said discretion, Lender shall allocate such amounts to Obligations other than the Subordinated Participation, and that as long as any Obligations (other than the Subordinated Participation) are due and owing to Lender, Lender shall be entitled to apply any and all amounts received by Lender on account of the Obligations to all of the Obligations (other than the Subordinated Participation but including any Term Loans) before Lender applies any of said amounts to the Subordinated Participation; but provided, further, that so long as no Event of Default under the Loan Agreement has occurred and is continuing, and no Participant is in breach or default of any of its obligations under this Agreement, then each payment of accrued interest received by Lender with respect to the Subordinated Participation shall be promptly forwarded by Lender to Participant's Agent for the benefit of all Participants pursuant to subsection (d) of this Section 3 below.  Anything in this Agreement to the contrary notwithstanding (except as provided in the last proviso to the immediately preceding sentence), Lender shall have no obligation to apply any payments, proceeds of Collateral, distributions in bankruptcy or other amounts received by Lender pursuant to the Loan Agreement, the other Loan Documents or otherwise, to principal or interest on the Subordinated Participation until all of the Obligations (other than Obligations consisting of principal of, and interest on, the Subordinated Participation but including Obligations consisting of principal of, and interest

D 40380

on, the Term Loans) have been indefeasibly paid in full and the Loan Agreement has been terminated.

(b)     Interest Payments.  Subject to the provisions of subsection (a) above, all payments received by Lender which Lender has credited as interest payments with respect to the Obligations shall first be applied to all interest due Lender, and the remainder of said interest payments shall then be applied, on a pro rata basis, to interest due to Participants.

(c)     Principal Payments.  Subject to the provisions of subsection (a) above, all payments received by Lender which Lender has credited as payments of principal with respect to the Obligations shall first be applied to all principal due Lender until such principal has been paid in full, and the remainder of said principal payments shall then be applied, on a pro rata basis, to principal due to Participants; it being the intent of the parties that no Participant shall receive any repayments of principal with respect to the Subordinated Participation unless and until Lender is no longer owed any principal or any other amounts with respect to its interest in the Obligations (other than the Subordinated Participation but including any Term Loans).

(d)     Timing of Payments to Participants.  On the first Business Day of each calendar month ("Interest Settlement Date"), Lender will advise Participant's Agent by telephone, telex, or telecopy of the amount of interest on the Obligations received by Lender and of each Participant's share thereof, with respect to the immediately preceding calendar month.  Provided that each Participant has made all payments required to be made by it under this Participation Agreement, and subject to the provisions of subsections (a) and (b) of this Section 3 above, Lender will pay to Participant's Agent by wire transfer, not later than the fifth (5th) Business Day following the Interest Settlement Date, each Participant's share of such interest, if any.  Each Participant agrees that each interest payments on the Subordinated Participation shall be made by one such single monthly wire transfer from Lender to Participant's Agent pursuant to written wire transfer instructions that Participant's Agent shall provide to Lender.  Not later than the first Business Day following the receipt thereof, Lender will advise Participant's Agent by telephone, telex, or telecopy of the amount of principal received by Lender in which each Participant has an interest.  Provided that each Participant has made all payments required to be made by it under this Participation Agreement, and subject to the provisions of subsection (a) and (c) of this Section 3 above, Lender will pay to Participant's Agent by wire transfer, each Participant's share of all such principal payments received not later than the fifth (5th) Business Day following receipt of such payment.  Participant's Agent agrees that it will remit all payments of principal and interest made to it by Lender with respect to the Subordinated Participation to Participants, as their interests may appear.  Each Participant agrees to indemnify, defend and hold Lender harmless from any liability relating to principal and interest payments on the Subordination Participation made by Lender to Participant's Agent.

D 40381

(e)     Payments Received by Participants from Borrower.     All payments with respect to the Obligations received by any Participant, or any party affiliated with any Participant, at any time, from any source other than Lender as provided herein, shall be immediately forwarded to Lender for application to the Obligations in the manner set forth herein.

4.     Return of Payments.

(a)     If Lender pays an amount to any Participant or to Participant's Agent under this Agreement in the belief or expectation that a related payment has been or will be received by Lender, and such related payment is not received by Lender, then Lender will be entitled to recover such amount from each Participant or from Participant's Agent, and each Participant and Participant's Agent will immediately pay any such amount received by it to Lender, upon Lender's demand, without set-off, counterclaim, or deduction of any kind.

(b)     If Lender is sued or threatened with any suit, claim or action in any bankruptcy or other insolvency proceeding involving any Borrower (i) on account of any alleged preferential or fraudulent transfer received or alleged to have been received, directly or indirectly, from such Borrower or any other Person, which is attributable in whole or in part to the Subordinated Participation, or (ii) relating to the equitable subordination of the Obligations or the recharacterization of any of the Obligations as equity, which is attributable in whole or in part to the Subordinated Participation, then each Participant shall jointly and severally indemnify, defend and hold Lender harmless from any liability arising from such suit, claim or action, including, without limitation, from all expenses, costs and attorneys' fees paid or incurred, or payments made by Lender, in connection therewith.  To the extent that any amounts previously paid in respect of the Obligations are recovered from Lender, such amounts shall be reinstated as part of the Obligations, repayable in accordance with the priorities established herein.

(c)     Each Participant's obligations under this Section 4 are absolute, unconditional, and continuing, and will be unaffected by any one or more of the following: (i) any amendment or waiver of any term of the Loan Agreement or any of the other Loan Documents agreed to or made by Lender in its discretion; (ii) any extension, indulgence, settlement or compromise granted or agreed to by Lender in its discretion in relation to the Obligations; (iii) any release or subordination made by Lender it its discretion of any security for, or any guarantee of, any of the Obligations; (iv) the invalidity, unenforceability, or insufficiency of the Loan Agreement or any of the other Loan Documents; (v) any default by, or insolvency of, any Borrower under the Loan Agreement or any of the other Loan Documents; (vi) any act or omission on Lender's part relating to this Agreement, the Loan Agreement, any of the other Loan Documents, the Obligations or the Collateral; (vii) any failure to give notice to any Participant of any of the foregoing; (viii) any requirement that Lender take any action against any Borrower or against  any of their respective assets; (ix) any defenses at law or in equity which any Participant may have to the full discharge of

-4-

D 40382

any of its obligations under this Agreement, (x) any consent made by Lender in its discretion to the use by any Borrower of cash collateral under § 363 of the Bankruptcy Code in any bankruptcy case of such Borrower, (xi) any extension by Lender of postpetition financing to any Borrower under § 364 of the Bankruptcy Code in any bankruptcy case of such Borrower, (xii) the termination or expiration of this Agreement or the Loan Agreement; or (xiii) any assignment of the Subordinated Participation pursuant to Section 9 below.

     5.    <u>Participant's Acknowledgments, Representations, Warranties, and Covenants.</u>

    (a)    Each Participant hereby acknowledges that Lender has made available to it copies of the Loan Agreement, the other Loan Documents and any other information or documentation that such Participant has requested.

    (b)    Each Participant hereby represents, warrants, and covenants to Lender as follows:

       (i)    This Agreement constitutes the legal, valid and binding obligation of such Participant, and is enforceable in accordance with its terms;

       (ii)    Such Participant's execution of this Agreement and the performance of its obligations hereunder will not require any registration with, notice to, or consent or approval by any federal, state or local governmental or regulatory body;

       (iii)    Such Participant is familiar with transactions of the kind and scope reflected in this Agreement, the Loan Agreement and the other Loan Documents;

       (iv)    Such Participant is a sophisticated investor and has made and will continue to make its own independent investigation and appraisal of the financial condition and affairs of each Borrower, has conducted and will continue to conduct its own evaluation of the Loan Agreement and the other Loan Documents, the Obligations, the Collateral and the creditworthiness of each Borrower and has made its decision to acquire the Subordinated Participation independently and without reliance upon Lender;

       (v)    Such Participant is acquiring the Subordinated Participation for its own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Participant has no present intention of selling, granting any participation in, or otherwise distributing the same;

D 40383

(vi)     Such Participant shall not obtain or seek to obtain any security interest in all or any portion of the Collateral independently of this Agreement;

(vii)    Such Participant is not purchasing the Subordinated Participation on behalf of one or more employee benefit plans, or with proceeds which constitute "plan assets," as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder; and

(viii)   Such Participant acknowledges its receipt of a copy of the Loan Agreement and all of the other Loan Documents requested by such Participant. Such Participant further acknowledges that Lender may possess material information not known to such Participant regarding or relating to any Borrower, any of Affiliates of any Borrower or any of the Collateral, that it has not requested such information, and that Lender shall have no liability whatsoever with respect to non-disclosure of such information, whether before or after the date hereof.

6.      Enforcement.

(a)     Rights of the Parties.  As between Lender and Participants, Lender (prior to an assignment and transfer of the Subordinated Participation to Participant pursuant to Section 9 below) shall have the exclusive right, in Lender's name alone, to carry out the provisions of the Loan Agreement and the other Loan Documents, to enforce and collect the Obligations, to exercise and enforce all rights and privileges granted to Lender under the Loan Agreement and the other Loan Documents, to take or refrain from taking legal action to enforce or protect each Participant's and/or Lender's interests with respect to the Loan Agreement, the other Loan Documents, the Collateral and the Obligations, to consent to the use by any Borrower of cash collateral under § 363 of the Bankruptcy Code in any bankruptcy case of such Borrower, and to extend postpetition financing to any Borrower under § 364 of the Bankruptcy Code in any bankruptcy case of such Borrower.  No Participant shall  have nor seek to exercise any right of legal or equitable redress against any Borrower.  No Participant shall have any voting rights nor consent or approval rights under the Loan Agreement or the other Loan Documents.

(b)     Certain   Actions   Requiring   Participant   Consent. Notwithstanding the foregoing provisions of Section 6(a) or any other provision of this Agreement, Lender will not, without the prior written consent of each Participant:

(i)      Forgive or discharge principal of, or interest payable in respect of the Subordinated Participation; or

(ii)     Decrease the rate of interest payable in respect of the Subordinated Participation.

-6-

D 40384

(c)     <u>Failure to Enforce</u>.  No failure or delay by Lender to exercise any power, right or privilege under this Agreement or under the Loan Agreement or any of the other Loan Documents will impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein.  No single or partial exercise of any such power, right or privilege will preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies of Lender under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available to Lender against any Participant.

7.     <u>Limitation of Liability</u>.

(a)     Lender makes no representations or warranties of any kind, express or implied, and assumes no responsibility or liability whatsoever, with regard to (i) the Loan Agreement, the other Loan Documents or the Obligations or the validity, genuineness, enforceability or collectibility of any of them, (ii) the performance of, or compliance with, any of the terms or provisions of the Loan Agreement or any of the other Loan Documents, (iii) any of the property, books or records of any Borrower, (iv) the validity, enforceability, perfection, priority, condition, value or sufficiency of any of the Collateral or (v) the present or future solvency or financial worth of any Borrower.

(b)     Lender does not, and will not, have any duty, either initially or on a continuing basis, to make any inquiry, investigation, evaluation or appraisal on any Participant's behalf, nor will Lender have any responsibility or liability with respect to the accuracy or completeness of any information provided to any Participant which has been provided to Lender by any Borrower or any other Person.

(c)     Lender will not be deemed to be a trustee or agent for any Participant in connection with this Agreement, the Loan Agreement, the other Loan Documents, the Obligations or the Collateral, nor will Lender be considered to have a fiduciary relationship with any Participant by virtue of this Agreement or any other document or by operation of law.

(d)     Lender may use its sole discretion in administering the Obligations and the Collateral, and in exercising or refraining from exercising any rights or taking or refraining from taking any actions to which Lender may be entitled under this Agreement, the Loan Agreement, the other Loan Documents or applicable law.  In exercising such discretion, Lender may, without incurring any liability to any Participant, rely upon the advice of legal counsel, accountants and other experts, including those retained by any Borrower.

(e)     Lender will not be liable to any Participant for any action or failure to act or any error of judgment, negligence, mistake or oversight on Lender's part or on the part of any of Lender's agents, officers, employees or attorneys; except for such matters resulting from Lender's gross negligence or willful misconduct.

D 40385

-7-

(f)     Lender will not be liable to any Participant for any action or failure of action taken by Lender at any Participant's direction or request or at Participant's Agent's direction or request.

8.     Indemnification.     Each Participant hereby jointly and severally indemnifies Lender against, and agrees to hold Lender harmless from, any and all claims, demands, actions, controversies, suits, obligations, losses, damages, judgments, awards, costs and expenses (collectively, "Losses"), including without limitation, all reasonable attorneys' fees and disbursements and reasonable time charges of in-house counsel of Lender, arising by reason of or resulting from (a) any breach by any Participant of any of such Participant's representations, warranties or covenants contained herein or of any of such Participant's other obligations hereunder, (b) any Losses described in Section 4 above, (c) any Losses relating to, or arising from, the Subordinated Participation or this Agreement, (d) any sale, assignment or transfer of, or grant of a subparticipation in, all or any part of the Subordinated Participation or (e) Lender's following any direction or request of any Participant or of Participant's Agent with respect to the Subordinated Participation.    Each Participant's obligation to indemnify Lender under this Agreement, including, without limitation, under Section 4 hereof, and each Participant's obligation of confidentiality under this Agreement pursuant to Section 12 hereof, will continue notwithstanding any termination or expiration of this Agreement or the Loan Agreement.

9.     Transfer of Subordinated Participation; Termination.     Upon the occurrence of a default by Participant hereunder, Lender shall have the right (but not the obligation) to transfer and assign to Participant's Agent, for the benefit of all Participants, all of Lender's right, title and interest in and to the Subordinated Participation, the Loan Agreement and the other Loan Documents, without recourse, representation or warranty. Upon the expiration or other termination of the Loan Agreement and the repayment in full of the Obligations (other than the Subordinated Participation), Lender shall have the right (and upon the request of all of the Participants, the obligation) to transfer and assign to Participant's Agent for the benefit of all Participants, all of Lender's right, title and interest in and to the Subordinated Participation, the Loan Agreement and the other Loan Documents, without recourse, representation or warranty. At Lender's sole option and election, Lender may terminate this Agreement by payment to Participant's Agent of an amount equal to the then outstanding principal balance of the Subordinated Participation, plus accrued interest to the date of payment. No termination of this Agreement or of the Subordinated Participation shall relieve any Participant from any liability hereunder or for damages, costs and expenses suffered or incurred by Lender as a result of any Participant's breach or default hereunder.

10.     Notices.    Any notices, demands, requests or communications under this Agreement shall be in writing and shall be personally delivered, by facsimile, by hand delivery or by nationally recognized overnight courier to the addresses set forth below the respective parties' signatures hereto. Notices delivered by hand or overnight courier shall be effective when delivered; facsimiled notices shall be effective when sent and confirmed by

D 40386

return transmission. Addresses and facsimile numbers for notices may be changed by any party by written notice to the each other party, given as provided in this Section 10.

11.   Miscellaneous.

(a)   Entire Agreement; Amendments. This Agreement embodies the entire agreement and understanding between Lender and each Participant and supersedes any and all prior agreements and understandings with respect to the subject matter hereof. No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written agreement of Lender, Participant's Agent and each Participant.

(b)   Other Relationships. Lender may make loans or otherwise extend credit to, and generally engage in any kind of debtor-creditor relationship with, each Borrower, or any Affiliate of any of Borrowers, and receive payment on such loans or extensions of credit and otherwise act with respect thereto without accountability to any Participant, in the same manner as if this Agreement did not exist.

(c)   Successors and Assigns. Lender may from time to time grant other participations in the Obligations or assign or transfer the Obligations or any portion thereof to any other Person. Each Participant agrees that it will not (i) sell, assign, transfer, or otherwise dispose of all or any portion of the Subordinated Participation or (ii) grant a sub-participation in all or any portion of the Subordinated Participation. This Agreement shall be binding upon the parties hereto, and inure to the benefit of Lender's successors and assigns.

(d)   Severability. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law. However, in the event any provision of this Agreement is or is held to be invalid, illegal or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement. In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

(e)   Section Titles. Section and subsection titles in this Agreement are included for convenience of reference only and shall have no substantive effect.

(f)   Applicable Law. This Agreement shall be construed in all respects in accordance with and  governed by the laws of the State of Illinois, without giving effect to any conflicts of laws provisions thereof.

(g)   JURISDICTION AND VENUE. WITH RESPECT TO ANY DISPUTES ARISING UNDER THIS AGREEMENT, LENDER, PARTICIPANT'S

D 40387

AGENT AND EACH PARTICIPANT HEREBY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED CHICAGO, ILLINOIS, AND PARTICIPANTS AND PARTICIPANT'S AGENT EACH WAIVE ANY OBJECTION THEY MAY HAVE IN RESPECT OF SUCH DISPUTE ON THE GROUND OF IMPROPER VENUE OR FORUM NON CONVENIENS.

(h)     Counterparts.  This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

12.     Confidentiality.  Each Participant agrees that it shall not disclose or disseminate any information regarding any Borrower, any of the Collateral or the Loan Agreement or any of the other Loan Documents or this Agreement to any Person (other than such Participant's accountants or counsel, regulatory authorities having jurisdiction over such Participant or pursuant to subpoena or similar legal compulsion) without Lender's prior written consent.   The provisions of this Section 12 shall continue notwithstanding any termination or expiration of this Agreement or the Loan Agreement, or any transfer and assignment of the Subordinated Participation pursuant to Section 9 hereof.  Notwithstanding the foregoing, this Section 12 shall not be deemed to apply to or restrict disclosure of information by a Participant that: (a) is or becomes generally available to the public other than as a result of a disclosure by any Participant in violation of this Agreement or by any Borrower in violation of its consent hereto, (b) can be demonstrated to have been within such Participant's possession prior to its being furnished to any Participant by or on behalf of any Borrower (provided that such source was not known by any Participant to be bound by any confidentiality agreement with respect to such information), or (c) is or becomes available to such Participant on a non-confidential basis from a Person other than any other Participant, any Borrower or any Affiliate of any Borrower (provided that such source is not known by any Participant to be bound by any confidentiality agreement with respect to such information).

D 40388

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

FLEET CAPITAL CORPORATION

By: _____

Its: _____

Address:
20800 Swenson Drive
Suite 350
Waukesha, Wisconsin  53186

Attention:  Dennis Rebman
Facsimile No.:  (414) 798-4882

JACKSON BOULEVARD VENTURES, L.P., an
Illinois limited partnership

By: Jackson Boulevard Capital Management, Ltd., an
    Illinois corporation and its general partner

    By _____
        President

Address:
53 West Jackson Boulevard, Suite 400
Chicago, Illinois  60604

Attention:  Paul Duggan
Facsimile No.:  (312) 294-6449

D 40389

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

FLEET CAPITAL CORPORATION

By: _____

Its: _____

Address:
20800 Swenson Drive
Suite 350
Waukesha, Wisconsin  53186

Attention:  Dennis Rebman
Facsimile No.:  (414) 798-4882

JACKSON BOULEVARD VENTURES, L.P., an
Illinois limited partnership

By: Jackson Boulevard Capital Management, Ltd., an
      Illinois corporation and its general partner

      By: _Paul Duggan_____
      President

Address:
53 West Jackson Boulevard, Suite 400
Chicago, Illinois  60604

Attention:  Paul Duggan
Facsimile No.:  (312) 294-6449

D 40390

John Beltramo

Address:
International Home Furnishing
1450 Mitchell Boulevard
Schaumburg, Illinois 60193
Facsimile No.: (847) 985-0133

Michael Schaechter

Address:
Litetronics International
4101 West 123rd Street
Alsip, Illinois 60658
Facsimile No.: (708) 371-0627

James A. Schoke

Address:
17216 Courtland Lane
Boca Raton, Florida 33496
Facsimile No.: (561) 451-2676

Robert C. Sorensen

Address:
DuroLite International, Inc.
9 Law Drive
Fairfield, New Jersey 07004
Facsimile No.: (973) 808-7107

**D 40391**

John Beltramo

Address:
International Home Furnishing
1450 Mitchell Boulevard
Schaumburg, Illinois  60193
Facsimile No.:  (847) 985-0133

Michael Schaechter

Address:
Litetronics International
4101 West 123rd Street
Alsip, Illinois  60658
Facsimile No.:  (708) 371-0627

James A. Schoke

Address:
17216 Courtland Lane
Boca Raton, Florida  33496
Facsimile No.:  (561) 451-2676

Robert C. Sorensen

Address:
DuroLite International, Inc.
9 Law Drive
Fairfield, New Jersey  07004
Facsimile No.:  (973) 808-7107

D 40392

John Beltramo

Address:
International Home Furnishing
1450 Mitchell Boulevard
Schaumburg, Illinois 60193
Facsimile No.: (847) 985-0133

Michael Schaechter

Address:
Litetronics International
4101 West 123rd Street
Alsip, Illinois 60658
Facsimile No.: (708) 371-0627

James A. Schoke

Address:
17216 Courtland Lane
Boca Raton, Florida 33496
Facsimile No.: (561) 451-2676

Robert C. Sorensen

Address:
DuroLite International, Inc.
9 Law Drive
Fairfield, New Jersey 07004
Facsimile No.: (973) 808-7107

D 40393

John Beltramo

Address:
International Home Furnishing
1450 Mitchell Boulevard
Schaumburg, Illinois  60193
Facsimile No.:  (847) 985-0133

Michael Schaechter

Address:
Litetronics International
4101 West 123rd Street
Alsip, Illinois  60658
Facsimile No.:  (708) 371-0627

James A. Schoke

Address:
17216 Courtland Lane
Boca Raton, Florida  33496
Facsimile No.:  (561) 451-2676

Robert C. Sorensen

Address:
DuroLite International, Inc.
9 Law Drive
Fairfield, New Jersey  07004
Facsimile No.:  (973) 808-7107

D 40394

## SCHEDULE 1 TO SUBORDINATED,
## LAST-OUT PARTICIPATION AGREEMENT

| Name of Participant | Amount of Participant's Interest in Subordinated Participation |
|---|---|
| Jackson Boulevard Ventures, L.P. | $1,175,000 |
| John Beltramo | $70,000 |
| Michael Schaechter | $13,000 |
| James A. Schoke | $100,000 |
| Robert Sorensen | $130,000 |

Aggregate Amount of
Subordinated Participation   $1,488,000

D 40395

## CONSENT

The Borrowers each hereby consent to the provisions of the foregoing Subordinated, Last-Out Participation Agreement and agree not to take any action inconsistent therewith.

DUROLITE INTERNATIONAL, INC., a Delaware corporation

By: _____
Its: _____

LITETRONICS INTERNATIONAL, INC., an Illinois corporation

By: _____
Its: _____

LITETRONICS TECHNOLOGIES, INC., an Illinois corporation

By: _____
Its: _____

LITETRONICS DISCHARGE, INC., an Illinois corporation

By: _____
Its: _____

D 40396

-14-

LITETRONICS COMPONENTS, INC., an Illinois
corporation

By: _____
Its: _____
         CEO

DURO-TEST CORPORATION, a New York
corporation

By: _____
Its: _____
         CEO

DURO-TEST CANADA, INC., a Canadian
corporation

By: _____
Its: _____
         CEO

DURO-TEST INTERNATIONAL CORPORATION,
a New Jersey corporation

By: _____
Its: _____
         CEO

D 40397

**DEPOSITION EXHIBIT**

*P58*

*2.19.04 nw*

## STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into on the 25th day of January, 2000, by and between WORLD LIGHTING INVESTMENT CO. (the "Purchaser"), an Illinois corporation with its principal place of business at 4101 West 123rd Street, Alsip, Illinois 60803, and DUROLITE INTERNATIONAL, INC. (the "Seller"), a Delaware corporation with its principal place of business at 200 Broadacres Drive, 3rd Floor, Bloomfield, New Jersey 07003.

### WITNESSETH:

WHEREAS, the Seller is the owner of four hundred eleven (411) shares of Class A common stock, without par value, and two hundred forty-seven thousand (247,000) shares of Class B common stock, without par value, of Litetronics International, Inc. ("Litetronics"), an Illinois corporation, which shares constitute all of the currently issued and outstanding shares of capital stock of Litetronics; and

WHEREAS the Purchaser desires to acquire all of said shares owned by the Seller (the "Shares"), and the Seller desires to sell all of the Shares to the Purchaser, all upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

1.1    Definitions.  The following terms, when used herein and unless the context clearly requires otherwise, shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Business Day" shall mean any day on which the trading of stocks occurs on the New York Stock Exchange.

"Certificate" shall mean a stock certificate evidencing an outstanding share or shares of Litetronics' Class A common stock, without par value, or Class B common stock, without par value.

T:\44138\99797\Stock Purchase Agreement v5.wpd

1

"Person" shall mean any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

Those terms not defined in this Section 1.1 but otherwise defined in this Agreement shall have the meanings ascribed to them as therein set forth.

1.2    Principles of Construction. All section references herein are references to sections in this Agreement, unless otherwise specified.

## ARTICLE II

## SALE AND PURCHASE

2.1    Sale and Purchase. At the Closing (as such term is hereinafter defined), subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell the Shares to the Purchaser, free and clear of any and all security interests, pledges, liens, voting agreements, voting trusts, claims and encumbrances, and the Purchaser hereby agrees to purchase all of said Shares.

2.2    Purchase Price. Subject to the terms of this Agreement, the Purchaser shall pay, in the aggregate, for all of the Shares purchased hereunder, the amount of Four Million Dollars ($4,000,000) (the "Purchase Price").

2.3    Payment of Purchase Price. At the Closing (as such term is hereinafter defined), upon delivery by the Seller to the Purchaser of the Certificate(s) evidencing the Shares, duly endorsed in blank or accompanied by duly executed stock powers, the Purchaser shall pay or cause to be paid to the Seller the full amount of the Purchase Price, said payment to be made by cashier's check, wire transfer or other form of immediately available funds.

2.4    Closing. The closing of the transaction contemplated hereby (the "Closing") shall take place on such date (the "Closing Date"), and at such time and location, as the parties hereto shall hereafter agree upon; provided, however, that, if the Closing does not take place on or before January 21, 2000, either party hereto may thereafter terminate this Agreement upon giving three (3) days prior written notice to the other in accordance with the provisions of this Agreement, and thereafter this Agreement shall be null and void and of no further force or effect. The Closing shall be deemed to be effective at the close of business on December 31, 1999 ("Effective Date").

2.5    Transfer of DuroLite Europe Holdings, Inc. The parties hereto acknowledge and agree that prior to the Closing all of the capital stock of DuroLite Europe Holdings, Inc. ("DuroLite Europe"), a Cayman Islands corporation, currently owned or held by Litetronics shall be transferred by Litetronics to the Seller or an affiliate of the Seller, and the promissory note

D 00914

2

heretofore issued by Litetronics in favor of DuroLite Europe will be cancelled and returned to Litetronics, without further consideration.

2.6   Reconciliation of Intercompany Accounts. Within 30 days after the Closing Date, Seller and Purchaser shall determine the amounts owed by Seller and its subsidiaries (other than Litetronics and its subsidiaries) to Litetronics and the amounts owed by Litetronics and its subsidiaries to Seller and its subsidiaries (other than Litetronics and its subsidiaries) (in both cases, excluding amounts owed under financing arrangements with Fleet Capital Corporation) as of the Effective Date. To the extent such determination reflects that either party owes the other any amounts, the party owed the amounts shall give an invoice to the other for such amounts, such invoice to be paid by the party which owes such amounts within 30 days of being given.

2.7   General Electric Billings. The parties hereto acknowledge that as of the Effective Date Litetronics has paid $ $24,010 ("GE Amount") to Duro-Test Corporation ("Duro-Test"), a wholly owned subsidiary of Seller, for products of General Electric Lighting ("GE") delivered to Litetronics and that Duro-Test owes such amount to GE. Duro-Test irrevocably and unconditionally covenants to pay such amount to GE as soon as commercially reasonable and hereby waives any rights of offset, counterclaim or other defenses it may have do to so.

2.8   Security Interest. To secure payment of any amounts that might be required to be paid by Seller under Section 2.6 above and any or all of the GE Amount that Litetronics or its subsidiaries pay due to the failure or inability of Duro-Test to so pay such amount, Duro-Test hereby grants to Purchaser and any assignee of Purchaser permitted hereunder, subject to the lien of Fleet Capital Corporation ("Lender") under its financing arrangements with Seller and certain of Seller's subsidiaries, a continuing security interest in all of the property of Duro-Test, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, including but not limited to: (a) all Accounts; (b) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, security interests, security deposits and any rights to indemnification; (c) all Inventory; (d) all Goods (other than Inventory), Equipment, vehicles and fixtures; and (e) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Duro-Test's books and records relating to any of the foregoing. "Account," "Account Borrower," "Chattel Paper," "Documents," "Equipment," "General Intangibles," "Goods," "Instruments," and "Inventory" shall have the respective meanings assigned to such terms, as of the date of this Agreement, in the Illinois Uniform Commercial Code. The aforesaid security interest of Purchaser shall be fully subordinated to the lien position of Lender under the aforesaid financing arrangement and be expressly subject to a complete standby to Lender rights, all pursuant to documentation in form and substance satisfactory to Lender as evidenced by its written approval thereof. Duro-Test hereby agrees to execute UCC-1 financing statements and such instruments as Purchaser shall reasonably require to perfect and maintain perfection of the security interest granted herein and Purchaser shall have all of the

rights and remedies of a secured party under the Uniform Commercial Code and other applicable law.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES BY SELLER

The Seller hereby represents and warrants, at the date hereof and as of the Closing Date, to the Purchaser as follows:

3.1    Ownership. The Seller owns and will, as of the Closing,  own, beneficially and of record, four hundred eleven (411) shares of Litetronics Class A common stock, without par value, and two hundred forty-seven thousand shares of Class B common stock, without par value. all of which, as of the Closing, shall be free and clear of all security interests, pledges, liens, voting agreements, voting trusts, claims and encumbrances. The Shares, which constitute all of the currently issued and outstanding shares of capital stock of Litetronics, are all duly authorized, validly issued, fully paid and nonassessable. There are no shares of capital stock of Litetronics of any other class authorized. There are no outstanding subscriptions, options, warrants, rights (except shareholder preemptive rights), calls, convertible securities or other agreements or commitments of any character relating to the issued or unissued capital stock or other securities of Litetronics obligating Litetronics to issue any securities of any kind.  To the knowledge of Richard J. Crossland, Duro-Test has good and marketable title to all of its assets, free and clear of all security interests, liens, claims and encumbrances, other than the security interest and lien of Fleet Capital Corporation and the security interest and lien granted to Purchaser pursuant to Section 2.8 (Mr. Crossland's knowledge is limited to security interests, liens. claims and encumbrances imposed since September 1, 1999).

3.2    Authority. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Seller and its subsidiaries other than Litetronics and its subsidiaries (Seller and such subsidiaries are hereafter collectively referred to as the "Seller Companies") have the requisite power and authority to enter into and perform their respective obligations under this Agreement and all agreements and transactions being executed, delivered or entered into by the Seller Companies in connection herewith ("Seller's Ancillary Documents"), and the execution, delivery and performance of this Agreement and the Seller's Ancillary Documents by the Seller Companies, and the consummation of the transaction contemplated thereby, have been duly authorized by all necessary corporate action.  Furthermore, this Agreement and Seller's Ancillary Documents constitute the legal, valid and binding obligation of the Seller Companies that are party hereto and thereto, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws, and subject to general principles of equity.

3.3    Brokerage Commissions. All negotiations relating to this Agreement and the transaction contemplated thereby have been and will be carried on by the Seller directly with the

D 00916          4

Purchaser, its counsel, accountants and other representatives in such a manner as not to give rise to any claim against the Purchaser or any of its subsidiaries or affiliates for any brokerage commission, finder's fee, investment advisor's fee or other like payment in connection with said transaction.

3.4    No Violations.  Neither the execution, delivery nor performance of this Agreement or Seller's Ancillary Documents by the Seller Companies will violate, be a default or an event of acceleration, or create grounds for termination, under the terms or provisions of any contract, agreement, indenture, judgment or regulatory order or the like to which any of the Seller Companies is a party or by which any of the Seller Companies is bound, or whereby timely performance by the Seller Companies according to the terms of this Agreement or Seller's Ancillary Documents may be prohibited, prevented or delayed.

3.5    Other Representations and Warranties.  Litetronics is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois. No consent, authorization. order or approval of, or filing or registration with, any governmental authority or other person is required for or in connection with the execution and delivery by the Seller Companies of this Agreement or Seller's Ancillary Documents and the consummation by the Seller Companies of the transaction contemplated hereby and thereby.  Neither the execution and delivery of this Agreement or the Seller's Ancillary Documents by the Seller Companies, nor the consummation by the Seller Companies of the transaction contemplated hereby or thereby, will conflict with or result in a breach of any of the terms, conditions or provisions of any Seller Company Articles of Incorporation or by-laws, or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or governmental authority or of any arbitration award to which any Seller Company is a party or by which any Seller Company is bound.

3.6    Litigation.  To the knowledge of Richard J. Crossland, there is not any litigation pending or threatened against or involving Litetronics, its subsidiaries and other affiliates, or their respective businesses, assets or facilities which has, or if decided adversely to Litetronics, such subsidiaries or affiliates, would be likely to have. a material adverse effect upon the financial condition, business, assets, facilities, properties or business prospects of Litetronics, such subsidiaries or affiliates.

3.7    Knowledge.  Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that (a) any and all actual knowledge (without giving effect to imputed knowledge) that Robert C. Sorensen ("Sorensen") or Michael Schaecter ("Schaecter") with respect to the Seller and Litetronics, and the subsidiaries and affiliates of the Seller and Litetronics, is irrebuttably deemed to be the knowledge of, the Purchaser, inasmuch as Sorensen and Schaecter are currently executive officers and key insiders of the Seller, the Purchaser or Litetronics and (b) no representation or warranty is being given by Seller in this Agreement or any of Seller's Ancillary Documents as to Duro de Mexico S.A. de C.V..

D 00917

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES BY THE PURCHASER

The Purchaser hereby represents and warrants to the Seller, at the date hereof and as of the Closing Date, as follows:

4.1     Organization and Authority.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois.  The Purchaser has the requisite power and authority to enter into and perform its obligations under this Agreement and all agreements and transactions being executed, delivered or entered into by the Purchaser or Litetronics (hereinafter collectively referred to as the "Purchaser Companies") in connection herewith ("Purchaser's Ancillary Documents"), and the execution, delivery and performance of this Agreement and Purchaser's Ancillary Documents by the Purchaser Companies and the consummation of the transaction contemplated hereby and thereby, have been duly authorized by all necessary corporate action.  Furthermore, this Agreement and Purchaser's Ancillary Documents constitutes the legal, valid and binding obligation of the Purchaser Companies that are party hereto and thereto, enforceable in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws, and subject to general principles of equity.

4.2     No Violations.  Neither the execution, delivery nor performance of this Agreement or Purchaser's Ancillary Documents by the Purchaser Companies will violate, be a default or an event of acceleration, or create grounds for termination, under the terms or provisions of any contract, agreement, indenture, judgment or regulatory order or the like to which the Purchaser Companies are a party or by which the Purchaser Companies are bound, or whereby timely performance by the Purchaser Companies according to the terms of this Agreement or Purchaser's Ancillary Documents may be prohibited, prevented or delayed.

4.3     Brokerage Commissions.  All negotiations relating to this Agreement and the transaction contemplated thereby have been and will be carried on by the Purchaser directly with the Seller, its counsel, accountants and other representatives in such a manner as not to give rise to any claim against the Seller or any of its subsidiaries or affiliates for any brokerage commission, finder's fee, investment advisor's fee or other like payment in connection with said transaction.

4.4     Investment Representations.  In connection with the Purchaser's receipt of the Shares pursuant to this Agreement, the Purchaser hereby makes the following representations and warranties to, and covenants with the Seller, on behalf of the Purchaser and all of its officers, directors and shareholders (the Purchaser and all such other persons being sometimes hereinafter referred to collectively as the "Investors"), provided that nothing set forth in this Section 4.4 shall limit or otherwise modify the representations, warranties and covenants of the Seller set forth in this Agreement or in any other agreement or instrument delivered or entered into in connection with the transaction contemplated by this Agreement: