(a)     The Investors understand and acknowledge that the Shares have not been registered under the federal Securities Act of 1933, as amended (the "Act"), or under any state "Blue Sky" laws, and that the Shares are being sold to the Purchaser in reliance upon certain exemptions from the registration requirements of the Act and such laws. Therefore, the Shares cannot be sold unless subsequently registered under the Act and such state laws or an exception from such registration is available.

(b)     The person signing this Agreement on behalf of the Purchaser has due authority to execute the same and such other instruments or documents as may be reasonably required by the Seller in connection with the Purchaser's acquisition of the Shares.

(c)     The Investors recognize that the purchase of the Shares by the Purchaser is a speculative venture involving a high degree of financial risk. The Purchaser is in a financial position to hold the Shares indefinitely and to sustain a complete loss of the Purchaser's investment therein. The Purchaser is not constrained or required presently to dispose of the Shares to satisfy any existing or contemplated debt or undertaking, nor does the Purchaser anticipate that any such constraint or requirement will arise in the future.

(d)     The Purchaser is acquiring the Shares solely for the Purchaser's own account, for investment, and not with a view toward the distribution or resale of such securities.

(e)     The Investors have the requisite knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of this investment by the Purchaser.

(f)     The Investors understand that no federal or state agency has recommended or endorsed the purchase of the Shares as an investment or passed on the adequacy or accuracy of the information set forth in any documents relating thereto or to the Shares.

(g)     The Investors have been advised to consult with the Investors' own attorney regarding legal matters concerning Litetronics and the information and materials supplied to the Investors in regard thereto, and to consult with the Investors' own tax advisor regarding the tax consequences of an investment by the Purchaser in Litetronics. All information that the Investors have provided to the Seller concerning the Investors and the Investors' financial position is correct and complete as of the date hereof, and if there should be any material change in such information prior to the sale of the Shares to the Purchaser, the Investors will immediately provide such information to the Seller.

(h)     The Investors represent that each of the stockholders of the Purchaser meets one or more of the following criteria:

(1)     the stockholder has an individual net worth or a joint net worth with his or her spouse of greater than $1,000,000;

(2)     the stockholder had an individual net income in excess of $200.000 in each of the last two years and he or she reasonably expects an income in excess of $200,000 in the current year;

(3)     the stockholder had joint income with his or her spouse in excess of $300,000 in each of the last two years and he or she reasonably expects a joint income in excess of $300,000 in the current year; and/or

(4)     the stockholder is a corporation, limited liability company, partnership, trust (other than an employee benefit plan) or unincorporated association, all of the stockholders, partners, grantors or members of which meet one or more of the criteria set forth in items (i), (ii) and (iii) immediately above.

## ARTICLE V

### CLOSING DELIVERIES

5.1     The Purchaser's Deliveries at Closing. At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Seller the following items:

(a)     a copy of the resolution of the Board of Directors of the Purchaser authorizing and approving this Agreement and Purchaser Ancillary Documents and the consummation of the transaction contemplated thereby, and all things ancillary thereto, certified as of the Closing Date by the Secretary or any Assistant Secretary of the Purchaser;

(b)     a copy of the Articles of Incorporation of the Purchaser certified by the Secretary of State of Illinois as of or just prior to the Closing Date;

(c)     a copy of the By-Laws of the Purchaser, certified as of the Closing Date by the Secretary or any Assistant Secretary of the Purchaser;

(d)     a Certificate of Incumbency for the Purchaser, dated as of the Closing Date, executed by the President, the Secretary or any Assistant Secretary of the Purchaser;

(e)     a Good Standing Certificate for the Purchaser, issued by the Secretary of State of Illinois as of the Closing Date;

(f)     such other documents as the Seller or the Seller's counsel shall reasonably request, including, without limitation, a counterpart of each of the agreements attached hereto as Exhibits B, C-1, C-2 and D, duly executed on behalf of the Purchaser and/or the Purchaser's subsidiaries or affiliates, as the case may be; and

(g)     the funds required to be paid to the Seller at Closing for the Shares.

5.2    <u>The Seller's Deliveries at Closing</u>. At the Closing, the Seller shall deliver, or cause to be delivered, to the Purchaser the following items:

(a)    a copy of the resolution of the Board of Directors of the Seller authorizing and approving this Agreement and Seller's Ancillary Documents and the consummation of the transaction contemplated thereby and all things ancillary thereto, certified as of the Closing Date by the President of the Seller;

(b)    a copy of the Certificate of Incorporation of the Seller, certified by the Secretary of State of Delaware as of, or just prior to, the Closing Date;

(c)    a copy of the Articles of Incorporation of Litetronics, certified by the Secretary of State of Illinois as of, or just prior to, the Closing Date:

(d)    a copy of the By-Laws of the Seller, certified as of the Closing Date by the President of the Seller;

(e)    a Certificate of Incumbency for the Seller, dated as of the Closing Date, executed by the President of the Seller;

(f)    a Good Standing Certificate for the Seller, issued by the Secretary of State of Delaware as of the Closing Date;

(g)    a Good Standing Certificate for Litetronics, issued by the Secretary of State of Illinois as of the Closing Date;

(h)    the Certificate(s), duly endorsed or accompanied by duly executed stock powers capable of transferring the same to the Purchaser;

(i)    such other documents as the Purchaser or the Purchaser's counsel shall reasonably request, including, without limitation, a counterpart of each of the written agreements attached hereto as Exhibits B, C-1, C-2 and D, duly executed on behalf of the Seller and/or the Seller's subsidiaries or affiliates, as the case may be;

(j)    the promissory note referred to in Section 2.5 hereof, marked cancelled;

(k)    evidence, satisfactory to all parties, of the transfer of all of the issued and outstanding capital stock of DuroLite Europe by Litetronics to the Seller or an affiliate of the Seller at or prior to the Closing Date;

(l)    the executed written consent of Fleet Capital Corporation ("Fleet") to consummation of the transaction contemplated hereby, including a release of Litetronics and its subsidiaries from any and all current debt obligations to Fleet, and a release of any and all

D 00921

collateral held by Fleet, or against which Fleet holds a lien of any kind, which collateral belongs to Litetronics or its subsidiaries;

  (m) the executed, written consent of Baker Fentress and Company to consummation of the transaction contemplated hereby;

  (n) Letter of Direction from Seller to Purchaser regarding payment of the Purchase Price to Fleet; and

  (o) Wire transfer instructions from Fleet regarding payment of Purchase Price.

## ARTICLE VI

## ADDITIONAL COVENANTS OF THE PARTIES

  6.1 Cooperation. The Seller and the Purchaser will fully and promptly cooperate with each other and their respective counsel and accountants in connection with any steps to be taken as part of their obligations under this Agreement.

  6.2 Publicity. The parties hereto will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transaction contemplated thereby and shall not issue any such press release or make any such public statement without the prior written consent of the other party, (which shall not be unreasonably withheld), except as may be required by law.

  6.3 Non-Solicitation. The parties hereto agree that for a period of three and one-half (3 ½ ) years after the Closing, neither Duro-Test or its subsidiaries or affiliates, on the one hand, nor Litetronics or its subsidiaries or affiliates, on the other, will solicit purchases of any products or services by any customers of the other party who or which are not also customers of the party seeking the sale. For purposes hereof, a person or entity shall be considered to be a "customer" of DuroTest or its subsidiaries or affiliates or Litetronics or its subsidiaries or affiliates if any of such companies has, respectively, made one or more sales of products or services to such person or entity at any time during 1998 or 1999.

  6.4 Hiring.

  (a) The parties hereto agree that for a period of three and one-half (3 ½ ) years after the Closing, (i) neither the Seller nor any of its subsidiaries or affiliates will hire or engage, as an employee, consultant, independent contractor or otherwise, any person or entity who or which is or was a sales representative of the Purchaser or Litetronics, or the subsidiaries or affiliates of either, until a minimum of nine (9) months has elapsed from the time such person or entity ceased to be engaged as a sales representative of the Purchaser or Litetronics, or any of the subsidiaries or affiliates of either; and (ii) neither the Purchaser nor Litetronics, nor any of the

D 00922

subsidiaries or affiliates of either, will hire or engage, as an employee, consultant, independent contractor or otherwise, any person or entity who or which is or was a sales representative of the Seller, or any of its subsidiaries or affiliates until a minimum of nine (9) months has elapsed from the time such person or entity ceased to be engaged as a sales representative of the Seller or its subsidiaries or affiliates.

(b)     The parties hereto further agree that for a period of three and one-half (3 ½ ) years after the Closing, (i) neither the Seller nor any of its subsidiaries or affiliates will hire or engage, as an employee, consultant, independent contractor or otherwise, any person or entity who or which served or was engaged by the Purchaser or Litetronics, or the subsidiaries or affiliates of either, in any business capacity other than as a sales representative until a minimum of one (1) year has elapsed from the time such person or entity ceased to be affiliated in such manner with the Purchaser or Litetronics, or the subsidiaries or affiliates of either; and (ii) neither the Purchaser nor Litetronics, nor the subsidiaries or affiliates of either, will hire or engage as an employee, consultant, independent contractor or otherwise, any person or entity who or which is or was served or was engaged by the Seller or any of its subsidiaries or affiliates in any business capacity other than as a sales representative until a minimum of one (1) year has elapsed from the time such person or entity ceased to be affiliated in such manner with the Seller or any of its subsidiaries or affiliates.

(c)     Notwithstanding the provisions or subsections 6.4(a) and 6.4(b) above, in the event any such person or entity ceased to be affiliated with the Seller, the Purchaser or Litetronics, or their respective subsidiaries or affiliates, as the case may be, because of a termination or discharge initiated respectively by the Seller, the Purchaser or Litetronics, or their respective subsidiaries or affiliates, without cause, then the restrictions of subsection 6.4(a) or 6.4(b), as the case may be, shall not apply to such person or entity. For purposes hereof, the term "cause" shall mean that such person or entity was terminated or discharged as a consequence of such person's or entity's illegal or immoral behavior.

6.5     Confidential Information.

(a)     The parties hereto acknowledge that because of their current business affiliation, each of them, as well as their respective subsidiaries, affiliates, officers, directors, shareholders and employees, has considerable confidential and proprietary knowledge regarding the other and the other's subsidiaries and affiliates and the current and proposed business operations thereof. Accordingly, the parties hereto agree that from and after the closing date hereof, neither of them, nor their respective subsidiaries, affiliates, officers, directors, shareholders or employees will make any use of the confidential or proprietary information that it has of the other, or the other's subsidiaries or affiliates, or their respective business operations, unless, in any such case, (i) the entity whose confidential or proprietary information is in question consents in writing to such use, (ii) such confidential or proprietary information is published or otherwise made known to the general public by the owner thereof; or (iii) such confidential or proprietary information is required by a court or other governmental authority to be disclosed, in which case the party required to disclose same shall give prompt written notice to the party whose confidential or

proprietary information is required to be disclosed. For purposes hereof, "confidential or proprietary information" shall include, but not be limited to, trade secrets, patents, trademarks, tradenames, copyrights, computer software and programming, business methods, customer names and lists, financial information, product specifications and designs, cost and pricing lists, employee names and information, vendor lists and each and every other item of intellectual property belonging to the respective parties or Litetronics. Nothing contained in this Section 6.5 shall preclude either party or its subsidiaries or affiliates from using general knowledge and experience accumulated either before or after the 1995 acquisition of Duro-Test.

(b)    Notwithstanding the foregoing, attached hereto as Exhibit A is a list of those items of confidential or proprietary information belonging to the Seller or Litetronics, as the case may be, with respect to which permission for cross-use by the others is hereby granted by the owner thereof, which exhibit identifies each such item, the period of use of each such item and the consideration and other terms negotiated by the parties or Litetronics for such use.

6.6    Inspection of Records. The Seller, on the one hand, and the Purchaser, on the other hand, and their respective subsidiaries and affiliates, shall each retain and make their respective books and records (including expired insurance policies and work papers in the possession of their respective accountants) available for inspection by the other party, or by its duly accredited representatives, for reasonable business purposes at all reasonable times during normal business hours, for a seven (7) year period after the Closing Date, with respect to all matters involving or affecting Litetronics and its subsidiaries occurring prior to and relating to the Closing, and the historical financial condition, assets, liabilities, operations and cash flows of Litetronics and its subsidiaries including, without limitation, matters affecting Litetronics due solely to its affiliation with Seller and the other Seller Companies. As used in this Section 6.6, the right of inspection includes the right to make extracts or copies. The representatives of a party inspecting the records of the other party shall be reasonably satisfactory to the other party.

6.7    Seller's Indemnification Obligations. Seller shall indemnify, save and keep Purchaser, its institutional lenders, Litetronics and their respective successors and permitted assigns (each a "Purchaser Indemnitee" and collectively the "Purchaser Indemnitees") forever harmless against and from all costs, damages, expenses, losses, claims and liabilities sustained or incurred by any Purchaser Indemnitee, including, without limitation, reasonable attorneys' fees, as a result of or arising out of or by virtue of any inaccuracy in, breach of, or failure to comply with, any representation and warranty, covenant or obligation made by Seller to Purchaser herein.

6.8    Purchaser's Indemnification Obligations. Purchaser shall indemnify, save and keep Seller and the other Seller Companies, its institutional lenders, Litetronics and their respective successors and permitted assigns (each a "Seller Indemnitee" and collectively the "Seller Indemnitees") forever harmless against and from all costs, damages, expenses, losses, claims and liabilities sustained or incurred by any Seller Indemnitee, including, without limitation, reasonable attorneys' fees, as a result of or arising out of or by virtue of any

inaccuracy in. breach of, or failure to comply with, any representation and warranty, covenant or obligation made by Purchaser to Seller herein.

## ARTICLE VII

## MISCELLANEOUS

7.1      Governing Law.  All questions concerning the construction, validity and interpretation of this Agreement, and the performance of the obligations imposed by this Agreement, shall be governed by the internal laws of the State of Illinois applicable to contracts made and wholly to be performed in such State without regard to conflicts of laws.

7.2      Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned, in whole or in part, by either of the parties hereto without the prior written consent of the other party hereto, and any purported assignment in violation hereof shall be void and of no force or effect; provided, however, that either party may collaterally assign its rights under this Agreement to its, or its affiliates', institutional lenders and a Purchaser may assign its rights hereunder to Litetronics, and either party herety may assign its rights to an acquiror of all or substantially all of the assets of such party, including through a merger or other business combination having a similar effect, provided that the acquiror assumes the assignor's obligations under this Agreement and that such assignment shall not relieve the assignor of its obligations hereunder.

7.3      Amendment and Modification.  The parties hereto may by written agreement signed by each of the parties (a) extend the time for the performance of any of the obligations or other acts of the parties hereto; (b) waive any inaccuracies in the representations or warranties contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with or modify, amend or supplement any of the conditions, covenants, agreements, representations or warranties contained in this Agreement, or waive or modify performance of any of the obligations of either of the parties hereto that are for the benefit of the waiving party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

7.4      Notices.  All notices, requests, demands, waivers, consents and other communications hereunder shall be in writing, shall be delivered either in person, by telegraphic, facsimile or other electronic means (so long as such transmission is followed up within one Business Day by deposit in the mails as certified or registered mail, return receipt requested), by overnight air courier or by certified or registered mail, return receipt requested, and shall be deemed to have been duly given and to have become effective (i) upon receipt if delivered in person or by telegraphic, facsimile or other electronic means calculated to arrive on any Business

Day prior to 6:00 p.m. local time. at the address of the addressee, or on the next succeeding Business Day if delivered on a non-Business Day or after 6:00 p.m., local time, (ii) one (1) Business Day after having been delivered to an air courier for overnight delivery, or (iii) three (3) Business Days after having been deposited in the mails as certified or registered mail, return receipt requested, all fees prepaid. directed to the parties at the following addresses (or at such other address as shall be given in writing by a party hereto):

        (a)     If to the Seller, to:

> DuroLite International, Inc.
> 200 Broadacres Drive
> 3rd Floor
> Bloomfield. New Jersey 07003
> Attn:  President
> Telecopier: (973) 893-8327

> with a copy to:

> Schwartz, Cooper, Greenberger & Krauss Chartered
> 180 N. LaSalle Street
> Suite 2700
> Chicago. Illinois 60601
> Attn: Robert Dunn Glick
> Telecopier: (312) 782-8416

        (b)     If to the Purchaser, to:

> World Lighting Investment Co.
> 4101 West 123rd Street
> Alsip, Illinois 60803
> Attn:  President
> Telecopier: (708) 371-0627

> with a copy to:

> Greenberg Traurig. LLP
> 227 West Monroe Street
> Suite 3500
> Chicago, Illinois 60606
> Attn: Paul K. Morton
> Telecopier No.: (312) 456-8412

   7.5    Headings. The captions and headings of articles and sections appearing in this Agreement have been inserted solely for convenience of reference and shall not be considered a

part of this Agreement nor shall any of them affect the meaning or interpretation of this Agreement or any of its provisions.

7.6    Entire Agreement.  This Agreement and any documents executed by the parties pursuant to this Agreement and referred to therein constitute the entire understanding and agreement of the parties hereto and supersede all other prior agreements and understandings, written or oral, relating to such subject matter among the parties hereto.  This Agreement and every representation, warranty, covenant, agreement and provision hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.7    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement unless the consummation of the transaction contemplated hereby is adversely affected thereby.

7.8    Further Instruments.  The parties hereto will, at the Closing, execute and deliver such further instruments as may be reasonably requested by either party hereto that are necessary to or appropriate with respect to the consummation of the transaction contemplated by this Agreement.

7.9    Counterparts.  This Agreement and any amendments thereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

7.10 ·  Survival of Representations, Warranties and Covenants.  Except as otherwise expressly provided herein, the representations, warranties and covenants contained in this Agreement shall not be extinguished by, but shall survive, the Closing.  The obligations of the respective covenantors under Sections 6.3, 6.4(a) and (b) shall cease to be in effect with respect to such covenantor if either of the Supply Agreements (attached as Exhibits C-1 and C-2), as a result of the other party's bankruptcy, assignment for the benefit of creditors or similar proceeding under state or federal insolvency laws (and in the case of an involuntary proceeding, if such proceeding is not dismissed could be terminated, whether or not such termination provision in either of the Supply Agreements is enforced, deemed unenforceable or modified by a bankruptcy court or other court or arbitration panel of competent authority.

7.11   Expenses; Transfer Taxes.  Each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the negotiation, preparation, execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby, including, without limitation, attorneys', accountants' and other professional fees and expenses.  The Seller shall pay the cost of all sales, use, excise and transfer taxes, if any, which may be payable in connection with the transaction contemplated hereby.

7.12   Arbitration.

(a)   If any dispute, claim or controversy shall arise between the parties hereto as to any issue relating to this Agreement (a "Dispute"), such Dispute shall be referred to and settled by the arbitration procedures set forth in the remainder of this Section 7.12, which may be requested upon the application of either party hereto.

(b)   It is expressly agreed that the arbitration hearings, if any, shall be held in Chicago, Illinois and any such dispute, claim or controversy shall be referred to and settled by such arbitration before a panel of three arbitrators (acting by majority vote), one to be chosen by Seller, one to be chosen by Purchaser, and the third to be chosen by the arbitrators chosen by Seller and Purchaser.  Such arbitration shall be conducted and governed in accordance with the rules of the American Arbitration Association and the United States Arbitration Act, 9 U.S.C. §1-16, and any decision, order or finding ("Award") rendered by the arbitrators appointed in accordance with such rules, shall be final and binding upon the parties hereto and judgment upon the Award rendered by the arbitrators may be entered in any court having proper jurisdiction. The arbitrators, if they deem that the matter requires it, are authorized to award to the party whose contention is sustained such sums as they shall deem proper to compensate said party for the time and expenses (including reasonable attorneys' fees) incident to the proceedings and, if arbitration was demanded without reasonable cause, he may also award damages for delay. The arbitrators may assess the cost of arbitration equally or in other percentages to the parties hereto. The arbitrators shall determine their own reasonable compensation in accordance with the rules specified above and shall assess such compensation to either or both parties as hereinabove provided.

(c)   The arbitrators may take whatever interim measures they deem necessary, including injunctive relief and measures for the protection or conservation of property.  Such interim measures may take the form of an interim award.  A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate set forth herein.

D 00928

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first hereinabove written.

The Purchaser:

WORLD LIGHTING INVESTMENT CO.

By:_____
                                    President

ATTEST:

By:_____
                        Secretary

The Seller:

DUROLITE INTERNATIONAL, INC.

By:_____
                                    President

ATTEST:

By:_____
                        Secretary

T:\44138\99797\Stock Purchase Agreement v5.wpd

17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first hereinabove written.

The Purchaser:

WORLD LIGHTING INVESTMENT CO.

By:_____
                        President

The Seller:

DUROLITE INTERNATIONAL, INC.

By:_____
                        President

The undersigned Investors hereby ratify and confirm, as of the date of the above Stock Purchase Agreement and as of the Closing Date, all of the representations, warranties and covenants given by them in Section 4.4 above, and each of them hereby agrees to be bound thereby.

WORLD LIGHTING INVESTMENT CO.

By: _____
                                    President

_____

_____

_____

The undersigned hereby ratifies, as of the date of the above Stock Purchase Agreement and as of the Closing Date, all of the terms and provisions of said Stock Purchase Agreement affecting, or purporting to affect, the undersigned, and the undersigned hereby agrees to be bound thereby, including, without limitation, Sections 2.6, 2.7, 2.8 and 6.3 through and including 6.6.

DURO-TEST CORPORATION

By: _____
        Title: _____

T:\44138\99797\Stock Purchase Agreement v5.wpd

D 00931

18

The undersigned Investors hereby ratify and confirm, as of the date of the above Stock Purchase Agreement and as of the Closing Date, all of the representations, warranties and covenants given by them in Section 4.4 above, and each of them hereby agrees to be bound thereby.

WORLD LIGHTING INVESTMENT CO.

By: _____
                            President

_____

_____

_____

The undersigned hereby ratifies, as of the date of the above Stock Purchase Agreement and as of the Closing Date, all of the terms and provisions of said Stock Purchase Agreement affecting, or purporting to affect, the undersigned, and the undersigned hereby agrees to be bound thereby, including, without limitation, Sections **2.6,** 2.7, 2.8 and 6.3 through and including 6.6.

DURO-TEST CORPORATION

By: _R J Cossel_____
      Title: _____



**American National Bank**
and Trust Company of Chicago

| PROMISSORY NOTE (SECURED) |
| --- |

**$4,000,000.00**              **Chicago, Illinois**              January 19, 2000
Due January 19, 2002

FOR VALUE RECEIVED, the undersigned (jointly and severally if more than one) ("Borrower"), promises to pay to the order of **American National Bank and Trust Company of Chicago** ("Bank"), at its principal place of business in Chicago, Illinois or such other place as Bank may designate from time to time hereafter, the principal sum of FOUR MILLION AND NO/100 DOLLARS, or such lesser principal sum as may then be owed by Borrower to Bank hereunder, which sum shall be due and payable on January 19, 2002.

Borrower's obligations and liabilities to Bank under this Note, and all other obligations and liabilities of Borrower to Bank (including without limitation all debts, claims and indebtedness) whether primary, secondary, direct, contingent, fixed or otherwise, including those evidenced in rate hedging agreements designed to protect the Borrower from the fluctuation of interest rates, heretofore, now and/or from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under this Note, any agreement, instrument or document heretofore, now or from time to time hereafter executed and delivered to Bank by or on behalf of Borrower, or by oral agreement or operation of law or otherwise shall be defined and referred to herein as "Borrower's Liabilities."

The unpaid principal balance of Borrower's Liabilities due hereunder shall bear interest from the date of disbursement until paid, computed at a daily rate equal to the daily rate equivalent of 0.00% per annum (computed on the basis of a 360-day year and actual days elapsed) in excess of the rate of interest announced or published publicly from time to time by Bank as its prime or base rate of interest (the "Base Rate"); provided, however, that in the event that any of Borrower's Liabilities are not paid when due, the unpaid amount of Borrower's Liabilities shall bear interest after the due date until paid at a rate equal to the sum of the rate that would otherwise be in effect plus 3%.

The rate of interest to be charged by Bank to Borrower shall fluctuate hereafter from time to time concurrently with, and in an amount equal to, each increase or decrease in the Base Rate, whichever is applicable.

Accrued interest shall be payable by Borrower to Bank on the same day of each month, and at maturity, commencing with the last day of February, 2000, or as billed by Bank to Borrower, at Bank's principal place of business, or at such other place as Bank may designate from time to time hereafter. After maturity, accrued interest on all of Borrower's Liabilities shall be payable on demand.

Borrower warrants and represents to Bank that Borrower shall use the proceeds represented by this Note solely for proper business purposes and consistently with all applicable laws and statutes.

To secure the prompt payment to Bank of Borrower's Liabilities and the prompt, full and faithful performance by Borrower of all of the provisions to be kept, observed or performed by Borrower under this Note and/or any other agreement, instrument or document heretofore, now and/or from time to time hereafter delivered by or on behalf of Borrower to Bank, Borrower grants to Bank a security interest in and to the following property: (a) all of Borrower's now existing and/or owned and

hereafter arising or acquired monies, reserves, deposits, deposit accounts and interest or dividends thereon, securities, cash, cash equivalents and other property now or at any time or times hereafter in the possession or under the control of Bank or its bailee for any purpose; (b) **all business assets of Borrower pursuant to Loan and Security Agreement of even date herewith, as amended from time to time, by and between Borrower and Bank;** and (c) all substitutions, renewals, improvements, accessions or additions thereto, replacements, offspring, rents, issues, profits, returns, products and proceeds thereof, including without limitation proceeds of insurance policies insuring the foregoing collateral (all of the foregoing property is referred to herein individually and collectively as "Collateral").

Regardless of the adequacy of the Collateral, any deposits or other sums at any time credited by or payable or due from Bank to Borrower, or any monies, cash, cash equivalents, securities, instruments, documents or other assets of Borrower in the possession or control of Bank or its bailee for any purpose, may be reduced to cash and applied by Bank to or setoff by Bank against Borrower's Liabilities.

Borrower shall execute and deliver to Bank, at any time upon Bank's demand, all agreements, instruments, documents and other written matter that Bank may request, in form and substance acceptable to Bank, to perfect and maintain perfected Bank's security interest in the Collateral or any additional collateral. Borrower agrees that a carbon, photographic or photostatic copy, or other reproduction, of this Note or of any financing statement, shall be sufficient as a financing statement.

Bank may take, and Borrower hereby waives notice of, any action from time to time that Bank may deem necessary or appropriate to maintain or protect the Collateral, and Bank's security interest therein, and in particular Bank may at any time after an Event of Default (i) transfer the whole or any part of the Collateral into the name of the Bank or its nominee, (ii) collect any amounts due on Collateral directly from persons obligated thereon, (iii) take control of any proceeds and products of Collateral, and/or (iv) sue or make any compromise or settlement with respect to any Collateral. Borrower hereby releases Bank from any and all causes of action or claims which Borrower may now or hereafter have for any asserted loss or damage to Borrower claimed to be caused by or arising from: (a) Bank's taking any action permitted by this paragraph; (b) any failure of Bank to protect, enforce or collect in whole or in part any of the Collateral; and/or (c) any other act or omission to act on the part of Bank, its officers, agents or employees, except for willful misconduct, or gross negligence.

The occurrence of any one of the following events shall constitute a default by the Borrower ("Event of Default") under this Note: (a) if Borrower fails to pay any of Borrower's Liabilities when due and payable or declared due and payable (whether by scheduled maturity, required payment, acceleration, demand or otherwise) and such failure continues for five (5) days after written notice by Bank to Borrower; (b) if Borrower fails or neglects to perform, keep or observe any term, provision, condition, covenant, warranty or representation contained in this Note or any of the Other Agreements and such failure continues for thirty (30) days after written notice; (c) occurrence of a default or Event of Default under any of the Other Agreements heretofore, now or at any time hereafter delivered by or on behalf of Borrower to Bank which continues beyond the notice or cure period applicable thereto, if any; (d) occurrence of a default or an Event of Default under any agreement, instrument or document heretofore, now or at any time hereafter delivered to Bank by any guarantor of Borrower's Liabilities or by any Person which has granted to Bank a security interest or lien in such Person's real or personal property to secure the payment of Borrower's Liabilities which continues beyond the notice or cure period applicable thereto, if any; (e) if the Collateral or any other of Borrower's assets are attached, seized, subjected to a writ, or are levied upon or become subject to any lien or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not discharged or dismissed within thirty (30) days; (f) if a notice of lien, levy or assessment is filed of record or given to Borrower with

respect to all or any of Borrower's assets by any federal, state, local department or agency; (g) if Borrower or any guarantor of Borrower's Liabilities becomes insolvent or generally fails to pay or admits in writing its inability to pay debts as they become due, if a petition under Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower or any such guarantor, if Borrower or any such guarantor shall make an assignment for the benefit of creditors, if any case or proceeding is filed by or against Borrower or any such guarantor for its dissolution or liquidation, if Borrower or any such guarantor is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs, but if any petition or proceedings are initiated involuntarily against any Guarantor of Borrower's Liabilities or Borrower, then it shall not be an Event of Default until the expiration of sixty (60) days after the filing of such involuntary proceeding, if such proceeding remains pending; (h) the death or incompetency of Borrower or any guarantor of Borrower's Liabilities, or the appointment of a conservator for all or any portion of Borrower's assets or the Collateral; (i) the revocation, termination, or cancellation of any guaranty of Borrower's Liabilities without written consent of Bank; (j) if a contribution failure occurs with respect to any pension plan maintained by Borrower or any corporation, trade or business that is, along with Borrower, a member of a controlled group of corporations or controlled group of trades or businesses (as described in Sections 414(b) and (c) of the Internal Revenue Code of 1986 or Section 4001 of ERISA) sufficient to give rise to a lien under Section 302(f) of ERISA; (k) if Borrower or any guarantor of Borrower's Liabilities is in default in the payment of any obligations, indebtedness or other liabilities to any third party and such default is declared and is not cured within the time, if any, specified therefor in any agreement governing the same; or (l) if any material statement, report or certificate made or delivered by Borrower, any of Borrower's partners, officers, employees or agents or any guarantor of Borrower's Liabilities is not true and correct.

Upon the occurrence of an Event of Default, at Bank's option, without notice by Bank to or demand by Bank of Borrower: (i) all of Borrower's Liabilities shall be immediately due and payable; (ii) Bank may exercise any one or more of the rights and remedies accruing to a secured party under the Uniform Commercial Code of the relevant jurisdiction and any other applicable law upon default by a debtor; (iii) Bank may enter, with or without process of law and without breach of the peace, any premises where the Collateral is or may be located, and may seize or remove the Collateral from said premises and/or remain upon said premises and use the same for the purpose of collecting, preparing and disposing of the Collateral; and/or (iv) Bank may sell or otherwise dispose of the Collateral at public or private sale for cash or credit, provided, however, that Borrower shall be credited with the net proceeds of any such sale only when the same are actually received by Bank.

Upon an Event of Default, Borrower, immediately upon demand by Bank, shall assemble the Collateral and make it available to Bank at a place or places to be designated by Bank which is reasonably convenient to Bank and Borrower.

All of Bank's rights and remedies under this Note are cumulative and non-exclusive. The acceptance by Bank of any partial payment made hereunder after the time when any of Borrower's Liabilities become due and payable will not establish a custom or waive any rights of Bank to enforce prompt payment hereof. Bank's failure to require strict performance by Borrower of any provision of this Note shall not waive, affect or diminish any right of Bank thereafter to demand strict compliance and performance therewith. Any waiver of an Event of Default hereunder shall not suspend, waive or affect any other Event of Default hereunder. Borrower and every endorser waive presentment, demand and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension or renewal of this Note, and hereby ratify and confirm whatever Bank may do in this regard. Borrower further waives any and all notice or demand to which Borrower might be entitled with respect to this Note by virtue of any applicable statute or law (to the extent permitted by law).

D41133

Borrower agrees to pay, immediately upon demand by Bank, any and all costs, fees and expenses (including reasonable attorneys' fees, costs and expenses) incurred by Bank (i) in enforcing any of Bank's rights hereunder, and (ii) in representing Bank in any litigation, contest, suit or dispute, or to commence, defend or intervene or to take any action with respect to any litigation, contest, suit or dispute (whether instituted by Bank, Borrower or any other person) in any way relating to this Note, Borrower's Liabilities or the Collateral, and to the extent not paid the same shall become part of Borrower's Liabilities.

This Note shall be deemed to have been submitted by Borrower to Bank and to have been made at Bank's principal place of business. This Note shall be governed and controlled by the internal laws of the State of Illinois and not the law of conflicts.

Advances under this Note may be made by Bank upon oral or written request of any person authorized to make such requests on behalf of Borrower ("Authorized Person"). Borrower agrees that Bank may act on requests which Bank in good faith believes to be made by an Authorized Person, regardless of whether such requests are in fact made by an Authorized Person. Any such advance shall be conclusively presumed to have been made by Bank to or for the benefit of Borrower. Borrower does hereby irrevocably confirm, ratify and approve all such advances by Bank and agrees to indemnify Bank against any and all losses and expenses (including reasonable attorneys' fees) and shall hold Bank harmless with respect thereto.

TO INDUCE BANK TO ACCEPT THIS NOTE, BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO BANK'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS NOTE SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SAID CITY AND STATE. BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST BORROWER BY BANK IN ACCORDANCE WITH THIS PARAGRAPH.

BORROWER IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, COUNTERCLAIM OR PROCEEDING (I) TO ENFORCE OR DEFEND ANY RIGHTS UNDER OR IN CONNECTION WITH THIS NOTE OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH, OR (II) ARISING FROM ANY DISPUTE OR CONTROVERSY IN CONNECTION WITH OR RELATED TO THIS NOTE OR ANY SUCH AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT, AND AGREES THAT ANY SUCH ACTION, SUIT, COUNTERCLAIM OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

4101 W. 123rd Street
Alsip, Illinois 60658

LITETRONICS INTERNATIONAL, INC.
an Illinois corporation

By: _____

FEIN:_____

Its:_____   C E O

seh\litetronics\noteps.doc\nonsed

D41134

Page 4 of 4

# HEICO ACQUISITIONS

152 W. 57TH STREET, 55TH FLOOR
NEW YORK, NY 10019

TELEPHONE: (212) 459-1831
FACSIMILE: (212) 459-1813

Monday, December 20, 1999

**Mr. Robert Sorenson**
**Chairman & Chief Executive Officer**
**Durolite International, Inc.**
**9 Law Drive**
**Fairfield, NJ 07004**

**Dear Bob:**

1. Proposed Transaction. This letter confirms our proposal whereby Heico Acquisitions, or an affiliate thereof ("Buyer"), shall form a new entity ("Newco") to acquire from Durolite International, Inc. ("Seller") all tangible and intangible assets of, and all tangible and intangible assets used by (the "Assets") Duro-Test International, Inc.

2. Purchase Price. In return for the Assets, Buyer will provide Seller consideration in the following amount:
   - $32 million in cash.
   - Up to $8 million in assumed Accounts Payable and Accrued Expenses incurred in the ordinary course of operations.

3. Access to Information; Confidentiality. As promptly as possible after the execution of this letter by Buyer, Seller will provide to Buyer and its business, legal and accounting representatives and advisors full access to the business, financial and other records and information relating to Seller and its assets, liabilities and business, and will make available all such information and personnel as may reasonably be requested in connection therewith. If the transaction contemplated herein is not consummated, none of the parties hereto will disclose, nor will they permit any of their employees, agents or representatives to disclose to any third party (except to the extent publicly available or obtainable from independent sources or required by law) any confidential information obtained from the other party.

4. Conditions. Buyer's obligations to consummate the purchase of the assets as described herein are subject to the satisfaction of each of the following conditions:
   a. The completion by the Buyer of its business, accounting, and legal review of the assets, liabilities, and business of Seller to the satisfaction of Buyer, in its sole discretion,
   b. The execution of a definitive agreement (the "Definitive Agreement") for the transactions contemplated herein which shall contain the terms and conditions set

D 01279

forth herein and other provisions customarily contained in agreements of this nature,

c. The execution of Non-Competition Agreements between Newco and all entities owned, operated or controlled by Robert Sorenson and

d. The obtaining of any consents of third parties and any governmental approvals that may be necessary.

5. Publicity. No party to this letter shall issue any press release or other publicity concerning the proposed transaction without the prior approval of the other party, except as otherwise required by law.

6. Expenses. Each party shall be responsible for paying its own expenses relating to the proposed transaction.

7. Exclusivity. For a period of 60 days from the signing of this letter Heico will have the exclusive right to evaluate and consummate an acquisition of the Assets. During this time, Seller agrees that it will neither solicit nor accept offers to buy any material part of its business.

8. Counterparts. This letter may be executed in one or more counterparts.

If the above accurately sets forth your proposal, please acknowledge by signing the enclosed duplicate copy of this letter and returning it to Buyer at 152 W. 57th Street, 55th Floor, New York, New York 10019, not later than Friday, December 31,1999.

Sincerely,

HEICO ACQUISITIONS

By:

AGREED
as of the date first
above written.

Durolite International, Inc.

By: _____

Its: _____

D 01280