IN THE UNITED STATES DISTRICT COURT U.S. DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RECEIVED-CLERK

2004 JUL -9 P 2: 28

| | |
|---|---|
| LAWRENCE SHEINBERG and GILES HAZEL, on behalf of themselves and others similarly situated, | CIVIL ACTION |
| v. | |
| ROBERT SORENSEN; DUROLITE INTERNATIONAL, INC.; LITETRONICS INTERNATIONAL, INC., | No. 2:00cv6041 (KSH) |
| v. | |
| FLEET CAPITAL CORPORATION | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

Lawrence Sheinberg ("Sheinberg") of Howell, New Jersey had been employed for 36

years as a Senior Engineer by Duro-Test Corp. ("Duro-Test"), a Clifton, New Jersey

manufacturer of high quality light bulbs.  On Friday, December 18, 2000, Sheinberg and

hundreds of other Duro-Test employees were abruptly advised by Duro-Test management to go

home and never return to work.  The Duro-Test employees were given no notice of the intention

of Duro-Test to permanently close its doors.

Sheinberg and the other Duro-Test employees did not know on that bleak Friday that

instant unemployment was one of many problems they would soon face.  Sheinberg and other

Duro-Test employees soon learned that many of their paychecks would bounce, Duro-Test

would not pay the wages and commissions owed to them, and Duro-Test had failed to fund the

self-insured health plan paid for by Sheinberg and his fellow employees out of payroll

deductions.  Sheinberg, who had been hospitalized months earlier for gall bladder surgery

believing he had health insurance, learned he was now responsible for payment of more than $40,000.00 in medical bills he had incurred for his surgical procedure.

Left with no health insurance, no jobs, and no practical sources for new health insurance, the union employees of Duro-Test filed a lawsuit in this Court seeking a positive injunction requiring Duro-Test, its parent company, Durolite International, Inc. ("Durolite"), its sister company Litetronics International, Inc. ("Litetronics") and Robert Sorensen ("Sorensen"), Chief Executive Officer and Chairman of Durolite, to resume and continue funding the Duro-Test Health Plan.[1]  Following a hearing on March 16, 2000, which included testimony from Sheinberg and Sorensen,[2] the Honorable Dickinson R. Debevoise found "Sorensen was a fiduciary under ERISA and Litetronics was the instrument he used to violate his fiduciary duties," and ordered the Defendants to continue to fund the union employees' health plan.[3]  Defendants appealed the March 16, 2000 decision which was affirmed by the United States Court of Appeals for the Third Circuit.[4]

Sheinberg and Giles Hazel ("Hazel") filed this action on behalf of themselves and approximately 350 other non-union employees, seeking damages for the wages, commissions and benefits owed to them, but not paid, by Duro-Test.[5]  Rather than pay the sums clearly owed to the Duro-Test employees, defendants have utilized their resources to vigorously oppose class

---

[1]  District Three, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO, et al. v. Robert Sorensen, et al. 00CV971 (hereinafter "District Three litigation").

[2]  The Record of the District Three litigation appears in the Appendix in Support of Plaintiff's Summary Judgment Motion (hereinafter "App.") as Exhibit "A".  The District Three litigation was brought only on behalf of the union employees.  Sheinberg, a non-union employee, testified as a fact witness on behalf of the union.  All references in this memorandum to the District Three Record are identified by the page number of the record followed by a lower-case "a".

[3]  The Opinion of Judge Debevoise appears at App. Exhibit "B".

[4]  App. Exhibit "C".

[5]  App. Exhibit "D".

certification. On March 5, 2002, the Honorable Katharine S. Hayden entered an Order granting the Motion for Class Certification of Plaintiffs and accepting the report and recommendation of Magistrate Judge Hedges dated March 5, 2002 certifying Plaintiffs' class of approximately three hundred fifty (350) non-union employees of Duro-Test, including (1) salaried management personnel; (2) engineers; (3) commissioned sales employees; and (4) support staff.[6] Since that time, the parties have conducted discovery on the substantive claims of Plaintiffs, all of whom were victims of an unconscionable plan by the Defendants to close Duro-Test's Clifton, New Jersey plant without notice, which resulted in the loss of, unpaid wages and commissions as well as the group health benefits for which the Duro-Test employees had contributed through payroll deduction.

Plaintiffs allege that the Defendants are liable for: (1) violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et. seq.; (2) violations of the Workers Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 et. seq. The undisputed evidence warrants the granting of Summary Judgment on each of Plaintiffs' claims against all Defendants.[7] Sorensen was a "fiduciary" under ERISA, 29 U.S.C. 1002(21)(A)(i), because he exercised actual control over the plan assets in the form of employee contributions, through payroll deduction to the Duro-Test health care plan. Sorensen agreed to a "lockbox" arrangement with Durolite's lender, Fleet Bank, by which Sorensen abdicated his control of the plan assets and unlawfully gave control to Fleet. By so doing, Sorensen permitted the plan assets to be available to pay Duro-Test's creditors. Moreover, Sorensen founded a new corporation, World Lighting, for the sole purpose of paying off debts owed by Litetronics, without setting

---

[6] App. Exhibit "E".

[7] While Plaintiffs' Complaint also makes common law claims for conversion and claims under the New Jersey Wage Payment Statute, summary judgment is not sought with regard to those counts.

aside any funds whatsoever for the employees' health plan. Because of his self-dealing with regard to the Litetronics transaction, Sorensen breached the duty of loyalty and prudence required by 29 U.S.C. 1104(a) (1) (A) and (B). In addition, Sorensen breached his fiduciary duty under ERISA by not making certain that the health care plan assets, i.e., the employee contributions, were kept separate from other corporation funds. 29 C.F.R. 2510.3-102(a).

The imposition of liability on Durolite and Litetronics is based primarily upon their status as a "single employer" of the class. The undisputed evidence demonstrates that all of the activities of Duro-Test and Litetronics were controlled directly by the Board of Directors of Durolite whose Chairman was Sorensen. Sorensen and Durolite ignored any distinction between the various corporate entities, engaged in transactions between the entities which were clearly conflicts of interest, and, as to Sorensen himself, stripped Durolite and its subsidiaries of valuable assets at the expense of the class members and for his own benefit.

Plaintiffs seek for themselves and the class: compensatory damages for unpaid wages and commissions; reimbursement of deductions from their paychecks for health insurance benefits which were never passed onto the intended recipient, Horizon Blue Cross; payment of health care costs that should have been reimbursed under the self-insured health plan, prejudgment interest, applicable statutory penalties, attorneys' fees and costs, and such other relief this Court deems appropriate against Defendants, Sorensen, Durolite, and Litetronics.[8]

---

[8]   The assets of Litetronics were acquired by Sorensen on January 25, 2000, 24 days prior to the closing of the Duro-Test plant. To the extent Litetronics is found liable, the responsibility flows through to Sorensen who owns 100% of the stock of World Lighting Investment Co., a company formed by Sorensen solely for the purpose of acquiring the assets of Litetronics.

## II.   STATEMENT OF FACTS

### A.   The Duro-Test Litetronics Merger

Duro-Test for many years was in the business of manufacturing and marketing lighting products, primarily incandescent and fluorescent bulbs and fixtures.  (96a).  Litetronics was also in the business of manufacturing and marketing lighting products, primarily halogen bulbs and fixtures.  Duro-Test sold mostly to end-users through a large nationwide sales force while Litetronics sold mostly to distributors.  Sorensen had been involved in the lighting business for about 25 years and had acquired Duro-Test.  In November of 1995, Duro-Test, Sorensen and Litetronics became part of a unified venture.  Durolite, a newly developed corporation, acquired the stock of both Duro-Test and Litetronics of which Sorensen had been a 56% shareholder.  Sorensen became a 32% shareholder of Durolite, and its largest shareholder.  Sorensen was empowered to designate three of Durolite's seven member Board of Directors, including himself.  Beginning in November 1995, Sorensen served as Chairman and Chief Executive Officer of Durolite, Duro-Test and Litetronics.

On November 3, 1995, to great fanfare, Sorensen, the owner of Litetronics (a Duro-Test competitor for many years), announced to Duro-Test's employees that he had acquired Duro-Test[9] and had "merged" the two companies by creating a holding company, Durolite, that would operate both Duro-Test and Litetronics as wholly owned subsidiaries.  (286a-291a).  Sorensen stated the merger "brings together two leaders in the global specialty lighting industry with complimentary manufacturing and marketing capabilities."  (291a).  Sorensen's announcement

---

[9]   Until February 18, 2000, when it abruptly closed its Clifton, New Jersey facility without any notice to its employees, Duro-Test was in the business of manufacturing and marketing lighting products, primarily incandescent and fluorescent bulbs and fixtures.  Duro-Test had a long and proud history of marketing high quality lighting products through a large nationwide sales force.  Many of Duro-Test's employees, including the class representatives, were employed by Duro-Test for more than 30 years.

of the new regime to Duro-Test employees in November of 1995 emphasized how close the relationship would be, "I am pleased to announce that we have merged Duro-Test Corporation and Litetronics International, Inc. Duro-Test has a fine heritage and so does Litetronics. Together we will build the best lighting company in the world." (291a). Sorensen also assured the Duro-Test workforce that the two companies would enjoy a bright future under his leadership as the Chairman and CEO of Duro-Test, Durolite and Litetronics. (286a-291a).

### B.    The Duro-Test Health Insurance Plan

As part of its employee benefits package, Duro-Test provided group health coverage to its employees (the "Plan") through a plan administered by Horizon Blue Cross Shield of New Jersey ("Horizon Blue Cross").[10] The Plan is an "employee welfare benefit plan" as defined by Section 3(1) of ERISA, 29 U.S.C. § 1002(1). Sorensen, Durolite and Duro-Test exercised discretionary authority or control regarding the management and/or disposition of the assets of the Plan and thus, at all relevant times, were fiduciaries within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21).

Both prior to and subsequent to the merger, Duro-Test had a self-funded health insurance plan. Sorensen Dep.,[11] p. 112 lines 4-21. Duro-Test deducted monies on a weekly basis from the paychecks of Duro-Test employees to pay for the health benefits. (123a-124a). However, the Duro-Test employees did not know that the health plan was self-insured and never received a document describing the plan. (126a-127a). Sorensen was aware of the plan. Sorensen Dep., p. 112 lines 4-11, p. 115 line 18. As CEO of Durolite, Sorensen received copies of Duro-Test budgets. Sorensen Dep., p. 297 lines 8 and 15. Sorensen knew that the Duro-Test plan was a

---

[10]   The Plan was an "employee welfare benefit plan" under Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

[11]   The deposition transcript of Robert Sorensen, App. Exhibit "F".

self-insured health plan and that Duro-Test employees had amounts deducted from their gross compensation to pay for health coverage. Sorensen Dep., p. 331 line 17, p. 332 line 18. (234a).

Duro-Test's self-insurance arrangement with Horizon Blue Cross provided that Horizon would administer claims, allow employees the use of its provider network, and then seek reimbursement weekly from Duro-Test for claims paid by Horizon, in addition to administrative fees.[12] Sorensen, however, had arranged with Fleet that all Duro-Test revenues, including the health plan contributions deducted from employees' paychecks, went into a "lockbox" controlled by Fleet. (201a-206a). On January 10, 2000, unbeknownst to any of Duro-Test's employees, the company stopped reimbursing Horizon for claims paid, even though employees continued to contribute up to $41.79 per week into the plan. As a result, Horizon then terminated its administrative services agreement with Duro-Test, when Duro-Test was $188,084.32 in arrears in payment of administrative fees. (65a-85a). Employees who sought medical treatment prior to the plan's termination, in the belief that they were insured, are now facing financial ruin because Duro-Test's abandonment of the plan has resulted in their being informed they are personally responsible for payment.

The employees were never provided with a summary plan description, or a disclosure that the Plan was self-funded by Duro-Test. Instead, the employees were told that the health plan was "provided" by Horizon Blue Cross and Blue Shield. In a memorandum to its employees, Duro-Test boasted that "in keeping with our commitment to provide economic and personal security for you and your family, Duro-Test Corporation is proud to offer you and your eligible dependents a very fine optional health and life insurance program." (306a). Each week a

---

[12] "Generally speaking, the Agreement provided that Horizon BCBSNJ will administer benefits of Duro-Test's self-insured ERISA plan by allowing Duro-Test participants to have access to Horizon BCBSNJ's provider networks and utilization services and by prepaying claims for which it is reimbursed by Duro-Test." (64a). A copy of the Administrative Services Agreement appears at 67a-84a.

deduction was taken from each participant's pay for this insurance. Under a service agreement with Horizon, Duro-Test was required to reimburse Horizon the amount of claims paid on behalf of its participants during the previous calendar week. It was also required to pay administrative charges monthly. (67a-84a).

In 1997, Duro-Test entered into a collective bargaining agreement with its union employees which stated that "in the event that Duro-Test chooses to close a plant, Duro-Test would provide continued medical insurance for separated employees for a period not to exceed three months. (35a-40a). Historically, non-union employees were advised by Duro-Test management that they would receive at least the same level of benefits offered to union employees.

On February 23, 2000, Horizon Blue Cross terminated its administrative contract with Duro-Test and advised Duro-Test employees who were receiving unemployment insurance payments per month that they could purchase their own health insurance at a cost of $11,000.00 per month. (126a-127a, 86a-86a). One employee incurred between $20,000 and $40,000 in unreimbursed medical bills while another incurred over $40,000 in unreimbursed medical bills. (136a-141a).

## C.    Sorensen Consolidates Duro-Test and Litetronics Operations and Operates Both Companies Through Durolite

The acquisition of Duro-Test was highly leveraged and risky considering Duro-Test sales had been declining in recent years. Durolite's financial condition was poor in November of 1995 and it continued to deteriorate. Its principal lender was Fleet Bank ("Fleet"), which held a security interest in much of its assets. At the time of the merger, Duro-Test, Litetronics and Durolite entered into an agreement with Fleet that all receipts would be delivered to a Fleet

lockbox. Sorensen Dep., p. 80 line 17, p. 84 line 18, Exhibit P-95.[13] The lockbox agreement

was approved by the board of Durolite, Duro-Test and Litetronics. Sorensen Dep., p. 86 lines

11-15. Sorensen knew that all monies that came into the Durolite companies came into the

lockbox. Sorensen Dep., p. 87 line 2, p. 88 line 8.

Following the merger, Sorensen decided how to "strategically align business units" of

Duro-Test and Litetronics. Sorensen was chief decision-maker for Durolite, Duro-Test and

Litetronics and decided what in his view was best for each entity. Sorensen Dep., p. 38 line 2,

p. 39 line 22. Sorensen had "the ultimate decision-making authority on behalf of Duro-Test and

Litetronics." Sorensen Dep., p.57 lines 8-17.

Neither Duro-Test nor Litetronics had functioning boards of directors. Both Duro-Test

and Litetronics were operated exclusively by Durolite at the direction of its CEO, Robert

Sorensen. Richard Crossland, the later titular CEO of Duro-Test testified:

> Q.    When you became CEO of Duro-Test, did you also become
> a member of the board of Duro-Test?
>
> A.    I believe I did, but the board of Duro-Test was not a
> functioning board. All board matters were done at the Durolite
> level.
>
> Q.    And was that true with respect to Litetronics as well?
>
> A.    As far as I know, yes.
>
> Q.    So you never attended a board meeting of Duro-Test
> separate and apart from Durolite?
>
> A.    No, no. We would cover Duro-Test issues in our Durolite
> board meetings as significant things related to that entity, but we
> didn't go off and have a separate meeting.
>
> Q.    And was that true with respect to Litetronics as well?
>
> A.    Yes.

---

[13]   App. Exhibit "I".

Crossland Dep.,[14] p.40 lines 7-23.

Durolite's board of directors met quarterly at the offices of Litetronics in Alsip, Illinois. Crossland Dep., p.13 line 2, p. 17 line 23. Sometimes, Lou Mattina, who was CFO of Duro-Test, would present financial  information about Litetronics to the Durolite board. Crossland Dep., p. 19 line 1, p.20 line 1. There was no division in the Durolite board meetings between business devoted to Duro-Test and business devoted to other Durolite subsidiaries. Sorensen Dep., p. 286 lines 10 and 15. (212a).

### D.    Sorensen Begins Transferring Assets Between Duro-Test And Litetronics

After 1995, Litetronics discontinued purchasing its bulbs from outside suppliers and purchased all of its incandescent bulbs from Duro-Test. Schaechter Dep.,[15] p. 17. There was no arms-length negotiation on the sale of product from Duro-Test to Litetronics which only paid Duro-Test its manufacturing costs plus five percent. In fact, Duro-Test never negotiated the price that Litetronics paid for Duro-Test lamps. Crossland Dep., p. 92 line 18, p. 93 line 10. Sorensen admitted that Duro-Test charged its thousands of other customers "much higher prices" than Litetronics. (189a-222a). Duro-Test's plan manager explained that these cut-rate sales were made because, "Litetronics was a part of Duro-Test." (101a).

In 1996, Duro-Test's profitable Las Vegas sign-lamp division ("Las Vegas bulbs") was "transferred" to Litetronics, along with a lighting showroom business. (99a-102a). However, Duro-Test continued to incur all expenses of manufacturing the Las Vegas bulbs, "selling" the bulbs to Litetronics at 5% above cost, while Litetronics marked up the bulbs by 300-500%. (102a-103a; 175a-176a; 196a-197a). At around the same time, the Litetronics telemarketing unit

---

[14]   The deposition transcript of Richard Crossland, App. Exhibit "G".

[15]   The deposition transcript of Michael Schaechter, App. Exhibit "H".

and international sales[16] were transferred to Duro-Test, but that unit, including valuable customer lists, later reverted back to Litetronics without any compensation paid to Duro-Test. (225a-226a). No negotiation of these transfers took place between Litetronics and Duro-Test, no written agreement memorialized the transactions and no money was transferred between the subsidiaries in consideration for the transfer. Shechter Dep., p. 57 line 4, p. 70 line.14.

Duro-Test and Litetronics continued their operations under the single control of Sorensen. For example, Duro-Test used, free of charge, Litetronics warehouse space located in Alsip, Illinois in a building owned by a partnership controlled by Sorensen. Sorensen Dep., p. 8 line 3, p. 12 line 17. Duro-Test and Litetronics shared warehouse facilities in Las Vegas. Sorensen Dep., p. 35 lines 2-24. Sorensen also utilized the design and engineering services of Duro-Test for the benefit of Litetronics without any cost to Litetronics.

In August 1999, Sorensen gave up the title of Chief Executive Officer of Duro-Test to Richard Crossland, a member of the Durolite board who had been hand-picked by Sorensen. Crossland continued to report directly to Sorensen and Sorensen continued to be compensated as CEO of Duro-Test.[17] Sorensen Dep., p. 70 lines 10-15. (173a). Duro-Test incurred an additional expense of $315,000 per year together with bonuses, stock options and benefits when it hired Richard Crossland as a "record" CEO. Crossland Dep., p. 23 line 11, p. 28 line 15. Sorensen continued to take part in the day-to-day management of Duro-Test until at least October 1999, even after October he participated in Duro-Test management meetings on Duro-

---

[16]  Duro-Test already had an extensive international sales organization in place. Shechter Dep., p. 78 line 16, p. 80 line 19.

[17]  Crossland Dep., p. 37 lines 13 and 15, p. 39 lines 8 and 18; Sorensen Dep., p. 80 lines 7-9. Sorensen's compensation as CEO of Duro-Test was paid by Litetronics. Sorensen Dep., p. 77 lines 11-12.

Test's premises on several occasions, until at least November or December 1999. (199a, 216a-217a).

By October of 1999, Sorensen was entertaining offers to purchase some of the assets of Durolite that would have involved closing the Duro-Test facility. Sorensen Dep., p. 249 line 9, p. 250 line 19.[18] Sorensen continued to act as CEO of Duro-Test in attempting to negotiate the sale and/or refinancing of Duro-Test. Sorensen Dep., p. 248 line 2, p. 267 line 17, Exhibits P-44, P-45, P-46, P-47, P-48, P-49 and P-50.[19] Up until the closing of the Duro-Test plant in February of 2000, Sorensen signed the paychecks of Duro-Test employees. (237a).

Litetronics siphoning of Duro-Test's assets intensified in late 1999 and early 2000. Fifty percent of Duro-Test's production was devoted to Litetronics products in the last months of 1999, rising to 70-80% in 2000. (132a-133a). At the same time, Litetronics, on the orders of Sorensen, stripped Duro-Test of perhaps its most valuable asset, the technological trade secrets developed by company engineers over the past 50 years, which allowed Duro-Test to become the preeminent specialty lighting manufacturer in the world. In December 1999, Sorensen asked Crossland to retrieve from Duro-Test Senior Engineering Manager Lawrence Sheinberg the specifications containing instruction on how to produce Duro-Test's most popular light bulbs. (103a-105a; 191a-192a). Feeling uncomfortable divulging secret technology of almost incalculable value, but certainly worth in the millions of dollars, in January 2000 Sheinberg asked Duro-Test's Plant Manager whether he should comply. The Plant Manager replied, "Bob Sorensen still owns the company and you have to give the specifications." (105a-107a).

---

[18]   Meanwhile, Sorensen's ostensible replacement at Duro-Test, Crossland, acted as an executive of Litetronics though he supposedly held no position at that firm. In financing statements filed in December 1999 and January 2000, Crossland executed the documents on behalf of Litetronics and two Litetronics subsidiaries. (214a-215a; (315a-317a).

[19]   App. Exhibit "J".

Sorensen received the technology in January or February 2000, and testified that he returned some of the specifications to Duro-Test after learning of Sheinberg's testimony in this case. (227a-228a).

### E.    Sorensen Forms World Lighting Investment Company to Strip Duro-Test of Valuable Assets For His Personal Benefit and the Benefit of Litetronics.

Because there was no market for the sale of Duro-Test,[20] Sorensen continued to shift Duro-Test assets to Litetronics for his own personal benefit. By early 1999, Duro-Test was experiencing financial difficulties which were severe enough that Duro-Test's trade creditors refused to extend it further credit. Sorensen Dep., p. 235 line 17, p. 236 line 8. By mid-1999, Durolite was in dire financial straits, and as a result, was forced to obtain additional financing from its commercial lender, Fleet Bank ("Fleet"), in order to continue operations. Duro-Test stopped sending union dues payments deducted from the paychecks of union employees to the local union and its parent organization. Sorensen Dep., p. 236 lines 9 and 21. By the fall of 1999, Duro-Test was on the brink of financial collapse. By November of 1999, Duro-Test was two weeks behind in its payroll tax payments and vendors were holding shipments until past invoices were paid. Crossland Dep., p. 65 line 6, p. 72 line 19; Exhibit P-76.[21]

On January 21, 2000, Sorensen hammered the final nail into Duro-Test's coffin by engaging in a bit of corporate maneuvering which left Duro-Test utterly unable to fulfill its obligations to its employees. Through a new corporation wholly-owned by Sorensen, World Lighting Investment Co. ("World Lighting"), Sorensen purchased Litetronics from Durolite for $4 million. Sorensen Dep., p. 124 line 10, p. 125 line 21. (41a-60a). $2.8 million of the purchase price went to Fleet Capital Corporation ("Fleet") to pay off all of Litetronics' debt.

---

[20]   Crossland Dep., p. 46 lines 6-9.

[21]   App. Exhibit "K".

Sorensen Dep., p. 125 line 24. (232a). Durolite did not negotiate any of the supply contracts between Litetronics and Duro-Test that benefited World Lighting. Crossland Dep., p. 93 line 2, p. 96 line 12.

Sorensen owns 100% of World Lighting. According to Sorensen, he "negotiated" the transaction to acquire Litetronics with Richard Crossland representing the interests of Durolite and Duro-Test, notwithstanding the fact that Crossland reported to Sorensen as CEO of Durolite. Sorensen Dep., p. 134 line 11, p. 135 line 3. The board of Durolite never obtained an independent valuation of Litetronics prior to selling Litetronics to World Lighting. Crossland Dep., p. 49 line 24, p. 50 line 3. Nor did Durolite seek any other offer for the sale of Litetronics. Crossland Dep., p. 52 lines 7 and 18.

Sorensen knew that Fleet was not obligated to advance any further funds to Duro-Test. Sorensen Dep., p. 356 line 18, p. 373 line 7. The proceeds of the stock sale were paid directly to Fleet to satisfy the $800,000.00 of overadvances by Fleet, $400,000.00 on account of the Fleet revolving credit line and $2,800,000.00 to pay off Litetronics' debts to Fleet. The closing took place on January 25, 2000. At the close of the transaction, Sorensen emerged as the 100% owner of the profitable Litetronics business, free of any debt obligations to Fleet. Sorensen Dep., p. 128 lines 12-19. Sorensen did not, however, make any provisions that the proceeds from the stock sale would be used to cover either the health plan's obligations or the outstanding payroll obligations of Duro-Test. While Litetronics was relieved of its debt to Fleet, Duro-Test's employees, the beneficiaries of its health plan, to which they had contributed through regular payroll deduction, were left with no jobs; no health insurance; no final paychecks, and perhaps worst of all, the bills for medical care incurred during they time they erroneously believed they

had health insurance.[22] Sorensen risked nothing of his own in "buying back" Litetronics. In fact, the counsel fees incurred by Sorensen in acquiring Litetronics were paid by Litetronics. Sorensen Dep., p. 143 line 18, p. 144 line 17. What Sorensen did risk, however, was the plan assets which Sorensen pledged to Fleet as collateral for a loan that ultimately benefited him.

On February 18, 2000, several weeks after the purchase of Litetronics, Duro-Test abruptly shut the doors of its Clifton, New Jersey facility. (119a). Prior to closing its doors, Duro-Test was manufacturing products for both Litetronics and Duro-Test. Sorensen Dep., p. 223 lines 10-24. The production of Litetronics' product was managed and performed by Duro-Test employees. Sorensen Dep., p. 231 lines 4-13. In January and February 2000, the Duro-Test manufacturing plant produced almost exclusively Litetronics products. In those two months, the plant manufactured approximately 200,000 pieces of Litetronics lighting products, that Duro-Test sold to Litetronics below Duro-Test's costs. Sorensen Dep., p. 231 lines 14-22. Declaration of Maritza Rodriguez, pp. 3-4. (305a). The documentation of the World Lighting transaction clearly confirmed that Durolite had operated as a single employer throughout Sorensen's tenure. In a license agreement drafted by Durolite's counsel for the World Lighting transaction, Durolite states: "Effective upon the consummation of the Acquisition, Duro-Test and Litetronics will cease to be under common management." The agreement also acknowledged that Litetronics and Duro-Test had "heretofore provided certain services to each

---

[22]   Horizon did not receive any claims reimbursements for any week after January 10, 2000. At the March 16, 2000 hearing before Judge Debevoise, Sorensen acknowledged that the participants' contributions to the Plan went into the Fleet lockbox and were co-mingled with other receipts. Sorensen took no steps to insure that Fleet would make the required payments to Horizon from the lockbox fund, nor did Sorensen take steps to separate the participants' contributions from other receipts before they were co-mingled in the lockbox. Judge Debevoise determined that Sorensen had breached his fiduciary duty to the participants as the only person with discretionary control over the Plan's management, assets and administration. See Exhibit "B", Opinion at pp. 10-13, 19-23. Sorensen further breached his fiduciary duty by failing to make provisions that a portion of the proceeds from the $4,000,000.00 sale price of the Litetronics stock would be used to fund the Plan and cover payroll expenses through February 18, 2000. Id., p. 22.

other and certain of their subsidiaries, such as warehousing and administrative services." Exhibit P-59. [Emphasis Added]. Crossland Dep., p. 129 line 11, p. 131 line 24.

On February 11, 2000, days before the closing, Local 433 members loaded an entire tractor-trailer with finished products to be immediately shipped to Litetronics in Chicago. Declaration of Georgeanna Pugh, ¶ 7. (278a,-287a). Many workers' final paychecks, signed by Sorensen, bounced. (121a-237a). On February 21, 2000. Sorensen resigned as an officer and director of Duro-Test and Durolite. (173a). On March 7, 2000, all of the remaining directors of Durolite resigned. Crossland Dep., p. 90 lines 17-18.

## III.   LEGAL ARGUMENT

### A.   Standard for Grant of Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a fact is "material" is determined by the substantive law defining the claims See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed.2d 202, 106 S. Ct. 2505 (1986); United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir. 1989).

If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 89 L.Ed.2d 538, 106 S. ct. 1348 (1986). When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. See

Anderson, 477 U.S. at 249-50. Here, there are no genuine issues regarding any material fact, therefore summary judgment is appropriate.

Plaintiffs are entitled to judgment as a matter of law because there is no genuine issue as to any material fact as to whether (1) Sorensen was a "fiduciary," pursuant to ERISA, 29 U.S.C. 1002(21)(A)(i) because he exercised actual control over the disposition of plan assets in the form of employee contributions to the Duro-Test health care plan. Sorensen did so by (1) agreeing to the lockbox arrangement with its lender, Fleet Blank that in effect, co-mingled employee contributions with other corporate monies and allowed the plan assets to be used to pay corporate debts; and (2) by proposing and negotiating the terms of the "Litetronics transaction," whereby Sorensen personally benefited, yet he made no provision whatsoever for the payment of funds into the health care benefit plan.

Moreover, the above-mentioned actions by Sorensen are clear breaches of his fiduciary duty, i.e., the duty of loyalty and prudence outlined in 29 U.S.C. 1104(a) (1) (A) and (B). Both of the transactions, - the lockbox arrangement and the "Litetronics transaction," are prohibited because they constitute a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. 1106(a)(1)(D). In addition, Sorensen's role in the "Litetronics transaction," also violated 29 U.S.C. 1106(b) (2), which prohibits a fiduciary from "act[ing] in any transaction involving the plan or on behalf of a party (or represent[ing] a party) whose interests are adverse to the interests of the plan."

Plaintiffs also are entitled to judgment as a matter of law against Durolite and Litetronics because there is no genuine issue of material fact as to whether Durolite, Duro-Test, and Litetronics (referred to collectively herein as "the Employer,") constituted a "single employer" for the purposes of the imposition of FLSA, and WARN Act liability. As the factual record

17

makes clear, Durolite, Duro-Test, and Litetronics shared common ownership in addition to common Officers and/or Directors. Sorensen was Chairman and Chief Executive Officer of Durolite, Duro-Test and Litetronics starting in November, 1995. It is clear from the entire record that the activities of the individual Defendant Sorensen and the corporate Defendants were inextricably intertwined; so much so in fact, that they were virtually indistinguishable from one another. Moreover, the operations of Duro-Test were dependent upon those of Durolite and Litetronics. In addition, Defendants Sorensen and Durolite formulated and implemented all personnel policy decisions for Duro-Test and Litetronics, including the decision to close Duro-Test's facilities.

Further evidence of the symbiosis of the Defendants can be seen in the aforementioned "Litetronics transaction." When the transaction was completed, Sorensen emerged as the one-hundred percent owner of the profitable Litetronics business, which had now been freed of any debt obligations to Fleet as a result of the combination with Durolite and Duro-Test. All of the aforementioned activities make clear that Sorensen, Duro-Test, Durolite and Litetronics constituted a "single employer."

Therefore, because no genuine issue of material fact exists as to the whether Durolite, Duro-Test and Litetronics constitute a "single employer" for the purposes of liability pursuant to FLSA, and WARN, Plaintiffs respectfully request that the Court enter summary judgment in their favor on and against Durolite and Litetronics. Plaintiffs also respectfully request that Plaintiffs be awarded damages pursuant to those allowed by the Fair Labor Standards Act, and the Worker Retraining and Notification Act, as well as any other relief the Court deems appropriate.

**B.**    **The Issue Of Whether Sorensen Is A Fiduciary As Contemplated By ERISA Has Already Been Adjudicated By This Court In An Earlier Proceeding And, Because It Is Precluded From Re-Litigation Summary Judgment On The Issue Is Appropriate**

The issue of whether Sorensen is a fiduciary as contemplated by ERISA has already been decided by this Court in the matter captioned at District Three, et al. v. Robert Sorensen, et al., C.A. No. 00-971 (DRD), (D. N.J. 2000). In District Three, this Court entered positive injunctive relief against Sorensen and the corporate Defendants on behalf of the union employees who also lost their health insurance benefits when Duro-Test shut its doors without warning on February 18, 2000. Judge Debevoise ruled:

> I find that in the circumstances of this case, Sorensen was a fiduciary under ERISA, and Litetronics was the instrument he used to violate his fiduciary duties.

Under the doctrine of issue preclusion, a determination by a court of competent jurisdiction on an issue necessary to support its judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity. Delaware River Port Auth. v. Fraternal Order of Police, Penna. Lodge 30, et al., 290 F.3d 567 (3d Cir. 2002). In Delaware River, the Court of Appeals for the Third Circuit held that preclusion was appropriate when an issue was "distinctly put in issue, [and] directly determined adversely to the party against whom estoppel is asserted, and where:

(1)    the identical issue was decided in a prior adjudication;

(2)    there was a final judgment on the merits;

(3)    the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and

(4)    the party against whom the bar is asserted had a full and fair opportunity to litigate the issue.

In this case, the parties are identical to those involved in the <u>District Three</u> lawsuit. The

issue at hand, whether Sorensen is a fiduciary for ERISA purposes was decided by the Court.

Sorensen and the corporate defendants had a full and fair opportunity to litigate the fiduciary

issue in a proceeding at which the Court took testimony from both sides and all witnesses were

subject to cross-examination. Finally, there were findings of fact and conclusions of law on the

merits when, in his opinion in <u>District Three</u>, Senior Judge Debevoise found that:

> Section 3(21(A) of ERISA defines a fiduciary: 'A person is a
> fiduciary with respect to a plan to the extent, first, he exercises any
> discretionary authority or discretionary control respecting
> management of such plan or exercises any authority or control
> respecting management or disposition of its assets. Or (iii), he has
> any discretionary authority or discretionary responsibility in the
> administration of such plan. Such term includes any person
> designated under section 1105(c)(1)(B) of this title.'

> The problem in the present case is unusual. Even though Duro-
> Test, Litetronics, and Durolite, the holding company, were separate
> entities on paper, in fact, they were treated as a single economic
> unit. When Sorensen announced the organization of the three
> companies in 1995 he talked of it as a merger. It is apparent that at
> least to some extent Duro-Test personnel and products were used
> for the benefit of Litetronics without adequate consideration. As
> Duro-Test was about to close, valuable Duro-Test assets were
> transferred to Sorensen's Litetronics. There was no evidence that it
> received adequate consideration for this.

> The medical plan agreed to in the collective bargaining agreement
> appears to have had no formal structure. Duro-Test collected
> contributions from participants depositing them with its other
> funds in the Fleet lock box. It entered into an agreement with
> Horizon for Horizon to administer the plan; prepay claims and
> receive reimbursement from Duro-Test on a weekly basis.

> It does not appear that any corporation or person was named as
> fiduciary. Sorensen, however, was Chairman and Chief Executive
> Officer of Durolite, Duro-Test and Litetronics starting in
> November, 1995. In August, 1999 he gave up the title of Chief
> Executive Officer of Duro-Test and remained active for a time in
> its management before he concentrated on securing new capital or
> structuring a reorganization. As stated previously, in determining
> who is the fiduciary under ERISA, the court should consider

whether a party has exercised discretionary authority or control over the plan management, assets or administration.

In the present case, it does not appear that anyone other than Sorensen exercised discretionary authority over the plan management, assets or administration. The plan apparently had no separate structure within the Durolite, Duro-Test, Litetronics organization. So in administering Duro-Test assets, which included the medical plan contributions of Duro-Test employees, Sorensen was exercising discretionary authority and control over the plan assets.

In the present case, the assets of the plan were the contributions which the participants paid each week and the general obligation of Duro-Test to contribute its own funds to pay any additional amounts owing under the administrative agreement. Sorensen testified that all of Duro-Test's money, including the employee contributions, went into Fleet lock box. And according to him, Fleet paid out these monies at the request of Duro-Test. This arrangement, however, was agreed to and perpetuated by Sorensen. He was responsible for removing plan assets from the control of Duro-Test and thus unavailable to the plan if Fleet decided not to honor a request to pay Horizon.

Sorensen's control establishes, and the lack of any other named fiduciary renders him a fiduciary of the plan. He breached his fiduciary duty in two particulars.

Debevoise Op. at p. 19, line 24 - p. 22, line 9.

The issue of whether Sorensen is a fiduciary as contemplated by ERISA has already been decided by this Court, there can be no genuine dispute as to a material fact on the issue of Sorensen's breaches of fiduciary duty under ERISA. Therefore, Plaintiffs respectfully request that the Court enter judgment as a matter of law in their favor.

**C.    Even Absent Issue Preclusion, Sorensen Clearly Falls
Within ERISA's Definition Of Fiduciary**

The express language of ERISA states that a "person is a fiduciary with respect to a

plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises

any discretionary authority or discretionary control respecting management" of the plan, or "has

any discretionary authority or discretionary responsibility in the administration" of the plan.

ERISA § 3(21)(A).

Therefore, in order to decide whether Sorensen's actions fall within the statutory

definition of "fiduciary" acts, the Court would necessarily interpret the statutory terms which

limit the scope of fiduciary activity to discretionary acts of plan "management" and

"administration." ERISA § 3(21)(A).  The ordinary trust law understanding of fiduciary

"administration" of a trust is that to act as an administrator is to perform the duties imposed, or

exercise the powers conferred, by the trust documents. See Restatement (Second) of Trusts § 164

(1957); 76 Am. Jur. 2d, Trusts § 321 (1992).  Cf. ERISA § 404(a), 29 U.S.C. 1104(a)(1).  The

law of trusts also understands a trust document to implicitly confer "such powers as are

necessary or appropriate for the carrying out of the purposes" of the trust. 3 A. Scott & W.

Fratcher, Law of Trusts § 186, p. 6 (4th ed. 1988).  See also Bogert & Bogert, Law of Trusts and

Trustees § 551, at 41; Central States, 472 U.S. at 570.  Conveying information about the likely

future of plan benefits, thereby permitting beneficiaries to make an informed choice about

continued participation, would seem to be an exercise of a power "appropriate" to carrying out an

important plan purpose.  ERISA itself specifically requires administrators to give beneficiaries

certain information about the plan.  See, e.g., ERISA §§ 102, 104(b)(1), 105(a).  In addition,

Administrators, as part of their administrative responsibilities, frequently offer beneficiaries

more than the minimum information that the statute requires, e.g., answering beneficiaries'

questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits. Moreover, offering beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity. Cf. Restatement (Second) of Agency § 229(1) (1957) (determining whether an activity is within the "scope of . . . employment" in part by examining whether it is "of the same general nature as that authorized").

In Varity Corp. v. Howe, 516 U.S. 489 (1996), the United States Supreme Court found that a 90-minute videotaped message given Varity Corporation's President, Ivan Porter, to Varity's employees, wherein Mr. Porter stated, among other things, "[F]inally, despite the depression which persists in the North American economy, I am excited about the future of Massey Combines Corporation," came from someone within the corporation who had authority to communicate as a fiduciary with plan beneficiaries. Id. at 502. The Varity Court explained that reasonable employees, in the circumstances found by the District Court, could have thought that Varity was communicating with them both in its capacity as employer and in its capacity as plan administrator. Reasonable employees might not have distinguished consciously between the two roles. But they would have known that the employer was their plan's administrator and had expert knowledge about how their plan worked. The central conclusion ("your benefits are secure") could well have drawn strength from their awareness of that expertise, and one could reasonably believe that the employer, aware of the importance of the matter, so intended. Id. at 503. The Varity Court concluded that the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that Varity was acting as a fiduciary. Id.

ERISA requires a "fiduciary" to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a), 29 U.S.C. 1104(a)(1). To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act "solely in the interest of the participants and beneficiaries." As other courts have held, "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in § 404(a)(1) of ERISA, 29 U.S.C. 1104(a)(1)" Peoria Union Stock Yards Co. v. Penn Mut. Life Ins. Co., 698 F.2d 320, 326 (CA7 1983). See also Central States, 472 U.S. at 570-571 (ERISA fiduciary duty includes common-law duty of loyalty); Bogert & Bogert, Law of Trusts and Trustees § 543, at 218-219 (duty of loyalty requires trustee to deal fairly and honestly with beneficiaries); 2A Scott & Fratcher, Law of Trusts § 170, pp. 311-312 (same); Restatement (Second) of Trusts § 170 (same).

**D.    The Corporate Defendants Are Liable For Their Actions Under ERISA Because All Of The Defendant Corporations Were Under Common Control And Therefore Were A "Single Employer," For Purposes of Imposing ERISA Liability**

The Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 832, as amended, 29 U.S.C. § 1001 et seq. (1988 ed.) treats all companies under common control as if they were a single employer. See 29 U.S.C. § 1301(b)(1); Trustees of the Chicago Truck Drivers Pension Fund v. Leaseway Transp. Corp., 76 F.3d 824, 826 (U.S. App., 1996). ERISA imposes fiduciary obligation to administer a benefit plan "solely in the interest of the participants and beneficiaries" of the plan. ERISA § 404(a), 29 U.S.C. 1104(a)(1).

**E.** **Sorensen's Decision to Allow ERISA Plan Assets which Belonged to the Duro-Test Employees to be Placed Into the Fleet Lockbox was a Per Se Violation of ERISA, Therefore, Plaintiffs are Entitled to Judgment as a Matter of Law**

ERISA does not specifically define the term "plan assets" but the Secretary of Labor has defined the term to include amounts:

> That a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.

Bannistor, et al. v. Ullman, et al., 287 F.3d 394 (5th Cir. 2002), *citing,* 29 C.F.R. § 2510.3-102 (2000). Other courts have similarly defined the term "plan assets" to "include employee contributions to benefit plans which are withheld from employees' paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan." Id. at 402, *citing,* United States v. Grizzle, 933 F.2d 943, 946 (11th Cir., 1991), *cert. denied,* 502 U.S. 897, 116 L. Ed. 2d 223, 112 S. Ct. 271 (1991); L.W. Cochran v. Coleman (In re Coleman), 231 B.R. 393, 395 (S.D. Ga. 1999); In re College Bound, Inc., 172 B.R. 399, 403 (S.D. Fla. 1994); Prof'l Helicopter Pilots Ass'n v. Denison, 804 F. Supp. 1447, 1453 (M.D. Ala. 1992); Pension Benefit Guar. Corp. v. Solmsen, 671 F. Supp. 938 (E.D. N.Y. 1987).

In Bannistor, the United States Court of Appeals for the Fifth Circuit upheld the finding of the District Court that the Defendant corporations were liable as fiduciaries under ERISA for:

> (1)   negotiating, implementing, and operating a "lockbox" financing arrangement with [its lender] Gibraltar; and
>
> (2)   devising and utilizing a payroll system where the withheld contributions, i.e., the ERISA plan assets, were not immediately applied to a separately segregated trust account but were instead only paid to the plans after funds were received from Gibraltar pursuant to the revolving line of credit made part of the "lockbox" financing arrangement.

Id., at 402.

The Bannistor case involved facts almost identical to those of this case. Appellees, who were employees of Colotone-Riverside, Inc. ("Debtor"), Id. at 397, and Colotone Imaging, Inc. ("Colotone"), Debtor's "sister" corporation, owned all of Debtor's stock. Pyramid Ventures ("Pyramid") owned a majority-shareholder interest in Sphinx. Id. BT Capital Partners, Inc. (BT Capital) acted as an advisor to Pyramid, and Pyramid and BT Capital were both second-tier, wholly-owned subsidiaries of Bankers Trust New York (BTNY). Id. BTNY operated its private-equity-investment business through BT Capital and BT Investment Partners, inc. ("BTIP"). BTIP, which was not a party to the action, managed BTNY's private-equity investments by advancing funds to Pyramid for eventual investment in Debtor. Id. From March 1994 to December 1995, BT Capital employed James Dworkin, who served on the Board of Directors of Sphinx, Colotone and Debtor. Dworkin also served as Debtor's assistant Secretary. For the purposes of the appeal, "BT Appellants" referred to, collectively, BTNY, BT Capital, Pyramid, Sphinx and Dworkin.

In financing the BT Appellants' acquisition of Debtor through Pyramid, Sphinx and Colotone, Dworkin, on behalf of the BT Appellants and as Debtor's Officer, negotiated, executed, and implemented a loan between Debtor and Gibraltar Financial Corp. ("Gibraltar") by which Debtor would pledge its accounts receivable to Gibraltar in exchange for the loan and a revolving line of credit, and by which Gibraltar obtained a lien on Debtor's assets in the event of a default. Id. Under the loan, Debtor's accounts receivable were collected in a "lockbox" controlled by Gibraltar, which would apply the accounts receivable to the outstanding balance of the loan and then re-advance funds to Debtor under a formula based on the value of its collateral.

Id. Once Debtor received such funds, Debtor paid its expenses, including its employees' payroll. Id.

Debtor offered its employees a 401(k) plan and a self-insured, health-benefit plan. Id. Because the health plan was self-insured, Debtor paid health claims as an expense through a third-party administrator, Health Choice of Connecticut. Id. at 398. The employee contributions were not separately deposited in a trust account, but were treated as accounting offsets against the health claims that Debtor had already paid. Id. In Fall 1995, Debtor's business suffered and Debtor became insolvent by December. Id. Dworkin, representing the BT Appellants, informed Gibraltar that the BT Appellants would no longer invest in Debtor, and that as a lienholder, Gibraltar could either continue to fund Debtor's operations or cease its operations and foreclose on the lien. Id. Debtor ultimately shut down operations on January 4, 1996, without paying approximately $276,000 in health claims made pursuant to the health plan. Debtor filed for Bankruptcy under Chapter 11 of the Bankruptcy Code. Id.

On appeal to the Fifth Circuit, the BT Appellants argued that the bankruptcy court erroneously imposed *per se* ERISA fiduciary liability for implementing the Gibraltar loan and notifying Gibraltar that they would not further invest in Debtor because such actions did not involve plan assets. Id. at 402. The BT Appellants further argued that Debtor's accounts receivables were not plan assets, but assets pledged to Gibraltar under the loan, and that because the loan and the decision not to further invest in Debtor were "perfectly normal business decisions," they could not be held liable even if such decisions had a collateral effect on the plans. Id.

In its opinion, the Appellate Court held that, although it "did not believe that negotiating and implementing the loan or communicating the decision not to further invest in Debtor *ipso*

*facto* violated fiduciary duties, we agree with the bankruptcy court that the BT Appellants

ultimately exercised authority or control respecting management or disposition of plan assets to

make them fiduciaries." Id. The Court reasoned that:

> The BT Appellants wrongly focus on the pledge of accounts
> receivable and the decision not to further invest in Debtor as
> absolving them of liability. Those facts are less important than the
> fact that the BT Appellants relinquished control over Debtor
> without allocating the contributions to the plans, leaving the
> management or disposition of such contributions to be determined
> by Gibraltar. Such action managed or disposed of plan assets by
> causing them to be used by Gibraltar pursuant to the loan's terms.
> The BT Appellants' complaint of the lack of any "res" of cash
> reflecting payroll deductions actually transferred to Gibraltar is
> irrelevant because it is undisputed that Appellees' contributions
> were withheld but not applied to the plans. The fact that there was
> no physical transfer of amounts from the BT Appellants to
> Gibraltar is simply the result of the very financing agreement the
> BT Appellants established and does not undermine the bankruptcy
> court's conclusion.

The facts of this case are virtually identical to those in Bannistor.  In Bannistor, the

corporate defendants:

1.      relinquished control over the Debtor corporation without allocating

contributions to the plans

2.      Secured a loan from its lender, Gibraltar, with the plan assets of the

Debtor's employees, i.e., the employees' contributions to the corporation's self-funded health

insurance plan, made through payroll deduction;

3.      left the management or disposition of such contributions to be determined

by its lender Gibraltar.

In this case, Durolite was in dire financial straits, and as a result, was forced to obtain

additional financing from its commercial lender, Fleet, in order to continue operations.  Fleet

held a security interest in most of Duro-Test's assets, and required Litetronics to cross-

collateralize the loans Fleet made to Duro-Test and Litetronics.  Fleet also required that Duro-

Test's receipts be delivered to a Fleet lock box, which included the employees' payroll

deductions for health benefits under the Plan.  Therefore, because there is no genuine issue as to

any material fact as to whether Sorensen breached his fiduciary duties under ERISA with respect

to the Duro-Test employees' health care benefit plan, Plaintiffs are entitled to judgment as a

matter of law.

### F.   Durolite, Duro-Test and Litetronics, Constitute a "Single Employer" Within the Contemplation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Section 203(d)

Under the Fair Labors Standard Act ("FLSA"), 29 USCS § 203 (2003), an employer is

defined as:

> "Employer" includes any person acting directly or indirectly in the
> interest of an employer in relation to an employee and includes a
> public agency, but does not include any labor organization (other
> than when acting as an employer) or anyone acting in the capacity
> of officer or agent of such labor organization.

29 U.S.C.S. § 203(d).

The United States Supreme Court has characterized FLSA's statutory definition of an

"employer", 29 U.S.C. § 203(d), as the "broadest . . . that has ever been included in any one act",

United States v. Rosenwasser, 323 U.S. 360, 363 n. 3, 89 L. Ed. 301, 65 S. Ct. 295 (1945).

Moreover, a corporate officer with operational control is an "employer", along with the

corporation, jointly and severally liable under FLSA for unpaid wages.  Donovan v. Agnew, 712

F.2d 1509, 1511 (1st Cir. 1983).  Further, any such corporate officer is liable in his individual,

not representative, capacity.  Dole v. Haulaway, Inc., 723 F. Supp. 274, 288 (D. N.J. 1989), Dole

v. Haulaway, Inc., 723 F. Supp. 274 (D.N.J. 1989), aff'd without op., 914 F.2d 242 (3d Cir.

1990); Dole v. Solid Waste Services, Inc., 733 F. Supp. 895, 923 (E.D. Pa. 1989), aff'd without

op. 897 F.2d 521 (3d Cir. 1990), cert. denied, 497 U.S. 1024, 110 S. Ct. 3271, 111 L. Ed.2d 781

(1990);Donovan v. Grim Hotel Company, 747 F.2d 966, 971 (5th Cir. 1984).  Brock v. Superior Care, Inc., 105 CCH Lab. Cases para. 34,839 (E.D.N.Y. 1986) (holding two corporate officers individually liable as employers), *aff'd on other grounds*, 840 F.2d 1054 (2d Cir. 1988).

In Dole v. Haulaway, Inc., the District Court held both the Defendant corporation and its President, individually liable , because the Court found that both Defendants had violated the record keeping and overtime payment requirements of the Fair Labor Standards Act.  In Dole, the corporation's President and sole shareholder, Joseph Scugoza, in addition to holding corporate authority, actually exercised day to day control over the affairs of the corporate Defendant including:  hiring and discharging employees, approving promotions and raises and establishing other terms and conditions of employment.  Accordingly, Scugoza himself was considered an "Employer" under FLSA.  723 F. Supp. 274, 286-287 (U.S. Dist. , 1989).

In Sandom v. Travelers Mortgage Services, Inc., 752 F. Supp. 1240, (D.N.J. 1991), *aff'd without op,*.  Sandom v. Travelers Mortgage Services, Inc., (3d Cir. 1993), the District Court had before it, *inter alia*, claims arising under the Equal Pay Act, 29 U.S.C. § 206(d)(1).  However, in its reasoning, the Court analogized to the Fair Labor Standards Act, noting that:

> The Third Circuit has explicitly recognized that there may be 'several simultaneous 'employers' under the Fair Labor Standards Act," *citing*, Hodgson v. Arnheim and Nelly, Inc., 444 F.2d 609, 611-12 (3d Cir. 1971) *rev'd on other grounds sub nom.*, Brennan v. Arnheim & Neely, Inc., 410 U.S. 512, 35 L. Ed. 2d 463, 93 S. Ct. 1138 (1973).

>     *                *               *

> The fact that the individual defendants in the instant case were employees of the corporate "employer" does not insulate them from potential liability, because "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *citing*, Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir.

1983); Dole v. Haulaway, Inc., 723 F. Supp. 274 (D.N.J. 1989), *aff'd without op.*, 914 F.2d 242 (3d Cir. 1990); Dole v. Solid Waste Services, Inc., 733 F. Supp. 895, 923 (E.D. Pa. 1989), *aff'd without op.* 897 F.2d 521 (3d Cir. 1990), *cert. denied,* 497 U.S. 1024, 110 S. Ct. 3271, 111 L. Ed.2d 781 (1990); Gusdonovich v. Business Information Company, 705 F. Supp. 262 (W.D. Pa. 1985).

Here, it is abundantly clear that Sorensen, Durolite and Litetronics were a "single employer" of the members of the Plaintiff class. The undisputed evidence demonstrates that all of the activities of Duro-Test and Litetronics were controlled directly by the Board of Directors of Durolite, the Chairman of which was Sorensen. The record in this case shows that Sorensen and Durolite blatantly ignored any distinction between the various corporate entities, as well as engaged in transactions between the entities which were clearly conflicts of interest.

### G.      Sorensen and the Corporate Defendants Are "Single Employers" For Purposes of Imposing Liability Pursuant to the WARN Act

The Worker Adjustment and Retraining Notification ("WARN") Act defines an "Employer" as "any business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a). It further provides that: "any employer who orders a [site] closing or mass layoff in violation of § 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for (A) back pay, . . . and (B) benefits." 29 U.S.C. § 2104(a)(1); Vogt v. Greenmarine Holding, LLC, 2004 U.S. Dist. LEXIS 1196 (U.S. Dist., 2004).

The United States Court of Appeals for the Third Circuit has decided that the appropriate test for intercorporate WARN liability is the five-factor Department of Labor ("DOL") test, which emphasizes de facto control of the decision to effect a mass layoff of employees, and not on veil piercing and/or the integrated employer test, or a combination of all three. See Pearson v. Component Technology Corp., 247 F.3d 471, 483-84 (3d Cir. 2001) (discussing WARN liability

for secured lenders of a defunct employer on a motion for summary judgment). See also

Administaff Co. v. UNITE, 337 F.3d 454, 458 (5th Cir. 2003) (following Pearson and applying

DOL test for intercorporate WARN Act liability).

The DOL regulation enumerates five relevant factors for courts to use when considering

whether to impose WARN Act liability on a parent corporation.  The regulation provides that:

> Under existing legal rules ..., subsidiaries which are wholly or
> partially owned by a parent company are treated as separate
> employers or as part of the parent of contracting company
> depending upon their degree of independence from the parent.
> Some of the factors to be considered in making this determination
> are (i) common ownership, (ii) common directors and/or officers,
> (iii) de facto exercise of control, (iv) unity of personnel policies
> emanating from a common source, and (v) the dependency of
> operations.

20 CFR § 639.3(a)(2).

In the context of the fact-specific inquiry into whether a company can be held responsible

under WARN for the act of a related company, no one factor set out by the DOL is controlling,

and all factors need not be present for liability to attach.  As the Third Circuit has noted, the

DOL test is a balancing test "intended to discover whether ... nominally separate entities actually

functioned as a single business, particularly with regard to labor policy."  Pearson, 247 F.3d at

498.  The labor policy at issue in a WARN case is the decision to terminate the employment of a

significant part of a company's work force.  Vogt v. Greenmarine Holding, LLC, 2004 U.S. Dist.

LEXIS 1196, 15-16 (U.S. Dist., 2004).

In Childress v. Darby Lumber, Inc., et al., Childress v. Darby Lumber, Inc., 357 F.3d

1000 (9th Cir. 2004) Defendants, Darby Lumber ("DLI,") and Bob Russell Construction, Inc.

("BRC") appealed the District Court's grant of summary judgment in favor of Sharon Childress

and other former employees in their action alleging violations of the WARN Act.  At issue was,

*inter alia*, whether the District Court erred in concluding that DLI and BRC constituted a "single

employer" for purposes of WARN.  In affirming the trial court's ruling, the United States Court of Appeals for the 9th Circuit analyzed the five WARN factors as follows:  (1) common ownership; (2) common directors and/or officers; (3) de facto exercise of control; (4) unity of personnel policies emanating from a common source; and (5) dependency of operations.  Id. at 1006.

In this case, the record shows that the actions and behaviors of Sorensen and the corporate defendants leave no doubt that they were acting as a "single employer" for the purpose of imposing liability on them pursuant to the WARN Act.  Durolite, Duro-Test, and Litetronics shared common ownership in addition to common Officers and/or Directors.  Sorensen was Chairman and Chief Executive Officer of Durolite, Duro-Test and Litetronics starting in November, 1995.  It is clear from the entire record that the activities of the individual Defendant Sorensen and the corporate Defendants were inextricably intertwined; so much so in fact, that they were virtually indistinguishable from one another.  Moreover, the operations of Duro-Test were dependent upon those of Durolite and Litetronics.

In addition, Defendants Sorensen and Durolite formulated and implemented all personnel policy decisions for Duro-Test and Litetronics, including the decision to close Duro-Test's two facilities located in or near Clifton, New Jersey.  Further evidence of the symbiosis of the Defendants can be seen in the aforementioned Litetronics transaction.  When the transaction was completed, Sorensen emerged as the one-hundred percent owner of the profitable Litetronics business, which had now been freed of any debt obligations to Fleet as a result of the combination with Durolite and Duro-Test.  All of the aforementioned activities on the part of Sorensen individually, as well as the corporate Defendant make clear that Sorensen, Duro-Test, Durolite and Litetronics constituted 'one employer."

**H.   Plaintiffs for Themselves, and On Behalf of the Class, are Entitled to an Award of Attorneys Fees Pursuant to the WARN Act**

The WARN Act provides for various penalties in civil actions against Employers under the Act. 29 U.S.C. § 2104. Those penalties are as follows:

(a) Civil actions against employers.

    (1) any employer who orders a plant closing or mass layoff in violation of section 3 of this Act 929 U.S.C. 2102] shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for-

    (A) back pay for each day of violation at a rate of compensation not less than the higher of - -

        (i) The average regular rate received by such employee during the last three (3) years of the employee's employment; or

        (ii) the final regular rate received by such employee;

and

    (B) benefits under an employee benefit plan described in section 3(3) of the Employment Retirement Income Security act of 1974 (29 U.S.C. 1002(3)), including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

       \*           \*          \*

(6)   In any such suit, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.  Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2104.

Here, Plaintiffs are entitled to an award of attorneys' fees as a result of the undisputed liability of Sorensen and the corporate defendants pursuant to WARN.

### I.   Plaintiffs, for Themselves, and On Behalf of the Class, are Entitled to an Award of Attorneys' Fees Pursuant to ERISA

ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.  29 U.S.C. § 1132(g)(1).  In Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983), the United States Court of Appeals for the Third Circuit established five factors which the court should consider when deciding whether to award attorney's fees under ERISA:

(1)   the offending parties' culpability or bad faith;

(2)   the ability of the offending parties to satisfy an award of attorneys; fees;

(3)   the deterrent effect of an award of attorneys' fees against the offending parties;

(4)   the benefit conferred on members of the pension plan as a whole; and

(5)   the relative merits of the parties' position.

Plaintiffs are entitled to an award of attorneys' fees because of the egregious conduct of Sorensen in deliberately depriving the Plaintiffs of the health care benefits to which they were entitled.  In his opinion, in District Three, Judge Debevoise found that:

> In the present case, the involvement of Sorensen is <u>even more</u>
> <u>egregious</u> when one adds to the diversion of employee
> contributions, his structuring of the reorganization without any
> provision for funding the health plan.

Debevoise Opinion at p. 24, lines 15-18. (Emphasis Added). It is abundantly clear that

Sorensen's conduct in this matter is of the sort that merits an award of attorneys' fees to

Plaintiffs.

In addition, Plaintiffs are entitled to an award of pre-judgment interest. <u>Anthuis v. Colt</u>

<u>Industries Oper. Corp.</u>, 971 F.2d 999 (3d Cir. 1992). In <u>Anthuis</u>, the Third Circuit upheld an

award of pre-judgment interest in an ERISA action concerning a denial of pension benefits. <u>Id.</u>

at 1010. The <u>Anthuis</u> court relied on its earlier decision in <u>Schake v. Colt Industries</u>, 960 F.2d

1187 (3d Cir. 1992) for the proposition that "it is undisputed that prejudgment interest typically

is granted to make a plaintiff whole because the defendant may wrongfully benefit from the

plaintiff's money." <u>Id.</u> at 1009.

The Appellate Court went on to cite with approval the language of <u>Stroh Container Co. v.</u>

<u>Delphi Industries, Inc.</u>, 783 F.2d 743, 752 (8th Cir. 1986) <i>cert. denied</i>, 475 U.S. 1141 (1986), an

Eight Circuit case which discussed the consideration which should be undertaken when a district

court exercises its discretion in the award of prejudgment interest. The <u>Stroh</u> court found that:

> As a general rule, prejudgment interest is to [sic] awarded when
> the amount of the underlying liability is reasonably capable of
> ascertainment and the relief granted would otherwise fall short of
> making the claimant whole because he or she has been denied the
> use of the money which was legally due.

971 F.2d at 1010.

Here, Plaintiffs are entitled to pre-judgment interest on the health plan contributions they

made but which never reached their intended destination, because of their diversion into a

lockbox by Sorensen in breach of his ERISA fiduciary duty.

## IV.   **CONCLUSION**

For each and all of the foregoing reasons, Plaintiffs respectfully request that this Court

enter summary judgment in Plaintiffs' favor as to all Defendants.

KLEINBARD, BELL & BRECKER LLP

ROBERT B. BODZIN, ESQUIRE
MARY VASSALLO SLINKARD, ESQUIRE
MARY J. WALK, ESQUIRE
1900 Market Street. Suite 700
Philadelphia, PA  19103
(215) 568-2000

Dated:   June 1, 2004