IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAWRENCE SHEINBERG and GILES HAZEL, on behalf of themselves and others similarly situated, | CIVIL ACTION |
| v. | |
| ROBERT SORENSEN; DUROLITE INTERNATIONAL, INC.; LITETRONICS INTERNATIONAL, INC., | No. 2:00cv6041 (KSH) |
| v. | |
| FLEET CAPITAL CORPORATION | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

It is clear from the Reply of defendants ("Sorensen") to Plaintiffs' Summary Judgment Motion that Robert Sorensen still does not appreciate or comprehend his obligations as Chairman and CEO of Durolite and a fiduciary of the Duro-Test Health Plan.  Sorensen fails to recognize that his structuring of Duro-Test to allow all receivables to be placed in a lock-box, including those assets necessary to fund the Duro-Test Health Plan, is a *per se* violation of his fiduciary duty to segregate funds paid by Duro-Test employees for health insurance.  Nor does Robert Sorensen recognize that by controlling all of the activities of Duro-Test and Litetronics through Durolite he has caused all three corporations to be the "single employer" of Duro-Test employees.

In his Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Memorandum in Opposition"), Sorensen raises a number of red herrings regarding facts that he may dispute, but are not material to the Court's disposition of this case by summary judgment.  However, when Sorensen is faced with undisputed facts that are material to the summary

judgment issues, he attempts to dismiss the evidence as being less probative, simply because it is unfavorable to his position. For example, Sorensen has coined the interesting phrase "shallow testimony" when referring to the District Three litigation before Judge Debevoise. Even though Sorensen testified under oath, and described his role in implementing a corporate structure that failed to protect employee contributions to their health plan from the claims of Duro-Test's creditors, Sorensen tries to run and hide from his admissions. Apparently, Sorensen would prefer to ignore his testimony, the District Three proceeding and Judge Debevoise's opinion, because they do not serve Sorensen well. However, like it or not, the District Three opinion is relevant; addresses the same issues as this case; and most importantly, the testimony given there by Robert Sorensen, are admissions under oath. Defendants suggest that because Sorensen was not able to overly prepare for the District Three hearing, his testimony there is of less value than his later testimony. This argument is senseless precisely because the District Three proceeding was so close in time to the Duro-Test plant closing. Sorensen's memory of critical events should have been better nine days after the plant closing, than nine months or two years later. Sorensen's argument regarding "shallow testimony," is nothing more than a recognition that a more fully developed record simply provides greater opportunities for Sorensen to distract the Court from the material facts at issue.

## II.   FACTUAL ISSUES

The Memorandum in Opposition of Sorensen attempts to rebut factual allegations of Plaintiff. Each rebuttal is flawed for the reasons described below.

### A.   The Duro-Test Litetronics "Merger"

Plaintiffs do not argue that the acquisition of Duro-Test by Robert Sorensen was technically a "merger" between Litetronics and Duro-Test. Plaintiffs do argue that the undisputed statement by Robert Sorensen to Duro-Test employees that the transaction was a

"merger" followed by Sorensen's control of Litetronics and Duro-Test, make the corporate defendants a "single employer" for purposes of the Fair Labor Standards Act and the WARN act.

Sorensen does not dispute that on November 3, 1995, he announced to Duro-Test's employees that he had acquired Duro-Test and had "merged" the two companies by creating a holding company, Durolite, that would operate both Duro-Test and Litetronics as wholly owned subsidiaries. (286a-291a). Sorensen does not dispute that he stated the merger "brings together two leaders in the global specialty lighting industry with complimentary manufacturing and marketing capabilities." (291a). Sorensen does not dispute his announcement of the new regime to Duro-Test employees in November of 1995 emphasized how close the relationship would be, "I am pleased to announce that we have merged Duro-Test Corporation and Litetronics International, Inc. Duro-Test has a fine heritage and so does Litetronics. Together we will build the best lighting company in the world." (291a). Sorensen does not dispute that he assured the Duro-Test workforce that the two companies would enjoy a bright future under his leadership as the Chairman and CEO of Duro-Test, Durolite and Litetronics. (286a-291a). Most importantly, Robert Sorensen did what he promised by operating both Duro-Test and Litetronics at the sole direction of Durolite.

### B. The Lock-Box Was a Mechanism by Which Sorensen Consolidated All Duro-Test Assets

Sorensen's Memorandum in Opposition mistakenly claims that Plaintiffs argued "employee contributions for Duro-Test's health plan were deposited into a lock box under the control of Fleet." What Plaintiffs did argue and, what is undisputed is that all receivables of Duro-Test were deposited into a lock-box pursuant to the Fleet loan agreement. The employee contributions were "deducted" from employee paychecks for accounting purposes, but no funds were placed in any account, let alone a segregated account to safeguard the employee

contributions. The lock-box assets were the only source available to pay obligations of the health plan. Thus, when Duro-Test failed to meet its obligations to adequately capitalize the health plan and pay its administrative expenses, the lock-box was the only source from which Duro-Test could obtain funds.

**C.     Sheinberg's Statement that Non-Union Employees Received
         At Least The Same Level of Benefits As Union Employees
         Remains Undisputed**

At the District Three hearing, Lawrence Sheinberg testified that traditionally non-union employees received at least the same level of benefits as union employees. While this factual allegation is disputed by Sorensen, it is not material to the Court's determination of the Summary Judgment issues.

**D.     Robert Sorensen and Durolite's Control of Duro-Test and Litetronics**

Sorensen seeks to avoid the admissions of Duro-Test's former CEO, that Robert Sorensen and Durolite controlled both Duro-Test and Litetronics, perpetuating the false testimony by Robert Sorensen that Litetronics and Duro-Test had separate and independent functioning boards of directors. In support of their Memorandum in Opposition, Sorensen has provided an additional "Declaration of Robert C. Sorensen." Attached to the Sorensen Declaration are two exhibits. The first Exhibit "A," is a "Unanimous Consent of Directors of Litetronics International, Inc." dated October 26, 1995, and the other Exhibit "B," is a copy of the "Minutes of Combined Telephonic Meeting of Board of Directors of Durolite International, Inc. and Duro-Test Corporation Held on January 17, 2000." Sorensen argues that these Exhibits prove that there were two separate and distinct Boards of Directors for Duro-Test and Litetronics. However, these Exhibits are probative of Plaintiffs' argument that Duro-Test and Litetronics did not have separate functioning boards. It is not a coincidence that there are no

minutes of any Litetronics Board meeting attached to Sorensen's Declaration because none exist. *See Declaration of Robert B. Bodzin.* Moreover, no minutes exist of Duro-Test board meetings.

Sorensen is simply misleading the Court by suggesting that the minutes reflect "independent" activity of the Duro-Test or Litetronics board. The only two notes over a five year period are simply minutes that memorialize the acquisition of Duro-Test and another Litetronics subsidiary. To the contrary, the Durolite minutes produced by Sorensen in discovery all corroborate Crossland testimony that <u>all</u> management decisions of Duro-Test and Durolite were made by the Duro-Test board. *See minutes attached to Declaration of Robert B.* Bodzin. For example, according to the Durolite board minutes of December 4, 1995, the business of both Duro-Test and Litetronics was discussed even though no representative of Litetronics was present. The minutes reflect Mr. Sorensen's "extensive" discussions of Duro-Test's cash flow problems. According to the minutes, "Mr. Sorensen noted that the cash flow situation mandated quick and decisive moves with respect to the problems in the personnel/management areas. Time has become more of the essence." In contrast, the situation at Litetronics "was viewed as strong."

According to the minutes of a February 15, 1997 Durolite board meeting: "Bob Sorensen updated the board on several ongoing activities, including: union negotiations [only Duro-Test had a union]; distribution tests; Duro-Lite's lighting showroom roll-out; Litetronics' organizational status; and, R&D initiatives." These two examples typify all of the Durolite board meetings where agendas and notes reflect extensive discussion and direction of the activities of both Duro-Test and Litetronics by the board of Durolite.

**E.**     **Duro-Test Did Not Benefit From the World Lighting Transaction**

Perhaps Defendants' most amazing argument is that the transfer of business to Litetronics from Duro-Test as well as the January, 2000 sale of Litetronics to World Lighting **benefited Duro-Test**. If this were true, why was Duro-Test out of business within less than one month of the sale and the liquidation in a Chapter 7 bankruptcy while Litetronics still thrives today?

**F.**     **The Siphoning of Duro-Test Assets to Litetronics is Not Rebutted by Sorensen's Self-Serving Statements**

Sorensen's self-serving statements of his intentions to assist Duro-Test in no way diminish the importance of the facts set forth in detail in Plaintiffs' opening memorandum that show a deliberate transfer of valuable assets from Duro-Test to Litetronics immediately prior to the closing of the Duro-Test facility.

## III.     LEGAL ARGUMENT

**A.**     **Plaintiffs Have Met their Evidentiary Burden on Their Fair Labor Standards Act Claims**

In their Memorandum in Opposition, Sorensen continues to insist that the corporate defendants are not "employers" within the meaning of the Fair Labor Standards Act, despite Sorensen's control of both Durolite and Durotest as Chairman and CEO of both entities. Moreover, Sorensen continues to cite a Third Circuit case in which the appellate court used a six-factor test to assist in determining whether a person was an employee. Donovan v. Dialamerica Marketing, 757 F.2d at 1382 (3d Cir. 1985). Therefore, Defendants reliance on Donovan is wholly misplaced.

Under the Fair Labors Standard Act ("FLSA"), 29 USCS § 203 (2003), an employer is defined as:

> "Employer" includes any person acting directly or indirectly in the
> interest of an employer in relation to an employee and includes a
> public agency, but does not include any labor organization (other
> than when acting as an employer) or anyone acting in the capacity
> of officer or agent of such labor organization.

29 U.S.C.S. § 203(d).

The United States Supreme Court has characterized FLSA's statutory definition of an

"employer", 29 U.S.C. § 203(d), as the "broadest . . . that has ever been included in any one act",

United States v. Rosenwasser, 323 U.S. 360, 363 n. 3, 89 L. Ed. 301, 65 S. Ct. 295 (1945).

Moreover, a corporate officer with operational control is an "employer", along with the

corporation, jointly and severally liable under FLSA for unpaid wages. Donovan v. Agnew, 712

F.2d 1509, 1511 (1st Cir. 1983). Further, any such corporate officer is liable in his individual,

not representative, capacity. Dole v. Haulaway, Inc., 723 F. Supp. 274, 288 (D. N.J. 1989), Dole

v. Haulaway, Inc., 723 F. Supp. 274 (D.N.J. 1989), aff'd without op., 914 F.2d 242 (3d Cir.

1990); Dole v. Solid Waste Services, Inc., 733 F. Supp. 895, 923 (E.D. Pa. 1989), aff'd without

op. 897 F.2d 521 (3d Cir. 1990), cert. denied, 497 U.S. 1024, 110 S. Ct. 3271, 111 L. Ed.2d 781

(1990);Donovan v. Grim Hotel Company, 747 F.2d 966, 971 (5th Cir. 1984). Brock v. Superior

Care, Inc., 105 CCH Lab. Cases para. 34,839 (E.D.N.Y. 1986) (holding two corporate officers

individually liable as employers), aff'd on other grounds, 840 F.2d 1054 (2d Cir. 1988).

In Sandom v. Travelers Mortgage Services, Inc., 752 F. Supp. 1240, (D.N.J. 1991), aff'd

without op,. Sandom v. Travelers Mortgage Services, Inc., (3d Cir. 1993), the District Court had

before it, inter alia, claims arising under the Equal Pay Act, 29 U.S.C. § 206(d)(1). However, in

its reasoning, the Court analogized to the Fair Labor Standards Act, noting that:

> The Third Circuit has explicitly recognized that there may be
> 'several simultaneous 'employers' under the Fair Labor Standards
> Act," citing, Hodgson v. Arnheim and Nelly, Inc., 444 F.2d 609,
> 611-12 (3d Cir. 1971) rev'd on other grounds sub nom., Brennan

v. Arnheim & Neely, Inc., 410 U.S. 512, 35 L. Ed. 2d 463, 93 S. Ct. 1138 (1973).

\*                    \*                    \*

The fact that the individual defendants in the instant case were employees of the corporate "employer" does not insulate them from potential liability, because "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *citing*, Donovan v. Agnew, 712 F.2d 1509, 1511 (1st Cir. 1983); Dole v. Haulaway, Inc., 723 F. Supp. 274 (D.N.J. 1989), *aff'd without op.*, 914 F.2d 242 (3d Cir. 1990); Dole v. Solid Waste Services, Inc., 733 F. Supp. 895, 923 (E.D. Pa. 1989), *aff'd without op.* 897 F.2d 521 (3d Cir. 1990), *cert. denied*, 497 U.S. 1024, 110 S. Ct. 3271, 111 L. Ed.2d 781 (1990); Gusdonovich v. Business Information Company, 705 F. Supp. 262 (W.D. Pa. 1985).

Here, it is abundantly clear that Duro-Test, Durolite and Litetronics were a "single employer" of the Duro-Test employees. The undisputed evidence demonstrates that all of the activities of Duro-Test and Litetronics were controlled directly by the Board of Directors of Durolite, the Chairman of which was Sorensen. The record in this case shows that Sorensen and Durolite blatantly ignored any distinction between the various corporate entities, as well as engaged in transactions between the entities which were clearly conflicts of interest. Significantly, Sorensen has no rebuttal to the uncontroverted facts that (1) Sorensen was Chairman and CEO at Durolite, the "parent" of Duro-Test, from the moment Sorensen acquired Duro-Test until the closing of the Duro-Test plant; and (2) neither Duro-Test nor Litetronics had functioning boards of directors but were operated exclusively under the direction and control of Sorensen and Durolite.

**B.     Plaintiffs Have Standing to Bring this Action
        Under Section 502(a)(2) of ERISA**

Defendants argue that "the Supreme Court has ruled that Section 502(a)(2) authorizes

relief solely for the benefit of the subject ERISA plan," and that Section 502(c) doesn't authorize

remedies for individual plan participants. *Citing* <u>Massachusetts Mut. Life Ins. Co. v. Russell</u>,

473 U.S. 134 (1985). However, this case is inapposite to the case at bar. In <u>Russell</u>, the Plaintiff

was not suing for "benefits" having already received her benefits, but was suing for

consequential loss from being denied the use of funds prior to her benefits being paid. <u>Id.</u> at 137.

Here, Plaintiffs are suing for their benefits, an action which is expressively permitted by ERISA,

which provides:

> A civil action may be brought -
>
> (1)     by a participant or beneficiary -
>
> (A)     for the relief provided for in subsection (c) of this section, or
>
> (B)     to recover benefits due to him under the terms of his plan, to enforce his

right under the terms of the plan, or to clarify his rights to future benefits under the terms of the

plan;

473 U.S. at 140, *citing* 29 U.S.C. § 32(a).

Sorensen's argument that Plaintiffs lack standing to bring this action for their health

insurance benefits is clearly unsupported by the <u>Russell</u> case.

### C.    Sorensen Clearly Falls Within ERISA's Definition of Fiduciary

Sorensen argues that the District Three court "did not make any factual finding concerning any discretionary authority that Sorensen supposedly exercised." See Defendants' Memorandum in Opposition at p. 20. This statement is all the more incredible considering that Sorensen goes on to quote Judge Debevois' opinion in District Three where the court specifically found that Sorensen engaged in the type of "control" that subjected him to ERISA liability:

> In the present case, it does not appear that anyone other than Sorensen exercised discretionary authority over the plan management, assets or administration. The plan apparently had no separate structure within the Durolite, Duro-Test, Litetronics organization. So in administering Duro-Test assets, which included the medical plan contributions of Duro-Test employees, Sorensen was exercising discretionary authority and control over the plan assets.

[Emphasis Added].

### D.    Sorensen Failed to Distinguish the Bannistor v. Ullman Imposition of *Per Se* ERISA Liability

Sorensen argues that Plaintiffs have mischaracterized the holding in Bannistor v. Ullman, 287 F.3d 394 (5th Cir.2002). However, Plaintiffs correctly stated in their Memorandum of Law in Support of their Motion for Summary Judgment that Bannistor hinged on the finding that Sorensen co-mingled plan assets with other lockbox monies. In Bannistor, the Fifth Circuit upheld the finding of the District Court that the Defendant corporations were liable as fiduciaries under ERISA for:

> (1)    negotiating, implementing, and operating a "lockbox" financing arrangement with [its lender] Gibraltar; and
>
> (2)    **devising and utilizing a payroll system where the withheld contributions, i.e., the ERISA plan assets, were not immediately applied to a separately segregated trust account but were instead only paid to the plans after funds were**

**received from Gibraltar pursuant to the revolving line of credit
made part of the "lockbox" financing arrangement.**

Id., at 402.  (emphasis added).

Sorensen attempts to distinguish Bannistor by claiming that with Duro-Test, there was no

"commingling employee withdrawals, meant for the ERISA plans, in the lockbox." *Sorensen*

*Opposition Memorandum, p. 23.* Sorensen is wrong.  By drawing from the lock-box funds that

were sufficient to meet some, but not all of its payroll obligations, Duro-Test did commingle the

employee health benefits with other lock-box assets.  Failing to withdraw and segregate

sufficient funds to meet the obligations of the health plan meant that those monies that should

have been earmarked for the health plan were never withdrawn and thus were commingled with

the lock-box funds.

> **E.    Sorensen Played a Part in Fleet's Decision to No Longer
> Advance Funds for Duro-Test's Operations, Therefore Defendants
> are Not Entitled  to Invoke Either the "Faltering Company," or
> "Unforeseeable Business Circumstances Defense."**

In his Motion in Opposition, Sorensen argues, incredibly, that he is entitled to assert the

"faltering company," and "unforeseeable business circumstances" affirmative defenses, because

"Fleet's decision to stop advancing funds for Duro-Test's operations under the revolving loan

was well beyond the control of Duro-Test, Litetronics, Durolite and Sorensen." However,

nothing could be further from the truth.  Duro-Test falsified the status of its accounts receivable

to Fleet.  It was based on these falsified accounts receivable figures that Fleet calculated the

amounts it would extend to Duro-Test.  Therefore, Duro-Test ran out of money because of the

actions of its own management, not Fleet.

Sorensen continues to insist that that Fleet controlled the lockbox at issue in this matter.

But Sorensen acknowledged that Fleet did not control the lockbox.  Sorensen Dep. P. 104, line

13 - p. 112, line 3. Sorensen knew that Fleet was not obligated to advance any further funds to Duro-Test. Sorensen Dep., p. 356 line 18, p. 373 line 7.

At the close of the transaction, whereby Sorensen acquired Litetronics, he emerged as the 100% owner of the profitable Litetronics business, free of any debt obligations to Fleet. Sorensen Dep., p. 128 lines 12-19. Sorensen did not, however, make any provisions that the proceeds from the stock sale would be used to cover either the health plan's obligations or the outstanding payroll obligations of Duro-Test. While Litetronics was relieved of its debt to Fleet, Duro-Test's employees, the beneficiaries of its health plan, to which they had contributed through regular payroll deduction, were left with no jobs; no health insurance; no final paychecks, and perhaps worst of all, the bills for medical care incurred during they time they erroneously believed they had health insurance.[1]

Sorensen would have one believe that an uninvolved third-party, Fleet, made a unilateral decision to close the doors of Duro-Test. However, the facts make clear that exactly the opposite occurred. Based on the foregoing, Sorensen should not now be permitted to argue that there were unforeseeable business circumstances that led to the closure of the Duro-Test facility. The potential financial collapse of Duro-Test was known to Sorensen at least eight months prior to the plant closing. Sorensen Dep. at p. 233, line 17-p. 236, line 21.

---

[1]  Horizon did not receive any claims reimbursements for any week after January 10, 2000. At the March 16, 2000 hearing before Judge Debevoise, Sorensen acknowledged that the participants' contributions to the Plan went into the Fleet lockbox and were co-mingled with other receipts. Sorensen took no steps to insure that Fleet would make the required payments to Horizon from the lockbox fund, nor did Sorensen take steps to separate the participants' contributions from other receipts before they were co-mingled in the lockbox. Judge Debevoise determined that Sorensen had breached his fiduciary duty to the participants as the only person with discretionary control over the Plan's management, assets and administration. See Exhibit "B", Opinion at pp. 10-13, 19-23. Sorensen further breached his fiduciary duty by failing to make provisions that a portion of the proceeds from the $4,000,000.00 sale price of the Litetronics stock would be used to fund the Plan and cover payroll expenses through February 18, 2000. *Id.*, p. 22.

## IV.   CONCLUSION

In summary, both Defendants' Motion for Summary Judgment, and their Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment employ the same strategy:  evade responsibility through blaming others and confusing the issues.  For example, blame Fleet for the closing of the Duro-Test plant, even though Sorensen entered into the lockbox arrangement with Fleet; mischaracterize Sorensen's testimony during the District Three proceeding as "shallow testimony," ignoring the fact that it is the admission of a party under oath; characterize a document in evidence as "a rather informal memorandum" in order to diminish its importance; and, mischaracterize the test for employer status under FLSA by continuing to cite a case which sets forth the test for employee status.  Sorensen is liable for Plaintiff's health benefit losses because he was clearly a fiduciary of the Duro-Test health plan. Sorensen is liable for wages and commissions owed to Duro-Test employees because he operated Duro-Test and Litetronics through Durolite as a single employer.

For all of these reasons, Sorensen's Motion for Summary Judgment should be denied and Summary Judgment should be granted in favor of Plaintiffs.

KLEINBARD, BELL & BRECKER LLP

ROBERT B. BODZIN, ESQUIRE
MARY VASSALLO SLINKARD, ESQUIRE
MARY J. WALK, ESQUIRE
1900 Market Street. Suite 700
Philadelphia, PA  19103
(215) 568-2000

Dated:   July 2, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAWRENCE SHEINBERG and GILES HAZEL, on behalf of themselves and others similarly situated, | CIVIL ACTION |
| v. | |
| ROBERT SORENSEN; DUROLITE INTERNATIONAL, INC.; LITETRONICS INTERNATIONAL, INC., | No. 2:00cv6041 (KSH) |
| v. | |
| FLEET CAPITAL CORPORATION | |

## DECLARATION OF ROBERT B. BODZIN, ESQUIRE

ROBERT B. BODZIN, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declares:

1.       I am an attorney for the Plaintiffs in this action.  I submit this Declaration in support of Plaintiffs' Reply Memorandum of Law in Opposition to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment.

2.       The statements set forth in this Declaration are made upon my personal knowledge.

3.       Attached hereto are all of the corporate minutes produced by Defendants in response to Plaintiffs' discovery requests in this matter.

Robert B. Bodzin, Esquire

July 2, 2004

{00014840;v1}

## UNANIMOUS CONSENT OF DIRECTORS

### OF

### LITETRONICS INTERNATIONAL, INC.

CONFIDENTIAL

The undersigned, being all of the directors of Litetronics International, Inc., an Illinois corporation (the "Company"), do hereby unanimously consent and agree to the adoption of the following resolutions, pursuant to Section 8.45 of the Business Corporation Act of 1983, as amended, in lieu of holding of a special meeting of the directors of the Company:

RESOLVED:  That the recitals and resolutions attached hereto and incorporated herein by reference as Exhibit A are hereby approved and adopted.

FURTHER RESOLVED:  That this Consent may be signed in any number of counterparts, each of which shall be deemed to be an original, and all of which when taken together shall be deemed to be a single document.

Dated as of _OCTOBER 26_, 1995

_____
Robert C. Sorensen

_____
Michael H. Schaechter

Being all of the directors of the Company

D 40495

## EXHIBIT A

WHEREAS, it is contemplated that the current shareholders of the Company will enter into: (i) a Stock Purchase Agreement with certain investors associated with LaSalle Capital Group, Inc. ("LaSalle Principals"), whereby, among other things, the LaSalle Principals will purchase twenty percent (20%) of the Company's Class A and Class B shares of common stock ("Shares") from the current shareholders of the Company on a pro rata basis; and (ii) a Contribution Agreement by and among all the shareholders of the Company (including the LaSalle Principals) and DuroLite International, Inc., a Delaware corporation ("DuroLite"), which was recently formed for purpose of acquiring the Company and Duro-Test Corporation, whereby, among other things, all the shareholders of the Company will contribute all of their capital stock of the Company in return for shares of common stock of DuroLite. It is contemplated that upon the consummation of the above transactions and the contribution of the Company's stock to DuroLite, the Company will become a wholly-owned subsidiary of DuroLite and all the shareholders of the Company will become the shareholders of DuroLite.

NOW, THEREFORE, BE IT RESOLVED:  That the Company hereby waives any and all rights, including without limitation, rights of first refusal, preemptive rights, and any other rights or privileges it has or it might have under the Business Corporation Act of 1983 of Illinois, as amended (the "BCA"), the Articles of Incorporation of the Company, the By-Laws of the Company, any agreement to which it is bound, or otherwise with respect to the purchase by and transfer of the Shares to the LaSalle Principals as contemplated by the aforesaid Stock Purchase Agreement.

FURTHER RESOLVED:  That the Company hereby waives any and all rights of first refusal, preemptive rights, or any other rights and privileges it has or it might have under the BCA, the Articles of Incorporation of the Company, the By-Laws of the Company, any agreement to which it is bound, or otherwise, with respect to the transfer of the Shares to be contributed to DuroLite in exchange for the shares of common stock of DuroLite as contemplated by the aforesaid Contribution Agreement.

FURTHER RESOLVED:  That any officer of the Company, including, without limitation, Robert C. Sorensen, its President, or Michael H. Schaechter, its Vice President, is hereby authorized, directed and empowered to execute and deliver, in the name and on behalf of the Company, any and all documents, certificates and instruments necessary to evidence the waiver of such rights of first refusal, preemptive rights or such other rights and privileges as provided in the foregoing resolutions and to evidence the transfer of the Shares as provided in said Stock Purchase Agreement and Contribution Agreement.

FURTHER RESOLVED:  That all acts and deeds heretofore done or actions taken by any director or any officer or agent of the Corporation for or on behalf of the Corporation in entering into, executing, acknowledging or attesting any arrangements, agreements, instruments, or documents which carry out the terms and intentions of any of the foregoing recitals and resolutions are hereby in all respects ratified, approved and confirmed.

PES04479.DOC

D 40496

CONFIDENTIAL

## UNANIMOUS CONSENT OF DIRECTORS

### OF

### LITETRONICS INTERNATIONAL, INC.

The undersigned, being all of the directors of Litetronics International, Inc., an Illinois corporation (the "Corporation"), hereby consent and agree to the adoption of the following resolutions pursuant to Section 8.45 of the Business Corporation Act of 1983 of the State of Illinois, in lieu of holding a special meeting of the directors of the Corporation:

RESOLVED:  That the recitals and resolutions attached hereto and incorporated herein by reference as Exhibit A are hereby approved and adopted.

FURTHER RESOLVED:  That this Consent may be signed in any number of counterparts, each of which shall be deemed to be an original, and all of which when taken together shall be deemed to be a single document.

Dated as of October 31 , 1995

_____
Robert C. Sorensen

_____
Michael H. Schaechter

Being all of the directors of the Corporation

D 40497

## EXHIBIT A

WHEREAS, under the terms of an agreement of merger, DuroLite Merger Sub II, Inc. merged with and into Duro-Test Corporation, with Duro-Test Corporation surviving (the "Merger") and thereby becoming a subsidiary of DuroLite International, Inc.; and

WHEREAS, certain obligations were created pursuant to the Merger and in order to satisfy such obligations, certain financing must be obtained; and

WHEREAS, the Board of Directors of the Corporation deems it advisable and in the best interest of the Corporation, in order to finance the transaction described by the foregoing recitals and to provide working capital for Duro-Test Corporation and certain of its subsidiaries and for certain subsidiaries of the Corporation, that the Corporation, and DuroLite International and its subsidiaries, Litetronics Technologies, Inc., Litetronics Discharge, Inc., Litetronics Components, Inc., Duro-Test Corporation, Duro-Test Canada, Inc., and Duro-Test International Corporation (the Corporation and the listed subsidiaries being herein referred to collectively as the "Borrower Subsidiaries"), enter into a Loan and Security Agreement (the "Loan and Security Agreement") among DuroLite International, the Borrower Subsidiaries and Shawmut Capital Corporation ("Shawmut"), pursuant to which Shawmut will provide a total credit facility of up to $32,000,000, comprised of (i) an $11,675,000 term loan to Duro-Test Corporation, (ii) a $325,000 term loan to the Corporation and (iii) a $20,000,000 revolving credit facility to certain of the Borrower Subsidiaries; and

WHEREAS, (i) the Loan and Security Agreement and related documents and instruments will create a security interest in favor of Shawmut in all of the property and interests in all of the property of each Borrower Subsidiary, including a pledge of the Corporation's stock in Litetronics Technologies, Inc., Litetronics Discharge, Inc. and Litetronics Components, Inc. (collectively, the "Litetronics Subsidiaries") to Shawmut pursuant to a pledge agreement (the "Pledge Agreement"), and (ii) DuroLite International and Litetronics FSC, Inc. ("Litetronics FSC") will guaranty the obligations of the Borrower Subsidiaries to Shawmut pursuant to a guaranty (the "Guaranty"); and

WHEREAS, in anticipation of the financing transaction described herein, the Borrower Subsidiaries have executed and caused to be filed certain financing statements and other security instruments perfecting Shawmut's security interest in all of the property and interests in all of the property of each Borrower Subsidiary.

NOW, THEREFORE, BE IT RESOLVED: That Robert C. Sorensen, as President of the Corporation, or any Vice President of the Corporation, acting alone or with the Secretary or any Assistant Secretary of the Corporation, is hereby authorized, empowered and directed, in the name of and on behalf of the Corporation, to negotiate and finalize, on such terms as such officer shall deem appropriate in his sole discretion, and to execute and deliver the Loan and Security Agreement and a Term Loan Note in the principal amount of $325,000 and to take such other actions and negotiate and finalize, on such terms as such officer shall deem appropriate in his sole discretion, and execute and deliver all other instruments, certificates, assignments or financing statements, and such other documents as may be necessary or appropriate to effect the transactions contemplated thereby, including, without limitation, the Pledge Agreement, any amendments or other modifications to the Loan and Security Agreement, Pledge Agreement and all other instruments, certificates, assignments or financing statements, and such other documents as such

D 40498

officers of the Corporation deem necessary and appropriate to effect the transactions contemplated herein and as may be necessary and appropriate from time to time in connection with the ongoing financing transactions contemplated by the Loan and Security Agreement.

FURTHER RESOLVED:  That the Corporation, as the sole shareholder of the Litetronics Subsidiaries, hereby consents to the execution, delivery and performance of the Loan and Security Agreement, together with such other documents as may be necessary and appropriate to effect the transactions contemplated thereby, by authorized officers of each of such entities, including, without limitation, the execution and delivery of the Guaranty by Litetronics FSC, any amendments or other modifications to the Loan and Security Agreement, all other instruments, certificates, assignments and financing statements, and such other documents as such officers of each such Litetronics Subsidiary deem necessary and appropriate from time to time in connection with the ongoing financing transactions contemplated by the Loan and Security Agreement.

FURTHER RESOLVED:  That the execution and filing of Financing Statements and other security instruments, perfecting Shawmut's security interest on all of the property and interests in all of the property of the Corporation, are hereby ratified, approved and confirmed.

FURTHER RESOLVED:  That all acts and deeds heretofore done or actions taken by any director or any officer or agent of the Corporation for or on behalf of the Corporation or any Litetronics Subsidiary or any Borrower Subsidiary in entering into, executing, acknowledging or attesting any arrangements, agreements, instruments, or documents which carry out the terms and intentions of any of the foregoing recitals and resolutions are hereby in all respects ratified, approved and confirmed.

PES04476.A

2

D 40499

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, Robert C. Sorensen hereby sells, assigns and transfers unto (i) Charles S. Meyer, twenty-three and nine tenths (23.9) Shares of the Class A Common Stock and fourteen thousand two hundred ninety-nine (14,299) Shares of the Class B Common Stock of Litetronics International, Inc., (ii) Anthony Pesavento, twelve and three tenths (12.3) Shares of the Class A Common Stock and seven thousand four hundred ten (7,410) Shares of the Class B Common Stock of Litetronics International, Inc., (iii) Rocco J. Martino, five and four tenths (5.4) Shares of the Class A Common Stock and three thousand two hundred eleven (3,211) Shares of the Class B Common Stock of Litetronics International, Inc., (iv) DL Investors, as nominee, sixteen and four tenths (16.4) Shares of the Class A Common Stock and nine thousand eight hundred eighty (9,880) Shares of the Class B Common Stock of Litetronics International, Inc., all standing in his name on the books of said Litetronics International, Inc. represented by Class A Stock Certificate No. 6 and Class B Stock Certificate No. 106 and do hereby irrevocably constitute and appoint _____ attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises.

Dated: _October 30, 1995_

IN PRESENCE OF

_____

Signature guaranteed

_____

PMT04077.DOC

D 40500

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, John W. Beltramo, as Trustee of the John W. Beltramo

Trust dated February 27, 1992 hereby sells, assigns and transfers unto Charles S. Meyer, twelve

(12) Shares of the Class A Common Stock and seven thousand two hundred (7,200) Shares of

the Class B Common Stock of Litetronics International, Inc. standing in his name on the books

of said Litetronics International, Inc. represented by Class A Stock Certificate No. 8 and Class B

Stock Certificate No. 108 and do hereby irrevocably constitute and appoint

_____ attorney to transfer the said stock on the books of the

within named Company with full power of substitution in the premises.

Dated: _October 30, 1995_

_John Beltramo_

IN PRESENCE OF

_Melody J Zobel_

Signature guaranteed

_____

PMT04077.D

**D 40501**

### ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, Michael H. Schaechter, as trustee of the Michael H. Schaechter Trust dated October 16, 1995  hereby sells, assigns and transfers unto Charles S. Meyer, nine (9) Shares of the Class A Common Stock and five-thousand four hundred seventy (5,470) Shares of the Class B Common Stock of Litetronics International, Inc. standing in his name on the books of said Litetronics International, Inc. represented by Class A Stock Certificate No. 10 and Class B Stock Certificate No. 110 and do hereby irrevocably constitute and appoint _____ attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises.

Dated: October 30, 1995

IN PRESENCE OF

_____

Signature guaranteed

_____

PMT04077.A

D 40502

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the Estate of Raymond Van Thyne hereby sells, assigns and transfers unto Charles S. Meyer, one and two tenths (1.2) Shares of the Class A Common Stock and seven hundred eighteen (718) Shares of the Class B Common Stock of Litetronics International, Inc. standing in Ray J. Van Thyne's name on the books of said Litetronics International, Inc. represented by Class A Stock Certificate No. 4 and Class B Stock Certificate No. 104 and do hereby irrevocably constitute and appoint _____ attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises.

Dated: *October 30, 1995*

*Mary Jane Van Thyne*
*executor Ray J Van Thyne estate*

IN PRESENCE OF

_____

Signature guaranteed

_____

PMT04077.E

D 40503

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, Charles Kriser hereby sells, assigns and transfers unto

Charles S. Meyer, one and two tenths (1.2) Shares of the Class A Common Stock and seven

hundred eighteen (718) Shares of the Class B Common Stock of Litetronics International, Inc.

standing in his name on the books of said Litetronics International, Inc. represented by Class A

Stock Certificate Certificate No. 2 and Class B Stock Certificate No. 102 and do hereby

irrevocably constitute and appoint _____ attorney to transfer the

said stock on the books of the within named Company with full power of substitution in the

premises.


Dated: *October 30, 1995*


_____

IN PRESENCE OF

_____


Signature guaranteed


_____

PMT04077.C

**D 40504**

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, James A. Schoke and Elayne R. Schoke, Trustees FBO
James A. Schoke Revocable Trust dated November 19, 1993 hereby sell, assign and transfer unto
Charles S. Meyer, eight tenths (0.8) Shares of the Class A Common Stock and four hundred
ninety four (494) Shares of the Class B Common Stock of Litetronics International, Inc.
standing in their name on the books of said Litetronics International, Inc. represented by Class
A Stock Certificate No. 9 and Class B Stock Certificate No. 109 and do hereby irrevocably
constitute and appoint _____ attorney to transfer the said stock
on the books of the within named Company with full power of substitution in the premises.

Dated: *October 30, 1995*

*James A. Schoke, Trustee*

IN PRESENCE OF

_____

Signature guaranteed

_____

PMT04077.B

**D 40505**

CONFIDENTIAL

## UNANIMOUS CONSENT OF DIRECTORS

### OF

### LITETRONICS INTERNATIONAL, INC.

The undersigned, being all of the directors of LITETRONICS INTERNATIONAL,

INC., an Illinois corporation (the "Corporation"), hereby consent and agree to the adoption of the

following recitals and resolutions pursuant to Section 8.45 of the Business Corporation Act of the

State of Illinois:

RESOLVED: the directors of the Corporation deem it desirable and in the Corporation's best interest, and hereby approve, that the Corporation consummate and perform, and cause certain of its now existing and hereafter acquired subsidiaries to consummate and perform, the transactions described herein in connection with the acquisition of Aura Industrier AB, a Swedish company ("Aura"): (i) the formation of a new subsidiary of the Corporation ("Newco"), to be capitalized with $90,000 (which may be paid in part by promissory note), (ii) the issuance by Newco of promissory notes (to persons and entities including Robert C. Sorensen, Charles S. Meyer, Baker, Fentress & Company and other officers, directors and stockholders of DuroLite International, Inc. and its subsidiaries), in the aggregate original principal amount of $2,510,000, bearing interest of up to 23% per annum, and the issuance to the note purchasers of warrants for 10% of the common shares of Newco, (iii) Newco's use of the proceeds of the sale of such notes and warrants to acquire a Swedish shelf company, which will in turn acquire Aura, (iv) the acquisition of Aura by Acquiror for 99,112,697 Swedish kronor (approximately $12,400,000), subject to adjustments, (v) the combination of the European operations of the subsidiaries of the Corporation with the business of Aura, and (vi) a loan agreement with Aura, its operating subsidiary Auralight AB, DuroLite and Skandinaviska Enskilda Banken AB ("SE Banken") for a term loan to Aura of SEK 85,000,000, and a revolving credit facility to Auralight in the amount of SEK 25,000,000, with such changes in the terms of the foregoing transactions as the Chairman of the Corporatin deems reasonable and appropriate..

FURTHER RESOLVED: That the Chairman, President, Vice President, Treasurer, Secretary or any Assistant Secretary (the "Designated Officers") are hereby authorized, directed and empowered, acting on behalf of the Corporation, to execute and deliver any and all agreements, certificates and documents (including all instruments contemplated by any of the above documents), and/or perform any and all acts, as such Designated Officers shall deem necessary or appropriate to effect the purposes and intent of the foregoing resolutions and to consummate the transactions contemplated therein, all such documents to be in substantially the form presented to the directors of the Corporation, with such changes, modifications and amendments thereto as such Designated Officers shall deem necessary or

D 40506

appropriate, the approval of which shall be conclusively established by the execution and delivery thereof.

FURTHER RESOLVED: That all acts and deeds heretofore done or actions taken by any director of any officer or agent of the Corporation on behalf of the Corporation, in entering into, executing, acknowledging or attesting any arrangements, agreements, instruments or documents in carrying out the terms and intentions of the foregoing recitals and resolutions and each of them are hereby in all respects ratified, approved and confirmed.

FURTHER RESOLVED: That this consent may be signed in any number of counterparts, each of which shall be deemed to be an original, and all of which, when taken together shall be deemed to be a single document.

Dated as of August 7, 1998

_____
Robert C. Sorensen

_____
Michael H. Schaechter

Being all of the directors
of the Corporation

2                                                           **D 40507**

**CONFIDENTIAL**

### CONSENT OF SOLE SHAREHOLDER

### OF

### DURO-TEST INTERNATIONAL CORPORATION

The undersigned, being the sole shareholder of Duro-Test International Corporation,

Inc., a New Jersey corporation (the "Corporation"), hereby consents and agrees to the adoption

of the following recitals and resolutions pursuant to Section 14A:5-6 of the New Jersey Business

Corporation Act, in lieu of holding a special meeting of the sole shareholder of the Corporation:

> WHEREAS, the sole shareholder of the Corporation deems it to be desirable and in the best interest of the Corporation to remove Anthony S. Cavalieri as a director of the Corporation.

> NOW, THEREFORE, BE IT RESOLVED:  That Anthony S. Cavalieri is hereby removed as a director of the Corporation.

Dated as of _____ December 21 ___ , 1995

DURO-TEST CORPORATION

By: _____
Its: _Chairman  CEO_____

Being the sole shareholder of the
Corporation

D 40508

CONFIDENTIAL

## CONSENT OF SOLE SHAREHOLDER

### OF

### DURO-TEST INTERNATIONAL CORPORATION

The undersigned, being the sole shareholder of Duro-Test International Corporation,

Inc., a New Jersey corporation (the "Corporation"), hereby consents and agrees to the adoption

of the following recitals and resolutions pursuant to Section 14A:5-6 of the New Jersey Business

Corporation Act, in lieu of holding a special meeting of the sole shareholder of the Corporation:

WHEREAS, the sole shareholder of the Corporation deems it to be desirable
and in the best interest of the Corporation to remove Dan E. Picini as a director
of the Corporation upon the effectiveness of the merger of DuroLite Merger Sub
II, Inc. with and into Duro-Test Corporation (the "Merger").

NOW, THEREFORE, BE IT RESOLVED:  That immediately upon the
effectiveness of the Merger, Dan E. Picini shall be removed as a director of the
Corporation.

FURTHER RESOLVED:  That immediately upon the effectiveness of the
Merger, Robert C. Sorensen shall be elected a director of the Corporation to fill
the vacancy on the board of directors of the Corporation created by the removal
of Dan E. Picini, to serve in accordance with the By-laws of the Corporation until
the next annual meeting of the sole shareholder of the Corporation or until his
successor is elected and shall have qualified.

Dated as of _October 31_____, 1995


DURO-TEST CORPORATION

By: _____

Its: _PRESIDENT_____

Being the sole shareholder of the
Corporation

CONFIDENTIAL

## UNANIMOUS CONSENT OF DIRECTORS

### OF

## DURO-TEST INTERNATIONAL CORPORATION

The undersigned, being all of the directors of Duro-Test International Corporation, Inc., a New Jersey corporation (the "Corporation"), hereby consent and agree to the adoption of the following resolutions pursuant to Section 14A:6-7 of the New Jersey Business Corporation Act, in lieu of holding a special meeting of the directors of the Corporation:

WHEREAS, the directors deem it to be desirable and in the best interest of the Corporation to remove Dan E. Picini as President of the Corporation and to remove C. David Goldman as Secretary of the Corporation upon the effectiveness of the merger of DuroLite Merger Sub II, Inc. with and into Duro-Test Corporation (the "Merger").

NOW, THEREFORE, BE IT RESOLVED:   That immediately upon the effectiveness of the Merger, Dan E. Picini shall be removed as President of the Corporation and C. David Goldman shall be removed as Secretary the Corporation.

FURTHER RESOLVED: That immediately upon the effectiveness of the Merger, the following persons are hereby elected to the offices set forth opposite their respective names, to serve in accordance with the By-laws of the Corporation until the next annual meeting of the directors of the Corporation or until their respective successors are elected and shall have qualified:

| | | |
|---|---|---|
| Robert C. Sorensen | - | Chief Executive Officer, President and Treasurer |
| Anthony R. Pesavento | - | Vice President and Secretary |

FURTHER RESOLVED:  That this consent may be signed in any number of counterparts, each of which is deemed to be an original, and all of which when taken together shall be deemed to be a single document.

Dated as of October 3/ , 1995

_____
Robert C. Sorensen

_____
Anthony S. Cavalieri

_____
Miguel R. Diaz

Being all of the directors of the Corporation

PES04491.DOC

D 40510

## UNANIMOUS CONSENT OF DIRECTORS

### OF

**CONFIDENTIAL**

### DURO-TEST INTERNATIONAL CORPORATION

The undersigned, being all of the directors of Duro-Test International Corporation, Inc., a New Jersey corporation (the "Corporation"), hereby consent and agree to the adoption of the following resolutions pursuant to Section 14A:6-7 of the New Jersey Business Corporation Act, in lieu of holding a special meeting of the directors of the Corporation:

RESOLVED: That the recitals and resolutions attached hereto and incorporated herein by reference as Exhibit A are hereby approved and adopted.

FURTHER RESOLVED: That this Consent may be signed in any number of counterparts, each of which shall be deemed to be an original, and all of which when taken together shall be deemed to be a single document.

Dated as of October 31 , 1995

_____
Robert C. Sorensen

_____
Anthony S. Cavalieri

_____
Miguel R. Diaz

Being all of the directors of the Corporation

D 40511

**UNANIMOUS CONSENT OF DIRECTORS**        CONFIDENTIAL

**OF**

**DURO-TEST INTERNATIONAL CORPORATION**

The undersigned, being all of the directors of Duro-Test International Corporation, Inc., a New Jersey corporation (the "Corporation"), hereby consent and agree to the adoption of the following resolutions pursuant to Section 14A:6-7 of the New Jersey Business Corporation Act, in lieu of holding a special meeting of the directors of the Corporation:

RESOLVED: That the recitals and resolutions attached hereto and incorporated herein by reference as Exhibit A are hereby approved and adopted.

FURTHER RESOLVED: That this Consent may be signed in any number of counterparts, each of which shall be deemed to be an original, and all of which when taken together shall be deemed to be a single document.

Dated as of October 31, 1995

Robert C. Sorensen

Anthony S. Cavalieri

Miguel R. Diaz

Being all of the directors of the Corporation.

D 40512

## EXHIBIT A

WHEREAS, under the terms of an agreement of merger, DuroLite Merger Sub II, Inc. merged with and into Duro-Test Corporation, with Duro-Test Corporation surviving (the "Merger") and thereby becoming a subsidiary of DuroLite International, Inc.; and

WHEREAS, certain obligations were created pursuant to the Merger and in order to satisfy such obligations, certain financing must be obtained; and

WHEREAS, the Board of Directors of the Corporation deems it advisable and in the best interest of the Corporation, in order to finance the transaction described by the foregoing recitals and to provide working capital for Duro-Test Corporation and certain of its subsidiaries and for Litetronics International, Inc. and certain of its subsidiaries, that the Corporation, and DuroLite International and its subsidiaries, Litetronics International, Inc., Litetronics Technologies, Inc., Litetronics Discharge, Inc., Litetronics Components, Inc., Duro-Test Corporation and Duro-Test Canada, Inc., (the Corporation and the listed subsidiaries being herein referred to collectively as the "Borrower Subsidiaries"), enter into a Loan and Security Agreement (the "Loan and Security Agreement") among DuroLite International, the Borrower Subsidiaries and Shawmut Capital Corporation ("Shawmut"), pursuant to which Shawmut will provide a total credit facility of up to $32,000,000, comprised of (i) an $11,675,000 term loan to Duro-Test Corporation, (ii) a $325,000 term loan to Litetronics International, Inc. and (iii) a $20,000,000 revolving credit facility to certain of the Borrower Subsidiaries; and

WHEREAS, (i) the Loan and Security Agreement and related documents and instruments will create a security interest in favor of Shawmut in all of the property and interests in all of the property of each Borrower Subsidiary, and (ii) DuroLite International will guaranty the obligations of the Borrower Subsidiaries under the Loan and Security Agreement pursuant to a guaranty (the "Guaranty"); and

WHEREAS, in anticipation of the financing transaction described herein, the Borrower Subsidiaries have executed and caused to be filed certain financing statements and other security instruments perfecting Shawmut's security interest in all of the property and interests in all of the property of each Borrower Subsidiary.

NOW, THEREFORE, BE IT RESOLVED: That Robert C. Sorensen, as President of the Corporation, or any Vice President of the Corporation, acting alone or with the Secretary or any Assistant Secretary of the Corporation, is hereby authorized, empowered and directed, in the name of and on behalf of the Corporation, to negotiate and finalize, on such terms as such officer shall deem appropriate in his sole discretion, and execute and deliver the Loan and Security Agreement and to take such other actions and negotiate and finalize, on such terms as such officer shall deem appropriate in his sole discretion, and execute and deliver all other instruments, certificates, assignments or financing statements, and such other documents as may be necessary or appropriate to effect the transactions contemplated thereby, including, without limitation, the Guaranty by the Corporation of the obligations of the Borrower Subsidiaries, any and all documents establishing a factors lien and assignments of accounts or inventory and accounts receivable located in Puerto Rico, any amendments or other modifications to the Loan and Security Agreement, Guaranty and all other instruments, certificates, assignments or financing statements, and such other documents as such officers of the Corporation deem necessary and appropriate to effect the transactions

contemplated herein and as may be necessary and appropriate from time to time in connection with the ongoing financing transactions contemplated by the Loan and Security Agreement.

FURTHER RESOLVED: That the execution and filing of Financing Statements and other security instruments, perfecting Shawmut's security interest on all of the property and interests in all of the property of the Corporation, are hereby ratified, approved and confirmed.

FURTHER RESOLVED: That all acts and deeds heretofore done or actions taken by any director or any officer or agent of the Corporation for or on behalf of the Corporation or any Borrower Subsidiary in entering into, executing, acknowledging or attesting any arrangements, agreements, instruments, or documents which carry out the terms and intentions of any of the foregoing recitals and resolutions are hereby in all respects ratified, approved and confirmed.

PES04476.A

2

D 40514

CORPORATE RECORDS

D 40515

*State of Delaware*

## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "DUROLITE INTERNATIONAL, INC.", FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF APRIL, A.D. 1997, AT 9 O'CLOCK A.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS FOR RECORDING.



Edward J. Freel, Secretary of State

2545488  8100

971120127

AUTHENTICATION:     6420690

DATE:     04-15-97

**D 40516**

CERTIFICATE OF AMENDMENT
TO
CERTIFICATE OF INCORPORATION
OF
DUROLITE INTERNATIONAL, INC.

DUROLITE INTERNATIONAL, INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

FIRST: The first paragraph of Part A of Article FOURTH of the Corporation's Amended and Restated Certificate of Incorporation is hereby amended in its entirety to read as follows:

"FOURTH:

## PART A   AUTHORIZED STOCK

The total number of shares of all classes of stock which the Corporation shall have authority to issue is 202,500 shares, consisting of:

(i)     80,000 shares of Class A Common Stock, $0.01 par value per share (the "Class A Common Stock);

(ii)    50,000 shares of Class B Common Stock, $0.01 par value per share (the "Class B Common Stock");

(iii)   50,000 shares of Class C Common Stock, $0.01 par value per share (the "Class C Common Stock");

(iv)    20,000 shares of Class D Common Stock, $0.01 par value per share (the "Class D Common Stock"); and

(v)     2,500 shares of Preferred Stock, $1,000 par value per share (the "Preferred Stock").

SECOND: This amendment of the Certificate of Incorporation of the Corporation has been duly adopted in accordance with the provisions of Sections 228 and 242 of the General Corporation Law of the State of Delaware. Prompt written notice of the adoption of the amendment herein certified has been given to those stockholders who have not consented in writing thereto, as provided in Section 228(d) of the General Corporation Law of the State of Delaware.

D 40517

IN WITNESS WHEREOF, DuroLite International, Inc. has caused this Certificate to be executed by Robert C. Sorensen, its President, and attested by Anthony R. Pesavento, its Secretary, this 14th day of March, 1997.

DUROLITE INTERNATIONAL, INC.

By: _____

Robert C. Sorensen, President

ATTEST:

_____

Anthony R. Pesavento, Secretary

( 223564.1 )

D 40518

*State of Delaware*

PAGE   1

## *Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE RESTATED CERTIFICATE OF "DUROLITE INTERNATIONAL,
INC.", FILED IN THIS OFFICE ON THE TWENTY-SEVENTH DAY OF
OCTOBER, A.D. 1995, AT 4 O'CLOCK P.M.

A CERTIFIED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO
THE KENT COUNTY RECORDER OF DEEDS FOR RECORDING.

*Edward J. Freel, Secretary of State*

**D 40519**

2545488   8100

950249520

AUTHENTICATION:          7691849

DATE:

10-27-95

<u>AMENDED AND
RESTATED
CERTIFICATE OF INCORPORATION
OF
DUROLITE INTERNATIONAL, INC.</u>

DUROLITE INTERNATIONAL, INC., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation") does hereby certify as follows:

1.      The original Certificate of Incorporation of the Corporation was filed in the Office of the Secretary of State of Delaware on October 10, 1995 and filed in the Office of the Secretary of State of the State of Delaware. This Amended and Restated Certificate of Incorporation amends and restates in its entirety said original Certificate of Incorporation of the Corporation.

2.      The Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation") is as follows, consisting of Articles FIRST through ELEVENTH:

<u>FIRST</u>: The name of the corporation is:

DuroLite International, Inc.

<u>SECOND</u>: The address of its registered office in the State of Delaware is 32 Loockerman Square, Suite L-100, in the City of Dover 19904, County of Kent. The name of its registered agent at such address is The Prentice-Hall Corporation System, Inc.

<u>THIRD</u>: The nature of the business or purposes to be conducted or promoted by the corporation is to conduct any lawful business, to exercise any lawful purpose and power, and to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware as the same may be amended from time to time ("GCL").

<u>FOURTH</u>:

PART A   <u>AUTHORIZED STOCK</u>

The total number of shares which the Corporation shall have authority to issue is 1,002,500 shares, consisting of:

(i)      400,000 shares of Class A Common Stock, $0.01 par value per share (the "Class A Common Stock");

(ii)     250,000 shares of Class B Common Stock, $0.01 par value per share (the "Class B Common Stock");

(iii)    250,000 shares of Class C Common Stock, $0.01 par value per share (the "Class C Common Stock");

D 40520

OCT 27 '95 15:04 FR ALTHEIMER & GRAY      312 715 4800 TO 913026748340      P.04

(iv)    100,000 shares of Class D Common Stock, $0.01 par value per share (the "Class D Common Stock"); and

(v)    2,500 shares of Preferred Stock, $1,000 par value per share (the "Preferred Stock").

The Class A Common Stock, Class B Common Stock and Class C Common Stock are collectively referred to herein as the "Voting Common Stock" and the Voting Common Stock and the Class D Common Stock are collectively referred to herein as the "Common Stock". All shares of stock of the Corporation may be issued for such consideration, not less than the par value thereof, as shall be fixed from time to time by the Board of Directors, and shares issued for not less than the consideration so fixed shall be fully paid and non-assessable.

Notwithstanding anything to the contrary contained herein, no amendment to this Certificate of Incorporation which alters or changes the powers, preferences or rights of any class of Common Stock or Preferred Stock so as to affect them adversely shall be effective unless it has been approved by the vote of the holders of a majority of the shares of such class of Common Stock or Preferred Stock outstanding, voting separately as a single class.

A statement of the powers, preferences, qualifications, limitations, restrictions and the special or relative rights in respect of the shares of stock of each class is as follows:

## PART B   COMMON STOCK

1.    _Voting Rights_. Except as otherwise provided by law, the holders of shares of Voting Common Stock shall be entitled to one vote for each share so held with respect to each matter voted on by the shareholders of the Corporation except that, in the election of directors, each class of Voting Common Stock voting separately as a class shall elect directors, as provided in Article SEVENTH herein, as follows:

(a)    the Class A Common Stock, voting separately as a class, shall be entitled to elect three (3) directors (the "Class A Directors");

(b)    the Class B Common Stock, voting separately as a class, shall be entitled to elect two (2) directors (the "Class B Directors"); and

(c)    the Class C Common Stock, voting together with the Preferred Shares as a class as provided in Part C Section 4 herein, shall be entitled to elect two (2) directors (the "Class C Directors").

The Class D Common Stock is non-voting Common Stock, except as otherwise provided above in the third paragraph of Part A of this Article FOURTH or as otherwise required by law.

2.    _Dividends_. As and when dividends are declared or paid on Common Stock, whether in cash, property or securities of the Corporation, holders of Class A Common Stock, holders of Class B Common Stock, holders of Class C Common Stock and holders of the Class

2

D 40521

D Common Stock shall be entitled to participate in such dividends ratably on a per share basis; provided, however, that if dividends are declared which are payable in shares of Common Stock, or options, warrants, or rights to acquire shares of Common Stock, or securities convertible or exchangeable for shares of such Common Stock, such dividends shall be payable to holders of Class A Common Stock in shares of, or options, warrants, or rights to acquire, or securities convertible or exchangeable for, shares of Class A Common Stock, to holders of Class B Common Stock in shares of, or options, warrants, or rights to acquire, or securities convertible or exchangeable for, shares of Class B Common Stock, to holders of Class C Common Stock in shares of, or options, warrants, or rights to acquire, or securities convertible or exchangeable for, shares of Class C Common Stock, and to holders of Class D Common Stock in shares of, or option, warrants, or rights to acquire, or securities convertible or exchangeable for, shares of Class D Common Stock, each as the case may be.

3.     Liquidation.  After payment or provision for payment of all debts and other liabilities of the Corporation, and subject to the rights of any other class of capital stock of the Corporation which may exist from time to time, holders of all outstanding shares of Common Stock shall be entitled to participate ratably on a per share basis in the remaining net assets of the Corporation upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

## PART C   CONVERTIBLE PREFERRED STOCK

1.     Preferred Stock Designation and Stated Value.  The Preferred Stock of the Corporation is hereby designated as "Convertible Preferred Stock" (herein referred to as "Preferred Stock"). The Corporation shall issue fractional shares of Preferred Stock upon the original issuance, transfer or exchange of a Preferred Stock share, unless the Corporation and the holder of such Preferred Stock shall agree upon a payment in lieu of any such fractional share.

2.     Dividends.  No dividend or other distribution shall be declared or paid on the Common Stock of the Corporation unless a dividend is declared or paid on each share of the Preferred Stock in an amount equal to the amount that would have been paid on the number of shares of Class C Common Stock into which each such share of Preferred Stock would be convertible as of the record date for such declaration or payment if all such shares of Class C Common Stock had been issued upon conversion on such record date and such dividends or distributions payable on the Preferred Stock pursuant to this Section 2 shall be declared and paid in the same medium as that in which the dividends or distributions on the Common Stock giving rise thereto have been declared and is to be paid; provided, however, that this Section 2 shall not apply in the case of any dividend or other distributions on Common Stock paid in shares of Common Stock as covered by Section 5(c)(i) and 5(c)(ii) of this Part C.

3.     Liquidation Rights.

(a)     In the event of any liquidation, dissolution or winding up of the business of the Corporation, whether voluntary or involuntary, each holder of Preferred Stock shall be entitled to receive, for each share thereof, out of assets of the Corporation legally available therefor, a preferential amount in cash equal to (and not more than) the sum of (A) the par value thereof, plus (B) an amount equal to all declared but unpaid

3

D 40522

dividends or distributions thereon payable pursuant to Section 2. All preferential amounts to be paid to the holders of Preferred Stock in connection with such liquidation, dissolution or winding up shall be paid before the payment or setting apart for payment of any amount for, or the distribution of any assets of the Corporation to, the holders of Common Stock. If in any such distribution the assets of the Corporation shall be insufficient to pay the holders of the outstanding shares of the Preferred Stock the full amounts to which they shall be entitled, such holders shall share ratably in any distribution of assets in accordance with the sums which would be payable on such distribution if all sums payable thereon were paid in full.

(b)     Holders of shares of Preferred Stock shall not be entitled to receive any amounts with respect to any liquidation, dissolution or winding up of the Corporation other than the amounts provided in this Section 3. Neither a merger nor consolidation of the Corporation into or with another corporation nor a merger or consolidation of any other corporation into or with the Corporation, nor a sale, transfer, mortgage, pledge or lease of all or any part of the assets of the Corporation shall be deemed to be a liquidation, dissolution or winding up of the Corporation for purposes of this Section 3.

4.     Voting Rights.

The holders of Preferred Stock shall be entitled to vote on all matters on which the holders of Voting Common Stock are entitled to vote, and each share of Preferred Stock shall be entitled to a number of votes equal to the maximum number of shares of Class C Common Stock into which a share of Preferred Stock is, as of the record date for determining shares entitled to vote on such matter, convertible pursuant to Section 5 hereof. The holders of Preferred Stock shall vote together with the holders of the Class C Common Stock as a single class in the election of Class C Directors, and the holders of Preferred Stock shall be entitled to a number of votes equal to the maximum number of shares of Class C Common Stock into which their shares of Preferred Stock are, as of the record date for determining shares entitled to vote on such matter, convertible pursuant to Section 5 hereof.

5.     Conversion into Common Stock.

(a)     Conversion Right.

(i)     Each holder of Preferred Stock may at any time, and from time to time, convert all of such holder's shares of Preferred Stock into fully paid and non-assessable shares of Class C Common Stock in an amount equal to the quotient of (i) the aggregate par value of the shares of Preferred Stock which are being converted to Common Stock plus the amount of all accrued and unpaid cash dividends as of the date of conversion, divided by (ii) the Conversion Price (determined as provided in this Section 5) in effect at the time of such conversion. In order to exercise the conversion privilege under this Section 5(a), the holder of any shares of Preferred Stock to be converted shall give written notice to the Corporation at its principal office that such holder elects to convert such shares of Preferred Stock into shares of Class C Common Stock as set forth in such notice.

4

D 40523

(ii)     At any time upon or after the closing of an underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of any class of the Corporation's Common Stock for the account of the Corporation to the public (x) which raises a minimum of ten million dollars ($10,000,000) for the account of the Corporation, and (y) pursuant to which the price per share at which the Common Stock of the Corporation is offered for sale to the public is equal to or greater then two times the Conversion Price (including any adjustments pursuant to Section 5(c) hereof) immediately prior to the closing of such public offering (a "Qualified Public Offering"), the holders of the Preferred Stock shall, at the request of the Corporation, convert such number of shares of Preferred Stock as the Corporation shall request into such number of fully paid and nonassessable shares of Class C Common Stock as determined pursuant to Section 5(a)(i) into which each such share of Preferred Stock would be entitled to convert immediately prior to the closing of such sale of securities.

(iii) At such time as the certificate or certificates representing the Preferred Stock which has been converted are surrendered to the Corporation, the Corporation shall issue and deliver a certificate or certificates representing the number of shares of Class C Common Stock determined pursuant to Section 5(a)(i). Until such time as the certificate or certificates representing Preferred Stock which has been converted are surrendered to the Corporation and a certificate or certificates representing the Class C Common Stock into which such Preferred Stock has been converted have been issued and delivered, the certificate or certificates representing the shares of Preferred Stock which have been converted shall represent the shares of Class C Common Stock into which such shares of Preferred Stock have been converted. The Corporation shall pay all documentary, stamp or similar issue or transfer tax due on the issue of shares of Class C Common Stock issuable upon conversion of the Preferred Stock.

(b)     Conversion Price. The price for the conversion of the Preferred Stock into Class C Common Stock (the "Conversion Price") shall, subject to adjustment as hereinafter provided, be $80.6452 for each share of Class C Common Stock.

(c)     Adjustment of The Conversion Price. The Conversion Price shall be subject to adjustment as follows:

(i)     In the event that the Corporation shall at any time subdivide or combine the outstanding shares of Common Stock, or make a dividend or other distribution on the Common Stock in shares of Common Stock, the Conversion Price shall forthwith be proportionately decreased in the case of a subdivision, dividend or distribution, or increased in the case of a combination.

(ii)     Shares of Common Stock issuable by way of dividend or other distribution on any capital stock of the Corporation shall be deemed to have been issued immediately after the opening of business on the day following the date fixed for the determination of stockholders entitled to receive such dividend or

5

D 40524

other distribution and without consideration for purposes of paragraph (iii) below.

(iii) Except in the event of issuances of up to 10,000 shares of Class D Common Stock (as adjusted for all stock dividends, stock splits, subdivisions and combinations) to, or options or rights to purchase such number of shares of Class D Common Stock granted to, directors, senior management or employees of the Corporation or companies or businesses in which the Corporation has a direct or indirect equity interest, in the event that the Corporation shall, during the period beginning on the initial issuance of any shares of Preferred Stock and ending on the third anniversary of such initial issuance, issue and sell any shares of any class of the Common Stock of the Corporation at a price which is below the Conversion Price, then, on the date of such sale, the Conversion Price shall forthwith be decreased such that it is equal to the per share price at which such shares of Common Stock were sold. For the purpose of the adjustment provided in this paragraph (iii), if at any time or from time to time within the time period stated above the Corporation shall issue any rights or options for the purchase of, or stock or other securities exchangeable or convertible into, shares of Common Stock (such exchangeable or convertible stock or securities being hereinafter referred to as "Convertible Securities"), except for issuances of options or rights to directors, senior management or employees of the Corporation or companies or businesses in which the Corporation has a direct or indirect equity interest, to purchase up to 10,000 shares of Class D Common Stock (adjusted for all stock dividends, stock splits, subdivisions and combinations), then, in each case, the Corporation shall be deemed to have issued at the time of the issuance of such rights, options or Convertible Securities the maximum number of shares of Common Stock issuable upon exercise, exchange or conversion thereof and to have received as consideration for the issuance of such shares an amount equal to the total amount of the consideration, if any, received by the Corporation for the issuance of such rights, options and Convertible Securities (and, in the case of a security which is only partially exchangeable or convertible into Common Stock thereby making such security a Convertible Security, including only the consideration which is allocable to the portion of such security which is so exchangeable or convertible), plus the minimum amounts of consideration, if any, payable to the Corporation upon exercise, exchange and conversion of such rights, options and Convertible Securities. No further adjustment of the Conversion Price adjusted upon the issuance of such rights, options or Convertible Securities shall be made as a result of the actual issuance of shares of Common Stock on the exercise of any such rights or options or the exchange or conversion of any such Convertible Securities. If any such rights or options or the exchange or conversion privilege represented by any such Convertible Securities shall expire without having been exercised, the Conversion Price adjusted upon the issuance of such rights, options or Convertible Securities shall be readjusted to the Conversion Price that would have been in effect had such expired rights, options or Convertible Securities not been issued. For purposes of this paragraph (iii), the price at which such shares of Common Stock are sold by the Corporation shall include, in addition to the consideration receivable by the Corporation in connection with the sale of such shares as provided above, the

6

D 40525