## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------------x

LAWRENCE SHEINBERG and GILES HAZEL,
on behalf of themselves and others
similarly situated,

            **Plaintiffs,**

      v.

ROBERT SORENSEN; DUROLITE
INTERNATIONAL, INC.; LITETRONICS
INTERNATIONAL, INC.,

            **Defendants and**
            **Third-Party Plaintiffs,**

      v.

FLEET CAPITAL CORPORATION,

            **Third-Party Defendant.**

-------------------------------------------------------------x

**Civil Action No. 00-6041(JLL)**

---

### DEFENDANTS' COUNTER-STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

       Defendants Robert Sorensen, Durolite International, Inc. and Litetronics International, Inc. submit this Counter-Statement in opposition to plaintiffs' motion for summary judgment, and in support of plaintiffs' summary judgment motion, as follows:

### I.

### PRELIMINARY STATEMENT

       Plaintiffs served their Motion for Summary Judgment on June 1, 2004, but failed to serve any Statement pursuant to Local Rule 56.1. On June 1, defendants inquired as to whether plaintiffs prepared or served a Rule 56.1 Statement. Plaintiffs made no response.

       Defendants' lead counsel has been litigating this case since it was filed in December 2000. The firm that originally represented plaintiffs has an office in New Jersey, and so does the firm that currently represents plaintiffs. There has been more than sufficient time for

plaintiffs' attorneys to familiarize themselves with the rules that govern summary judgment motions before this Court.[1]

For nearly two weeks following the service of their summary judgment motion, plaintiffs failed to prepare a Local Rule 56.1 Statement. During this time, plaintiffs were in possession of defendants' Rule 56.1 Statement -- which means that plaintiffs certainly were aware that such a pleading was required.

On June 14, 2004, defendants served a motion to strike plaintiffs' summary judgment motion. Plaintiffs received that motion on June 15. On June 17, 2004 -- only 5 days before the parties were scheduled to serve opposition papers -- plaintiffs served a Rule 56.1 Statement via telecopier. Apparently, plaintiffs would not prepare the materials that are required for a motion for summary judgment until defendants served their motion to strike.[2]

Plaintiffs' Rule 56.1 Statement does not contain a single citation to any testimony or other evidence to support any of plaintiffs' assertions.[3] Plaintiffs' Rule 56.1 Statement is defective. Defendants submit that it should not be considered by the Court.

## II.

## COUNTER-STATEMENT TO PLAINTIFFS' ALLEGED FACTS

Plaintiffs' Statement No. 1        Duro-Test for many years was in the business of manufacturing and marketing lighting products, primarily incandescent and fluorescent bulbs and fixtures.

---

[1]   In addition, plaintiffs' lead counsel, Robert B. Bodzin, Esq., is undoubtedly familiar with the requirement of a Rule 56.1 Statement, and the effect of such a Statement. See Brookridge Funding Corp. v. Northwestern Human Services, 175 F. Supp. 2d 355, 357, 358 n. 3 (D. Conn. 2001).

[2]   The service of plaintiffs' Rule 56.1 Statement with just 5 days remaining before the service of a response violates Section 12 of "Lawyers' Duties to Other Counsel, as set forth in Appendix R to the Court's Local Rules."

[3] As set forth herein, even when plaintiffs' Brief contains language that is similar or identical to plaintiffs' Rule 56.1 Statement, citations to evidence are often missing. When such citations exist, the evidence does not support plaintiffs' assertions.

Plaintiffs have failed to cite any evidence in support of this statement. Plaintiffs made an identical statement in the Memorandum of Law in support of plaintiffs' motion for summary judgment ("Brief"). However, the evidence cited therein does not support plaintiffs' statement.

Duro-Test was founded in the late 1920's. Its operations were based in New Jersey and it manufactured mainly incandescent light bulbs. See Defendants' Rule 56.1 Statement, dated June 1, 2004, and submitted in support of defendants' motion for summary judgment, ¶¶ 1-4.

**Plaintiffs' Statement No. 2**     Litetronics was also in the business of manufacturing and marketing lighting products, primarily halogen bulbs and fixtures.

Plaintiffs have failed to cite any evidence in support of this statement, either in their Rule 56.1 Statement or in their Brief. For background facts relating to Litetronics, defendants respectfully refer the Court to Defendants' Rule 56.1 Statement, ¶¶ 5-8 and the evidence cited therein.

**Plaintiffs' Statement No. 3**     Duro-Test sold mostly to end-users through a large nationwide sales force while Litetronics sold mostly to distributors.

Plaintiffs have failed to cite any evidence to support this statement. Plaintiffs' Brief (p. 5) contains an identical statement, but plaintiffs cited no evidence there, either. Nowhere have plaintiffs offered any evidence concerning the size of Duro-Test's sales force.

Defendants respectfully refer the Court to Defendants' Rule 56.1 Statement, ¶¶ 1-8 and 99-101 for a comparison of Duro-Test's and Litetronics' business.

**Plaintiffs' Statement No. 4**     Robert Sorensen was the Chief Executive Officer and 36% shareholder of Litetronics and had been involved in the lighting business for about 25 years prior to acquiring Duro-Test.

Plaintiffs have not cited any evidence to support this assertion. Plaintiffs' Brief (p. 5) contains similar assertions, which plaintiffs also failed to support.

Defendants respectfully refer the Court to the Declaration of Robert Sorensen, dated May 28, 2004, submitted in support of Defendants' motion for summary judgment.

Plaintiffs' Statement No. 5    In November of 1995, Duro-Test, Sorensen and Litetronics became part of a unified venture when Sorensen joined Durolite to acquire the stock of both Duro-Test and Litetronics.

Plaintiffs have failed to cite any evidence to support this assertion, either in their Rule 56.1 Statement or in their Brief.

Plaintiffs' statement is at odds with the evidence. The evidence shows that Duro-Test and Litetronics operated separately in all aspects of their respective businesses. The separate nature of the two companies was reflected in the separate composition of their boards of directors; their separate products and customers; their separate banking relationships; their separate HR departments and health plans; their separate personnel policies and procedures; and their separate payrolls and banking relationships. See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 6    Sorensen became a 32% shareholder of Durolite, and its largest shareholder and Sorensen was empowered to designate three of Durolite's seven member Board of Directors, including himself.

Plaintiffs have failed to provide any evidence to support this statement. Plaintiffs' Brief (p. 5) contains a similar statement, which plaintiffs have also failed to support.

Following Durolite's acquisition of Duro-Test in or about October 1998, Sorensen held approximately 32% of the stock of Durolite, and no shares of either Duro-Test or Litetronics. See Sorensen Decl., dated May 28, 2004, ¶¶ 8-9.

Plaintiffs' Statement No. 7        On November 3, 1995, to great fanfare, Sorensen, the owner of Litetronics (a Duro-Test competitor for many years), announced to Duro-Test's employees that he had acquired Duro-Test and had "merged" the two companies by creating a holding company, Durolite, that would operate both Duro-Test and Litetronics as wholly owned subsidiaries.  Sorensen stated the merger "brings together two leaders in the global specialty lighting industry with complimentary manufacturing and marketing capabilities."

Plaintiffs have supplied no citation to any evidence to support this assertion.  In their Brief (p. 5), defendants refer to a declaration by Georgeanna Pugh to support a similar statement.  The Pugh Declaration (which plaintiffs have not supplied in their summary judgment papers), contains no information that Ms. Pugh ever heard any announcement by Sorensen, or ever attended any meeting with him.  Neither the Pugh Declaration nor any documents referenced therein provide any evidence of any legal "merger" or to any other transaction that had the effect of merging Duro-Test and Litetronics.

In addition, plaintiffs have provided no evidence whatsoever that Duro-Test and Litetronics were ever competitors.  The evidence indicates that, on every level, the management and operations of Duro-Test and Litetronics were conducted separately.  There was little, if any competition between Litetronics and Duro-Test.  See Defendants' Rule 56.1 Statement, ¶¶ 22-94, 99.

Plaintiffs' Statement No. 8        Sorensen's announcement of the new regime to Duro-Test employees in November of 1995 emphasized how close the relationship would be, "I am pleased to announce that we have merged Duro-Test Corporation and Litetronics International, Inc.  Duro-Test has a fine heritage and so does Litetronics.  Together we will build the best lighting company in the world."  Sorensen also assured the Duro-Test workforce that the two companies would enjoy a bright future under his leadership as the Chairman and CEO of Duro-Test, Durolite and Litetronics.

Plaintiffs have supplied no citation to any evidence to support this assertion.  In their Brief (pp. 5-6), plaintiffs made a similar assertion, and referred to a declaration by Georgeanna Pugh, which they failed to include in their summary judgment papers.  The Pugh Declaration contains no information that Ms. Pugh ever heard any announcement by Sorensen, or ever attended any meeting with him.  In addition, the document referenced the Pugh

Declaration contains no reference to statement or transaction that has any material affect on any issue in this action.

The evidence indicates that, on every level, the management and operations of Duro-Test and Litetronics were conducted separately at all times between 1995 and 2000. See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

**Plaintiffs' Statement No. 9**      Beginning in November 1995, Sorensen served as Chairman and Chief Executive Officer of Durolite, Duro-Test and Litetronics.

Plaintiffs have failed to cite any evidence in support of this assertions. Plaintiffs' Brief (p. 5) contains an identical statement that lacks evidentiary support, particularly for the assertion that Sorensen served as "Chairman" of Durolite, Duro-Test and Litetronics.

The facts are that following the acquisition of Duro-Test in or about October 1995, Sorensen became CEO of Durolite, Litetronics and Duro-Test. Sorensen ceded all day-to-day management of Litetronics, and he resigned as CEO of Duro-Test in August 1999. See Defendants' Rule 56.1 Statement, ¶¶ 22-24, 32, 147.

**Plaintiffs' Statement No. 10**      As part of its employee benefits package, Duro-Test provided group health coverage to its employees (the "Plan") through a plan administered by Horizon Blue Cross Shield of New Jersey ("Horizon Blue Cross").

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs' Brief (p. 6) contains an identical assertion, which is also unsupported. Nor do plaintiffs provide any evidence that the Plan provided "group health coverage."

The facts are that Duro-Test maintained a self-funded health insurance plan that was already in place before Durolite acquired Duro-Test in late 1995. Horizon administered the Duro-Test self-insured plan. Neither Sorensen, Durolite or Litetronics ever exercised any control over the plan or over any health care funds of Duro-Test employees. See Defendants' Rule 56.1 Statement, ¶¶ 60-66.

**Plaintiffs' Statement No. 11**       Duro-Test deducted monies on a weekly basis from the paychecks of Duro-Test employees to pay for the health benefits.

Plaintiffs have provided no citation or reference to any evidence in support of this assertion. Plaintiffs made a similar assertion in their Brief (p. 6), but the testimony cited also does not support the assertion. The cited testimony was only to the effect that covered individuals were required to make payments, as opposed to deductions.

For the facts relating to payment for the plan, see Defendants Rule 56.1 Statement, ¶¶ 63-67 and Sorensen Decl., dated May 28, 2004, ¶ 13.

**Plaintiffs' Statement No. 12**       Duro-Test did not segregate the funds it deducted from the paychecks of Duro-Test employees.

Plaintiffs have not cited any evidence to support this assertion.

Plaintiffs' assertion is contrary to fact. As set forth in Defendants' Rule 56.1 Statement, Duro-Test maintained separate accounts for general operating expenses and for payroll. See Defendants' Rule 56.1 Statement, ¶¶ 84, 88. In addition, all funds to pay Duro-Test expenses were drawn from a Fleet account and were not "deducted" or removed from Duro-Test paychecks, as plaintiffs assert. See Defendants' Rule 56.1 Statement, ¶¶ 63-67.

**Plaintiffs' Statement No. 13**       Sorensen knew that the Duro-Test plan was a self-insured health plan and that Duro-Test employees had amounts deducted from their gross compensation to pay for health coverage.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made a similar assertion in their Brief (pp. 6-7), but the testimony that they cite does not support the assertion. Sorensen testified only that he was generally aware of the self-insured plan and assumed that deductions were made from the gross compensation of Duro-Test employees. See Sorenson Dep. at 331 line 17 and 332 line 18 (Plaintiffs' Appendix, Exh. F).

The evidence also renders plaintiffs' assertion immaterial.    Sorensen never exercised any operational control over the Plan.    See Defendants' Rule 56.1 Statement, ¶¶ 63-67; Sorensen Decl., dated may 28, 2004, ¶ 14.

Plaintiffs' Statement No. 14        Duro-Test's self-insurance arrangement with Horizon Blue Cross provided that Horizon would administer claims, allow employees the use of its provider network, and then seek reimbursement weekly from Duro-Test for claims paid by Horizon, in addition to administrative fees.

Plaintiffs have failed to cite any evidence in support of this assertion.    As the evidence shows, neither Sorensen, Durolite, or Litetronics ever exercised any control or operational authority over the plan or the payment of any Horizon invoices.    Such functions were delegated to Duro-Test's CFO and HR Department.    See Defendants' Rule 56.1 Statement, ¶¶ 63-67, 76.    For the facts relating to the operation of the Duro-Test plan and billing-related matters, see Defendants' Rule 56.1 Statement, ¶¶ 60-67.

Plaintiffs' Statement No. 15        The employees were never provided with a summary plan description, or a disclosure that the Plan was self-funded by Duro-Test.

Plaintiffs have failed to cite any evidence in support of this assertion either in their Rule 56.1 Statement or in their Brief (p. 7).

Plaintiffs' assertion is contrary to fact.    Louis Szucs, Duro-Test's HR manager, testified that summary plan descriptions were provided to all Duro-Test employees.    See Szucs Dep. at 62, 75 (both pages of Mr. Szucs' deposition are attached hereto as Exhibit A.).    In addition, plaintiffs' assertions concerning whether Duro-Test employees knew that the Plan was self funded are immaterial.

Plaintiffs' Statement No. 16        Instead, the employees were told that the health plan was "provided" by Horizon Blue Cross and Blue Shield.

Plaintiffs have failed to provide a citation to any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (p. 7), and failed to support it there as well.

Plaintiffs' assertion is immaterial. For the facts relating to the plan, and the dissemination of plan-related materials, see defendants' response to Statements Nos. 14 and 15 herein.

Plaintiffs' Statement No. 17    In a memorandum to its employees, Duro-Test boasted that "in keeping with our commitment to provide economic and personal security for you and your family, Duro-Test Corporation is proud to offer you and your eligible dependents a very fine optional health and life insurance program."

Plaintiffs have not cited any evidence to support the assertion made above.

Plaintiffs made an identical assertion in their Brief (p. 7). However, plaintiffs failed to supply the document at page 306a of the District Three hearing, to which their Brief refers. Moreover, "boast" was involved in any Duro-Test memorandum. The Duro-Test memorandum, identified by one Duro-Test union member during the District Three hearing, generally describes life insurance, medical coverage, vision coverage, and other benefits. The memorandum states, inter alia, "A package explaining your health coverage is provided prior to your effective date of enrollment." This undermines, Statements Nos. 15 and 16 in plaintiffs' Rule 56.1 Statement, and those statements are without merit.

Plaintiffs' Statement No. 18    On January 10, 2000, unbeknownst to any of Duro-Test's employees, Duro-Test stopped reimbursing Horizon for claims paid, even though employees continued to contribute up to $41.79 per week into the plan.

Plaintiffs have failed to cite any evidence to support the foregoing assertion. In addition, plaintiffs made a similar assertion in their Brief (p. 7), but also failed to cite to any supporting evidence.

Plaintiffs have failed to provide any evidence that any employees of Duro-Test continued to contribute up to $41.79 per week into the Plan following January 10, 2000. In addition, the uncontroverted evidence is that Duro-Test's Plan was in effect on January 10, 2000, and remained in effect on February 18, 2000, when Duro-Test's facilities were closed. See Defendants' Rule 56.1 Statement, ¶¶ 65-73.

Plaintiffs' Statement No. 19    As a result, Horizon then terminated its administrative services agreement with Duro-Test, when Duro-Test was $188,084.32 in arrears in payment of administrative fees.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made a similar assertion in their Brief (p. 7), but failed to provide any evidence other than a reference to:  (a) a certification that does not comply with 28 U.S.C. § 1748; and (b) an Administrative Services Agreement and an accompanying letter.  The accompanying letter shows that Horizon sent a "past due notice" to Duro-Test on February 23, 2000, and not on January 10, 2000, as plaintiffs' Statement 19 implies. In addition, Horizon's letter, dated February 23, 2000, states that "accounts cannot be more than 90 days in arrears." At the time, Duro-Test's account was only 44 days in arrears. In addition, the uncontroverted evidence is that, for several years, Duro-Test paid Horizon several weeks in arrears. See Defendants' Rule 56.1 Statement, ¶¶ 67- 73.

Plaintiffs' Statement No. 20    In 1997, Duro-Test entered into a collective bargaining agreement with its union employees which stated that "in the event that Duro-Test chooses to close a plant, Duro-Test would provide continued medical insurance for separated employees for a period not to exceed three months."

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 8), but failed to supply the document referenced to therein with their summary judgment papers. Plaintiffs also ignored a

request by defendants for the correct documentation. <u>See</u> Defendants' Memorandum of Law In Opposition to plaintiffs' summary judgment motion, p. 10 and Exh. B.

Plaintiffs' assertion is, in any event, irrelevant to this case, because this action does not involve a union, or any collective bargaining agreement.

<u>Plaintiffs' Statement No. 21</u>      Historically, non-union employees were advised by Duro-Test management that they would receive at least the same level of benefits offered to union employees.

Plaintiffs have failed to supply any evidence to support this assertion. Plaintiffs made a similar assertion in their Brief (p. 8). They also failed to supply any evidence in their Brief.

The uncontroverted evidence is that plaintiffs did <u>not</u> have the same benefits as their unionized counterparts at Duro-Test. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 128-40. Moreover, the two named plaintiffs, Lawrence Sheinberg and Giles Hazel, are the only plaintiffs with knowledge concerning this action, and both testified that they have no information to support plaintiffs' assertion in paragraph 21. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 128, 136, 139, 230-31.

<u>Plaintiffs' Statement No. 22</u>      On February 23, 2000, Horizon Blue Cross terminated its administrative contract with Duro-Test and advised Duro-Test employees who were receiving unemployment insurance payments per month that they could purchase their own health insurance at a cost of $11,000.00 per month.

Plaintiffs have failed to cite any evidence to support the assertion made above. Plaintiffs made a similar assertion in their Brief (p. 8), and referred to a one-page letter from Horizon concerning purchase of health insurance by individuals. That letter is dated March 8, 2000 (not, February 23, 2000 as plaintiffs assert). The Horizon letter is marked "DRAFT", and there is no evidence that the letter was ever sent (<u>see</u> p. 66a). The draft letter made no mention of the cost of $11,000.00 per month.

Horizon sent a "past due notice" to Duro-Test on February 23, 2000, and not on January 10, 2000, as plaintiffs' Statement 19 implies. In addition, Horizon's letter, dated February 23, 2000, states that "accounts cannot be more than 90 days in arrears." At the time, Duro-Test's account was only 44 days in arrears. In addition, the uncontroverted evidence is that, for several years, Duro-Test paid Horizon several weeks in arrears. See Defendants' Rule 56.1 Statement, ¶¶ 67- 73.

Plaintiffs' Statement No. 23        One employee incurred between $20,000 and $40,000 in unreimbursed medical bills while another incurred over $40,000 in unreimbursed medical bills.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made a similar statement in their Brief (p. 8). The testimony cited therein shows that only one employee incurred between $20,000 and $40,000 in unreimbursed medical bills. No mention is made of any other Duro-Test employees.

Plaintiffs' Statement No. 24        The acquisition of Duro-Test was highly leveraged and risky considering Duro-Test sales had been declining in recent years.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made an identical statement in their Brief (p. 8) and failed to cite any evidence there as well. There is no evidence in the record concerning any degree of leverage or risk in the acquisition of Duro-Test. The uncontroverted summary judgment evidence is that Duro-Test was acquired for approximately $30 million, and that its financing was collateralized by Duro-Test's assets. See Defendants' Rule 56.1 Statement, ¶¶ 9-17.

Plaintiffs' Statement No. 25        Durolite's financial condition was poor in November of 1995 and it continued to deteriorate.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made a similar assertion in their Brief (p. 8) and failed to provide any evidence there as well.

12

The financial condition of Durolite is not at issue in this litigation, and it is not material to any claim in this action. The uncontroverted evidence is that, following the acquisition of Duro-Test in or about October 1995, Durolite functioned as a holding company, with no assets, product, or employees of its own. See Defendants' Rule 56.1 Statement, ¶ 10.

Plaintiffs' Statement No. 26    Its principal lender was Fleet Bank ("Fleet"), which held a security interest in much of its assets.

Plaintiffs have failed to cite any evidence in support of this assertion. In addition, plaintiffs made an identical assertion in their Brief (p. 8) and failed to cite any evidentiary support there.

The uncontroverted evidence is that the lender for Durolite, Duro-Test and Litetronics was Fleet Capital Corp. ("Fleet") and that, pursuant to a certain Loan Agreement, the assets of all borrowers thereunder collateralized the term loan and revolving loans made pursuant to the Loan Agreement. See Defendants' Rule 56.1 Statement, ¶¶ 12-17.

Plaintiffs' Statement No. 27    At the time of the merger, Duro-Test, Litetronics and Durolite entered into an agreement with Fleet that all receipts would be delivered to a Fleet lockbox.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made a similar assertion in their Brief (pp. 8-9); however, the deposition testimony that plaintiffs cited does not support plaintiffs' assertion. Sorensen testified that Duro-Test and Litetronics had *separate* lock boxes under the Loan Agreement. Sorensen Dep. at 80 line 17. The Sorensen testimony that plaintiffs cite at page 84, line 18 does not support the proposition. Plaintiffs also cite exhibit P-95 in support of this assertion. However, exhibit P-95 is not a lock box agreement and Sorensen was not able to identify the document at his deposition. See Sorensen Dep. at 246 (Plaintiffs' Appendix, Exh. F).

The uncontroverted evidence is that pursuant to the Loan Agreement, each of the borrowers were required to establish a separate lock box, over which Fleet could exert control in

order to sweep all customer receipts from each separate lock box.  See Defendants' Rule 56.1 Statement, ¶¶ 15-16.

   Plaintiffs' Statement No. 28      The lockbox agreements were approved by the board of Durolite, Duro-Test and Litetronics.

   Plaintiffs have cited no evidence to support this assertion.  In their Brief (p. 9), plaintiffs assert that a single lock box agreement was approved by the Board of Durolite, Duro-Test and Litetronics.   The authority cited by plaintiffs in their Brief fails to support the proposition.

   At his deposition, Sorensen was asked whether the Loan Agreement -- as opposed to any "lockbox agreements" -- was approved by the Boards of Durolite, Duro-Test and Litetronics.  Sorensen replied that he did not know but he believed so.  Sorensen Dep. at 86, lines 11-15.   Sorensen was not asked about any lock box agreements, and he did not respond concerning any lock box agreements.

   The uncontroverted evidence is that the Loan Agreement required all of the borrowers thereunder, including Duro-Test and Litetronics, to establish their own lock boxes.  In addition, the Loan Agreement provided for separate revolving loans to Duro-Test and Litetronics.   See Defendants' Rule 56.1 Statement, ¶¶ 12-18.   In addition, in contrast to plaintiffs' assertion, Durolite, Duro-Test and Litetronics had separate Boards of Directors.  See Defendants' Rule 56.1 Statement, ¶¶ 34-42.

   Plaintiffs' Statement No. 29      Sorensen knew that all monies that came into the Durolite companies came into the lockboxes.

   Plaintiffs have failed to cite any evidence in support of this assertion.

   Plaintiffs made a similar assertion in their Brief (p. 9), except that plaintiffs asserted that all monies came into a single lock box.  Id.  The authority cited by plaintiffs does

14

not support that proposition.  Sorensen testified that Duro-Test and Litetronics had separate lock boxes.  Sorensen Dep. at 86-87.

The uncontroverted evidence is that the Loan Agreement with Fleet required Duro-Test, Litetronics and their affiliates were to establish separate lock boxes.  See Defendants' Rule 56.1 Statement, ¶ 15.  In addition, the only funds that were deposited into the separate lock boxes were payments from customers of Duro-Test or Litetronics respectively.  See Defendants' Rule 56.1 Statement, ¶¶ 15, 16, and Sorensen Dep., pp, 80-81, 86-87, 334.


Plaintiffs' Statement No. 30      Following the merger, Sorensen decided how to "strategically align business units" of Duro-Test and Litetronics.

Plaintiffs have cited no evidence to support this assertion.  Plaintiffs made the identical assertion in their Brief (p. 9) but failed to cite any evidence for that proposition.

Plaintiffs' assertion has no basis in fact.  The uncontroverted evidence is that in connection with any decision to transfer any business between Duro-Test and Litetronics, discussions were held with Michael Schaechter (Litetronics' President), Mr. Kersting (an executive with Duro-Test), and Sorensen.  Duro-Test and Litetronics separately approved the lines of business that were transferred between them.  See Schaechter Dep. at 55-65 (Plaintiffs' appendix, Exh. H), and Defendants' Rule 56.1 Statement, ¶¶ 99-112.


Plaintiffs' Statement No. 31      Sorensen was chief decision-maker for Durolite, Duro-Test and Litetronics and decided what in his view was best for each entity.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 9); however the testimony that plaintiffs cite fails to support their assertion.  Sorensen testified at his deposition that he made decisions for Duro-Test and made recommendations to the Durolite Board of Directors.  Sorensen Dep. at 38-40.

The uncontroverted evidence is that following the acquisition of Duro-Test in or about October 1995, Michael Schaechter, as Litetronics President, exercised all day-to-day management functions over Litetronics and was never countermanded or reversed. In addition, Schaechter approved transfers of various lines of business between Duro-Test and Litetronics. In the end, Litetronics received business from Duro-Test that yielded approximately $1 million in annual revenues. Duro-Test, however, received business from Litetronics that yielded $1.5 million in revenues per year. See Defendants' Rule 56.1 Statement, ¶¶ 24, 99-122; and Schaechter Dep. at 55-65.

Plaintiffs' Statement No. 32     Sorensen had "the ultimate decision-making authority on behalf of Duro-Test and Litetronics."

Plaintiffs cite no evidence to support this assertion.

In their Brief (p. 9), plaintiffs made an identical assertion. However, the testimony cited by plaintiffs fails to support the assertion. Sorensen denied that he exercised control over Duro-Test and Litetronics. Sorensen Dep. at 57, lines 8-17. He testified that he would exercise decision making authority only in the event of a disagreement, and if the matter was brought to him for a decision. Id.

The uncontroverted evidence is that, with respect to the alignment of various "business units" of Duro-Test and Litetronics, any realignment was approved by Michael Schaechter, President of Litetronics, by the Durolite Board of Directors and by the appropriate sales personnel at Duro-Test. See Schaechter Dep. at 55-65. In connection with the transfer of business units, Litetronics received lines of business that generated $1 million per year from Duro-Test; however Duro-Test received lines of business from Litetronics that generated $1.5 million in annual revenues. See Defendants' Rule 56.1 Statement, ¶¶ 100-112.

Plaintiffs' Statement No. 33     Neither Duro-Test nor Litetronics had functioning boards of directors.

Plaintiffs cite no evidence to support this assertion.

In their Brief (p. 9), plaintiffs made the identical assertion, and attempted to support their assertion with deposition testimony from Richard Crossland, who became Duro-Test's CEO in August 1999. Plaintiffs' proffered testimony does not support their assertion. Richard Crossland was appointed to the Durolite Board of Directors in 1998, but he did not sit on the Duro-Test Board of Directors. Sorensen Dep. at 283. Crossland testified that the Boards of Directors of Durolite and Duro-Test met at the same time. See Defendants' Rule 56.1 Statement ¶¶ 34-42. Board of Directors minutes were generated for both Durolite and Duro-Test in the same document. See Declaration of Robert Sorensen, dated June 22, 2004, and Exhibit B, attached thereto.

Crossland never sat on Litetronics' Board of Directors. Litetronics had its own Board of Directors, consisting of Sorensen and Michael Schaechter. See Defendants' Rule 56.1 Statement, ¶¶ 39, 41. Litetronics' Directors signed various documents independent of Duro-Test's or Durolite's Board. See Sorensen Decl., dated June 22, 2004 and Exh. A thereto.

Plaintiffs' Statement No. 34    Both Duro-Test and Litetronics were operated exclusively by Durolite at the direction of its CEO, Robert Sorensen.

Plaintiffs cite no evidence to support this assertion.

Plaintiffs made the identical assertion in their Brief (p. 9) but cited no evidence in their Brief to support the assertion. Although plaintiffs' Brief quotes a portion of the deposition testimony of Richard Crossland, that testimony does not support plaintiffs' assertion.

The uncontroverted summary judgment evidence is that Duro-Test and Litetronics functioned independently on every level, including the operations of their Boards of Directors; their product lines and customers; their banking relationships; their human resources departments; their payrolls; their engineering and sales staffs; their policies and procedures in the workplace; and their health plans. See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 35      Durolite's board of directors met quarterly at the offices of Litetronics in Alsip, Illinois.

Plaintiffs fail to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 10).   However, the deposition testimony does not support plaintiffs' assertion.  Plaintiffs first cite Mr. Crossland's deposition testimony at page 13, line 2.  That testimony does not support plaintiffs' assertion. Plaintiffs next cite Mr. Crossland's testimony at page 17 line 23 of his deposition.  Mr. Crossland testified only that Durolite Board meetings were conducted "usually in Alsip [Illinois]."

The uncontroverted summary judgment evidence is that meetings of the Durolite Board of Directors were held quarterly, and the meetings alternated between Duro-Test's offices in New Jersey and Litetronics' offices in Illinois.  Schaecter Dep., p. 42.  See Defendants' Rule 56.1 Statement, ¶ 35 and the testimony referenced therein.

Plaintiffs' Statement No. 36      Sometimes, Lou Mattina, who was CFO of Duro-Test, would present financial information about Litetronics to the Durolite board.

Plaintiffs have failed to cite any authority to support this statement.

Plaintiffs made an identical statement in their Brief (p. 10); however, the testimony that plaintiffs cite fails to support the assertion.  At his deposition, Richard Crossland testified that it was unusual for Lou Mattina, Duro-Test's CFO, to present financials for any company other than Duro-Test.   Mr. Crossland testified that, usually, Michael Schaechter, Litetronics' President, presented the financials of Litetronics to the Durolite Board.   See Crossland Dep. at 19-20.

In addition, the uncontroverted summary judgment evidence is that Durolite Board meetings were divided into separate portions to consider Duro-Test and Litetronics business.  See Defendants' Rule 56.1 Statement, ¶¶ 36-37.

Plaintiffs' Statement No. 37      There was no division in the Durolite board meetings between business devoted to Duro-Test and business devoted to other Durolite subsidiaries.

Plaintiffs have failed to provide any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 10).   However, the testimony that plaintiffs cited in their Brief fails to support the assertion.  Plaintiffs relied upon Mr. Sorensen's testimony at page 286 of his deposition.  Sorensen testified:  (a) that there was no *formal* division at Durolite Board meetings between *Durolite* and *Duro-Test* business; and (b) Sorensen did not mention any other affiliates of Durolite and Duro-Test, such as Litetronics. Accordingly, plaintiffs' use of this citation was improper.

In addition, plaintiffs attempted in their Brief to rely on Sorensen's testimony at page 212a of the <u>District Three</u> record.   Sorensen testified that the Durolite and Duro-Test Boards of Directors had common meetings -- but that the Litetronics Board of Directors *did not* meet in common with the Durolite or Duro-Test Boards of Directors.  <u>See</u> page 212a, lines 20-25.  Accordingly, plaintiffs' use of this testimony for their assertion was also improper.

The uncontroverted summary judgment evidence is that Duro-Test, Durolite and Litetronics had separate Boards of Directors; the Litetronics Board of Directors met separately; and that when the Durolite Board of Directors met, their meetings were divided so that Litetronics personnel attended only the portions of the meeting devoted to Litetronics business and Duro-Test personnel attended only those portions of the meetings that were devoted to a discussion of Duro-Test business.  <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 34-42.


<u>Plaintiffs' Statement No. 38</u>      After 1995, Litetronics discontinued purchasing its bulbs from outside suppliers and purchased all of its incandescent bulbs from Duro-Test.

Plaintiffs have failed to cite any evidence in their Rule 56.1 Statement to support this assertion.

Plaintiffs Brief (p. 10) contains an identical assertion. However, the evidence that plaintiffs cite fails to support the assertion. Plaintiffs rely on the deposition testimony of Michael Schaechter.  However, Mr. Schaechter testified that Litetronics' purchases of incandescent bulbs from Duro-Test began in 1996 or 1997, and not following the acquisition of Duro-Test, as

plaintiffs' assertion implies. In addition, Mr. Schaechter testified only that "we [Litetronics] *started* purchasing from Duro-Test." Schaechter Dep. at 17. (emphasis added). Mr. Schaechter did not testify that Litetronics purchased *all* of its incandescent lamps from Duro-Test.

The uncontroverted summary judgment evidence is that Litetronics made purchases of incandescent lamps from Duro-Test because Duro-Test had significant unused capacity at its manufacturing plant. Litetronics paid Duro-Test a price that was 14% higher than what Litetronics could otherwise obtain in the market. In addition, Litetronics' purchases, made at 5% over Duro-Test's cost, were used to defray Duro-Test's fixed overhead and operating expenses -- which Duro-Test would incur whether or not it manufactured light bulbs for Litetronics. These purchases benefited Duro-Test. Moreover, Litetronics' purchases did not impede the sale of any other Duro-Test product at higher margin to other customers. See Defendants' Rule 56.1 Statement, ¶¶ 113-22.

Plaintiffs' Statement No. 39     There was no arms-length negotiation on the sale of product from Duro-Test to Litetronics which only paid Duro-Test its manufacturing costs plus five percent.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made the identical assertion in their Brief (p. 10) and failed to cite any evidence there as well.

The uncontroverted summary judgment evidence is that Litetronics made purchases of incandescent lamps from Duro-Test because Duro-Test had significant unused capacity at its manufacturing plant. Litetronics paid Duro-Test a price that was 14 percent higher than what Litetronics could otherwise obtain in the market. In addition, Litetronics purchases, made at 5 percent over Duro-Test's cost, were used to defray Duro-Test's fixed overhead and operating expenses--which Duro-Test would have had to pay whether or not it manufactured light bulbs for Litetronics--and benefited Duro-Test. These purchases did not impede the sale of any other Duro-Test product at higher margin to other customers. See Defendants' Rule 56.1 Statement, ¶¶ 113-22.

**Plaintiffs' Statement No. 40**      In fact, Duro-Test never negotiated the price that Litetronics paid for Duro-Test lamps.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 10); however, the testimony to which plaintiffs cite fails to support their assertion. Plaintiffs cite to pages 92-93 of the deposition of Richard Crossland, who became Duro-Test's President in August 1999. Mr. Crossland testified only that the price that Litetronics paid Duro-Test for the manufacture of incandescent lamps had been established "before I came on board, so it would be speculating to say who established that price . . ." Crossland Dep. at 93. Accordingly, plaintiffs have no support for their assertion that Duro-Test "never negotiated the price that Litetronics paid" (plaintiffs Brief at 10).

The uncontroverted summary judgment evidence is that Sorensen testified, at a deposition which plaintiffs conducted, that the prices at which Litetronics purchased product from Duro-Test were negotiated; that the sales benefited Duro-Test by utilizing excess capacity at the Duro-Test plant; and that it did not interfere with any higher-margin sales to any other Duro-Test customers. See Sorensen Dep. at pp. 234-235 (Plaintiffs' Appendix, Exh. F). Litetronics paid Duro-Test a price that was 14% higher than what Litetronics could otherwise obtain in the market. In addition, Litetronics' purchases, made at 5% over Duro-Test's cost, were used to defray Duro-Test's fixed overhead and operating expenses -- which Duro-Test would have incurred whether or not it manufactured light bulbs for Litetronics. This benefited Duro-Test. See Defendants' Rule 56.1 Statement, ¶¶ 113-22.

**Plaintiffs' Statement No. 41**      Sorensen admitted that Duro-Test charged its thousands of other customers "much higher prices" than Litetronics.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 10). However, the evidence does not support their assertion. Sorensen testified that three other Duro-Test customers paid the same price to Duro-Test for incandescent lamps that Litetronics paid. See District Three record at 222(a).

More importantly, plaintiffs have repeatedly failed to confront the purpose behind Litetronics' purchases of incandescent lamps from Duro-Test. Every witness whom plaintiffs deposed made it clear on the record that Litetronics made purchases of incandescent lamps from Duro-Test because Duro-Test had significant unused capacity at its manufacturing plant. Litetronics paid Duro-Test a price that was 14% higher than what Litetronics could otherwise obtain in the market. In addition, Litetronics' purchases, made at 5% over Duro-Test's cost, were used to defray Duro-Test's fixed overhead and operating expenses -- which Duro-Test would incur whether or not it manufactured light bulbs for Litetronics. This benefited Duro-Test. Litetronics purchases did not impede the sale of any other Duro-Test product at higher margin to other customers. See Defendants' Rule 56.1 Statement, ¶¶ 113-22.

Plaintiffs' Statement No. 42    Duro-Test's plan manager explained that these cut-rate sales were made because, "Litetronics was a part of Duro-Test."

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made a similar assertion in their Brief (p. 10); however, the testimony that plaintiffs cite does not support their assertion. Plaintiffs rely on the testimony of plaintiff Lawrence Sheinberg during the District Three preliminary injunction hearing. Sheinberg testified that a plant manager supplied him with information concerning Litetronics' purchases of Duro-Test product. Sheinberg's testimony consists exclusively of hearsay, and it is not summary judgment evidence. See District Three hearing at 101a. In addition, plaintiffs have furnished absolutely no evidence that either Mr. Sheinberg or the plant manager had any knowledge concerning the corporate structure of Duro-Test and Durolite that enabled either of them to make

the statement that "Litetronics was a part of Duro-Test." This is contrary to the evidence. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 22-54.

In addition, plaintiffs have furnished no evidence that any sales of product to Litetronics were "cut rate sales," as plaintiffs allege in Statement 42. The uncontroverted summary judgment evidence is that every witness whom plaintiffs deposed made it clear on the record that Litetronics made purchases of incandescent lamps from Duro-Test because Duro-Test had significant unused capacity at its manufacturing plant. Litetronics paid Duro-Test a price that was 14% higher than what Litetronics could otherwise obtain in the market. In addition, Litetronics' purchases, made at 5% over Duro-Test's cost, were used to defray Duro-Test's fixed overhead and operating expenses -- which Duro-Test would incur whether or not it manufactured light bulbs for Litetronics. This benefited Duro-Test. Litetronics purchases did not impede the sale of any other Duro-Test product at higher margin to other customers. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 113-22.

<u>Plaintiffs' Statement No. 43</u>      In 1996, Duro-Test's profitable Las Vegas sign-lamp division ("Las Vegas bulbs") was "transferred" to Litetronics, along with a lighting showroom business.

Plaintiffs have failed to supply any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 10). However, the testimony that plaintiffs cite fails to support this assertion.

First, plaintiffs supplied no evidence that Duro-Test Las Vegas sign-lamp division was "profitable." Plaintiffs relied on the testimony of Lawrence Sheinberg during the <u>District Three</u> preliminary injunction hearing. Sheinberg did not testify that the Las Vegas sign-lamp division was profitable. He testified only that "I assume they were sold at a profit because we continued to sell lamps." <u>See District Three</u> hearing at 99a.

The uncontroverted summary judgment evidence is that Duro-Test's sign-lamp business and its showroom business were transferred to Litetronics because it involved sales of

product to distributors, which fit better with Litetronics' customer portfolio. Litetronics transferred its international business and its telemarketing business to Duro-Test because those sales were made to end users, which fit better with Duro-Test's business. The value of the business transferred to Litetronics was approximately $1 million per year. In comparison, the value of the business that Litetronics transferred *to Duro-Test* was $1.5 million per year. See Defendants' Rule 56.1 Statement, ¶¶ 100-112.

Plaintiffs' Statement No. 44       However, Duro-Test continued to incur all expenses of manufacturing the Las Vegas bulbs, "selling" the bulbs to Litetronics at 5% above cost, while Litetronics marked up the bulbs by 300-500%.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (page 10). However, the testimony that plaintiffs cited in their Brief fails to support this assertion.

Plaintiffs first cited to the testimony of Lawrence Sheinberg at pages 102a-103a of the District Three preliminary injunction hearing. That testimony provides no information to support plaintiffs' assertion that "Duro-Test continued to incur all expenses of manufacturing." Nor does this testimony even mention any manufacture of the "Las Vegas bulbs." Plaintiffs also cite pp. 175a-176a of the District Three hearing. That testimony states that Litetronics purchased light bulbs from Duro-Test and that the business that Duro-Test received from Litetronics was even greater. In addition, Plaintiffs also rely on pages 196a-197a of the District Three hearing. None of the testimony cited therein supports plaintiffs' assertion that Duro-Test continued to incur all expenses.

The uncontroverted summary judgment evidence is that Duro-Test transferred two lines of business to Litetronics, including the Las Vegas sign business. Those two lines of business generated revenues of approximately $1 million per annum. Litetronics transferred to Duro-Test two lines of business that generated $1.5 million per annum. See Defendants' Rule 56.1 Statement, ¶¶ 100-112. This benefited Duro-Test.

Plaintiffs' Statement No. 45      At around the same time, the Litetronics telemarketing unit and international sales were transferred to Duro-Test, but that unit, including valuable customer lists, later reverted back to Litetronics without any compensation paid to Duro-Test.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (pp. 10-11). However, the testimony upon which plaintiffs rely fails to support the assertion. In particular, there is no testimony that any international sales reverted to Litetronics. Moreover, to the extent that any telemarketing personnel were re-hired by Litetronics, the testimony is that such personnel were re-hired after Duro-Test ceased business operations and ceased servicing its own customers. There is no testimony that any customer lists were transferred from Duro-Test to Litetronics.

Any matters relating to the re-hiring of telemarketing personnel by Litetronics is not material to any issue to be decided in this action. Plaintiffs have provided no evidence that any re-hiring, made after Duro-Test ceased business operations, would have provided or generated any funds for the payment of plaintiffs' wages or for the payment of health-related benefits, or that re-hriing has any effect on any liability of defendants.

Plaintiffs' Statement No. 46      No negotiation of these transfers took place between Litetronics and Duro-Test, no written agreement memorialized the transactions and no money was transferred between the subsidiaries in consideration for the transfer.

Plaintiffs fail to cite any evidence in support of this assertion. Plaintiff made an identical assertion in their Brief (p. 11). However, the testimony that plaintiffs cite fails to support the assertion. In the testimony that plaintiffs cite on page 11 of their Brief, Litetronics' President, Michael Schaechter, testified only that Duro-Test and Litetronics had customers that overlapped.

At pages 56-57 of his deposition, Litetronics' President, Michael Schaechter, testified that he had discussions concerning the transfer of various lines of business with Carl Kersting, Duro-Test Vice President of Sales, and Robert Sorensen. At page 70 of his deposition

-- which plaintiffs have cited -- Sorensen testified only that the idea of transferring various lines of business between Duro-Test and Litetronics was not his idea originally.

The uncontroverted summary judgment evidence is that Duro-Test transferred two lines of business to Litetronics, which generated revenues that aggregated $1 million per year. In contrast, Litetronics transferred two lines of business to Duro-Test that generated $1.5 million per year. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 99-112.

Plaintiffs' Statement No. 47     Duro-Test and Litetronics continued their operations under the single control of Sorensen.

Plaintiffs have provided no evidence to support this assertion. Plaintiffs made exactly the same assertion in their Brief (p.11), and failed to provide a citation to any evidence as well.

All of the uncontroverted summary judgment evidence is that Duro-Test and Litetronics operated independently. Michael Schaechter, Litetronics' President, was in charge of all of Litetronics' day-to-day operations, and was never reversed or countermanded by Sorensen. From 1995, following the Acquisition, through August 1999, Sorensen's time was devoted to managing Duro-Test. Litetronics and Duro-Test maintained, at all times, separate product lines and customers; separate engineering and sales departments; separate accounting departments and payrolls; separate HR departments and health plans; separate banking relationships and separate rules in the workplace. They were never managed or operated as one entity. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 48     For example, Duro-Test used, free of charge, Litetronics warehouse space located in Alsip, Illinois in a building owned by a partnership controlled by Sorensen.

Plaintiffs have provided no evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (page 11). However, the testimony that plaintiffs cite does not support the assertion. Plaintiffs relied on pages 8 and 12 of

Mr. Sorensen's deposition. The testimony on which plaintiffs rely indicates only: (a) Litetronics -- and not Duro-Test -- operated in a building located in Alsip, Illinois; and (b) Litetronics' building in Alsip, Illinois was owned by a trust. There was no testimony concerning any control by Sorensen relating to the trust.

In sum, plaintiffs' assertion is not supported and it is not material to any issue to be decided on plaintiffs' motion for summary judgment.

Plaintiffs' Statement No. 49      Duro-Test and Litetronics shared warehouse facilities in Las Vegas.

Plaintiffs have not cited any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (p. 11). However, the testimony that plaintiffs cite does not support the assertion. At pages 37-38 of his deposition, Mr. Sorensen made it clear that he was *not* testifying as to any combined use of warehouse space or shared warehouse facilities in Las Vegas between Duro-Test and Litetronics.

In sum, plaintiffs' assertion is inaccurate and not relevant to any issue to be decided on plaintiffs' motion for summary judgment. It is also contrary to all the evidence that confirms the separate operations of Duro-Test and Litetronics. See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 50      Sorensen also utilized the design and engineering services of Duro-Test for the benefit of Litetronics without any cost to Litetronics.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (p.11) and also failed to provide any evidence.

There is no evidence that Sorensen utilized any design or engineering services of Duro-Test. The uncontroverted summary judgment evidence is that, at all times following the 1995 acquisition of Duro-Test by Durolite, Litetronics maintained its own product line and

customers, its own engineering and sales departments, its own payroll and health plan and its own separate banking relationships. See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 51     In August 1999, Sorensen gave up the title of Chief Executive Officer of Duro-Test to Richard Crossland, a member of the Durolite board who had been hand-picked by Sorensen.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made the identical assertion in their Brief (p. 11), and failed to cite any evidence in their Brief.

The uncontroverted summary judgment evidence is *not* to the effect that Sorensen "gave up the title" of Duro-Test's CEO; rather, Sorensen resigned as Duro-Test CEO when Richard Crossland was appointed to take Sorensen's place. See Defendants' Rule 56.1 Statement, ¶¶ 32-33, 146-152.

Contrary to plaintiffs' unsupported assertion, there is no evidence that Crossland had been "handpicked by Sorensen" for any position. The uncontroverted summary judgment evidence is that Sorensen knew of Crossland only by Crossland's reputation in the lighting industry, and Crossland's name was suggested to Sorensen by Kurt Kersting, Duro-Test's Vice President of Sales. Sorensen Dep. at 282-83 (Plaintiffs' Appendix, Exh. F). Sorensen asked Crossland whether he would like to serve on Durolite's Board of Directors. Crossland was *not* appointed to a directorship that Sorensen had the power to fill. Crossland Dep. at 13-14; Sorensen Dep. at 283. Crossland became a member of the Durolite Board of Directors with the approval of the Durolite Board; and approximately a year later, in August 1999, with the approval of the Durolite Board of Directors, he was appointed as Duro-Test CEO. See Defendants' Rule 56.1 Statement, ¶¶ 32-33, 146-152;. see also Crossland Dep. at 10.

Plaintiffs' Statement No. 52     Crossland continued to report directly to Sorensen and Sorensen continued to be compensated as CEO of Duro-Test.

Plaintiffs have failed to cite any evidence in support of this assertion.

28

Plaintiffs made a similar assertion in their Brief (p. 11); however, the testimony that plaintiffs cite fails to support this assertion. Plaintiffs cite to page 70 of Mr. Sorensen's deposition. Sorensen testified that, upon appointment as Duro-Test's new CEO, Mr. Crossland reported to Sorensen and to the Durolite Board of Directors. Plaintiffs also cite to page 173a of the District Three preliminary injunction hearing. Sorensen's testimony does not address Crossland's reporting obligations, and confirms that Crossland was elected -- not handpicked -- to be the new CEO of Duro-Test.

In addition, the uncontroverted summary judgment evidence is that Sorensen was not compensated by Duro-Test. See Defendants' Rule 56.1 Statement, ¶¶ 123-127.

Plaintiffs' Statement No. 53    Sorensen continued to take part in the day-to-day management of Duro-Test until at least October 1999, even after October he participated in Duro-Test management meetings on Duro-Test's premises on several occasions, until at least November or December 1999.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (pp. 11-12). However, the testimony on which plaintiffs rely does not support their assertion. As set forth in that testimony, following Crossland's election and appointment as Duro-Test CEO, Sorensen ceased going to Duro-Test's offices before the end of September 1999. See District Three preliminary injunction hearing at 199a. Sorensen was present at one Duro-Test meeting in which the topic was *not* Duro-Test operations, but Sorensen's efforts to refinance the company and, while there, he talked with some of the individuals in Duro-Test's management. See District Three preliminary injunction hearing at 216a-217a. In addition, the uncontroverted summary judgment evidence is that Sorensen was present in Duro-Test's offices during August and September, and by the end of September had removed himself from Duro-Test facilities. See Crossland Dep. at 38, 70-71 and Defendants' Rule 56.1 Statement ¶¶ 146-52.

Plaintiffs' Statement No. 54    By October of 1999, Sorensen was entertaining offers to purchase some of the assets of Durolite that would have involved closing the Duro-Test facility.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 12). However, the testimony that plaintiffs cite does not support the statement; nor is it material to any issues to be determined in this action. Plaintiffs have identified only one offer -- not several -- that would have involved the closure of the Duro-Test facility in Clifton, New Jersey. See Sorensen Dep., pp. 249-250 (cited in plaintiffs' Brief at 12). GE's offer letter, which was not accepted, expressed GE's intention to interview Duro-Test sales personnel and management. See Plaintiffs' Appendix, Exhibit J, first page. In any event, the General Electric offer letter was not signed on behalf of Durolite (See Plaintiffs' Appendix, Exhibit J, pp. D01663-65). Discussions between Durolite and GE ended by November 1999. See Defendants' Rule 56.1 Statement ¶ 198.

The GE offer is not material to any issue to be determined in this action. The evidence is that Duro-Test conducted discussions with several potential purchasers or sources of refinancing. Duro-Test was ultimately pursuing a sale or refinancing with Heico and PPM at the time of the closure of the Duro-Test facility. See Defendants' Rule 56.1 Statement ¶¶ 193-228.


Plaintiffs' Statement No. 55    Sorensen continued to act as CEO of Duro-Test in attempting to negotiate the sale and/or refinancing of Duro-Test.

Plaintiffs have failed to cite any evidence to support this statement.

Plaintiffs made an identical statement in their Brief (p. 11). However, the testimony and documents to which plaintiffs refer all fail to support their assertion. Plaintiffs cite to Mr. Sorensen's deposition at p. 248. Sorensen did not testify that he acted as Duro-Test CEO in attempting to renegotiate Duro-Test's sale or refinancing. None of the exhibits that plaintiffs cite (Exhibits P-44 through P-50) contain any indication that Sorensen was contacted as, or acted as, Duro-Test's CEO. See Plaintiffs' Appendix, Exhibit J. Within plaintiffs' Exhibit

J, the letter from GE lighting is addressed to Mr. Sorensen as Chairman and CEO of *Durolite*; Sorensen's letter to Lawson Products, Inc. was not signed as Duro-Test CEO; and Sorensen did not sign his October 26, 1999 letter to General Electric as CEO of any entity.

The uncontroverted summary judgment evidence indicates that, following Sorensen's resignation as CEO of Duro-Test in August 1999, he did not exercise any authority or control over the management or operations of Duro-Test. See Defendants' Rule 56.1 Statement ¶¶ 146-52.

Plaintiffs' Statement No. 56     Up until the closing of the Duro-Test plant in February of 2000, Sorensen signed the paychecks of Duro-Test employees.

Plaintiffs failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 12). However, the testimony upon which plaintiffs rely fails to support their assertion. Sorensen testified only that months after he resigned as Duro-Test CEO, Duro-Test continued to use a stamp with a facsimile signature of Sorensen in order to generate checks to employees. Sorensen did not physically sign the checks. See District Three preliminary injunction hearing at 237a.

The uncontroverted summary judgment evidence indicates that, following Sorensen's resignation as CEO of Duro-Test in August 1999, he did not exercise any authority or control over the management or operations of Duro-Test. See Defendants' Rule 56.1 Statement ¶¶ 146-52.

Plaintiffs' Statement No. 57     Litetronics *[sic]* siphoning of Duro-Test's assets intensified in late 1999 and early 2000.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made an identical assertion in their Brief (p. 12), and failed to supply a citation to any evidence to support the assertion.

31

The uncontroverted summary judgment evidence is that in late 1999, Litetronics supplied Duro-Test with cash advances, even though it was not obligated to do so. See Defendants' Rule 56.1 Statement ¶¶ 155-57. Litetronics purchased incandescent lamps from Duro-Test prices which were at 14% above the market rate, which provided Duro-Test with cash to defray its overhead. See Defendants' Rule 56.1 Statement ¶¶ 113-122.

Litetronics transferred two lines of business to Duro-Test, which provided $500,000 more in revenue per year to Duro-Test than the business that was transferred to Litetronics. See Defendants' Rule 56.1 Statement ¶¶ 100-112.

Plaintiffs' Statement No. 58       Fifty percent of Duro-Test's production was devoted to Litetronics products in the last months of 1999, rising to 70-80% in 2000.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs' Brief (p. 12) contains an identical assertion; however, the testimony that plaintiffs cite does not support their assertion. The testimony in question indicates only that portions of Duro-Test's production of *incandescent lamps* were sold to Litetronics. In addition, the witness had no credible basis upon which to quantify any of the percentages to which he testified. See District Three preliminary injunction hearing at 132a-133a.

The uncontroverted summary judgment evidence is that Litetronics purchased incandescent lamps from Duro-Test at a price that was 14% above the market rate. None of Litetronics' purchases ever impeded sales of a Duro-Test product to other customers who paid higher margins. The revenues from Litetronics' purchases went to defray Duro-Test overhead expenses, which Duro-Test would incur even if it did not manufacture any product for Litetronics. Purchases by Litetronics were for the purpose of utilizing idle, unused capacity at Duro-Test's Clifton plant, and to reduce Duro-Test's operating expenses in the process. See Defendants' Rule 56.1 Statement ¶¶ 113-22. Litetronics never directed Duro-Test had to engineer any Duro-Test products; and neither Litetronics nor any employee of Litetronics

established the production schedules for Duro-Test's Clinton, New Jersey manufacturing facility.

See Defendants' Rule 56.1 Statement, ¶¶ 27-28.


    Plaintiffs' Statement No. 59     At the same time, Litetronics, on the orders of Sorensen, stripped Duro-Test of perhaps its most valuable asset, the technological trade secrets developed by company engineers over the past 50 years, which allowed Duro-Test to become the preeminent specialty lighting manufacturer in the world.

    Plaintiff's have failed to cite any evidence in support of the statement set forth above. Plaintiff's made an identical statement Brief (p. 12) and failed to cite any evidence to support the statement there as well.

    Plaintiffs' statement is not supported by any evidence. Plaintiffs have proffered no evidence that Duro-Test had or maintained any trade secrets. Plaintiffs' statement, if it is to be believed, is to the effect that 50-year-old technology in the business of manufacturing light bulbs could still qualify as "trade secrets." Nor do plaintiffs proffer any testimony, reliable or otherwise, that Duro-Test was the "pre-eminent specialty lighting manufacturer in the world" -- despite plaintiffs' assertions that the company was on the brink of collapse.

    The testimony in the District Three preliminary injunction hearing undermines plaintiffs' assertion. Duro-Test manufactured various light bulbs for Litetronics, based upon Litetronics' own specifications. Litetronics forwarded specifications for manufacturing its light bulbs, as well specifications for coating the light bulbs, to Duro-Test in or about 1996. In late 1999 or early 2000, Litetronics requested Duro-Test to provide copies of the specifications that Duro-Test utilized to manufacture light bulbs for Litetronics. See District Three preliminary injunction hearing at 190a-192a; 194a; 262a, 264-65a.

    In addition, plaintiffs have failed to provide any evidence whatsoever as to how -- if at all -- the alleged transfer of "trade secrets" shortly before Duro-Test ceased business operations had any effect upon the alleged non-payment of wages and health benefits, or any liability that plaintiffs attempt to foist upon defendants. In sum, plaintiffs' assertion is not material.