Plaintiffs' Statement No. 60      In December 1999, Sorensen asked Crossland to retrieve from Duro-Test Senior Engineering Manager Lawrence Sheinberg the specifications containing instruction on how to produce Duro-Test's most popular light bulbs.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 12); however, the evidence that plaintiffs cited therein fails to support the assertion. The testimony that plaintiffs cite does not support plaintiffs' assertion that any specifications were sought for Duro-Test's "most popular light bulbs." See District Three preliminary injunction hearing at 103a-105a. Rather, the testimony that plaintiffs cite establishes that the specifications at issue were those from which Duro-Test used in order to manufacture product *for Litetronics.* Id. at 191a-92a, and 190a.

The testimony in the District Three preliminary injunction hearing undermines Plaintiffs' assertion. Duro-Test manufactured various light bulbs for Litetronics, based upon Litetronics' own specifications. Litetronics forwarded specifications for manufacturing its light bulbs, as well specifications for coating the light bulbs, were made available to Duro-Test in or about 1996. In late 1999 or early 2000, Litetronics requested Duro-Test to provide copies of the specifications that Duro-Test utilized to manufacture light bulbs for Litetronics. See District Three preliminary injunction hearing at 190a-192a; 194a; 262a, 264-65a.

In addition, plaintiffs have failed to provide any evidence whatsoever as to how -- if at all -- the alleged transfer of "trade secrets" shortly before Duro-Test ceased business operations had any effect upon payment of wages and health benefits, or any liability of defendants in this action. In sum, plaintiffs' assertion is not material.


Plaintiffs' Statement No. 61      Feeling uncomfortable divulging secret technology of almost incalculable value, but certainly worth in the millions of dollars, in January 2000 Sheinberg asked Duro-Test's Plant Manager whether he should comply.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (p. 12), and failed to support the assertion there as well.

Plaintiffs have no evidence upon which to make the assertion that any of Duro-Test's technology was "secret technology," or that an such technology was "of almost incalculable value." To the extent that plaintiff Sheinberg attributed to any value during the District Three preliminary injunction hearing, it amounts to surmise and rank speculation. See District Three preliminary injunction hearing at 107a.

The testimony in the District Three preliminary injunction hearing undermines plaintiffs' assertion. Duro-Test manufactured various light bulbs for Litetronics, based upon Litetronics' own specifications. Litetronics forwarded specifications for manufacturing its light bulbs, as well specifications for coating the light bulbs, were made available to Duro-Test in or about 1996. In late 1999 or early 2000, Litetronics requested Duro-Test to provide copies of the specifications that Duro-Test utilized to manufacture light bulbs for Litetronics. See District Three preliminary injunction hearing at 190a-192a; 194a; 262a, 264-65a.

In addition, plaintiffs have failed to provide any evidence whatsoever as to how -- if at all -- the alleged transfer of "trade secrets" shortly before Duro-Test ceased business operations had any effect upon payment of wages and health benefits, or any liability of defendants in this action. In sum, plaintiffs' assertion is not material.

Plaintiffs' Statement No. 62      The Plant Manager replied, "Bob Sorensen still owns the company and you have to give the specifications."

Plaintiffs have not cited any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 12). The testimony that plaintiffs cite in their Brief reveals that: (a) the testimony consists of hearsay; and (b) the "Plant Manager" has no knowledge of the Duro-Test corporate structure.

The uncontroverted evidence is that Sorensen never owned any stock of Duro-Test. See Defendants' Rule 56.1 Statement, ¶¶ 9-11.

The testimony in the District Three preliminary injunction hearing undermines plaintiffs' assertion. Duro-Test manufactured various light bulbs for Litetronics, based upon

35

Litetronics' own specifications. Litetronics forwarded specifications for manufacturing its light bulbs, as well specifications for coating the light bulbs, were made available to Duro-Test in or about 1996. In late 1999 or early 2000, Litetronics requested Duro-Test to provide copies of the specifications that Duro-Test utilized to manufacture light bulbs for Litetronics. See District Three preliminary injunction hearing at 190a-192a; 194a; 262a, 264-65a.

In addition, plaintiffs have failed to provide any evidence whatsoever as to how -- if at all -- the alleged transfer of "trade secrets" shortly before Duro-Test ceased business operations had any effect upon payment of wages and health benefits, or any liability of defendants in this action. In sum, plaintiffs' assertion is not material.

Plaintiffs' Statement No. 63      Sorensen received the technology in January or February 2000, and testified that he returned some of the specifications to Duro-Test after learning of Sheinberg's testimony in this case.

The plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 13). The testimony upon which plaintiffs rely does not support the assertion and, in any event, the statement is not material to any issue to be determined in this litigation.

The testimony upon which plaintiffs rely states that Litetronics, and not Sorensen, received various specifications. The testimony is also to the effect that Litetronics, and not Sorensen, returned various specifications to Duro-Test. See District Three preliminary injunction hearing at 227a-28a. As other portions of the District Three testimony indicate, Litetronics requested specifications concerning the lamps that Duro-Test manufactured *for Litetronics*, based on technical data that Litetronics previously furnished to Duro-Test. See District Three preliminary injunction hearing at 190a-92a, 194a, 262a, 264a-65a.

Plaintiffs assert that the alleged technology was transferred in January or February 2000. This was only a few weeks, or a few days, prior to the closure of Duro-Test's operations. Plaintiffs have failed to provide any evidence as to how the alleged transfer of any purported

technology, or its return, would have had any effect upon the alleged non-payment of wages and benefits in this action, or upon any theory of liability concerning defendants. Accordingly, plaintiffs' assertion is not material.

Plaintiffs' Statement No. 64     By early 1999, Duro-Test was experiencing financial difficulties which were severe enough that Duro-Test's trade creditors refused to extend it further credit.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 13); however, the testimony upon which plaintiffs rely fails to support the assertion. That testimony is only to the effect that Duro-Test had a history of difficulty in paying its creditors. Also, the testimony was not focused upon Duro-Test's financial condition in early 1999.

The uncontroverted summary judgment evidence is that in 1999 Durolite engaged in intensive attempts, with the assistance of BT Alex Brown, to obtain financing for Duro-Test. During the same period, Sorensen and other co-investors invested nearly $1.5 million of their own funds to ensure that Duro-Test had availability and working capital under its Loan Agreement with Fleet. In addition, Litetronics supplied Duro-Test with cash advances, even though Litetronics was under no obligation to do so. See Defendants' Rule 56.1 Statement, ¶¶ 141-144; 155-162.

Plaintiffs' Statement No. 65     Duro-Test stopped sending union dues payments deducted from the paychecks of union employees to the local union and its parent organization.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 13). However, the testimony upon which plaintiffs rely does not support plaintiffs' assertion.

Nor is this matter material to any issue to be determined in this action. This action does not involve any former unionized employees of Duro-Test, and does not involve any issues relating to the payment of union dues.

Plaintiffs' Statement No. 66     By the fall of 1999, Duro-Test was on the brink of financial collapse.  By November of 1999, Duro-Test was two weeks behind in its payroll tax payments and vendors were holding shipments until past invoices were paid.

Plaintiffs have failed to cite any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 13); however, the testimony and documentation that plaintiffs cite do not support plaintiffs' assertion.

Plaintiffs rely upon pages 65 and 72 of Richard Crossland's deposition testimony. Page 65 of Mr. Crossland's deposition transcript does not provide any support for plaintiffs' assertion.  Indeed, two pages later, Mr. Crossland testified that when he became Duro-Test's CEO during the Summer of 1999, he "would not tolerate" any delinquencies in tax payments, even if payments to other Duro-Test vendors had to be delayed in the process.  See Crossland Dep. at 67-68.  None of plaintiffs' citations refer to any "brink" of financial collapse, either directly or indirectly.

In their Brief (p. 13), plaintiffs also refer to Exhibit K of their Appendix.  None of the documentation therein supports plaintiffs' assertion.

The uncontroverted summary judgment evidence is that in 1999 Durolite engaged in a search for a buyer or a source for refinancing with the assistance BT Alex Brown; Sorensen and others invested nearly $1.5 million of their own funds to supply Duro-Test with working capital; and Litetronics supplied Duro-Test with cash advances even though it was not under any obligation to do so.  See Defendants' Rule 56.1 Statement, ¶¶ 141-145; 155-162.

Plaintiffs' Statement No. 67     Through a new corporation wholly-owned by Sorensen, World Lighting Investment Co. ("World Lighting"), Sorensen purchased Litetronics from Durolite for $4 million.  Sorensen owns 100% of World Lighting and $2.8 million of the purchase price went to Fleet Capital Corporation ("Fleet") to pay off all of Litetronics' debt.

Plaintiffs fail to cite any evidence in support of this assertion.

Plaintiffs made similar assertions in their Brief (pp. 13-14); however, plaintiffs' citations to testimony in Mr. Sorensen's deposition (pp. 124-25) and testimony during the District Three preliminary injunction hearing (p. 232a) makes it clear that World Lighting -- not Sorensen, as plaintiffs assert -- purchased Litetronics from Durolite. In addition, the testimony indicates that: (a) as a result of the transaction, Litetronics became more heavily indebted with a $4 million loan from American National Bank; (b) Sorensen guaranteed the $4 million loan from American National Bank; and (c) out of the $4 million purchase price, $1.2 million was paid to Fleet *for the benefit of* Duro-Test.

In addition, the uncontroverted summary judgment evidence indicates that, in connection with the purchase of Litetronics, the $1.2 million paid to Fleet eliminated a $800,000 overadvance from Fleet and provided Duro-Test with an additional $400,000 in working capital so that Duro-Test could continue to operate. See Defendants' Rule 56.1 Statement, ¶¶ 166-183.

Plaintiffs' Statement No. 68     Durolite did not negotiate any of the supply contracts between Litetronics and Duro-Test that benefited World Lighting.

Plaintiffs fail to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 14); however, none of the testimony that plaintiffs cite in their Brief supports this assertion. Plaintiffs cite to pages 93 and 96 of Mr. Crossland's deposition testimony.   Mr. Crossland testified, on page 93 of his deposition, that the price of the *lamps* that Litetronics purchased from Duro-Test was established before he became CEO of Duro-Test in August 1999. This does not support plaintiffs' assertion in paragraph 68 of their Rule 56.1 Statement.  On page 96 of Mr. Crossland's deposition, Crossland testified that the Durolite Board of Directors discussed and approved the pricing of the various products that were the subject of various Supply Agreements between Duro-Test and Litetronics. This undermines plaintiffs' statement

Plaintiffs did not include the Supply Agreements between Duro-Test and Litetronics in connection with their motion for summary judgment.  Durolite is not a party to

either of those agreements. Accordingly, plaintiffs' assertion that "Durolite did not negotiate any of the supply contracts" is not material. In addition, the uncontroverted summary judgment evidence is that the supply contracts did not benefit World Lighting; rather those contracts benefited Duro-Test, Litetronics, and especially both companies' respective customers. See Defendants' Rule 56.1 Statement, ¶¶ 185-92.

Plaintiffs' Statement No. 69    According to Sorensen, he "negotiated" the transaction to acquire Litetronics with Richard Crossland representing the interests of Durolite and Duro-Test, notwithstanding the fact that Crossland reported to Sorensen as CEO of Durolite.

Plaintiffs have failed to cite evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 14); however, the deposition testimony they cite fails to support their assertion. At pages 134-35 of his deposition, Mr. Sorensen testified that, for purposes of the Litetronics purchase, the Durolite Board of Directors made it clear that Sorensen was *not* Mr. Crossland's boss. As Mr. Sorensen: "What was clearly stated by the board was that he [Crossland] would represent Durolite/Duro-Test's interests and I would represent Litetronics' interest in the negotiations."

The uncontroverted summary judgment evidence is that, in connection with the purchase of Litetronics, Sorensen was excluded from various proceedings before the Durolite Board of Directors; Sorensen did not vote with respect to the transaction; World Lighting deliberately overpaid for Litetronics; and Fleet approved the purchase price and the other terms of the transaction. See Defendants' Rule 56.1 Statement, ¶¶ 166-184.

Plaintiffs' Statement No. 70    The board of Durolite never obtained an independent valuation of Litetronics prior to selling Litetronics to World Lighting. Nor did Durolite seek any other offer for the sale of Litetronics.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 14). The deposition testimony upon which plaintiffs rely fails to support their assertion. Plaintiffs cite to pages 49

and 50 of Mr. Crossland's deposition. Crossland testified as to the methodology that Durolite utilized to arrive at a purchase price from Litetronics, and stated that Durolite used a multiple of EBITDA that other potential purchasers had used to arrive at evaluation for all of the Durolite companies, including Litetronics and Duro-Test. Ordinarily, a smaller multiple would be employed to arrive at valuation of Litetronics, which was a smaller company -- but the larger multiple was used in any event. In addition, Fleet was involved in all aspects of the valuation, and concurred in the valuation for Litetronics.

Mr. Crossland's testimony at page 52 also fails to support plaintiffs' assertion. As Crossland testified, Durolite previously sought purchasers and sources of refinancing for all of the Durolite companies, including Litetronics. He also testified that the sale of Litetronics was well-timed because other candidates were interested in acquiring the balance of Durolite's business.

The uncontroverted summary judgment evidence is that World Lighting employed a more-than-generous multiple of EBITDA to arrive at a purchase price for Litetronics, and overpaid for Litetronics. Fleet, which had a lien on all of Litetronics assets, concurred in the valuation. As a result of the transaction, Litetronics replaced its $2.8 million debt to Fleet with a $4 million debt to American National Bank and had a negative net worth. See Defendants' Rule 56.1 Statement, ¶¶ 169-83.

Plaintiffs' Statement No. 71    Sorensen knew that Fleet was not obligated to advance any further funds to Duro-Test.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made a similar assertion in their Brief (p. 14). However, the deposition testimony cited by plaintiffs fails to support their assertion.

Plaintiffs attempt to rely on pages 356 and 373 of Mr. Sorensen's deposition. At page 356 of his deposition, Mr. Sorensen testified that Fleet entered into a Forbearance Agreement with Duro-Test in order to keep Duro-Test operating as a going concern. That does

not support plaintiffs' assertion. At page 373 of his deposition, Mr. Sorensen testified that in the event that Fleet terminated the "forbearance period" under the Forbearance Agreement, then Fleet could accelerate its loan. This also fails to support plaintiffs' assertion.

Plaintiffs' Statement No. 72        The closing took place on January 25, 2000. At the close of the transaction, Sorensen emerged as the 100% owner of the profitable Litetronics business, free of any debt obligations to Fleet. Sorensen Dep., p. 128 lines 12-19.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 14). However, the evidence that plaintiffs cite therein fail to support their assertion.

Plaintiffs attempt to rely upon page 128 of Mr. Sorensen's deposition testimony. Mr. Sorensen testified that as a result of the purchase of Litetronics, World Lighting -- and not Sorensen -- became the owner of Litetronics. In addition, Sorensen did not testify that Litetronics was profitable; instead, Sorensen testified that, as a result of the purchase of Litetronics by World Lighting, Litetronics was saddled with more debt (to be exact, $1.2 million more debt) than Litetronics had previously with Fleet.

The uncontroverted summary judgment evidence is that World Lighting, not Sorensen, owns Litetronics; and the additional $1.2 million debt that World Lighting and Litetronics assumed was paid to Fleet for the benefit of Duro-Test. The $1.2 million was applied to reduce an overadvance that Fleet had made to Duro-Test, and to provide Duro-Test with an additional $400,000 in working capital to keep the company operating while it pursued a refinancing or an acquisition. See Defendants' Rule 56.1 Statement, ¶¶ 166-84. Indeed, on page 128 of Mr. Sorensen's deposition -- the same page upon which plaintiffs rely -- Mr. Sorensen testified that selling Litetronics "was the only thing at the time that we could think of to get some additional borrowing capability into Duro-Test to allow us to proceed on refinancing or selling the company."

Plaintiffs' Statement No. 73    Sorensen did not, however, make any provisions that the proceeds from the stock sale would be used to cover either the health plan's obligations or the outstanding payroll obligations of Duro-Test.

Plaintiffs fail to cite any evidence in support of this assertion. Plaintiffs made the identical assertion in their Brief (p. 14), and also fail to cite any evidence whatsoever.

Plaintiffs have failed to establish, with any evidence, that Sorensen was under any obligation to ensure that the additional $1.2 million that Duro-Test received from the sale of Litetronics would be allocated to the Duro-Test health plan or Duro-Test's payroll. The uncontroverted summary judgment evidence is that Sorensen never exercised any control over the administration of Duro-Test's health plan or the allocation of any of Duro-Test payroll or operating funds. Those tasks were delegated to and handled exclusively by Duro-Test's HR Department and Duro-Test's CFO. Duro-Test's CFO was in charge of drawing available funds from Fleet under Duro-Test's revolving loan, and allocating those funds as appropriate. See Defendants' Rule 56.1 Statement, ¶¶ 58-67, 84.

Plaintiffs' Statement No. 74    While Litetronics was relieved of its debt to Fleet, Duro-Test's employees, the beneficiaries of its health plan, to which they had contributed through regular payroll deduction, were left with no jobs; no health insurance; no final paychecks, and perhaps worst of all, the bills for medical care incurred during they time they erroneously believed they had health insurance.

Plaintiffs have failed to cite any evidence to support this assertion. Plaintiffs made an identical assertion in their Brief (pp. 14-15), and failed to cite to any evidence there as well.

Plaintiffs' assertion is an improper attempt to imply a cause-and-effect relationship between the sale of Litetronics and various injuries that allegedly befell Duro-Test employees. Plaintiffs have no evidence in this regard.

The uncontroverted summary judgment evidence is that the sale of Litetronics provided $1.2 million for the benefit of Duro-Test. Of that amount, $800,000 was used to eliminate an over advance that Fleet made to Duro-Test; and the remaining $400,000 went to

provide additional availability and working capital to Duro-Test under its revolving loan with Fleet. In addition, the uncontroverted summary judgment evidence is that Duro-Test ceased business operations several weeks after the sale of Litetronics, while Duro-Test was operating under the Forbearance Agreement with Fleet, which was intended to provide additional financing and breathing room for Duro-Test while it pursued a purchase or refinancing transaction. The uncontroverted summary judgment evidence further indicates that Duro-Test was forced to cease business operations, even while it pursued a potential acquisition or refinancing, when Fleet abruptly stopped advancing funds to Duro-Test under the Loan Agreement. See Defendants' Rule 56.1 Statement, ¶¶ 167-222.

Plaintiffs' Statement No. 75      Sorensen risked nothing of his own in "buying back" Litetronics. In fact, the counsel fees incurred by Sorensen in acquiring Litetronics were paid by Litetronics.

Plaintiffs have failed to cite to any evidence to support this assertion.

Plaintiffs made an identical assertion in their Brief (p. 15); however, the deposition testimony upon which plaintiffs attempt to rely fails to support their assertion.

Sorensen did not "buy back" Litetronics. The uncontroverted summary judgment evidence is that World Lighting was the purchaser of Litetronics. In addition, Sorensen guaranteed the $4 million loan by which World Lighting financed its purchase of Litetronics. See Defendants' Rule 56.1 Statement, ¶¶ 176-77.

Plaintiffs attempt to rely upon pages 143-44 of Mr. Sorensen's deposition testimony. That testimony shows, however, that in connection with the purchase of Litetronics, World Lightning obtained separate counsel, and that World Lighting's legal fees -- not Sorensen's -- were paid by Litetronics. This portion of plaintiffs' assertion is not material to any issue to be determined on plaintiffs' summary judgment motion.

Plaintiffs' Statement No. 76      On February 18, 2000, several weeks after the purchase of Litetronics, Duro-Test abruptly shut the doors of its Clifton, New Jersey facility.

Plaintiff did not cite any evidence for this assertion. Plaintiffs made an identical assertion in their Brief (p. 15), but the evidence that plaintiffs cite does not address the issue. More important, none of plaintiffs' "evidence" supports their attempt, whether explicit or implied, to link the sale of Litetronics to the closure of Duro-Test's facility.

The uncontroverted summary judgment evidence is that Duro-Test was forced to cease operations on February 18, 2000 when Fleet refused to advance any funds under a revolving loan to enable Duro-Test to pay wages and other expenditures. At the time, Duro-Test was operating under a Forbearance Agreement, under which Fleet had agreed to advance funds, and Duro-Test was proceeding with a potential sale or refinancing of its business. When Fleet refused to advance funds, the company was forced to shut its doors. None of the defendants made any decision to close Duro-Test. See Defendants' Rule 56.1 Statement, ¶¶ 193-229.

Plaintiffs' Statement No. 77     Prior to closing its doors, Duro-Test was manufacturing products for both Litetronics and Duro-Test.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 15); the evidence that plaintiffs cite, however, is incomplete. Plaintiffs rely on page 223 of Mr. Sorensen's deposition, in which he assumes that lighting products for Duro-Test and Litetronics were manufactured at the Clifton Plant shortly prior to Duro-Test's closing in February 2000. Only a few pages later in his deposition, Mr. Sorensen provided a complete description of the Duro-Test manufacturing facility, the lighting products that were manufactured there and the proportion of products that were made by Duro-Test for Litetronics. See Sorensen Dep. at 231-35. (Plaintiffs' Appendix, Exh. F) In that testimony, Sorensen stated that Duro-Test manufactured several different varieties of lamps, including fluorescent, incandescent and HID lamps; that Litetronics' purchases amounted to approximately 1 million light bulbs per year out of Litetronics' total *incandescent* production of 6 million bulbs per year; and that the prices paid by Duro-Test were negotiated between Duro-Test employees and Litetronics employees; and that Litetronics'

purchases did not cause Duro-Test to forego the manufacture of any product for any other customer.  Id.

In addition, the uncontroverted summary judgment evidence is that Duro-Test and Litetronics had separate engineering departments.  Litetronics never directed Duro-Test how to engineer any Duro-Test products.  Neither Litetronics nor any employee of Litetronics established the production schedules for Duro-Test's Clifton, New Jersey manufacturing facility. See Defendants' Rule 56.1 Statement, ¶¶ 27-28.

Plaintiffs' Statement No. 78      The production of Litetronics' product was managed and performed by Duro-Test employees.

Plaintiffs have failed to cite any evidence to support this statement.

Plaintiffs made an identical statement in their Brief (p. 15), with a reference to p. 231 of Mr. Sorensen's deposition.  Mr. Sorensen's statement that Duro-Test's employees managed the production of lamps for Litetronics underscores the fact -- consisted with all of the summary judgment evidence -- that Duro-Test and Litetronics operated separately and independently.  See Defendants' Rule 56.1 Statement, ¶¶ 22-94.  The uncontroverted summary judgment evidence is that Duro-Test and Litetronics had separate engineering departments; Litetronics never directed Duro-Test how to engineer any Duro-Test products; and neither Litetronics nor any employee of Litetronics established the production schedules for Duro-Test's Clinton, New Jersey manufacturing facility.  See Defendants' Rule 56.1 Statement, ¶¶ 27-28.

Moreover, plaintiffs have never alleged that Litetronics failed to pay for any product that Duro-Test manufactured for Litetronics.

Plaintiffs' Statement No. 79      In January and February 2000, the Duro-Test manufacturing plant produced almost exclusively Litetronics products.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made an identical assertion in their Brief (p. 15) and failed to supply any evidence to support the assertion there as well.

To the extent that plaintiffs cited any evidence later in their Brief, their use of the evidence is misleading. At p. 15 of their Brief, plaintiffs rely on page 223 of Mr. Sorensen's deposition, in which he assumes that lighting products for Duro-Test and Litetronics were manufactured at the Clifton Plant shortly prior to Duro-Test's closing in February 2000. Only a few pages later in his deposition, Mr. Sorensen provided a complete description of the Duro-Test manufacturing facility, the lighting products that were manufactured there and the proportion of products that were made by Duro-Test for Litetronics. See Sorensen Dep. at 231-35. (Plaintiffs' Appendix, Exh. F) In that testimony, Sorensen stated that Duro-Test manufactured several different varieties of lamps, including fluorescent, incandescent and HID lamps; that Litetronics' purchases amounted to approximately 1 million light bulbs per year out of Litetronics' total *incandescent* production of 6 million bulbs per year; and that the prices paid by Duro-Test were negotiated between Duro-Test employees and Litetronics employees; and that Litetronics' purchases did not cause Duro-Test to forego the manufacture of any product for any other customer. Id.

In addition, the uncontroverted summary judgment evidence is that all of Litetronics' purchases defrayed overhead costs that Duro-Test incurred, whether or not it ever manufactured light bulbs for Litetronics. The price that Litetronics paid Duro-Test was 14% greater than what Litetronics could obtain in the market. See Defendants' Rule 56.1 Statement, ¶¶ 113-122. Moreover, the uncontroverted summary judgment evidence is that Duro-Test and Litetronics had separate engineering departments. Litetronics never directed Duro-Test how to engineer any Duro-Test products. Neither Litetronics nor any employee of Litetronics established the production schedules for Duro-Test's Clifton, New Jersey manufacturing facility. See Defendants' Rule 56.1 Statement, ¶¶ 27-28.

Plaintiffs' Statement No. 80    In those two months, the plant manufactured approximately 200,000 pieces of Litetronics lighting products, that Duro-Test sold to Litetronics below Duro-Test's costs.

Plaintiffs have failed to cite any evidence in support of this assertion.

Plaintiffs made an identical assertion in their Brief (p. 15); however, the testimony and the declaration to which plaintiffs refer fail to support the proposition. Plaintiffs attempt to rely upon page 231 of Sorensen's deposition. Mr. Sorensen did not testify as to the amount of Litetronics lamps that were manufactured at Duro-Tests facility in early 2000. On the following pages -- which plaintiffs did not cite in their Brief -- Sorensen explained the process of incremental pricing that was negotiated between Duro-Test and Litetronics. Sorensen Dep. at 234-35. In addition, Sorensen testified that the incremental pricing utilized by Duro-Test and Litetronics defrayed overhead costs that Duro-Test would incur whether or not it manufactured any product for Litetronics. The uncontroverted summary judgment evidence is that Duro-Test *benefited* from Litetronics' purchases. See Defendants' Rule 56.1 Statement, ¶¶ 113-122.

Plaintiffs also attempt to rely on a declaration of Martiza Rodriguez for their assertion that Duro-Test manufactured product below cost. Ms. Martiza's declaration in this regard reveals that she has no knowledge concerning the matter, and the information that she purports to provide is based exclusively on hearsay from unnamed people. See District Three preliminary injunction hearing, p. 305a.

The uncontroverted summary judgment evidence is that Litetronics paid Duro-Test prices that were 14% above what Litetronics could obtain in the market; Litetronics' purchases utilized only excess capacity at Duro-Test, defrayed Duro-Test's overhead and never impeded or interfered with sales to any other Duro-Test customers; and helped to reduce Duro-Test's overhead. See Defendants' Rule 56.1 Statement, ¶¶ 113-122. Moreover, Duro-Test and Litetronics had separate engineering departments. Litetronics never directed Duro-Test how to engineer any Duro-Test products.   Neither Litetronics nor any employee of Litetronics established the production schedules for Duro-Test's Clifton, New Jersey manufacturing facility. See Defendants' Rule 56.1 Statement, ¶¶ 27-28.

Plaintiffs' Statement No. 81      The documentation of the World Lighting transaction clearly confirmed that Durolite had operated as a single employer throughout Sorensen's tenure.

Plaintiffs have failed to cite any evidence to support this assertion.  Plaintiffs made the identical assertion in their Brief (p. 15).  Plaintiffs failed to cite any evidence in their Brief.

Plaintiffs' statement number 81 is improper for several reasons.  First, it is an legal conclusion.  Second, it is neither a cogent nor a logical statement.  Third, plaintiffs have failed to provide any documentations concerning the "World Lighting transaction."

Plaintiffs' statement is belied by the uncontroverted evidence.   If, by their reference to the "World Lighting transaction," plaintiffs attempt to refer to the sale of Litetronics, sale benefited Duro-Test.    World Lighting overpaid to acquire Litetronics, based upon a generous multiple of EBITDA that (a) is ordinarily used to value a much larger company; (b) that the Durolite Board of Directors (without Sorensen) reviewed and approved; and (c) that Fleet, which held a lien against all of Litetronics' assets, reviewed and approved.  The sale of Litetronics generated a total of $1.2 million to reduce Duro-Test's indebtedness to Fleet and to provide Duro-Test with additional working capital.  In addition, the sale of Litetronics was only the first part of two-phase plan to provide additional capital to Duro-Test while Fleet provided additional time for Duro-Test to complete a sale or refinancing of the company.  See Defendants' Rule 56.1 Statement, ¶¶ 163-204.

Plaintiffs' Statement No. 82      In a license agreement drafted by Durolite's counsel for the World Lighting transaction, Durolite states:  "Effective upon the consummation of the Acquisition, Duro-Test and Litetronics will cease to be under common management."

Plaintiffs have failed to cite any evidence in support of this statement.  Plaintiffs made identical statement in their Brief (p. 15), but failed to provide any citation there as well.

Plaintiffs' statement is misleading and out of context.  At his deposition, Mr. Crossland testified that the language in question was only to signify that, as a result of the sale,

Litetronics would no longer be owned by Durolite.  See Crossland Dep., pp. 161-162 (Plaintiffs' Appendix, Exh. G).  Mr. Sorensen was presented with the same language at his deposition. Sorensen testified that the statement was not accurate and although Duro-Test and Litetronics were under common control, they were never under common management.  Sorensen Dep. at 149-151.  (Plaintiffs' Appendix, Exh. F)  In addition, Sorensen testified that the language in question (which is found in a preamble, as opposed to a substantive provision) was drafted by an attorney and was not accurate.  Moreover, as plaintiffs indicate in their statement, the agreement at issue was drafted not by Litetronics' counsel, but by Durolite's counsel.

In any event, all of the uncontroverted summary judgment evidence is that Duro-Test and Litetronics were never under common management.   Each company operated separately; had separate board of directors; separate engineering, sales and human resources departments, separate product lines and customers; separate payrolls and banking relationships; separate health insurance plans and separate operations on all levels.  See Defendants' Rule 56.1 Statement, ¶¶ 22-94.

Plaintiffs' Statement No. 83    On February 11, 2000, days before the closing, Local 433 members loaded an entire tractor-trailer with finished products to be immediately shipped to Litetronics in Chicago.

Plaintiffs have failed to provide any evidence to support this statement.

Plaintiffs made an identical statement in their Brief (p. 16).   However, the testimony that plaintiffs cite fails to support the statement.  In addition, plaintiffs' statement is not material to any issue to be determined in this action.

At the District Three preliminary injunction hearing, Michael Schaechter (Litetronics' President) was asked whether a tractor trailer was filled with product and shipped to Litetronics' facilities.  Schaechter replied that the product shipped amounted to only four skids. Schaechter was also asked the following questions:  "And so this is something special that was done right at the end of the closing of the facility to try to get product out and into the Alcrow

warehouse?" Schaechter replied: "No. He called me and said should I sent it? Because we didn't have sleeves. I said yes. I didn't think there was anything special on our part." <u>See</u> <u>District Three</u> injunction hearing, pp. 115a-116a.

This matter is not material to any issue to be decided in this litigation. Plaintiffs have not made any claim that Litetronics failed to pay for any product that Duro-Test manufactured at Litetronics' request. Moreover, as the facts developed in this action demonstrate, all of Litetronics' purchases of Duro-Test products benefited Duro-Test. <u>See</u> Defendants' Rule 56.1 Statement, ¶¶ 113-122.

<u>Plaintiffs' Statement No. 84</u>       Many workers' final paychecks, signed by Sorensen, bounced.

Plaintiffs have failed to cite any evidence in support of this statement.

Plaintiffs made an identical statement in their Brief (p. 16). However, the citations in plaintiffs' Brief do not support the statement. Nor they are not material.

Plaintiffs rely on two pages from the <u>District Three</u> preliminary injunction hearing. The testimony on page 121a refers only to pay checks of union employees, who are not within the plaintiff class. The same is true concerning the testimony at page 237a, line 9.

Plaintiffs' assertion that Sorensen signed payroll checks is at odds with the uncontroverted summary judgment evidence. Sorensen testified only that months after he resigned as Duro-Test CEO, Duro-Test continued to use a stamp with a facsimile signature of Sorensen in order to generate checks to employees. Sorensen did not physically sign any checks. <u>See</u> <u>District Three</u> preliminary injunction hearing at 237a.

The uncontroverted summary judgment evidence indicates that, following Sorensen's resignation as CEO of Duro-Test in August 1999, he did not exercise any authority or control over the management or operations of Duro-Test. <u>See</u> Defendants' Rule 56.1 Statement ¶¶ 146-52.

Plaintiffs' statement, in any event, is not material. It has no bearing upon whether any of the defendants may be held liable for monies allegedly owed by Duro-Test.

Plaintiffs' Statement No. 85    On February 21, 2000. Sorensen resigned as an officer and director of Duro-Test and Durolite.

Plaintiffs have failed to cite any evidence to support this statement.

Plaintiffs made an identical statement in their Brief (p. 16). However, the citation in plaintiffs' Brief does not support the statement. Plaintiffs refer to page 173a of the District Three injunction hearing. Although there is a transcriptional error, Sorensen's testimony indicates that he resigned as an Duro-Test CEO in August 1999.

In addition, the facts developed in this litigation are that Sorensen resigned as CEO of Duro-Test in August 1999, upon the appointment of Richard Crossland to that position, and he may also have resigned as a Director of Duro-Test at that time. See Defendants' Rule 56.1 Statement, ¶¶ 146-151.

Plaintiffs' Statement No. 86    On March 7, 2000, all of the remaining directors of Durolite resigned.

Plaintiffs have failed to cite any evidence in support of this assertion. Plaintiffs made an identical assertion in their Brief (p. 16). The testimony upon which plaintiffs rely does not reflect that Sorensen previously resigned his position within Durolite, the parent holding company, during February 2000. In any event, this statement is not material to any issue to be determined on plaintiffs' motion for summary judgment, or in this action.

Dated:  June 22, 2004

Respectfully submitted,

**KING, PAGANO & HARRISON**

By: _____
        Jeffrey W. Pagano, Esq.
425 Park Avenue
New York, New York 10022
(212) 223-4000
        and

**DENOIA & TAMBASCO**

By: _____
        Jeffrey W. Pagano, Esq.
501 Main Street
Toms River, New Jersey 08754
(732) 341-1030

Attorneys for Defendants and Third-Party Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June **22**, 2004, I caused the foregoing Counter-Statement Pursuant To Local Civil Rule 56.1 to be served upon the following by depositing a true and correct copy of same with Federal Express for overnight delivery, and addressed as follows:

> Robert B. Bodzin, Esq.
> Kleinbard, Bell & Brecker, LLP
> 1900 Market Street, Suite 700
> Philadelphia, Pennsylvania 19103
> Attorneys for Plaintiffs
>
> Daniel P. Shapiro, Esq.
> Goldberg Kohn Bell Black Rosenbloom &Moritz, Ltd.
> 55 East Monroe Street, Suite 3700
> Chicago, Illinois 60603
> Attorneys for Third-Party Defendant
>
> Alison L. Galer, Esq.
> Norris, McLaughlin & Marcus
> 721 Route 202/206
> Bridgewater, New Jersey 08807
> Local Counsel for Third-Party Defendant

_____
Gary A. Stahl

Exhibit A

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2                  NO. 00-6041(JLL)
 3                      - - -
    LAWRENCE SHEINBERG and GILES
 4  HAZEL, on behalf of themselves
    and others similarly situated,
 5
            Plaintiffs,
 6
                v.
 7
    ROBERT SORENSEN; DUROLITE
 8  INTERNATIONAL, INC.; LITETRONICS
    INTERNATIONAL, INC.,
 9
            Defendants and
10          Third-Party Plaintiffs
11              v.
12  FLEET CAPITAL CORP.,
13          Third-Party Defendant.
14                      - - -
15      DEPOSITION UNDER ORAL EXAMINATION OF
16                  LOUIS SZUCS
17              Newark, New Jersey
18              March 16, 2004
19
                    - - -
20
        REPORTED BY: LAURA A. GRABOWSKI, CSR
21
                    - - -
22
            ESQUIRE DEPOSITION SERVICES
23          90 Woodbridge Center Drive
            Woodbridge, New Jersey 07095
24              (732) 283-1060
25  JOB NO. 34954
```

1       A.     I don't have any knowledge of them

2  ever being changed.

3       Q.     Were they the same plans that

4  Duro-Test had for its employees just prior to the

5  acquisition of Duro-Test by Durolite?

6       A.     Yes.  I don't recall changing health

7  insurance plans.

8       Q.     So at the time of the acquisition,

9  the Duro-Test employees had -- was it one booklet?

10      A.     For each plan.  There was one for the

11  POS plan and one for the PPO plan.

12      Q.     And are you saying that those

13  booklets never changed during your tenure?

14      A.     The summary plan descriptions might

15  have, because Horizon would modify those books, and

16  occasionally we would get new books to hand out to

17  employees.

18      Q.     Was the other plan, the PPO plan, was

19  that a self-funded or self-insured plan?

20      A.     They both were, to my knowledge.

21      Q.     They were both.  Do you know why you

22  had two separate plans?

23      A.     Because the people outside the state

24  weren't eligible to be covered under the Point of

25  Service Plan.

1          Q.       The conversations you are talking

2    about were after that?

3          A.       Yes, I believe so.

4                   MR. KARPELES:  Let's mark this as

5    Fleet-9.

6                   (The above-mentioned document is marked

7                   as Fleet-9 for Identification.)

8          Q.       Mr. Szucs, I am going to hand you

9    Exhibit 9, and this is a document bearing Bates

10   numbers D0005 through D0007.  Please review that.

11                  (Witness reviews.)

12         Q.       Mr. Szucs, do you recognize this

13   document?

14         A.       Yes.

15         Q.       Can you tell us what it is?

16         A.       It's the summary of the Point of

17   Service Plan that we had.  These were given out to

18   employees.

19         Q.       Do you know how often they were given

20   out to employees?

21         A.       When they were hired.  And anybody

22   that requested them, we had them in the office.

23         Q.       Do all three of these pages relate to

24   the Point of Service Plan for New Jersey employees

25   that we talked about earlier?