UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED

FEB 22 2005

AT 8:30 _____  M
WILLIAM T. WALSH, CLERK

LAWRENCE SHEINBERG and GILES HAZEL,          )
on behalf of themselves and others similarly  )
situated,                                     )
                                              ) Action No. CIV 00-6041 CKSH
        Plaintiffs,                           )
                                              ) Hon. Jose L. Linares, U.S.D.J.
    v.                                        )
                                              ) Hon. Ronald J. Hedges, U.S.M.J.
ROBERT SORENSEN, DUROLITE INTN'L,             )
and LITETRONICS INTERNATIONAL, INC.           )
                                              )
        Defendants.                           )

Final Pretrial Order

A pretrial conference* having been held before the Honorable Ronald J. Hedges, U.S.M.J., Mary J. Walk having appeared for plaintiff(s) and Gerald Krovatin having appeared for defendant(s), this Final Pretrial Order is hereby entered:

*Time Incurred: _____

1

(Precede with Divider #1)

1.    JURISDICTION:      (Set forth specifically)

This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action presents federal questions arising out of the laws of the United States, including, the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216, and the Workers Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 et seq. This Court also has supplemental jurisdiction over Plaintiffs' New Jersey Wage Act claim and tortious conversion claims.

(Precede with Divider #2)

2.      PENDING/CONTEMPLATED MOTIONS: (Set forth all pending or
        contemplated motions, whether dispositive or addressed to discovery or the
        calendar. Also set forth the nature of the motion. If the Court indicated that it
        would rule on any matter at pretrial, summarize that matter and each party's
        position contemplated in <u>limine</u> motions should also be set forth.)

Plaintiffs:

None anticipated at this time.


Defendant contemplates the following motions:

Dispositive Motions:

None anticipated at this time.


Calendar Motions:

**Defendants' Calendar Motion**

(1)     Defendants shall file a motion to stay the trial of this case pending a
disposition or settlement of its action for declaratory judgment pending in the
United States District Court for the Northern District of Illinois, captioned <u>Robert
C. Sorensen v. Federal Insurance Company</u>, No. 05 CV1231, Hon. Rebecca
Pallmeyer, U.S.D.J., presiding. The allegations set forth in the above referenced
case claim that Federal Insurance Company is the insurer of Defendant, Robert C.
Sorensen, the insured under the policy, for defense and indemnification of claims
alleging breach of fiduciary duty. If Federal Insurance has a duty to defend and
indemnify, as alleged, then Defendant Sorensen would have a defense provided to
him against the Plaintiff's claims, and if found liable for breach of fiduciary duty
would be indemnified. *Letter-brief due 3/7. Response due 3/17/06.*

**Defendants' Motions in Limine:  Defendants intend to file motions in limine
prior to trial on the following:**

(1)     Judge Debevoise's Prior Ruling.  Defendants will file a motion in limine
against Defendants referring to, offering documents related to, or otherwise

3

seeking to introduce evidence of the prior ruling of the Hon. Dickinson R. Debevoise in the case District Three International Union of Electrical Salaried machine and Furniture Workers, AFL-CIO v. Robert Sorensen, Civil Action No. 00-971. The basis for this motion will be that the Order has no estoppel effect ( See Opinion of Hon. J. Linares) and that the findings of Judge Debevoise in that Order are irrelevant and would be prejudicial against Sorensen.

(2)     Defendant's Prior Settlement in the District Three Litigation. Defendants will file a motion in limine against Defendants referring to, offering documents related to, or otherwise seeking to introduce evidence of the prior settlement reached in the case District Three International Union of Electrical Salaried machine and Furniture Workers, AFL-CIO v. Robert Sorensen, Civil Action No. 00-971. The basis for this motion will be that the mention of the settlement is irrelevant to this case and is prejudicial to the Defendants.

(3)     Comparison of Plaintiffs' Benefits to those of Union Employees. Defendants will file a motion in limine to bar Plaintiffs from referring to, offering documents related to, or otherwise seeking to introduce evidence that Plaintiff have "historically" enjoyed benefits on par with those provided pursuant to Duro-Test's collective bargaining agreement. Plaintiff have never provided any foundation for this assertion. Moreover, an attempt to introduce such evidence would necessarily require introduction of the prior District Three litigation.

(4)     Defendants' Insurance Coverage. Defendants will file a motion in limine to bar Plaintiffs from referring to, offering documents related to, or otherwise seeking to introduce evidence of Defendants coverage of insurance policies related to claims made in this case by Plaintiffs.

(5)     Prior Press Coverage of the Duro-Test Closing. Defendants will file a motion in limine to bar Plaintiffs from referring to, offering documents related to or otherwise seeking to introduce any of the news paper articles or other media accounts of the Duro-Test plant closing. There has been no prior disclosure of such articles and accounts by Plaintiff, Plaintiffs could not establish evidentiary foundation, they are prejudicial and irrelevant.

(6)     Movement of Product Inventory, Equipment or other Property out of Duro-Test after the closing seeking to argue that this went to Litetronics for the benefit of Sorensen. Certain reports of former Duro-Test employees had raised this activity in prior documents as evidence of Sorensen and Litetronics benefiting at the expense of Duro-Test. Defendants will file a motion in limine to bar Plaintiffs from referring to, offering documents related to or otherwise seeking to introduce evidence of such claims. There has been no foundational testimony provided for such statements and they would be highly prejudicial.

4

(7)    Witnesses Disclosed but not Called. Defendants will file a motion in limine to bar Plaintiffs from attempting to introduce identities of witnesses disclosed but not called.

(8)    Dismissal of Fleet as a Third Party Defendant. Defendant will file a motion in limine to bar Plaintiffs from attempting to introduce testimony, evidence or otherwise mention the Defendants' prior third party action against Fleet Financial and the subsequent dismissal of Fleet. Such statements would be prejudicial and irrelevant.

(9)    Proposed Facts Submitted by Defendants to Which Plaintiff Objects deemed Admitted. Defendants will file a motion in limine to have certain facts submitted in its Proposed Stipulations of Fact admitted into evidence. Defendants submitted a Proposed Stipulations of Fact to Plaintiffs with citations to the record. Many of the Proposed Facts were included in Defendants previously filed Rule 56.1 Statement of Undisputed Material Facts. Plaintiffs failed to file a counter-statement of fact and in an Order dated March 18, 2005 Judge Linares Ordered that the Facts in Defendants Rule 56.1 statement were admitted unless contradicted in Plaintiffs' briefs of evidence.

3

(Precede with Divider #3)

3.    STIPULATION OF FACTS: (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions to which the parties agree.)


See Attached Stipulated Facts ~~from Plaintiffs and Defendants~~

6

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LAWRENCE SHEINBERG and GILES HAZEL,        )
on behalf of themselves and others similarly        )
situated,                                          )
                                                   ) Action No. CIV 00-6041 CKSH
                    Plaintiffs,                    )
        v.                                         ) Hon. Jose L. Linares, U.S.D.J.
                                                   )
ROBERT SORENSEN, DUROLITE INTN'L,                  ) Hon. Ronald J. Hedges, U.S.M.J.
and LITETRONICS INTERNATIONAL, INC.                )
                                                   )
                    Defendants.                    )
                                                   )

## **Stipulated Facts**

1. Duro-Test no longer exists, and is a defunct Chapter 7 debtor. Duro-Test filed a Chapter 7 bankruptcy in March 2000. Sorensen Decl., ¶ 5.

2. Duro-Test manufactured mainly incandescent light bulbs, and its customer base consisted mainly of end users of lighting products. Sorensen Decl., ¶ 7.

3. Litetronics is an Illinois corporation that is headquartered in Alsip, Illinois. Sorensen Dep. at 7-8; Sorensen Decl., ¶ 3. Since 1970, Litetronics has engaged in manufacturing and marketing various products for the lighting industry. Sorensen Decl., ¶ 4; Sorensen Dep. at 42.

4. Litetronics was a successful company in the mid-1990s. Schaechter Dep. at 31. In 1995, Litetronics' corporate structure included a President, Vice President, a marketing manager, a sales manager, a controller, an engineering manager, a telemarketing group, a sign group, a distribution group and an international group. Schaechter Dep. at 21-23.

5. In October 1995, Litetronics and Duro-Test participated in a transaction (the "Acquisition") in which they both became subsidiaries of defendant Durolite International, Inc. ("Durolite"). Sorensen Decl., ¶ 8.

6. As a result of the Acquisition, Durolite became the owner of 100% of the stock of Litetronics and 100% of the stock of Duro-Test. Sorensen Decl., ¶ 8.

7. In connection with the Acquisition, on or about October 31, 1995, Durolite, Duro-Test and Litetronics (and other affiliates) entered into a certain Loan And Security Agreement (the "Loan Agreement") with Shawmut Capital Corp, which was the predecessor of third-party defendant Fleet Capital Corp ("Fleet"). Sorensen Dep. at 82; Declaration of Gary A. Stahl, Esq., Exh. Q, dated May 28, 2004 ("Stahl Decl."). The Borrowers under the Loan Agreement were Durolite, Litetronics and Duro-Test and other affiliates of Litetronics and Duro-Test. See Loan Agreement (Stahl Decl., Exh. Q).

8. Following the Acquisition, Sorensen became CEO of Durolite, Litetronics and Duro-Test. Sorensen Dep. at 39. Michael Schaechter worked for Litetronics from 1985-2001. Schaechter Dep. at 7-9. He became President of Litetronics in 1995 or 1996. Schaechter Dep. at 8-9.

9. Litetronics had no collective bargaining agreement and was never unionized. Sorensen Dep. at 228.

10. The Durolite Board of Directors held meetings approximately once per calendar quarter. Durolite Board meetings were held at the offices of Litetronics, in Alsip, Illinois. The directors would usually attend in person. Crossland Dep. at 16-18; Schaechter Dep. at 42-46.

11. At the time of the Acquisition, Duro-Test had a fully-staffed Human Resources ("HR") Department. Sorensen Dep. at 112-13.

12. Louis Szucs ("Szucs") was employed by Duro-Test from 1986 through February 2000, when the Clifton Plant closed. Szucs Dep. at 11-12. Szucs became head of Duro-Test's HR Department in late 1998 or early 1999. Szucs Dep. at 17-20.

13. During the period 1998 through January 2000, Szucs was the most senior person in Duro-Test's HR Department, and supervised a staff of six people (excluding himself) in Duro-Test's HR Department. Szucs Dep. at 163-4; Crossland Dep. at 76.

14. Horizon was the administrator for the Duro-Test self insured health plans for both union and non-union employees. Szucs Dep. at 43-44, 65. .

15. Szucs would ordinarily receive Horizon's invoices for Duro-Test health insurance plans and would forward them to Duro-Test's CFO, who would schedule the invoices for payment. Szucs Dep. at 68-70. Duro-Test was, in general, at least two or three payments behind with respect to its health insurance plans during the period 1995 through February 2000. Szucs Dep. at 70-71, 173.

16. Duro-Test was also, in general, a month or two behind in its payments to its life insurance company. Szucs Dep. at 173.

17. After the cessation of Duro-Test's operations, Szucs remained employed at the Duro-Test facilities for a few months. Szucs Dep. at 10-11, 27-30.

18. Duro-Test's unionized sales force was paid weekly, in arrears. Szucs Dep. at 47. The non-union, salaried employees were paid bi-weekly, and were paid current. Id.

19. Crossland's salary as CEO of Duro-Test was higher than Sorensen's. Sorensen Dep. at 80.

20. In 1999 and 2000, the Durolite Board of Directors did not consider closing or selling the Duro-Test manufacturing facility in Clifton, New Jersey. Crossland Dep. at 42-46.

21. On or about June 23, 1999, Sorensen and other investors entered into a certain Subordinated, Last-Out Participation Agreement (the "Last-Out Participation") with Fleet. See Sorensen Decl., Exh. 14.

22. On or about November 12, 1999, Fleet issued a notice to Durolite due to a purported overadvance of $800,000 under the Loan Agreement. See Stahl Decl., Exh. M and Sorensen Dep. at 262-63.

23. By letter dated November 15, 1999, Richard Crossland forwarded Fleet's default notice to Durolite's Board of Directors. As set forth in Crossland's letter, losing $15,000 per day of availability under the Loan Agreement "will undermine our already precarious cash flow situation." In addition, Crossland advised the Durolite Board that selling Litetronics and Duro de Mexico "is the only solution to our immediate need for cash." See Stahl Decl., Exh. M.

24. By letter dated November 8, 1999, Sorensen made an offer, to the Durolite Board of Directors, to purchase Litetronics and Duro de Mexico, which was Duro-Test's Mexico subsidiary, for a total amount of $8 million. Sorensen Dep. at 258-59; see Stahl Decl., Exh. N.

25. On January 25, 2000, World Lighting entered into a certain Stock Purchase Agreement with Durolite to purchase all of the issued and outstanding shares of Litetronics. See Stock Purchase Agreement. See Sorensen Decl., Exh. 2. As set forth in the Stock Purchase Agreement, the purchase price was $4 million. Id.

26. Contemporaneously with the Stock Purchase Agreement, Fleet entered into a certain Forbearance Agreement with Litetronics, Duro-Test, Durolite and other affiliates. See Forbearance Agreement. Stahl Decl., Exh. O; Sorensen Dep. at 358-59.

27. On February 18, 2000, Fleet refused to fund the Duro-Test payroll that was due on that day. Crossland Dep. at 78-81. Nor would Fleet advance funds to pay for other ongoing expenses of Duro-Test's operations. Sorensen Dep. at 338-39; Crossland Dep. at 102.

28. Duro-Test filed a Chapter 7 bankruptcy petition on or about March 27, 2000. Crossland Dep. at 257.

28. **STIPULATION OF FACTS** (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions to which the parties agree.)

29. Duro-Test for many years was in the business of manufacturing and marketing lighting products, primarily incandescent and fluorescent bulbs.

30. Litetronics was also in the business of manufacturing and marketing lighting products, primarily halogen bulbs.

31. Duro-Test sold mostly to end-users while Litetronics sold mostly to distributors.

32. **Sorensen, as a part of an announcement to All Duro-Test Employees, stated, "I am pleased to announce that we have merged Duro-Test Corporation and Litetronics International, Inc. Duro-Test has a fine heritage and so does Litetronics. Together we will build the best lighting company in the world." Sorensen also assured the Duro-Test workforce that the two companies would "enjoy a bright future under his leadership" as the Chairman and CEO of Duro-Test..**

33. As part of its employee benefits package, Duro-Test provided group health coverage to its employees (the "Plan") through a plan administered by Horizon Blue Cross and Shield of New Jersey ("Horizon Blue Cross").

34. Duro-Test's self-insurance arrangement with Horizon Blue Cross provided that Horizon would administer claims, allow employees the use of its provider network, and then seek reimbursement weekly from Duro-Test for claims paid by Horizon, in addition to administrative fees.

35. The acquisition of Duro-Test was highly leveraged and risky considering Duro-Test sales had been declining in recent years.

36. Durolite's financial condition was poor in November of 1995 and it continued to deteriorate.

37. By early 1999, Duro-Test was experiencing financial difficulties which were severe enough that Duro-Test's trade creditors refused to extend it further credit.

38. Through a new corporation wholly-owned by Sorensen, World Lighting Investment Co. ("World Lighting"), Sorensen purchased Litetronics from Durolite for $4 million. Sorensen owns 100% of World Lighting and $2.8 million of the purchase price went to Fleet Capital Corporation ("Fleet") to pay off all of Litetronics' debt.

39. On February 18, 2000, Duro-Test shut the doors of its Clifton, New Jersey facility.

4 β)     Prior to closing its doors, Duro-Test was manufacturing products for both Litetronics and Duro-Test.

(Precede with Divider #4)

4.  CONTESTED FACTS: (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.)

A.  Plaintiff:

Agrees to Defendants Statement of Contested Facts

B.  Defendant:

a) Sorensen resigned as the Chief Executive Officer of Duro-Test during the August of 1999.

b) Sorensen did not act in any executive capacity on behalf of Duro-Test after his resignation as Chief Executive Officer of Duro-Test in August of 1999.

c) As part of its financing terms with Shawmut Capital, predecessor to Fleet Capital Corp. ("Fleet"), Duro-Test was required to maintain a "lockbox" arrangement.

d) The financing terms with Fleet were negotiated by the Board of Directors of Duro-Lite with Fleet.

e) The "lockbox" was maintained and controlled by Fleet.

f) Under the terms of the Fleet financing arrangement with Duro-Test, all customer payments were directed to the lockbox.

g) All receipts into the Duro-Test lockbox were deducted from the amount of indebtedness to Fleet under its financing arrangement with Duro-Test.

h)  The sole deposits received into the Duro-Test lockbox were
    revenues received via Duro-Test customer payments.

i)  The lock box arrangement was non-negotiable.

j)  No ERISA plan assets (i.e. Duro-Test employee deducted
    portions of health insurance) were deposited into the lockbox.

k)  Sorensen did not exercise any discretionary authority or
    discretionary responsibility in the administration of the Duro-
    Test health insurance plan.

l)  Duro-Test did not maintain a separate account for its employees'
    share of their applicable health insurance premium.

m)  Duro-Test did not maintain a separate account for what was
    accounted for as deductions from Duro-Test employees' wages
    for co-pay on health insurance premiums.

n)  All funds from which Duro-Test paid the employees' wages
    came from borrowings from Fleet.

o)  All funds from which Duro-Test paid health insurance premiums
    came from borrowings from Fleet.

p)  Litetronics had its own board of directors.

q)  Duro-Test had its own board of directors.

r)  Sorensen was not actively engaged in the management of Duro-
    Test's business after Crossland was named CEO.

s)  Litetronics played no role in determining the terms of the
    financing arrangement with Duro-Test.

8

t) Duro-Test was not operated primarily for Sorensen's profit.

u) Litetronics did not have any direct supervisory control over Plaintiffs.

v) Litetronics having issued the check Sorensen's salary, rather than Duro-Test, and intercompany allocations were made between the two operating companies.

w) Sorensen submitted a written resignation after his effective resignation as CEO of Duro-Test in order to formalize his resignation from all positions that he had ever at any time held as either a director or officer of Duro-Test and Duro-Lite.

x) Sorensen's signature on payroll checks was used because it was a mechanically stamped signature and the CFO at Duro-Test never changed the signature used by Duro-Test's payroll service.

y) Sorensen did not exercise control over the payroll of Duro-Test.

5

(Precede with Divider #5)

5.   FACT WITNESSES: (Aside from those called for impeachment purpose, only the fact witnesses set forth by name and address may testify at trial.  No summary of testimony is necessary.)

A.   Plaintiff:

Lawrence Sheinberg

21 Southport Drive

Howell Township, NJ  07731

Giles Hazel

21 West Shore Road

Bloomingdale, NJ  07403

3.   Robert Sorensen

4.   Richard Crossland

5.   Michael Schaechter

Plaintiffs reserve the right to call any witnesses called by Defendants during trial.  Plaintiffs also reserve the right to call other members of the Plaintiff class in addition to Sheinberg and Hazel during the damages portion of the trial.

B.   Defendant:

a)  Mr. Robert C. Sorensen
320 Devon Drive
Burr Ridge, Illinois
b)  Mr. Richard Crossland
1587 Waynesboro Drive
Hudson, Ohio
c)  Mr. Louis Szuchs
C/o William Paterson University of N.J.
356 Hamburg Dr.
Wayne, New Jersey 07470
d)  Mr. Michael Schaechter

10

Northbrook, Illinois 60062
e)  Dennis Rebmann
P.O. Box 310
Lindale, GA 31047
f)  Frank Mellazzo
C/o Fleet Capital
Chicago, Illinois